## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| RYO NAKAMURA, Individually and On Behalf of All Others Similarly Situated, )<br><br>Plaintiff, )<br><br>v. )<br><br>BRF S.A., PEDRO DE ANDRADE FARIA, JOSÉ ANTONIO DO PRADO FAY, CLAUDIO GALEAZZI, JOSÉ ALEXANDRE CARNEIRO BORGES, AUGUSTO RIBEIRO JÚNIOR, LEOPOLDO VIRIATO SABOYA, and HELIO RUBENS MENDES DOS SANTOS JUNIOR )<br><br>Defendants. ) | **Case No.**<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiff Ryo Nakamura ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding BRF S.A. ("BRF" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

1

**NATURE OF THE ACTION**

1.     This is a federal securities class action on behalf of a class consisting of all persons other than Defendants who purchased or otherwise acquired BRF's securities between April 4, 2013 and March 2, 2018, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.     BRF S.A. is a food processor and the world's largest poultry exporter.   Its portfolio includes established brands in Brazil and abroad, such as Sadia, Perdigão, Qualy, Chester, Perdix and Paty. The Company provides meat (poultry and pork), foods processed from meats, pizzas, pastas and frozen vegetables.

3.     Founded in 1900, the Company was formerly known as "BRF-Brasil Foods S.A." and changed its name to BRF S.A. in April 2013.  The Company is headquartered in São Paulo, Brazil, and its American Depositary Receipts ("ADRs") trade on the New York Stock Exchange ("NYSE") under the ticker symbol "BRFS".

4.     Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) BRF employees paid bribes to regulators and politicians to subvert inspections in order to conceal unsanitary practices at the Company's meatpacking plants; (ii) the foregoing conduct, when it came to light, would foreseeably subject the Company and its officers to heightened regulatory enforcement and/or prosecution; and (iii) as a result of the foregoing, BRF's public statements were materially false and misleading at all relevant times.

5.     On March 17, 2017, news outlets reported that Brazilian federal police had raided the offices of BRF and dozens of other meatpackers following a two-year investigation into alleged bribery of regulators to subvert inspections of their plants. The probe, known as "Operation Weak Flesh", had uncovered some 40 cases of meatpackers who had bribed inspectors and politicians to overlook unsanitary practices, such as processing rotten meat and running plants with traces of salmonella.  According to media reports, police found evidence that the companies were tampering with packages to sell products that had already expired and that higher-than permitted levels of parts such as "pig heads" were mixed with sausages and cold cuts.  Police arrested three BRF employees, as well as 20 public officials.

6.     On this news, BRF's ADR price fell $0.99, or 7.73%, to close at $11.81 on March 17, 2017.

7.     On February 23, 2018, the Company held an earnings conference call with investors and analysts to discuss the Q4 2017 earnings results.  In the call, Chairman of the Board Abilio Diniz and CFO Lorival Luz discussed the impact of "Operation Weak Flesh," stating in relevant part:

**Abilio Diniz**

So we were surprised and taken aback with an episode that I never imagined I would have in my life, something that was really shocking, Operation Weak Flesh. You have no idea what it was about. You don't know what the impact was to this company and to other companies, too. We had very serious problems, problems in the market, closing the doors to us. 7 million broilers are slaughtered per day, not per year, but per day. Imagine, when you break the chain, when you break such a long chain, there is things interrupted, think about the impact in ports, harbors, distribution centers, our raw materials, our products, our inventories. We had some imbalance since late 2016. It's true. It has to be admitted. But Weak Flesh still requires some actions, and we have been actively working on it as you see in our numbers today. But that was a terrible episode. The markets closed the doors and then started to renegotiate prices. And now conditions are more favorable to buyers, and things are more challenging to us, debtors. But we are overcoming step-by-step, but we still have plans that have not been fully released.

So this episode was really shocking, a huge impact. And most of the earnings last year were not only related to Weak Flesh, but mostly related to it…

\*\*\*

**Lorival Luz**

Now going towards the figures. You see here the lines and the amounts that are being considered. So we have a first line for minority shareholders stake. There is another line with a more relevant impact, which is, as Abilio has already mentioned, that it's a direct impact from the Weak Flesh Operation that happened in 2017. And then we had BRL40 million in the first quarter, additionally BRL118 million in the second quarter of '17. And now in the fourth quarter, we had an impact of BRL206 million.

8.     On this news, BRF's ADR price fell $0.76, or 8.00%, to close at $8.73 on February 23, 2018.

9.     On March 5, 2018, *Reuters* reported that Brazilian federal police arrested BRF's former Chief Executive Officer ("CEO") Pedro de Andrade Faria ("Faria") on charges that he and other executives, including the Company's Vice President of Global Operations Hélio dos Santos Júnior, were aware that BRF committed fraud by trying to avoid food safety checks. According to the report, the "police cited evidence that five laboratories accredited by the Agriculture Ministry colluded with the analysis department of BRF to "falsify" test results related to the safety of its industrial process."  In a court ruling authorizing the arrests, Brazilian federal judge André Duszczak said "Faria and other BRF officers sought to cover up claims of possible food contamination, as shown in certain laboratory tests, made by a former employee in a labor lawsuit."

10.     On this news, BRF's ADR price fell $1.83 or 19.42% to close at $7.59 on March 5, 2018.

11.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

12.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b), 78n(e) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

13.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

14.     Venue is properly laid in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b).  BRF's ADRs trade on the NYSE, located within this District.

15.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

16.     Plaintiff, as set forth in the attached Certification, acquired BRF securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

17.     Defendant BRF is incorporated under the laws of Brazil.  The Company's principal executive offices are located at 1400 Rua Hungria - 5º andar, Jardim Europa, CEP: 01455-000, São Paulo, Brazil.  BRF's shares trade on the NYSE under the ticker symbol "BRFS."

5

18.     Defendant Pedro de Andrade Faria served as the Company's Global Chief Executive Officer ("CEO") from 2015 to December 31, 2017, and as a Member of the Executive Board until November 22, 2017.

19.     Defendant José Antonio do Prado Fay ("Fay") served as the Company's CEO from October 30, 2008 until August 14, 2013, as a member of the Executive Board until August 2013.

20.     Defendant Claudio Galeazzi ("Galeazzi") served as the Company's CEO from December 31, 2013 until December 31, 2014.

21.     Defendant José Alexandre Carneiro Borges ("Borges") served as the Company's Chief Financial Officer ("CFO") from February 25, 2016 until his resignation on March 9, 2017.

22.     Defendant Augusto Ribeiro Júnior ("Ribeiro") served as the Company's CFO and as a Member of the Board of Executive Officers from December 19, 2013 until February 2016.

23.     Defendant Leopoldo Viriato Saboya ("Saboya") served as the Company's CFO from June 26, 2008 until December 2013.

24.     Defendant Helio Rubens Mendes dos Santos Junior ("Santos") served as the Company's Vice President of Global Operations and Member of the Executive Board from January 1, 2015 until his resignation on February 26, 2018.

25.     The Defendants referenced above in ¶¶ 18-24 are sometimes referred to herein as the "Individual Defendants."

26.     The Individual Defendants possessed the power and authority to control the contents of BRF's SEC filings, press releases, and other market communications. The Individual Defendants were provided with copies of the Company's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity

to prevent their issuance or to cause them to be corrected. Because of their positions with the Company, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein.

## SUBSTANTIVE ALLEGATIONS

### Background

27.     BRF is a food processor and the world's largest poultry exporter.  Its portfolio includes established brands in Brazil and abroad, such as Sadia, Perdigão, Qualy, Chester, Perdix and Paty. The Company provides meat (poultry and pork), foods processed from meats, pizzas, pastas and frozen vegetables.

### Materially False and Misleading Statements Issued During the Class Period

28.     The Class Period begins on April 4, 2013, when BRF filed an annual report on Form 20-F with the SEC, announcing the Company's financial and operating results for the quarter and fiscal year ended December 31, 2012 (the "2012 20-F"). For fiscal year 2012, BRF reported net income of $395.31 million, or $0.46 per diluted share, on revenue of $14.64 billion, compared to net income of $819.04 million, or $0.94 per diluted share, on revenue of $15.39 billion for fiscal year 2011.

29.     In the 2012 20-F, the Company stated in relevant part:

***Emphasis on Product Quality and Safety and on a Diversified Product Portfolio.***  We focus on quality and food safety in all our operations in order to meet customers' specifications, prevent contamination and minimize the risk of outbreaks of animal diseases. We employ traceability systems that allow us to quickly identify and isolate any farm on which a quality or health concern may arise. We also monitor the health and treatment of the poultry and hogs that we

raise at all stages of their lives and throughout the production process. We were the first Brazilian company approved by the European Food Safety Inspection System as qualified to sell processed poultry products to European consumers. We have a diversified product range, which gives us the flexibility to channel our production according to market demand and the seasonality of our products.

\*\*\*

We retain professionals with training in risk and waste management capable of prompt action in emergency situations. All our meat and dairy processing plants were built in compliance with applicable environmental laws relating to the disposal of effluents and waste. In addition, our Marau facility was the first Brazilian industrial plant in the meat processing sector to adopt the Integrated Management System (SGI), a management tool that seeks excellence in quality, the environment, and occupational health and safety. Its implementation has led to the certification under ISO 9001 and ISO 14001 (International Organization for Standardization), and OHSAS 18001 (Occupational Health and Safety Assessment Series), respectively.  In 2009, 2010, 2011, 2012, eight of our units were certified according to the ISO 14001 standards: Paranaguá, Chapecó, Ponta Grossa, Capinzal, Herval d'Oeste, Marau Aves, Marau Suínos and Serafina Corrêa.

\*\*\*

Under NYSE Rule 303A.10, each U.S. listed company must adopt and disclose a code of business conduct and ethics for directors, officers and employees and promptly disclose any waivers of the code for directors or executive officers. We are subject to a similar recommendation under Brazilian law, and we have adopted a code of ethics that applies to our officers and employees.

Our code of ethics, as well as further information concerning our corporate governance practices and applicable Brazilian law, is available on our website www.brf-br.com/ir. Information on our website is not incorporated by reference in this form. Copies of our Code of Business Conduct and Ethics are also available without charge upon request to our Investor Relations Office.  "Item 10—Additional Information—B. Memorandum and Articles of Association."

If we make any substantive amendment to the code of ethics or grant any waivers, including any implicit waiver, from a provision of the code of ethics, we will disclose the nature of such amendment or waiver on our website.  During the year ended December 31, 2012, no such amendment was made or waiver granted.

30.      In BRF's Code of Ethics and Conduct (last updated in 2015), the Company stated

in relevant part:

### 3.2 ANTI-BRIBERY AND CORRUPTION

8

BRF conducts its business in strict compliance with both national and international anti-bribery and anticorruption legislation, and People should do the same. The Company condemns all forms of corruption, direct or indirect, whether in public (transactions directly or indirectly involving the government) or in private relations (transactions between private companies without the involvement of governmental entities). People are forbidden to support or participate in acts of corruption, both passive and active, whether directly or indirectly.

### 3.3 GOVERNMENT RELATIONS

BRF and all People must act transparently, in accordance with the ethical principles set forth herein, in their relationships and communications with public agencies and/or government authorities. Offering any kind of benefit or advantage to public agents in view of their position or function is strictly forbidden. Moreover, demonstrations or contributions to political parties and/or government agencies on behalf of the Company are prohibited without prior approval from the Board of Directors.

***

### 4.3 PRODUCT QUALITY

BRF is committed to the manufacture of safe, healthy and tasty products, seeking continuous improvement of its standards, processes, products and services. The Company recognizes that food safety and the perception of the quality of its products are the foundation of its success. BRF values the quality and responsible management throughout its supply chain, based on internationally recognized laws and standards.

31.     The 2012 20-F contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Fay and Saboya, stating that the information contained in the 2012 20-F "fairly presents, in all material respects, the financial condition and results of operations of the Company."

32.     On March 31, 2014, BRF filed an annual report on Form 20-F with the SEC, announcing the Company's financial and operating results for the quarter and fiscal year ended December 31, 2013 (the "2013 20-F"). For fiscal year 2013, BRF reported net income of $494.23 million, or $0.57 per diluted share, on revenue of $12.92 billion, compared to net

income of $395.31 million, or $0.46 per diluted share, on revenue of $14.64 billion for fiscal year 2012.

33.     In the 2013 20-F, the Company stated in relevant part:

*Emphasis on Product Quality and Safety and on a Diversified Product Portfolio.*  We focus on quality and food safety in all our operations in order to meet customers' specifications, prevent contamination and minimize the risk of outbreaks of animal diseases. We employ traceability systems that allow us to quickly identify and isolate any farm on which a quality or health concern may arise. We also monitor the health and treatment of the poultry and hogs that we raise at all stages of their lives and throughout the production process. We were the first Brazilian company approved by the European Food Safety Inspection System as qualified to sell processed poultry products to European consumers. We have a diversified product range, which gives us the flexibility to guide our production according to market demand and the seasonality of our products. To support the continued innovation of our products portfolio, we invested in a new Technology Center in Jundiaí, in the State of São Paulo.

\*\*\*

We retain professionals with training in risk and waste management capable of prompt action in emergency situations. All of our meat processing plants were built in compliance with applicable environmental laws relating to the disposal of effluents and waste.

\*\*\*

Under NYSE Rule 303A.10, each U.S. listed company must adopt and disclose a code of business conduct and ethics for directors, officers and employees and promptly disclose any waivers of the code for directors or executive officers. We are subject to a similar recommendation under Brazilian law, and we have adopted a code of ethics that applies to our officers and employees.

Our code of ethics, as well as further information concerning our corporate governance practices and applicable Brazilian law, is available on our website www.brf-br.com/ir. Information on our website is not incorporated by reference in this form. Copies of our Code of Business Conduct and Ethics are also available without charge upon request to our Investor Relations Office.  "Item 10—Additional Information—B. Memorandum and Articles of Association."

If we make any substantive amendment to the code of ethics or grant any waivers, including any implicit waiver, from a provision of the code of ethics, we will disclose the nature of such amendment or waiver on our website.  During the year ended December 31, 2013, no such amendment was made or waiver granted.

34.     BRF's Code of Ethics and Conduct contained the representations described *supra* at ¶30.

35.     The 2013 20-F contained signed certifications pursuant to SOX by Defendants Galeazzi and Ribeiro, stating that the information contained in the 2013 20-F "fairly presents, in all material respects, the financial condition and results of operations of the Company."

36.     On March 31, 2015, BRF filed an annual report on Form 20-F with the SEC, announcing the Company's financial and operating results for the quarter and fiscal year ended December 31, 2014 (the "2014 20-F"). For fiscal year 2014, BRF reported net income of $947.95 million, or $1.09 per diluted share, on revenue of $12.35 billion, compared to net income of $494.23 million, or $0.57 per diluted share, on revenue of $12.92 billion for fiscal year 2013.

37.     In the 2014 20-F, the Company stated in relevant part:

> ***Emphasis on Quality, Safety and Diversified Portfolio of the Product.*** We concentrate on food safety and quality in all our operations to meet the specifications of the clients, prevent contamination and reduce the risks of epidemics of animal illnesses. We monitor the treatment of the poultry and the hogs we create in all the stages of their lives and during the whole production process. We launched a campaign in Brazil to publicize the Sadia Total Guarantee Program (*Programa de Garantia Total Sadia*) that ensures our chickens have no hormones or preservatives and are inspected individually. Moreover, we were the first Brazilian company approved by the European Food Safety and Inspection System which qualified us to sell processed poultry products to European consumers. This means we attend the most demanding clients in the world and meet their quality controls and external audits. We have a diversified variety of products that give us the flexibility to direct our production according to the market demand and the seasonality of our products. To support this continuous innovation of our product portfolio, we have been continuously investing in our Technology Center in Jundiaí, in upstate São Paulo.
>
> ***
>
> Under NYSE Rule 303A.10, each U.S. listed company must adopt and disclose a code of business conduct and ethics for directors, officers and employees and promptly disclose any waivers of the code for directors or executive officers. We

are subject to a similar recommendation under Brazilian law, and we have adopted a code of ethics that applies to our officers and employees.

Our code of ethics, as well as further information concerning our corporate governance practices and applicable Brazilian law, is available on our website www.brf-br.com/ir. Information on our website is not incorporated by reference in this form. Copies of our Code of Business Conduct and Ethics are also available without charge upon request to our Investor Relations Office. "Item 10—Additional Information—B. Memorandum and Articles of Association."

If we make any substantive amendment to the code of ethics or grant any waivers, including any implicit waiver, from a provision of the code of ethics, we will disclose the nature of such amendment or waiver on our website. During the year ended December 31, 2014, no such amendment was made or waiver granted.

38. BRF's Code of Ethics and Conduct contained the representations described *supra* at ¶30.

39. The 2014 20-F contained signed certifications pursuant to SOX by Defendants Faria and Ribeiro, stating that the information contained in the 2014 20-F "fairly presents, in all material respects, the financial condition and results of operations of the Company."

40. On April 5, 2016, BRF filed an annual report on Form 20-F with the SEC, announcing the Company's financial and operating results for the quarter and fiscal year ended December 31, 2015 (the "2015 20-F"). For fiscal year 2015, BRF reported net income of $948.10 million, or $1.13 per diluted share, on revenue of $9.81 billion, compared to net income of $947.95 million, or $1.09 per diluted share, on revenue of $12.35 billion for fiscal year 2014.

41. In the 2015 20-F, the Company stated in relevant part:

*Emphasis on Quality, Safety and Diversified Portfolio of the Product.* We concentrate on food safety and quality in all our operations to meet the specifications of the clients, prevent contamination and reduce the risks of epidemics of animal illnesses. We monitor the treatment of the poultry and the hogs we create in all the stages of their lives and during the whole production process. We launched a campaign in Brazil to publicize the Sadia Total Guarantee Program (*Programa de Garantia Total Sadia*) that ensures our chickens have no hormones or preservatives and are inspected individually. Moreover, we were the first Brazilian company approved by the European Food Safety and Inspection System which qualified us to sell processed poultry products to European

consumers. This means we attend the most demanding clients in the world and meet their quality controls and external audits. We have a diversified variety of products that give us the flexibility to direct our production according to the market demand and the seasonality of our products. To support this continuous innovation of our product portfolio, we have been continuously investing in our Technology Center in Jundiaí, in upstate São Paulo.

*** 

Under NYSE Rule 303A.10, each U.S. listed company must adopt and disclose a code of business conduct and ethics for directors, officers and employees and promptly disclose any waivers of the code for directors or executive officers. We are subject to a similar requirement under Brazilian law, and we have adopted a code of ethics that applies to our directors, officers and employees.

Our code of ethics, as well as further information concerning our corporate governance practices and applicable Brazilian law, is available on our website www.brf-br.com/ir. Information on our website is not incorporated by reference in this form. Copies of our Code of Business Conduct and Ethics are also available without charge upon request to our Investor Relations Office.

If we make any substantive amendment to the code of ethics or grant any waivers, including any implicit waiver, from a provision of the code of ethics, we intend to disclose the nature of such amendment or waiver on our website.  During the year ended December 31, 2015, no such amendment was made or waiver granted.

42.     BRF's Code of Ethics and Conduct contained the representations described *supra* at ¶30.

43.     The 2015 20-F contained signed certifications pursuant to SOX by Defendants Faria and Borges, stating that the information contained in the 2015 20-F "fairly presents, in all material respects, the financial condition and results of operations of the Company."

44.     On April 26, 2017, BRF filed an annual report on Form 20-F with the SEC, announcing the Company's financial and operating results for the quarter and fiscal year ended December 31, 2016 (the "2016 20-F").  For fiscal year 2016, BRF reported a net loss of $107.49 million, or $0.13 per diluted share, on revenue of $9.73 billion, compared to net income of $948.10 million, or $1.13 per diluted share, on revenue of $9.81 billion for fiscal year 2015.

45.     In the 2016 20-F, the Company stated in relevant part:

***Emphasis on Quality, Safety and Diversified Portfolio of the Product.*** We are committed to food safety and quality in all of our operations to meet the specifications of our clients, prevent contamination and reduce the risks of epidemics of animal illnesses. We monitor the treatment of our poultry and hogs raised in all the stages of their lives and throughout the entire production process. In 2013, we launched a campaign in Brazil to publicize the Sadia Total Guarantee Program (Programa de Garantia Total Sadia) that ensures our chickens have no hormones or preservatives and are individually inspected. Moreover, we were the first Brazilian company approved by the European Food Safety and Inspection System, which qualified us to sell processed poultry products to European consumers. This means that our clients include some of the most demanding clients in the world and that we meet their quality controls and external audits. We have a diversified variety of products that give us the flexibility to direct our production according to the market demand and the seasonality of our products. To support this continuous innovation of our product portfolio, we have been continuously investing in our Technology Center in Jundiaí, in upstate São Paulo.

***

Under NYSE Rule 303A.10, each U.S. listed company must adopt and disclose a code of business conduct and ethics for directors, officers and employees and promptly disclose any waivers of the code for directors or executive officers. We are subject to a similar requirement under Brazilian law, and we have adopted a code of ethics that applies to our directors, officers and employees.

Our code of ethics, as well as further information concerning our corporate governance practices and applicable Brazilian law, is available on our website at www.brf-br.com/ir. Information on our website is not incorporated by reference in this Annual Report on Form 20-F. Copies of our "Code of Ethics and Conduct" are also available without charge upon request to our Investor Relations Office.

If we make any substantive amendment to the code of ethics or grant any waivers, including any implicit waiver, from a provision of the code of ethics that apply to our principal executive officer, principal financial officer, principal accounting officer or controller, or persons performing similar functions, we intend to disclose the nature of such amendment or waiver on our website.  During the year ended December 31, 2016, no such amendment was made or waiver granted.

46.     BRF's Code of Ethics and Conduct contained the representations described *supra* at ¶30.

47.     The 2016 20-F contained signed certifications pursuant to SOX by Defendant Faria, stating that the information contained in the 2016 20-F "fairly presents, in all material respects, the financial condition and results of operations of the Company."

48.     The statements referenced in ¶¶ 28-47 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) BRF employees paid bribes to regulators and politicians to subvert inspections in order to conceal unsanitary practices at the Company's meatpacking plants; (ii) the foregoing conduct, when it came to light, would foreseeably subject the Company and its officers to heightened regulatory enforcement and/or prosecution; and (iii) as a result of the foregoing, BRF's public statements were materially false and misleading at all relevant times.

**The Truth Begins to Emerge**

49.     On March 17, 2017, news outlets reported that Brazilian federal police raided the offices of BRF and dozens of other meatpackers following a two-year investigation into alleged bribery of regulators to subvert inspections of their plants. The probe, known as "Operation Weak Flesh," had uncovered about 40 cases of meatpackers who had bribed inspectors and politicians to overlook unsanitary practices such as processing rotten meat and running plants with traces of salmonella.  According to media reports, police found evidence that the companies were tampering with packages to sell products that had already expired and that higher-than-permitted levels of parts such as "pig heads" were mixed with sausages and cold cuts.  Police arrested three BRF employees, as well as 20 public officials.

50.     On this news, BRF's ADR price fell $0.99, or 7.73%, to close at $11.81 on March 17, 2017.

51.     On February 23, 2018, the Company held an earnings conference call with investors and analysts to discuss the Q4 2017 earnings results.  In the call, Chairman of the

Board Abilio Diniz and CFO Lorival Luz discussed the impact of "Operation Weak Flesh," stating in relevant part:

**Abilio Diniz**

So we were surprised and taken aback with an episode that I never imagined I would have in my life, something that was really shocking, Operation Weak Flesh. You have no idea what it was about. You don't know what the impact was to this company and to other companies, too. We had very serious problems, problems in the market, closing the doors to us. 7 million broilers are slaughtered per day, not per year, but per day. Imagine, when you break the chain, when you break such a long chain, there is things interrupted, think about the impact in ports, harbors, distribution centers, our raw materials, our products, our inventories. We had some imbalance since late 2016. It's true. It has to be admitted. But Weak Flesh still requires some actions, and we have been actively working on it as you see in our numbers today. But that was a terrible episode. The markets closed the doors and then started to renegotiate prices. And now conditions are more favorable to buyers, and things are more challenging to us, debtors. But we are overcoming step-by-step, but we still have plans that have not been fully released.

So this episode was really shocking, a huge impact. And most of the earnings last year were not only related to Weak Flesh, but mostly related to it…

***

**Lorival Luz**

Now going towards the figures. You see here the lines and the amounts that are being considered. So we have a first line for minority shareholders stake. There is another line with a more relevant impact, which is, as Abilio has already mentioned, that it's a direct impact from the Weak Flesh Operation that happened in 2017. And then we had BRL40 million in the first quarter, additionally BRL118 million in the second quarter of '17. And now in the fourth quarter, we had an impact of BRL206 million.

52.     On this news, BRF's ADR price fell $0.76 or 8.00%, to close at $8.73 on February 23, 2018.

53.     On March 5, 2018, *Reuters* reported that Brazilian federal police arrested BRF's former CEO Faria on charges that he and other executives, including the Company's Vice President of Global Operations Hélio dos Santos Júnior, were aware that BRF committed fraud

by trying to avoid food safety checks.  According to the report, the "police cited evidence that five laboratories accredited by the Agriculture Ministry colluded with the analysis department of BRF to "falsify" test results related to the safety of its industrial process."  In a court ruling authorizing the arrests, Brazilian federal judge André Duszczak said "Faria and other BRF officers sought to cover up claims of possible food contamination, as shown in certain laboratory tests, made by a former employee in a labor lawsuit."

54.     On this news, BRF's ADR price fell $1.83 or 19.42% to close at $7.59 on March 5, 2018.

55.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

56.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired BRF securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

57.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, BRF securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or

thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by BRF or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

58.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

59.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

60.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of BRF;

- whether the Individual Defendants caused BRF to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of BRF securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

61. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

62. Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- BRF securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold BRF securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

63. Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

64. Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material

information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## **COUNT I**

### **(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

65.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

66.     This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

67.     During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did:  (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of BRF securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire BRF securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

68.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly

and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for BRF securities.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about BRF's finances and business prospects.

69.      By virtue of their positions at BRF, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.  Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.  In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

70.      Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  As the senior managers and/or directors of BRF, the Individual Defendants had knowledge of the details of BRF's internal affairs.

71.      The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of BRF.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to BRF's businesses,

operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of BRF securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning BRF's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired BRF securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

72.     During the Class Period, BRF securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of BRF securities at prices artificially inflated by Defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of BRF securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of BRF securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

73.     By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

74.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### (Violations of Section 20(a) of the Exchange Act Against The Individual Defendants)

75.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

76.     During the Class Period, the Individual Defendants participated in the operation and management of BRF, and conducted and participated, directly and indirectly, in the conduct of BRF's business affairs.  Because of their senior positions, they knew the adverse non-public information about BRF's misstatement of income and expenses and false financial statements.

77.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to BRF's financial condition and results of operations, and to correct promptly any public statements issued by BRF which had become materially false or misleading.

78.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which BRF disseminated in the marketplace during the Class Period concerning BRF's results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause BRF to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of BRF within the

meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of BRF securities.

79.    Each of the Individual Defendants, therefore, acted as a controlling person of BRF.  By reason of their senior management positions and/or being directors of BRF, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, BRF to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of BRF and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

80.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by BRF.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.    Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: March 12, 2018

                                        Respectfully submitted,

                                        **POMERANTZ LLP**

                                        */s/ Jeremy A. Lieberman*
                                        Jeremy A. Lieberman
                                        J. Alexander Hood II
                                        Hui M. Chang
                                        600 Third Avenue, 20th Floor
                                        New York, New York 10016
                                        Telephone:  (212) 661-1100
                                        Facsimile:  (212) 661-8665
                                        Email:  jalieberman@pomlaw.com
                                               ahood@pomlaw.com
                                               hchang@pomlaw.com

                                        **POMERANTZ LLP**
                                        Patrick V. Dahlstrom
                                        10 South La Salle Street, Suite 3505
                                        Chicago, Illinois 60603
                                        Telephone:  (312) 377-1181
                                        Facsimile:   (312) 377-1184
                                        Email:  pdahlstrom@pomlaw.com

                                        *Attorneys for Plaintiff*

## CERTIFICATION PURSUANT
## TO FEDERAL SECURITIES LAWS

1.   I, _Ryo Nakamura_____, make this declaration pursuant to Section 27(a)(2) of the Securities Act of 1933 ("Securities Act") and/or Section 21D(a)(2) of the Securities Exchange Act of 1934 ("Exchange Act") as amended by the Private Securities Litigation Reform Act of 1995.

2.   I have reviewed a Complaint against BRF S.A. ("BRF" or the "Company") and authorize the filing of a comparable complaint on my behalf.

3.   I did not purchase or acquire BRF securities at the direction of plaintiffs counsel or in order to participate in any private action arising under the Securities Act or Exchange Act.

4.   I am willing to serve as a representative party on behalf of a Class of investors who purchased or acquired BRF securities during the class period, including providing testimony at deposition and trial, if necessary. I understand that the Court has the authority to select the most adequate lead plaintiff in this action.

5.   To the best of my current knowledge, the attached sheet lists all of my transactions in BRF securities during the Class Period as specified in the Complaint.

6.   During the three-year period preceding the date on which this Certification is signed, I have not sought to serve as a representative party on behalf of a class under the federal securities laws.

7.   I agree not to accept any payment for serving as a representative party on behalf of the class as set forth in the Complaint, beyond my pro rata share of any recovery, except such reasonable costs and expenses directly relating to the representation of the class as ordered or approved by the Court.

8.  I declare under penalty of perjury that the foregoing is true and correct.

Executed _____03/09 / 18_____
                    **(Date)**

_____
                 **(Signature)**

_____
             **(Type or Print Name)**

**BRF S.A. (BRFS)**                                                                          **Nakamura, Ryo**

### LIST OF PURCHASES AND SALES

| DATE | PURCHASE OR SALE | NUMBER OF SHARES/UNITS | PRICE PER SHARES/UNITS |
|---|---|---|---|
| Common Stock | | | |
| 9/18/2017 | Purchase | 2,000 | $12.5000 |
| BRFS Sept 15 2017 $12.50 Call | | | |
| 3/27/2017 | Purchase | 20 | $0.8600 |