UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re BRF S.A. SECURITIES LITIGATION | : | Civil Action No. 1:18-cv-02213-PKC |
| | : | CLASS ACTION |
| This Document Relates To: | : | |
| ALL ACTIONS. | : | DEMAND FOR JURY TRIAL |

**SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

## TABLE OF CONTENTS

**Page**

I. NATURE OF THE ACTION ....1

II. JURISDICTION AND VENUE ....5

III. PARTIES ....5

IV. ADDITIONAL KEY NON-PARTIES ....9

V. BACKGROUND OF BRF....10

A. The Company's Business....10

B. BRF's Organizational Structure During the Class Period ....11

VI. GOVERNMENT REGULATION OF THE AGRICULTURE INDUSTRY IN BRAZIL ....13

A. The Regulatory Framework Governing the MAPA Certification Process ....16

VII. OPERATION WEAK FLESH....17

A. Operation Weak Flesh: Phase I....17

B. Operation Antidote: Phase II ....18

C. Operation Trap: Phase III....18

D. Brazilian Public Health Officials and BRF Officials Are Convicted in Connection with the Crimes Described in the *Carne Fraca* Decision ....19

E. The Brazilian Federal Police Issue a Final Investigative Report Recommending Charges Against BRF Executives....20

F. October 17, 2018: MAPA Orders an Administrative Investigation into Allegations that BRF Prevented SIF Officials from Performing Their Duties ....21

VIII. DEFENDANTS' FRAUDULENT SCHEME AND COURSE OF CONDUCT ....21

Introduction to Defendants' Fraudulent Scheme and Course of Conduct ....21

A. BRF Exports Poultry Products Contaminated with Dioxins ....23

1. Background: Feather Meal and Dioxins ....24

2. The Chinese Authorities Detect Dioxins in BRF Exports ....25

**Page**


3. BRF Controls the Flow of Information; BRF's CEO and Chairman Are Kept Informed ....................29

4. BRF Obtains Retroactive Certification for the Eurofins Laboratory and the Suspension Is Eventually Lifted ....................30

B. BRF Falsifies Laboratory Reports and Traceability Analyses; BRF Executives Participate in the Cover Up ....................32

1. The Carvalho Lawsuit ....................33

2. BRF Executives Work Together to Quash the Lawsuit ....................38

3. The Suspicious Interest and Involvement of BRF's Top Executives in the Carvalho Lawsuit ....................43

C. BRF Bribes Public Official to Prevent the Closure of a Poultry Facility Contaminated with Salmonella ....................45

1. The European Officials Detect Salmonella in BRF Products ....................46

2. The Company Directs Roney to Contact Dinis and Try to Prevent the Closure of the Mineiros Facility ....................47

3. Dinis Agrees to Prevent the Closure of the Facility in Exchange for a R$300,000 Political "Donation" ....................52

4. Dinis Delivers and Prevents the Closures of the Mineiros Unit ....................62

5. BRF Continues Producing Contaminated Poultry Products at the Mineiros Facility and Salmonella is Again Detected in European Exports ....................65

6. BRF Used Fraudulent Laboratory Reports to Obtain Health Certifications for Contaminated Products From its Mineiros Facility ....................67

7. BRF Management Knew About the Contamination at the Mineiros Facility and the Bribe to Conceal the Contamination ....................70

D. The Line Speed Bribe ....................73

1. Background: Line Speeds in the Poultry Industry ....................74

2. BRF Bribes a Government Official to Increase the Line Speed ....................75

**Page**


3. BRF Promises to Fabricate Evidence to Undermine a Federal Corruption Probe into the Line Speed Bribe....76

E. The Company's Lack of Internal Controls Regarding Other Aspects of Food Safety....84

1. Lack of Controls Regarding Detection and Reporting of Salmonella and Other Pathogens....84

2. Lack of Controls in Production of Poultry Feed and Premix....104

3. Lack of Controls Regarding Use of Accredited Laboratories to Analyze Food Products....121

4. Lack of Controls Regarding Water Absorption in Poultry Products....124

5. Lack of Controls Relating to Legal, Regulatory, and Health Certifications....126

IX. POST CLASS PERIOD EVENTS....139

A. BRF Launches a Public Relations Campaign....139

B. Europe and Other Countries Ban All Poultry Exports from Brazil....140

C. BRF Shareholders Remove the Entire Board of Directors....141

D. Brazilian Judge Bars VP Hélio Rubens Mendes from Entering BRF Facilities....142

X. BRF FAILED TO COMPLY WITH INTERNATIONAL CERTIFICATION STANDARDS....142

XI. DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD....152

A. Materially False and Misleading Statements Regarding the Company's Growth and Operations....152

B. Defendants' Statements Regarding Product Quality and Food Safety Were Materially False and Misleading and Omitted Material Facts Defendants Had a Duty to Disclose....159

**Page**

1. Defendants' Statements Regarding BRF's Commitment to Product Quality and Food Safety Were Materially False and Misleading and Omitted Material Facts Defendants Had a Duty to Disclose ............159

2. Defendants' Statements About Traceability Systems and Feed Control Were Materially False and Misleading and Omitted Material Facts Defendants Had a Duty to Disclose ................................165

3. Defendants' Statements Regarding the Potential Impact of Animal Disease and Other Health Risks on BRF's Operations Were Materially False and Misleading and Omitted Material Facts Defendants Had a Duty to Disclose ........................................................167

C. Defendants' Statements Regarding BRF's Use of Medications Were Materially False and Misleading and Omitted Material Facts Defendants Had a Duty to Disclose ..........................................................................174

D. Defendants' Statements Regarding Compliance with Labeling Requirements Were Materially False and Misleading and Omitted Material Facts Defendants Had a Duty to Disclose ............................................178

E. Defendants' Statements Regarding BRF's Compliance with Voluntary International Certification Standards Were Materially False and Misleading and Omitted Material Facts Defendants Had a Duty to Disclose..........................................................................................180

F. Defendants' Statements Regarding the Company's Code of Ethics and Conduct Were Materially False and Misleading and Omitted Material Facts Defendants Had a Duty to Disclose...........................................................183

G. Defendants' Statements Regarding the Company's Political Contributions Were Materially False and Misleading and Omitted Material Facts Defendants Had a Duty to Disclose ....................................................................189

H. Defendants' Statements Regarding BRF's Competitive Advantages Were Materially False and Misleading and Omitted Material Facts Defendants Had a Duty to Disclose ..........................................................................193

I. Defendants' Statements Regarding the Amount of Poultry BRF Slaughtered Were Materially Misleading and Omitted Material Facts Defendants Had a Duty to Disclose ....................................................................197

**Page**

J. Defendants' Statements Regarding and in Response to Operation Weak Flesh Were Materially False and Misleading and Omitted Material Facts Defendants Had a Duty to Disclose ....202

XII. ADDITIONAL SCIENTER ALLEGATIONS ....207

A. The Coordinated Efforts by BRF's Chairman, Global CEO, Three Vice Presidents, General Manager of Asia, and a Director of Operations to Control the Flow of Information Regarding the Dioxin Contamination Support an Inference of Scienter....209

B. Cover Up of Claims of Possible Food Contamination by BRF's Global CEO, Three of BRF's Five Vice Presidents and a Director of Operations Supports an Inference of Scienter ....210

C. The Company Authorized the Payment of a R$300,000.00 Political Contribution to Jovair Arantes to Prevent the Closure of a Poultry Facility Contaminated with Salmonella ....211

D. Defendants Knew About the Line Speed Bribe and Participated in the Cover Up ....212

E. André Baldissera's Conduct Is Imputed to the Board ....213

F. Roney's Conduct Is Imputed to the Board....214

XIII. DEFENDANTS FAILED TO DISCLOSE KNOWN MATERIAL TRENDS AND UNCERTAINTIES ....215

XIV. THE RISK DISCLOSURES IN BRF'S CLASS PERIOD FORMS 20-F WERE INADEQUATE....219

XV. LOSS CAUSATION....221

XVI. APPLICABILITY OF THE PRESUMPTION OF RELIANCE ....223

XVII. CLASS ACTION ALLEGATIONS ....225

XVIII. NO SAFE HARBOR ....226

COUNT I ....227

Violation of §10(b) of the Exchange Act and Rule 10b-5 Against BRF ....227

COUNT II ....228

**Page**

Violation of §10(b) of the Exchange Act and Rule 10b-5 Against the Individual Defendants ....................228

COUNT III....................230

Violation of §20(a) of the Exchange Act Against the Individual Defendants....................230

PRAYER FOR RELIEF ....................231

JURY DEMAND....................231

Lead Plaintiff City of Birmingham Retirement and Relief System ("Lead Plaintiff"), by and through its undersigned counsel, alleges the following based upon personal knowledge as to Lead Plaintiff and Lead Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Lead Plaintiff's attorneys, which included, among other things, a review of Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding BRF S.A. ("BRF" or the "Company"), analysts' reports and advisories about the Company, a review of the filings, evidentiary submissions, and court orders in related criminal proceedings in Brazil, and information readily obtainable on the internet. Lead Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I. NATURE OF THE ACTION

1. This is a federal securities class action on behalf of all persons other than Defendants who purchased or otherwise acquired BRF's American Depositary Receipts ("ADRs")[1] between April 4, 2013 and March 2, 2018, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2. Headquartered in São Paulo, Brazil, BRF is a food processor and the world's largest poultry exporter.

---

[1] An ADR represents ownership in a security issued by a foreign company in foreign markets. *See Edward F. Greene, et al., U.S. Regulation of the International Securities and Derivatives Markets* 2-19 (9th ed. 2009). Generally, a U.S. bank (the "depository") has custody of the security corresponding to an ADR and issues the ADR certificate to an investor in the United States. *See id.*

3. As detailed herein, during the Class Period, BRF was engaged in an unprecedented and massive case of food fraud. This widespread fraud involved numerous senior executives, as well as the Company's top management, and included paying bribes to regulators and politicians to subvert inspections in order to conceal unsanitary practices at the Company's meatpacking plants, falsifying laboratory test results and improper use of additives and chemicals. Nonetheless, Defendants failed to disclose these material facts and repeatedly made statements to investors that emphasized BRF's growth, its focus on product quality and food safety, and its compliance with legislation, legal requirements, and international certification standards – all of which were false.

4. On March 17, 2017, news outlets reported that Brazilian federal police had raided the offices of BRF and dozens of other meatpackers following a two-year investigation into alleged bribery of regulators regarding plant inspections. The probe, known as "Operation Weak Flesh" (in Portuguese, *Operação Carne Fraca*), had uncovered some 40 cases of meatpackers who had bribed inspectors and politicians to overlook unsanitary practices, reassign honest health inspectors, and obtain fraudulent health certifications for their products. Brazilian Federal Police arrested three BRF employees, as well as 20 public officials, in connection with these crimes and others.

5. On this news, BRF's ADR price fell $0.99, or 7.73%, to close at $11.81 on March 17, 2017.

6. More arrests would later follow, including the arrest of BRF's former Global Chief Executive Officer ("CEO") Pedro de Andrade Faria ("Pedro Faria").

7. On February 23, 2018, the Company held an earnings conference call with investors and analysts to discuss its Q4 2017 earnings results. On the call, Chairman of the Board Abilio dos Santos Diniz ("Abilio Diniz") and then-Chief Financial Officer ("CFO") Lorival Nogueira Luz Jr.

("Lorival Luz") discussed the impact that Operation Weak Flesh had on the Company's financial performance, stating, in pertinent part, as follows:

> **Abilio Diniz**
>
> So we were surprised and taken aback with an episode that I never imagined I would have in my life, something that was really shocking, Operation Weak Flesh. You have no idea what it was about. You don't know what the impact was to this company and to other companies, too. We had very serious problems, problems in the market, closing the doors to us. 7 million broilers are slaughtered per day, not per year, but per day. Imagine, when you break the chain, when you break such a long chain, there is things interrupted, think about the impact in ports, harbors, distribution centers, our raw materials, our products, our inventories. We had some imbalance since late 2016. It's true. It has to be admitted. But Weak Flesh still requires some actions, and we have been actively working on it as you see in our numbers today. But that was a terrible episode. The markets closed the doors and then started to renegotiate prices. And now conditions are more favorable to buyers, and things are more challenging to us, debtors. But we are overcoming step-by-step, but we still have plans that have not been fully released.
>
> So this episode was really shocking, a huge impact. And most of the earnings last year were not only related to Weak Flesh, but mostly related to it . . .
>
> * * *
>
> **Lorival Luz**
>
> Now going towards the figures. You see here the lines and the amounts that are being considered. So we have a first line for minority shareholders stake. There is another line with a more relevant impact, which is, as Abilio has already mentioned, that it's a direct impact from the Weak Flesh Operation that happened in 2017. And then we had BRL40 million in the first quarter, additionally BRL118 million in the second quarter of '17. And now in the fourth quarter, we had an impact of BRL206 million.

8. On this news, BRF's ADR price fell $0.76, or 8.00%, to close at $8.73 on February 23, 2018.

9. After the first phase of Operation Weak Flesh on March 17, 2017, the police continued to investigate various companies and executives in the agro-industry sector in the same Brazilian states, including BRF. The evidence collected in the initial raid led the Brazilian authorities to the conclusion that numerous BRF executives and other high ranking employees were

involved in a wide-ranging scheme to avoid complying with the quality control methods required by Brazil's Ministry of Agriculture, Livestock and Food Supply ("MAPA").

10. On March 5, 2018, *Reuters* reported that Brazilian federal police arrested BRF's former Global CEO Pedro Faria on charges that he and other executives, including the Company's Vice President ("VP") of Global Operations Hélio Rubens Mendes dos Santos Júnior ("Hélio Rubens Mendes"), were aware that BRF committed fraud by taking steps to avoid legitimate food safety checks. In a court ruling authorizing the arrests, Brazilian Judge André Wasilewski Duszczak described a "vicious circle of criminal practices" performed by BRF and its employees, "in which one crime was committed to conceal another."

11. This cycle of fraud was present at every stage of the poultry production process – from incubation to slaughter to export – in BRF facilities across Brazil. BRF hatcheries hatched chicks contaminated with salmonella.[2] After identifying and confirming the infection, BRF sent the chicks to contract farmers for raising and fattening. BRF also provided the farmers with adulterated poultry feed supplement called "premix" laced with additives designed to unnaturally fatten the poultry. The birds were also fed poultry feed laced with high levels of dangerous toxic substances, including dioxins, furans, and polychlorinated biphenyls ("PCBs"). The contaminated chickens were sent to the slaughtering facility where BRF veterinarians and production managers again confirmed – and ignored – the presence of salmonella. A web of unscrupulous laboratories provided

[2] Salmonella is a type of bacteria responsible for an infection called salmonellosis. According to the Center for Disease Control, salmonella causes about 1.2 million illnesses, 23,000 hospitalizations, and 450 deaths in the United States every year. Most people infected with salmonella develop fever, diarrhea, and abdominal cramps 12 – 72 hours after exposure. Salmonella can cause severe illness to occur that requires medical attention and hospitalization. In these patients, the salmonella infection can spread from the intestines to the bloodstream and then to other body sites. In this situation, the infection can cause death unless the patient is treated promptly with antibiotics. Infants, elderly people, and people with impaired immune systems are more likely than other people to become severely ill. *See https://www.cdc.gov/salmonella/general/index.html* (last visited Dec. 3, 2018).

BRF with falsified laboratory results, which BRF used to mislead health inspectors and obtain domestic and international health certifications. The products were then shipped out of BRF's production facility bearing labels stating that the meat was healthy and free of bacteria.

12. On this news, BRF's ADR price fell $1.83, or 19.42%, to close at $7.59 per ADR on March 5, 2018.

13. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Lead Plaintiff and other Class members have suffered significant losses and damages.

## II. JURISDICTION AND VENUE

14. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b), 78n(e) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

15. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act (15 U.S.C. §78aa).

16. Venue is properly laid in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(b). BRF's ADRs trade on the NYSE, which is located within this District.

17. In connection with the acts, conduct, and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## III. PARTIES

18. As set forth in its previously-filed certification, Lead Plaintiff purchased BRF ADRs during the Class Period, and has been damaged thereby.

19. Defendant BRF is incorporated under the laws of Brazil. The Company's principal executive offices are located at 1400 Rua Hungria – 5º andar, Jardim Europa, CEP: 01455-000, São Paulo, Brazil. BRF's shares trade on the NYSE under the ticker symbol "BRFS."

20. Defendant José Antonio do Prado Fay ("Fay") served as the Company's CEO from October 30, 2008 until August 14, 2013, and as a member of the Executive Board until August 2013. Defendant Fay signed BRF's annual report for fiscal year ended December 31, 2012, which was filed on Form 20-F with the SEC on April 4, 2013 (the "2012 Form 20-F").

21. Defendant Claudio Galeazzi ("Galeazzi") served as the Company's CEO from August 2013 until December 31, 2014. Galeazzi signed BRF's annual report for fiscal year ended December 31, 2013, which was filed on Form 20-F with the SEC on March 31, 2014 (the "2013 Form 20-F"). Galeazzi also signed the Company's Annual and Sustainability Report for year ended December 31, 2013, which was filed on Form 6-K with the SEC on February 27, 2014 (the "2013 Sustainability Report").

22. Defendant Pedro Faria served as the Company's Global CEO from January 1, 2015 to December 31, 2017, and the Company's International CEO from November 14, 2013 until December 31, 2014. He also served as a Director from April 2011 to November 2013. Faria signed the following documents on behalf of the Company: (1) BRF's annual report for fiscal year ended December 31, 2014, which was filed on Form 20-F with the SEC on March 31, 2015 (the "2014 Form 20-F"); (2) BRF's annual report for fiscal year ended December 31, 2015, which was filed on Form 20-F with the SEC on April 5, 2016 (the "2015 Form 20-F"); (3) BRF's annual report for fiscal year ended December 31, 2016, which was filed on Form 20-F with the SEC on April 26, 2017 (the "2016 Form 20-F"); (4) BRF's Annual and Sustainability Report for year ended December 31, 2015, filed with the SEC on Form 6-K on February 26, 2016 (the "2015 Sustainability Report"); and

(5) BRF's Annual and Sustainability Report for year ended December 31, 2016, filed with the SEC on Form 6-K on April 28, 2017 (the "2016 Sustainability Report").

23. Defendant Leopoldo Viriato Saboya ("Saboya") served as the Company's CFO from June 26, 2008 until December 2013. Saboya signed the Company's 2012 Form 20-F.

24. Defendant Augusto Ribeiro Júnior ("Ribeiro") served as the Company's CFO and as a Member of the Board of Executive Officers from December 19, 2013 until February 2016. Ribeiro signed the Company's 2013 Form 20-F and 2014 Form 20-F.

25. Defendant José André Carneiro Borges ("Borges") served as the Company's CFO from February 25, 2016 until his resignation on March 9, 2017. Borges signed the Company's 2015 Form 20-F.

26. Defendant Lorival Luz served as the Company's CFO and Chief Investor Relations Officer from August 2017 through the end of the Class Period.

27. Defendant Hélio Rubens Mendes served as the Company's VP of Supply Chain and Member of the Executive Board from January 1, 2015 until his resignation on February 26, 2018. Prior to that, from January 2013 until December 31, 2014, Hélio Rubens Mendes served as the Company's VP of Integrated Planning and Management Control. Hélio Rubens Mendes signed the Company's 2016 Form 20-F.

28. Defendant Abilio Diniz served as the Chairman of Board of BRF from April 9, 2013 until April 26, 2018. Abilio Diniz signed the Company's 2015 Sustainability Report and 2016 Sustainability Report.

29. The Defendants referenced above in ¶¶20-28 are sometimes referred to herein as the "Individual Defendants."

30. During the Class Period, the Individual Defendants, as senior executives and/or directors of BRF, were privy to confidential and proprietary information concerning BRF, its operations, finances, financial condition, and present and future business prospects. Because of their positions with BRF, the Individual Defendants had access to non-public information about the Company's business, finances, products, markets, and present and future business prospects via internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof, and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

31. The Individual Defendants are liable as direct participants in the wrongs complained of herein. In addition, the Individual Defendants were "controlling persons" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein. Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of BRF's business.

32. The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of BRF's reports, press releases, and presentations to securities analysts, and through them, to the investing public. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading, prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

33. As controlling persons of a publicly traded company whose stock was registered with the SEC pursuant to the Exchange Act, and was traded on the NYSE and governed by the federal securities laws, Defendants had a duty to promptly disseminate accurate and truthful information with respect to BRF's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings, and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of BRF ADRs would be based upon truthful and accurate information. Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

34. Each of the Defendants is liable for: (i) making false or misleading statements; and/or (ii) failing to disclose adverse facts known to them about BRF. Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of BRF ADRs was a success, as it: (i) deceived the investing public regarding BRF's prospects and business; (ii) artificially inflated the price of BRF ADRs; and (iii) caused Lead Plaintiff and other members of the Class to purchase BRF ADRs at inflated prices.

## IV. ADDITIONAL KEY NON-PARTIES

35. José Roberto Pernomian Rodrigues ("Roberto Rodrigues" or "JR") served as the Company's VP of Legal and Corporate Affairs from January 1, 2015 until his resignation on August 2, 2017.

36. Gilberto Antonio Orsato ("Gilberto Orsato") served as the VP of Quality and Management from January 1, 2015 until 2017.

37. At all relevant times herein, André Luis Baldissera ("Baldissera") served as the Company's Director of Operations in the Midwest region of Brazil, which encompassed the Brazilian states of Minas Gerais, Goiás and Mato Grosso. As the Director of Operations, Baldissera

managed over 26,000 employees, more than a quarter of BRF's entire work force, and oversaw all of the production processes in the region, from cattle and poultry production through the final product.

38. At all relevant times herein, Roney Nogueira dos Santos ("Roney") served as the Manager of Institutional and Government Relations of BRF.

## V. BACKGROUND OF BRF

### A. The Company's Business

39. BRF is one of the largest producers of fresh and frozen protein foods in the world, with a vast portfolio of products including marinated and frozen chicken, Chester® rooster and turkey meat, specialty meats, frozen processed foods, frozen prepared entrees, portioned products and sliced products.

40. In December 2017, BRF was responsible for 13.1% of the world trade in poultry.

41. In Brazil alone, BRF operates 33 meat processing plants and 20 distribution centers, most of which are located in the southeastern region (consisting of the Brazilian states of Paraná, Santa Catarina, Rio Grande do Sul, Sao Paulo, and Minas Gerais) and central region (consisting of the Brazilian states of Mato Grosso, Mato Grosso do Sul, and Goiás).






In the international markets, the Company has nine industrial units in Argentina, five in Thailand, two in Europe, one in Abu Dhabi, one in Malaysia, and five in Turkey, and 26 international distribution centers.

42. The Company maintains 27 sales offices outside of Brazil, serving customers in more than 140 countries on five different continents.

**B. BRF's Organizational Structure During the Class Period**

43. BRF is governed by a Board of Directors, which, throughout the Class Period, consisted of Defendant Abilio Diniz, Defendant Pedro Faria, and between 8 and 10 other directors. Defendant Abilio Diniz served as the Chairman of the Board at all relevant times.

44. In 2013, the Company was organized within a matrix consisting of a Global CEO, a Brazil CEO, an International CEO, a CFO, and five Vice Presidents, including: (1) VP of Marketing and Innovation; (2) VP of Food Service; (3) VP of Operations; (4) VP of Integrated Planning and Management Control; and (5) VP of Administration and Human Resources.

45. In January 2015, BRF adopted a decentralized corporate governance model designed to "increase flexibility and boost the Company's growth potential." In an announcement filed on a Form 6-K filed with the SEC on January 16, 2015 announcing the new management model (the "Announcement"), the Company stated that "[t]he foundation of the model is based on strengthening the leading role and autonomy of the Company's regional structures in Brazil and abroad."

46. Under the new model, the global executive structure consisted of a Global CEO, a CFO, and five Vice Presidents, including: (1) VP of Quality and Management; (2) VP of People; (3) VP of Innovation and Marketing; (4) VP of Finance and Investor Relations; and (5) VP of Legal and Corporate Relations.

47. Five General Managers reported directly to the Global CEO, and were responsible for business units in the following geographical areas: (1) Brazil; (2) Latin America; (3) Europe; (4) Asia; and (5) Africa/Middle East.

48. In Brazil, the Company established regional leaders to serve as directors of operations in the following five regions: (i) the Northeast; (ii) Midwest/North; (iii) São Paulo; (iv) South; and (v) the Southeast. These directors reported directly to the General Manager of Brazil.

49. This decentralized model contemplated that the regional directors would have a significant amount of power to establish operational policy at the regional level. As explained in the Announcement, "[t]he General Managers and regional leaders will play a decisive role in establishing BRF's priorities in different markets[.]"

50. The following graph, adapted from the Company's 2015 Sustainability Report, depicts BRF's decentralized governance structure:




51. At all relevant times herein, Baldissera served as BRF Director of Operations in the Midwest region of Brazil, which encompassed the Brazilian states of Goiás, Minas Gerais, and Mato Grosso.

## VI. GOVERNMENT REGULATION OF THE AGRICULTURE INDUSTRY IN BRAZIL

52. MAPA is the federal agency responsible for the management of public policies to stimulate agriculture, the promotion of agribusiness, and the regulation of services linked to the sector.

53. The Department of Inspection of Products of Animal Origin ("DIPOA") is a MAPA agency charged with regulating the entire process of producing products of animal origin. To that

end, DIPOA is authorized to promulgate and enforce regulations and circular memoranda governing the entire production process, from the initial delivery of live animal and raw materials to the facilities, through all stages of handling, processing, storage, shipping and transport of the products.

54. At the state level, DIPOA policies are carried out by: (i) the State Inspection Service of Products of Animal Origin ("SIPOA"); (ii) the Inspection of Animal Health Service ("SISA"); or (iii) the Inspection of Ingredients and Animal Health Service ("SIFISA").

55. Of the three, SIPOA offices are responsible for enforcing DIPOA regulations governing operations in the slaughterhouses, processing plants, and cold storage facilities within the state.

56. In addition, the Federal Inspection Service ("SIF") assigns federal health inspectors to each meatpacking facility to oversee the production process and verify that the food safety programs comply with all applicable regulatory standards. SIF inspectors also conduct routine audits of the facilities, according to the audit schedule set forth in DIPOA regulations.

57. Each meatpacking facility is assigned a SIF number, which is used on all official correspondence and documentation. BRF's facilities were assigned the following SIF designations:

| | |
|---|---|
| **<u>Paraná</u>** | |
| Carambeí | SIF 424 |
| Francisco Beltrão | SIF 2518 |
| Ponta Grossa | SIF 928 |
| Toledo | SIF 716 |
| Dois Vizinhos | SIF 1985 |
| **<u>Santa Catarina</u>** | |
| Concórdia | SIF 1 |
| Videira | SIF 87 |
| Chapecó | SIF 104 |
| Capinzal | SIF 466 |
| **<u>Rio Grande do Sul</u>** | |
| Serafina Corrêa | SIF 103 |
| Lajeado | SIF 1449 |
| Marau | SIF 2014 |
| **<u>Mato Grosso do Sul</u>** | |
| Varzea Grande | SIF 3371 |
| Lucas do Rio Verde | SIF 3515 |
| Nova Mutum | SIF 4567 |
| Nova Marilandia | SIF 2675 |

| | | | |
|---|---|---|---|
| **<u>Goiás</u>** | | **<u>Minas Gerais</u>** | |
| Rio Verde | SIF 1001 | Uberlândia | SIF 121 |
| Mineiros | SIF 1010 | | |
| Buriti Alegre | SIF 3001 | | |
| Jataí | SIF 4011 | | |
| | | | |
| **<u>Mato Grosso</u>** | | | |
| Dourados | SIF 18 | | |

58. SIPOA is responsible for supervising the performance of SIF health inspectors.

59. Brazilian law permits food packing companies such as BRF to hire food inspectors directly. Thus, not all health inspectors are SIF agents. For example, of the 112 health inspectors assigned to the Mineiros unit, 93% of inspectors (or 104 inspectors) are employees of BRF. The remaining eight inspectors are federal SIF employees.

60. The following chart depicts the organizational structure described above:



### A. The Regulatory Framework Governing the MAPA Certification Process

61. In Brazil, the statutory code governing agricultural policy is codified in Law No. 8.171/91. Article 27 of the law deals with agricultural sanitation and hygiene, and authorizes MAPA to: (i) inspect and surveil animal production plants; (ii) develop classifications of products of plant and animal origin, their derivatives, by-products and wastes of economic value; and (iii) supervise inputs and services used in agricultural activities.

62. The implementing regulations for Law No. 8.171/91 are codified in Decree No. 5.741/2006. Article 62 of the implementing regulations govern the certification and licensing of covered products and "aim to guarantee the origin, quality, and identity of the certified products and give credibility to the process of traceability."[3]

63. To that end, Article 65 of the implementing regulations sets forth the general requirements to obtain certification in Brazil, which include, *inter alia*: (i) the sanitary and phytosanitary requirements and legal support for certification; (ii) the qualifications of those responsible for certification; (iii) the control points necessary to ensure the reliability of the certification; (iv) the procedures for issuing, accompanying, deploying, cancelling, rectifying, and replacing certificates; and (v) the documentation that must accompany the products after the official controls have been met.

64. Under Article 66 of the implementing regulations, in cases where certification is mandated, the company shall ensure that: (i) there is a relationship and guaranteed traceability between the certificate and the consignment, the lot, the item, or the consignment; (ii) the

[3] Traceability, which enables a company to trace back to the source of any tainted food item, is an important tool to enhance food safety, allowing a better communication throughout the food chain, and also between industries and regulatory agencies, resulting in benefits for food quality and safety management, as well as increasing the productivity of this sector.

information contained in the certificate must be accurate and true; and (iii) the applicable specific certification requirements have been met.

65. MAPA also promulgates binding Normative Instructions (in Portuguese, *Instrução Normativa*) ("IN") which provide official guidance on how to comply with the applicable regulations.

66. For example, IN No. 34/2010 governs the issuance of the International Health Certificate ("CSI") and International Sanitary Certificate ("ITUC") in facilities that are authorized to export goods.

67. IN No. 10/2014 governs the issuance of the National Sanitary Certificate ("CSN") and Animal Transit Permit ("GTA").

## VII. OPERATION WEAK FLESH

### A. Operation Weak Flesh: Phase I

68. On March 17, 2017, the Federal Police in Brazil raided the facilities of dozens of meatpackers as part of a two-year criminal investigation codenamed "Operation Weak Flesh" (in Portuguese, *Operação Carne Fraca*) which found at least 40 cases of federal regulators accepting bribes in exchange for loosening regulations and helping food processors put adulterated food products in the marketplace.

69. The raids, which were authorized by Brazilian Judge Marcos Joségrei da Silva of the Fourteenth Federal Court of Curitiba in a decision spanning more than 300 pages (the "*Carne Fraca* Decision"), were carried out across seven Brazilian states, and involved 1,100 federal police officers, 169 search and seizure warrants, 79 driving license suspensions, 26 arrest warrants, and 11 temporary detention orders.

70. The *Carne Fraca* Decision revealed that BRF was a major player in what it described as a "staggering" web of corruption in Brazil's meatpacking industry.

71. BRF's Manager of Institutional and Governmental Relations, Roney Santos, had close relationships with numerous government officials, including the regional superintendents of SIPOA and MAPA in the Brazilian states of Paraná, Goiás, and Minas Gerais. These were classic two-way street relationships: Roney would ply his government contacts with a wide array of favors and bribes including, among other things, paid European vacations, free meat, political contributions, and cash bribes and, in exchange, Roney would reach out to his government contacts when BRF needed favors.

**B. Operation Antidote: Phase II**

72. The second phase of Operation Weak Flesh was kicked off on May 31, 2017, when the Brazilian Federal Police conducted raids in "Operation Antidote" (in Portuguese, *Operação Antídoto*). Police carried out three search warrants and one arrest warrant. According to *Reuters*, the main target of Operation Antidote was Francisco Carlos de Assis, the former Superintendent of MAPA in Goiás, who was accused of destroying evidence.

73. Operation Antidote did not directly implicate BRF or its employees in any new criminal acts.

**C. Operation Trap: Phase III**

74. On March 5, 2018, Brazilian Judge André Wasilewski Duszczak of the First Federal Court of Ponta Grossa, Paraná, issued a decision authorizing a new round of raids in the third phase of Operation Weak Flesh, codenamed "Operation Trap" (in Portuguese, *Operação Trapaça*) (the "*Trapaça* Decision"). The raids were carried out across five Brazilian states, and involved 270 federal police officers, 21 SIF inspectors, 91 court orders, and 11 temporary arrest warrants.

75. The *Trapaça* Decision described a vicious circle of corruption in which BRF fed adulterated poultry feed infected with salmonella to chickens. BRF concealed the contamination

using a web of corrupt laboratories, slaughtered the contaminated chickens on regular production lines, and packaged the final poultry products for domestic and international consumption.

76. Together, the *Carne Fraca* Decision and the *Trapaça* Decision paint a picture of a company beset by corruption, with individuals throughout the organization, including those at the highest level of the Company, engaging in widespread, fraudulent, and illegal conduct.

### D. Brazilian Public Health Officials and BRF Officials Are Convicted in Connection with the Crimes Described in the *Carne Fraca* Decision

77. After the first three phases of Operation *Carne Fraca*, the Brazilian Federal Police continued to investigate and prosecute various companies and executives in the agro-industry sector in the same Brazilian states, including BRF.

78. Six separate criminal actions were filed against sixty (60) criminal defendants accused of committing a wide array of crimes, including crimes against the public administration, public health, conspiracy, collusion, and other derivative charges relating to their association with a criminal enterprise.

79. Dozens of hearings were conducted in which more than 250 witnesses (aside from the 60 defendants) were questioned. Six defendants entered into court-approved leniency agreements in exchange for their cooperation and testimony. Multiple defendants in related proceedings have already been convicted and sentenced to jail, financial penalties, removal from public positions, and/or community service.

80. On September 28, 2018, Brazilian Judge Silva issued a decision convicting eight different individuals in connection with the crimes described in the Carne Fraca Decision (the "*Carne Fraca* Verdict").

### E. The Brazilian Federal Police Issue a Final Investigative Report Recommending Charges Against BRF Executives

81. On October 15, 2018, the Brazilian Federal Police issued a final report of their investigation into BRF (the "*Trapaça* Report").

82. The 404-page report is divided into the following three sections – Premix and Rations, Salmonella, and Laboratory Testing Fraud.

- The Premix and Rations section describes how BRF manufactured animal feed and nutritional supplements that contained illegal antimicrobials, antibiotics, and other medications in violation of Brazilian and international law, and fabricated traceability reports and other analyses to circumvent strict licensing and labeling requirements.

- The Salmonella section describes how the Company systematically concealed serious salmonella outbreaks to avoid the financial fallout from reporting the contamination to the proper authorities, choosing instead to distribute unsafe food products to the domestic and international markets.

- The Laboratory Testing Fraud section describes how BRF utilized a web of corrupt pharmacies to manipulate laboratory reports and analyses to produce laboratory reports that falsely reported that its products were free of pathogens and same for human consumption.

83. The *Trapaça* Report recommended criminal charges against multiple high-ranking BRF employees, including, *inter alia*, BRF's former Chairman Abilio Diniz, former Global CEO Pedro Faria, former VP Roberto Rodrigues, VP Gilberto Orsato, VP Hélio Rubens Mendes Junior, Director Andre Luis Baldissera, and others.

84. On November 14, 2018, *Reuters* reported that charges were expected to be filed by the end of the year. *See Reuters*, Brazilian prosecutors near decision on BRF corruption charges (Nov. 14, 2018), *available at* https://www.reuters.com/article/us-brazil-meat-corruption-idUSKCN1NJ2XY (last visited Dec. 2, 2018).

### F. October 17, 2018: MAPA Orders an Administrative Investigation into Allegations that BRF Prevented SIF Officials from Performing Their Duties

85. On October 25, 2018, *Reuters* reported that MAPA had initiated an administrative investigation into allegations that BRF prevented SIF officials from performing their duties. *See* https://finance.yahoo.com/news/brazil-agriculture-ministry-investigates-food-215836719.html (last visited Nov. 19, 2018).

86. The next day MAPA raided multiple BRF facilities in connection with the new probe. *See* http://www.thepoultrysite.com/poultrynews/40537/brazil-agriculture-ministry-launches-surprise-inspections-at-brf/ (last visited Dec. 2, 2018).

87. The MAPA investigation is ongoing.

## VIII. DEFENDANTS' FRAUDULENT SCHEME AND COURSE OF CONDUCT

### Introduction to Defendants' Fraudulent Scheme and Course of Conduct

88. Throughout the Class Period, BRF routinely packaged and sold meat and poultry products that failed to meet health and sanitary standards and engaged in other illegal and unlawful conduct which rendered its Class Period statements materially false and misleading. As discussed in detail below, this required the participation of BRF employees at every stage of the production process. The illegal conduct included the following:

- After dangerously high levels of dioxins were detected in BRF exports to China, the Company convinced MAPA to rely on the results of its own internal investigation to appease the Chinese instead of performing its own rigorous inspection and audit of BRF's controls and processes. BRF then arranged for a corrupt laboratory to obtain accreditation so it could provide fraudulent reports certifying the absence of dioxins in contaminated products. When the details of the contamination in Chinese exports were leaked to the Brazilian press, BRF orchestrated a behind-the-scenes campaign to prevent journalists from reporting on similar contaminations in products destined for the domestic market. BRF's chairman later testified that the entire board of directors and CEO knew about the contamination by July 30, 2015. In addition, the Company's Global CEO, at least three Vice-Presidents, and a Regional General Manager who reported directly to the CEO, knew about the contamination. The contamination, however, was never disclosed.

- According to a lawsuit filed by a former laboratory supervisor at a food laboratory owned and operated by the Company, senior quality control personnel routinely ordered laboratory technicians to falsify sanitary and traceability reports. Upon being served with the lawsuit, individuals at the highest levels of the Company, including BRF's Global CEO, three of its five Vice Presidents, and the Director of Operations in the Midwest, worked feverishly to quash the lawsuit, before approving a settlement over 400% higher than those ordinarily approved in comparable actions. The underlying allegations of wrongdoing were never questioned or followed up on and were covered up by these senior executives.

- After a severe outbreak of the salmonella at its poultry production facility in the city of Mineiros, Goiás, the Company, with the direct involvement of two Vice Presidents, bribed government officials and politicians to prevent the closure of the facility.

- When the European authorities at the Spanish and Italian ports detected salmonella in BRF poultry shipments from the Mineiros facility, and threatened to permanently bar all future exports if similar contamination was detected in other shipments, the Company diverted three additional contaminated shipments to another European country with weaker controls to avoid a permanent embargo.

- The Company knowingly slaughtered over 25,000 birds infected with salmonella enteritis and salmonella typhimurium. Emails between BRF employees show that the Company deliberately chose not to inform the authorities about the contamination to avoid an investigation which would have revealed a serious and undisclosed history of rodent infestations at the farm where the birds were raised.

- The Company financed a summer vacation in Europe for a high-ranking government official. In exchange, the government official lobbied for an amendment to an existing regulation that would enable BRF to increase its annual poultry production rate by approximately 20%. When the Brazilian Federal Police began investigating the government official for her involvement in lobbying for the regulatory policy, BRF, with the direct involvement of its Vice President of Legal and Corporate Affairs, promised to fabricate a receipt showing that the government official had reimbursed the Company for the cost of the trip to help undermine the entire investigation.

- The Company failed to report, and affirmatively concealed, a severe outbreak of salmonella pullorum, a particularly aggressive form of salmonella, at its poultry production facility in Carambei, Paraná. The Company then falsified laboratory reports to mislead government health inspectors that were investigating the potential contamination.

- After a new regulatory policy was enacted that mandated enhanced testing for salmonella at official government laboratories to obtain the required health certifications, the Company, having already confirmed the presence of the bacteria at its Uberlândia, Minas Gerais facility, leaned on its relationships with corrupt

government officials to circumvent the requirement that testing be done in official laboratories.

- The Company routinely adulterated animal feed and nutritional supplements by either: (i) adding ingredients that are prohibited; or (ii) adding permissible ingredients at impermissible ratios.

- The Company routinely and improperly administered antibiotics and other medications to birds to artificially stimulate and enhance their growth.

- The Company used a web of corrupt laboratories to manipulate laboratory analyses of contaminated products and produce reports falsely stating that the products were fit for human consumption. The Company then used these laboratory reports to obtain legal and regulatory certifications for export and domestic consumption.

- The Company injected water into frozen chicken products to fraudulently increase the weight and cost of its frozen products.

- The Company used fraudulent means to obtain health and sanitary certifications for poultry products, including, *inter alia*, directly accessing the government computer network to generate the desired certification, or using political connections to skirt the applicable certification requirements.

- BRF operated a turkey production facility in Buriti Alegre, Goiás, without the appropriate certifications and/or licenses.

- BRF relied on its relationships with government officials to remove any SIF inspector that meddled in its operations.

### A. BRF Exports Poultry Products Contaminated with Dioxins

| **Key Figures** | | |
|---|---|---|
| **Name** | **Position** | **Role in Scheme** |
| Abilio Diniz | Chairman of BRF | Member of Partners WhatsApp Group. Corresponded with Pedro Faria regarding BRF's efforts to control flow of information. |
| Adriano Zerbini | Executive Manager of International Government Relations | Member of Dioxin WhatsApp Group. Coordinated with MAPA to create Brazil's official report on the contamination. |
| Alexandre ("Ale") Loures | Outside Media Consultant | Hired by BRF to help quash control flow of information regarding dioxins in domestic products. |
| Andre Baldissera | BRF Director of Operations in Midwest Brazil | Member of Dioxin WhatsApp Group. |

| Key Figures | | |
|---|---|---|
| **Name** | **Position** | **Role in Scheme** |
| Decio Coutinho | Brazil's Secretary of Defense for Agriculture | Arranged retroactive certification for Eurofins Laboratory to help BRF circumvent dioxin testing requirement. |
| Gilberto Orsato | BRF Vice President of Quality and Management | Coordinated communications strategy. Member of Dioxin WhatsApp Group. |
| Hélio Rubens Mendes | BRF Vice President of Supply Chain | Member of Dioxin WhatsApp Group. |
| Marcos Jank | BRF Global Director of Corporate Affairs | Member of Dioxin WhatsApp Group. |
| Simon Cheng | General Manager of Asia | Member of Dioxin WhatsApp Group. |
| Suely Nakashima | Global Director of Quality and Food Safety | Member of Dioxin WhatsApp Group. Altered the group to additional contaminations. |
| Pedro Faria | Global CEO | Member of Dioxin WhatsApp Group and Partners WhatsApp Group. |
| Simon Cheng | BRF General Manager - Asia | Member of Dioxin WhatsApp Group. |

### 1. Background: Feather Meal and Dioxins

89. Feather meal is a byproduct of poultry processing made from poultry feathers by hydrolyzing poultry feathers under elevated heat and pressure, and then steam-drying and grinding the feathers. The pressure hydrolysis process is necessary in order to convert the hard, fibrous proteins called keratin, which is the principal component of feathers, into feather meal that contains the amino acids.

90. The nutritional quality of the feather meal is determined largely by the source of heat used in the drying process. Clean heat sources result in higher production costs, however, and feather meal manufacturers are often tempted to utilize a heat source fueled by industrial waste or other by-products of the poultry production process, such as plastics or chemically treated wood pallets.

91. As these products burn, however, they can release a dangerous class of toxic substances known as dioxins and furans. According to the World Health Organization ("WHO") and the National Institute of Environmental Health Sciences, dioxins can cause reproductive and

developmental problems, damage the immune system, interfere with hormones and also cause cancer. Short-term exposure of humans to high levels of dioxins may result in skin lesions, such as chloracne and patchy darkening of the skin, and altered liver function. Long-term exposure is linked to impairment of the immune system, the developing nervous system, the endocrine system and reproductive functions.[4]

92. Thus, the use of unclean heat sources in the feather meal production process can result in a final product contaminated with dioxins, furans, and PCBs.

93. These toxic substances are ingested by birds and then passed along to unsuspecting consumers in the final poultry products.

### 2. The Chinese Authorities Detect Dioxins in BRF Exports

94. During the Class Period, BRF produced feather meal in at least six different facilities, including the plants in Toledo, Porto Alegre, Videira, and Chapeco, using unclean heat sources, including heat fueled by pallet wood and plastic.

95. The birds that consumed the contaminated feather meal were slaughtered at the Company's Rio Verde, Goiás facility between March 14 and March 29, 2015, and shipped to markets around the world, including China, Europe, Japan, the Middle East, and Africa.

96. On July 19, 2015, the Chinese government detected excessive levels of dioxin in two cargo loads of BRF products produced at the Rio Verde facility between March 14 and March 29, 2015.

---

[4] *See* WHO, Dioxins and their effects on human health (Oct. 4, 2016), *available at* http://www.who.int/news-room/fact-sheets/detail/dioxins-and-their-effects-on-human-health (last visited Nov. 20, 2018); *see also* National Institute of Environmental Health Sciences, Dioxins, https://www.niehs.nih.gov/health/topics/agents/dioxins/index.cfm (last visited Dec. 1, 2018) (explaining that dioxins are classified as "persistent organic pollutants," because they "endure a long time [and] are extremely resistent to environmental degradation").

97. At the time, Brazil was actively trying to expand its business in China, and enter into the strategic markets of Southeast Asia. To avoid jeopardizing these efforts, MAPA swiftly reacted to news of the contamination and, on July 30, 2015, it suspended the production and certification of meat and derivative products destined for China, originating at BRF's Rio Verde facility. *See* MAPA Circular No. 648/2015/CGPE/DIPOA.

98. BRF's Global CEO Pedro Faria was informed about the dioxin contamination on July 29, 2015. On July 30, 2015, BRF's Board of Directors held a meeting at BRF's headquarters in Sao Paulo. During the meeting, Pedro Faria informed the Board about the contamination. the entire Board deliberated discussed the Company's response to the issue. Excerpts of minutes of the Board's July 30, 2015 meeting were filed on a Form 6-K with the SEC on August 5, 2015, and confirm that "[a]ll of the members of the Board of Directors on duty were present." And in testimony given before the Brazilian Federal Police on November 27, 2018, Abilio Diniz confirmed the entire Board of Directors learned about the dioxin contamination on this date.

99. The Chinese government was not satisfied with the suspension, and demanded that the Brazilian authorities mount a full investigation to determine why and how BRF managed to obtain an international export certification for the contaminated items.

100. The Brazilian authorities promised that DIPOA would conduct a comprehensive audit of the Rio Verde facility and present its findings to the Chinese government.

101. On August 3, 2015, Adriano Zerbini, BRF's Executive Manager of International Government Relations, met with the director of DIPOA and Secretariat of International Relations of the Agribusiness Sector ("SRI") to discuss the upcoming audit.

102. During the meeting, Zerbini downplayed the need for a formal investigation, arguing that BRF was already conducting its own investigation. At Zerbini's suggestion, the DIPOA

Director and SRI Secretary agreed that any DIPOA audit would be postponed until BRF could complete its internal investigation and present its findings to DIPOA. If BRF's presentation was persuasive, the Company's findings would be adopted as the official position of the Brazilian government and presented to the Chinese government. The presentation was scheduled for August 7, 2015.

103. That evening, Zerbini sent an email to senior members of BRF management, including, *inter alia*, VP Gilberto Orsato, VP Hélio Rubens Mendes, VP Roberto Rodrigues, and Asia GM Simon Cheng. Zerbini emphasized the high stakes of the meeting, explaining that "***[t]his presentation to MAPA will be . . . a shortcut***," that affords BRF the opportunity to create the report that would serve "***as the basis for the official defense***," while simultaneously avoiding a "***deep investigation***" into BRF's industrial processes and controls. After triumphantly declaring that "***MAPA is on our side***," Zerbini concluded by reminding everyone to "***treat these messages with absolute reserve.***"

104. The August 7, 2015 presentation went smoothly, and MAPA sent BRF's presentation to China as the official position of Brazil. The next day, Zerbini sent a WhatsApp message stating:

> We are building MAPA's confidence step by step. The fact that MAPA sent the material to China yesterday, at the request of the Chinese. This was a good victory for the work we have done together. The matter has been conducted by MAPA within our expectations.

105. BRF nearly succeeded in getting off with nothing more than a slap on the wrist. But on August 21, 2015, the Chinese authorities detected high levels of dioxin in another load originating from BRF's Rio Verde unit.

106. On August 27, 2015, CEO Pedro Faria created a WhatsApp group to monitor the dioxin situation (the "Dioxin WhatsApp Group"). The Dioxin WhatsApp Group included the following BRF employees:

| | |
|---|---|
| Pedro de Andrade Faria (BRF's Global CEO) | Hélio Rubens Mendes dos Santos Junior (VP of Operations) |
| Adriano Nogueira Zerbini (Executive Manager of International Corporate Relations) | Simon Cheng (General Manager BRF Asia) |
| Suely Nakashima (Director of Quality) | Luiz Adalberto Stabile Benicio (Director of Agriculture and Livestock) |
| Gilberto Orsato (VP of Human Resources) | Alexandre Loures ("Ale") (Social Media Consultant) |
| Marcos Jank (Global Director of Corporate Affairs) | José Lourenço Perottoni (Director of Logistics for Foreign Markets) |
| José Roberto Rodrigues - JR (VP of Integrity) | Fabricio da Silva Delgado (Director of Agriculture and Livestock) |

107. On August 29, 2015, VP Gilberto Orsato sent a message to the Dioxin WhatsApp Group reporting that high levels of dioxins had been detected in samples of feather meal and abdominal fat taken from slaughtered birds at the Company's Rio Verde facility.

108. On September 8, 2015, Suely Nakashima texted the Dioxin WhatsApp Group stating: "We have received more results from Eurofins referencing a Rio Verde product of recent slaughter dates (August 15) all with results above Maximum limit. Results from other units continue to confirm that we have a problem related to [Rio Verde] feed."

109. Then, on September 9, 2015, approximately two months after BRF learned about the contamination, someone within MAPA leaked details of the contamination to the Brazilian press. The reporting on the contamination was comprehensive and accurate, and it was clear that the reporter had broad access to MAPA records regarding the issues at the Rio Verde facility.

110. Two days later, on September 11, 2015, MAPA issued Circular No. 47/2015/CGI/DIPOA/SDA which stated that all exports to China must contain a certification

from an accredited laboratory verifying that the levels of dioxins in the product are within the legal limit.

111. By that point, the Company knew that the Rio Verde facility was contaminated, and that it had no legitimate way to comply with the new certification requirement. At the same time, although the media coverage was focused on the toxins in Chinese exports, BRF was gravely concerned that reporters would soon start questioning whether domestic products were also contaminated.

112. In response to these two developments, the Company devised a two-part strategy. The Company – led by VP Gilberto Orsato – would work to control the flow of information and prevent any news reporting that suggested that the contamination was anything more than an isolated occurrence. At the same time, the Company would work to obtain certification for a laboratory, the Eurofins Laboratory, that would provide fraudulent certifications to products containing dioxins.

### 3. BRF Controls the Flow of Information; BRF's CEO and Chairman Are Kept Informed

113. Abilio Diniz was on vacation in Capri when the story broke, and was in close contact with Pedro Faria and José Carlos Magalhães Neto (also known as "Zeca") about the leak and the status of the dioxin investigation. The three men communicated extensively regarding the leak and the dioxin contamination on a private WhatsApp group called "Partners" (the "Partners WhatsApp Group").

114. On September 12, 2015, at 7:32 a.m, Abilio Diniz sent a text message to the Partners WhatsApp Group stating that he was "***concerned about the China issue because I am without news . . . All good?***"

115. At 9:24 a.m., Pedro Faria responded to Abilio Diniz with a message stating: "In relation to China we are good because we have been able to control the information and keep it

under control. Our technical defense was very robust and we were able to move MAPA and MRE in firmer response to the Chinese . . Situation still delicate but the team worked well."

116. BRF management also discussed their efforts to stifle media coverage on the Dioxin WhatsApp Group. On September 14, 2015, for example, Ale Loures wrote that "***Miguel has convinced Folha not to go into [BRF's] history [of dioxin contaminations]***".

117. On September 16, 2015, Ale Loures sent a gleeful message to the Dioxin WhatsApp Group stating: "***Friends, apparently our reporter friend has run out of content.***"

118. And on September 18, 2015, Ale Loures sent another message to the Dioxin WhatsApp Group stating: "***Our job is to prevent the internal market issue from surfacing.***"

### 4. BRF Obtains Retroactive Certification for the Eurofins Laboratory and the Suspension Is Eventually Lifted

119. Although it could obtain fraudulent certifications from the Eurofins Laboratory, Eurofins was not accredited to conduct dioxin analyses or issue an export certification, and while it could arrange for Eurofins to become certified, the accreditation process would take two weeks.

120. In the meanwhile, the warehouses at BRF's Rio Verde facility were packed with inventory that had to be distributed immediately or it would be forced to halt operations. BRF's desperation was captured in a message sent to the Dioxin WhatsApp Group by Suely Nakashima on September 15, 2015, which stated: "***The factories are at the limit of storage. We need to get out of the factories somehow today. My suggestion is that they use to accredit the fact of being ISO 17025.***"[5]

121. After much discussion, the Company finally settled on a different solution. To ensure that the facility would be able to continue operating while the application was pending, BRF's

[5] "ISO17025" refers to an accredited laboratory's general competence to perform certified testing and analyses, according the standards promulgated by the International Organization for Standarization.

contacts at MAPA and the Brazilian Animal Protein Association (*Associação Brasileira de Proteína Animal*) ("ABPA") promised to issue a retroactive accreditation to cover any analyses performed by Eurofins before it was actually accredited. These contacts included: (1) Francisco Sergio Turra, the president of ABPA and former president of MAPA; (2) Decio Coutinho, the Secretariat of Agricultural Defense/MAPA; and (3) Rui Eduardo Saldanha Vargas, President of MAPA's Poultry and Swine Chamber (*Câmara Setorial de Aves e de Suínos*) and the vice president of ABPA.

122. On September 15, 2015, Adriano Zerbini sent a message to the Dioxin WhatsApp Group informing the other members that Decio Coutinho promised that "***he would find a way that the [Eurofins] lab could be used***," even though the MAPA circular "***clearly speaks of an 'accredited laboratory', which we know not to be the case of Eurofins in the case of D[ioxin].***"

123. But even with the retroactive accreditation, the Company still had to contend with the local SIF agents, who would refuse to issue the international sanitary certification ("CSI") until the laboratory was actually accredited. As Adriano Zerbini explained in another message: "***the SIF probably would not have accepted to issue the CSI before the accreditation of the laboratory, following what is written in the circular. Thus, even with retroactive accreditation, the CSIs would not be issued until the time the lab counted as accredited, even though the [laboratory] reports were in their hands***."

124. That issue was easily resolved with another phone call to the Secretariat of MAPA, Decio Coutinho, who told BRF to immediately start using the Eurofins laboratory to perform the dioxin analyses. If the local SIF agents refused to issue the CSIs, BRF was told it could rely on Dr. Rafael Olivieri Filiputti, the General Coordination Office for Inspections, or José Luis Ravagnani Vargas, the Director of DIPOA, to intervene.

125. On September 30, 2015, BRF provided MAPA with a complete set of traceability records and laboratory analyses for the two contaminated lots, together with a report on the status of the recall for all affected products.

126. At the same time, BRF requested the immediate reinstatement of its export privileges, subject only to a laboratory analysis.

127. Finally, on October 2, 2015, MAPA lifted BRF's suspension, and the Rio Verde facility's export privileges were immediately reinstated to all countries, except for China and Saudi Arabia. *See* MAPA Circular No. 59/2015.

128. On October 10, 2015, the Company's internal laboratories again detected dioxins in products from the São Gonçalo, Bahia facility (SIF 3720).

### B. BRF Falsifies Laboratory Reports and Traceability Analyses; BRF Executives Participate in the Cover Up

| Key Figures | | |
|---|---|---|
| **Name** | **Position** | **Role in Scheme** |
| Ana Rovai | BRF's Legal Director | Concurred with Luciano Weinke and counseled the Company to settle the Carvalho Lawsuit. |
| Baldissera | BRF's Director of Operations in Midwest Region of Brazil | Coordinated the Company' efforts to settle the Carvalho Lawsuit. |
| Carvalho | BRF Laboratory Supervisor at Rio Grande, Goiás food laboratory | Whistleblower who brought labor action alleging that BRF routinely falsified laboratory results. |
| Cesar Salce | BRF's Manager of Quality Control | Directed Carvalho to alter laboratory test results. |
| Fabiane Baldo | BRF Quality Control Supervisor at Rio Grande, Goiás food laboratory | Directed Carvalho to alter laboratory test results. |
| Gilberto Orsato | BRF Vice President of Quality and Management | Orsato learned about the lawsuit on September 3, 2015. |
| Hélio Rubens Mendes | BRF's Vice President of Supply Chain | Learned about the Carvalho Lawsuit in an email from Global CEO Pedro Faria, and directed Baldissera to "eliminate all exposure." |

| Key Figures | | |
|---|---|---|
| **Name** | **Position** | **Role in Scheme** |
| Ivan Antonio Peruzzo | Manager Rio Verde Hatchery | Received notice of the action on August 13, 2015. Forwarded the notice to Baldiserra on August 26, 2015. |
| Luciano Wienke | BRF's Legal Manager | Advised BRF management to settle the lawsuit immediately to avoid exposure. |
| Pedro Faria | BRF's Global CEO | Learned about the Carvalho Lawsuit and directed VP Hélio Rubens Mendes to "do something drastic." |
| Roberto Rodrigues | BRF's Vice President of Legal and Corporate Affairs | Learned about the Carvalho Lawsuit in an email from Global CEO Pedro Faria. |
| Tiago Both | BRF attorney based out of Curitiba, Paraná | Conducted negotiations with Carvalho. |

### 1. The Carvalho Lawsuit

129. Although BRF purported to conduct quality control tests throughout the production process, the actual testing was nothing more than a façade. Instead, BRF routinely circumvented its inspection systems by requiring employees to manipulate the results of laboratory tests and falsify traceability readings.

130. In 2015, a former BRF laboratory manager named Carvalho filed a labor lawsuit claiming that since at least 2012, she was frequently pressured by superiors to alter laboratory results and analyses, and falsify the traceability of samples being tested (the "Carvalho Lawsuit"). Carvalho sought R$20,000.00 in damages.

131. As a laboratory supervisor at a BRF food laboratory, Carvalho was responsible for analyzing samples, preparing quality reports, and preparing national and international certifications. Carvalho was also responsible for preparing the reports mandated by MAPA's Pathogen Reduction Program (in Portuguese, *Programa de Redução de Patógenos*) ("PRP"), discussed in more detail *infra*.

132. Throughout her tenure at BRF, Carvalho, by her own admission, performed fraudulent laboratory analyses using simulated (*i.e.*, fake) samples to create a paper trail showing that the analysis had been performed properly. She also created falsified traceability reports to use in external audits.

133. According to her lawsuit, these alterations were usually ordered by senior members of BRF's quality control team, including: (1) Fabiane Baldo; (2) Cesar Salce; (3) Marcelo Pereira da Silva, Quality Control Manager in charge of BRF facilities in Rio Verde, Goiás; Jataí, Goiás; and Nova Mutum, Mato Grosso do Sul; (4) Vitor José Bionchi, Coordinator of Quality Guaranty; (5) Bruna Carregaro Pontes, successor to Vitor Bionchi; (6) Cristina Pasinato, successor to Bruna Pontes; and (7) Paulo Rogerio Franchin, Laboratory Manager in Videira, Santa Catarina.

134. These allegations were substantiated by emails attached to her complaint.

135. On June 18, 2014, for example, Fabiane Baldo sent an email to Carvalho with the subject "Russia Report," casually requesting an amendment to several lab reports. In the email, which is reproduced below, Fabiane Baldo wrote: "***Girls, can we alter the analyses below to generate the reports***[,]"[6] followed by a list of 24 lab reports that needed to be changed.

[6] All materials written in Portuguese have been translated by attorneys fluent in both Portuguese and English.

**De:** Fabiane Baldo
**Enviada em:** quarta-feira, 18 de junho de 2014 13:29
**Para:** Adriana Marques; Cristiane Amaral
**Assunto:** LAudo Russia

Meninas, podemos alterar para gerar laudo nas análises abaixo?
Sobrecoxa 4146 A
5995613
5995624
5995628
5995630
5995635

Sobrecoxa 4149D
6008778
6008781
6008782
6008784
6008786

Coxa 4153 A
6032390
6032410
6032429

6032435
6032439

Sobrecoxa 4153 A
6032443
6032446
6032448
6032452
6032459

http://intranet.perdigao.com.br/images/logo-BRF.jpg
**Fabianne Baldo**
Garantia da Qualidade

Rod. GO 341 - Km 2,5 - Zona Rural -Mineiros-GO
Telefone: +55 64 3672-7615 /+55 64 81480383
Canal de Voz interno: 6464 7615
fabiane.baldo@brf-br.com
www.brf-br.com

136. In response, Carvalho wrote that she had already altered two of the reports "at the request of Mariele," and stated that "we run the risk of being caught in a lie if we are not careful, " writing, in pertinent part, as follows:

> Good afternoon, Fabiane . . .
>
> We verified the files below and ***the first two traceability reports had already been modified according to the request made by Mariele,*** and the reports for them have already been sent on June 5 and June 6, 2014. Therefore, we will not change them again.
>
> The others we will change according to your request.
>
> Obs.: ***There are lots of requests for changes in results, causing great nuisance in "cleaning" all the traceability analysis reports, not to mention that we run the risk of being "caught" in the lie.*** Please try to make sure this does not happen anymore, as we have reduced staff numbers (people on vacation).

I count on your understanding.

137. A copy of Carvalho's June 18, 2014 email is reproduced below:

**De:** Adriana Marques
**Enviada em:** quarta-feira, 18 de junho de 2014 14:13
**Para:** Fabiane Baldo; Cristiane Amaral
**Assunto:** RES: LAudo Russia

Boa tarde, Fabiane...
Verificamos os cadastros abaixo e as duas primeiras rastreabilidades já tinham sido modificadas de acordo com a solicitação da Mariele (César Salce), e os laudos desses já foram enviados dia 05 e 06/06/14. Assim não iremos alterá-los novamente.
Os demais iremos alterar conforme sua solicitação.

Obs.: Está acontecendo MUITO esses pedidos de alterações nos resultados, causando grandes transtornos em "passar a limpo" toda as rastreabilidades das análises, sem falar que corremos o risco de sermos "pegos" na mentira. Favor tentar p/ que isso não ocorra mais, pois estamos com o quadro de pessoal reduzido (pessoas de férias).

Conto com sua compreensão.

Att

http://intranet.perdigao.com.br/images/logo-BRF.jpg
**Adriana Marques Carvalho**
**Laboratório de Alimentos**
**BR 060 Km 395 s/nº Setor Industrial Rio Verde-GO**
**Tel 64 3620 5151**
adriana.marques@brf-br.com
www.brf-br.com

138. In addition, the Carvalho Lawsuit described a MAPA program called the Pathogen Reduction Program (in Portuguese, *Programa de Reducao de Patogenos*) ("PRP"), which was designed to test meat products for salmonella and other contagions. The PRP guidelines required meat packers to test 51 samples from each production cycle to test the overall quality of the production. Companies were required to report the number of samples containing dangerous pathogens detected in each production run. Isolated instances of pathogens would be documented

and excused. However, if the pathogen was detected in more than 23% of the samples (or more than 12 samples per cycle), the entire production would be condemned by the SIF. Companies that reported multiple contaminated cycles were subject to severe penalties, including the suspension of operating and export certification for repeat offenders. *See generally* IN No. 70/2003, as amended by IN No. 20/2016.

139. Carvalho alleged that, at the direction of her superiors, she routinely altered the PRP report by reducing the numbers and percentages of confirmed pathogens in each production cycle. She attached to her complaint a chart which tracked the actual and falsified numbers of pathogens in production cycles ***dating back to January 2012***.

140. The chart was entitled "Results of Pathogen Reduction Program – MNE FGO Unit," and presented the following information for each cycle: (i) Cycle; (ii) Start Date; (iii) End Date; (iv) Number of Samples Tested; (v) Number of Samples Containing Pathogens; (vi) Percentage of Samples Containing Pathogens; and (vii) Number of Positive Samples Reported to SIF.

141. The chart indicates that between January 2012 and April 2014, between 40% and 70% of the samples from most production cycles contained pathogens – far more than the 23% permitted under the PRP guidelines. BRF, however, reported a much lower number to the SIF. A true and correct copy of the chart is presented below:

| RESULTADOS PRP - UNIDADE MNE FGO | | | | | | |
|---|---|---|---|---|---|---|
| Ciclo | Data início | Data término | N° Amostras | N° Presença | % Presença | N° de amostras informadas ao SIF |
| 01/2012 | | | 51 | 13 | 25,49 | 9 |
| 02/2012 | | | 51 | 6 | 11,76 | 4 |
| 03/2012 | | | 51 | 21 | 41,18 | 10 |
| 01/0213 | | | 51 | 22 | 43,14 | 8 |
| 02/2013 | | | 51 | 24 | 47,06 | 6 |
| 03/2013 | | | 51 | 27 | 52,94 | 7 |
| 04/2013 | | | 51 | 32 | 62,75 | 8 |
| 05/2013 | | | 51 | 38 | 74,51 | 10 |
| 06/2013 | | | 51 | 37 | 72,55 | 9 |
| 07/2013 | | | 51 | 33 | 64,71 | 6 |
| 08/13 | 29/10/13 | 03/12/13 | 51 | 31 | 60,78 | 7 |
| 09/13 | 04/12/13 | 14/01/14 | 51 | 29 | 56,86 | 7 |
| 01/14 | 14/01/14 | 16/02/14 | 51 | 31 | 60,78 | 6 |
| 02/14 | 19/02/14 | 27/03/14 | 51 | 35 | 68,63 | 7 |
| 03/14 | 27/03/14 | 06/05/14 | 51 | 38 | 74,51 | 10 |
| 04/14 | 07/05/14 | | 12 | 7 | 58,33 | 2 |
| | | | | | #DIV/0! | |
| | | | | | #DIV/0! | |
| | | | | | #DIV/0! | |
| | | | | | #DIV/0! | |
| | | | | | #DIV/0! | |
| | | | | | #DIV/0! | |
| | | | | | #DIV/0! | |
| | | | | | #DIV/0! | |
| | | | | | #DIV/0! | |
| | | | | | #DIV/0! | |
| | | | | | #DIV/0! | |
| | | | | | #DIV/0! | |
| | | | | | #DIV/0! | |
| | | | | | #DIV/0! | |
| | | | | | #DIV/0! | |

### 2. BRF Executives Work Together to Quash the Lawsuit

142. BRF was served with the Carvalho Lawsuit in or about August 2015.

143. On August 13, 2015, Rose Pelacani, the Manager of BRF's Civil and Labor Litigation department, informed Ivan Peruzzo, Cristina Pasinato, and Rodrigo Maia about the lawsuit. The email included a large excerpt from the lawsuit containing the allegations described above.

144. On August 26, 2015, Ivan Peruzzo forwarded the email to Baldissera, BRF's Director of Operations in the Midwest Region of Brazil, stating: "***André, we need to look at this topic*** . . . ***She was a quality control employee***."

145. Baldiserra forwarded the email to Luciano Wienke on September 2, 2015.

146. On September 3, 2015, at 8:07 p.m., Luciano Wienke sent an email to Roberto Rodrigues and Ana Rovai stating, in pertinent part:

> Labor claim filed by an employee of the Rio Verde unit claiming that she was ordered by her superiors to change salmonella report.
>
> She attached emails proving the allegations…
>
> ***As an emergency measure, we are taking the necessary steps to enter into an agreement and not let the process move forward, running the risk of the judge sending the information to the competent entities and further complicate the situation of the company.***

147. A copy of Luciano Wienke's September 3, 2015 email is produced below:



**De:** Luciano Wienke <[redacted]>
**Data:** 3 de setembro de 2015 20:07:05 GMT+1
**Para:** Jose Roberto Rodrigues <[redacted]>, Ana Rovai <[redacted]>
**Assunto: ENC: ADRIANA MARQUES CARVALHO - SUPERVISORA DE LABORATÓRIO**

José Roberto/Ana, boa tarde.

Segue para conhecimento.

Reclamatória ajuizada por uma funcionária da unidade de Rio Verde alegando que recebia ordens superiores para alterar laudo de salmonela.

Juntou e-mails comprovando a alegação...

Como medida emergencial, estamos tomando as devidas providências para realizar um acordo e não deixar o processo andar, **sob pena do Juiz enviar as informações para os órgãos competentes e complicar mais a situação da empresa.**

Abraços.

148. Ana Rovai, BRF's Legal Director, immediately responded to Luciano Wienke's email saying that she "agree[d] with the strategy," and "[t]he fact that this information is already in public . . . is of concern," stating, as follows:

> Luciano, I agree with the strategy. ***We need to resolve it.*** I think it is the case of consulting Mauricio of the BMA. ***The fact that this information is already in public judicial proceedings is of concern.*** Please keep us informed. Thank you.

149. A true and correct copy of Ana Rovai's September 3, 2015 email is produced below:

**Assunto: Re: ENC: ADRIANA MARQUES CARVALHO - SUPERVISORA DE LABORATÓRIO**
**De:** Ana Rovai /O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=2EAD083ED1584B08BDAEF8437E93AADA-ANA LUISA F
**Para:** Luciano Wienke /o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=f16e14eddcc8409fa510acbfaed44ec0-Luciano Bau;
**CC:** Jose Roberto Rodrigues /o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=af92be681430409f9361b4b274840bd5-Jose Robert;
**Envio:** 03/09/2015 20:07:51

Luciano, estou de acordo com a estratégia. Precisamos resolver. Acho que é o caso de consultarmos o Mauricio do BMA. Preocupa o fato desta infos já estarem em processo judicial público. Pf., mantenha-nos informados. Muito obrigada

Enviado do meu iPhone

150. Later that day, the Company's Global CEO, Pedro Faria, forwarded Luciano Wienke's email to VP Roberto Rodrigues, VP Hélio Rubens Mendes, and VP Gilberto Orsato. In his email, Pedro Faria stated that it was "absurd" and "[i]mpressive how we always take busts from the same places."

151. He also copied Hélio Rubens Mendes on the email and wrote: "Hélio, please evaluate something drastic over there." A copy of Pedro Faria's email is reproduced below:

**De:** Pedro Faria <pedro.faria@brf-br.com>
**Data:** 3 de setembro de 2015 17:01:00 BRT
**Para:** Jose Roberto Rodrigues <jr.rodrigues@brf-br.com>
**Cc:** Helio Rubens Santos <helio-rubens.santos@brf-br.com>, Gilberto Orsato <gilberto.orsato@brf-br.com>
**Assunto: Re: ENC: ADRIANA MARQUES CARVALHO - SUPERVISORA DE LABORATÓRIO**

É um absurdo! Impressionante como sempre levamos bucha dos mesmos lugares.
Hélio por favor avalie algo drástico por lá.
Tem coisa que ofende nosso senso de propósito.

Enviado do meu iPhone

152. Based on the context surrounding the word "busts," it appears that BRF routinely dealt with fallout from the same conduct: falsification of laboratory test results.

153. By email dated September 4, 2015, Hélio Rubens Mendes delegated the task of settling the Carvalho Lawsuit to Baldissera, stating, "together, we will eliminate all exposure!" A true and correct copy of the email is produced below:

Em 04/09/2015, às 07:36, Helio Rubens Santos <helio-rubens.santos@brf-br.com> escreveu:

André
Vamos ter bastante trabalho pela frente!
**Vamos juntos eliminar todas as exposições!**
Conversamos próxima semana para ver melhor forma de tratarmos!
Abs Hélio

Enviado do meu iPhone

154. Over the next few weeks, members of BRF's legal team engaged in extensive settlement discussions with Carvalho's attorneys.

155. On October 4, 2015, Baldissera asked Luciano Wienke for an update on the status of the negotiations. Luciano Wienke forwarded the status request to Tiago Both, the BRF attorney who was handling the negotiations.

156. The next day, Tiago Both wrote back to Luciano Wienke stating that the negotiations had stalled because Carvalho had demanded R$70,000.00 and would not accept anything less. This settlement demand was substantially higher than the Company's original offer of R$29,000.00. A copy of the email is reproduced below:

De: Tiago Both <tiago.both@brf-br.com>
Data: seg, 5 de out de 2015 08:01
A: Luciano Wienke <Luciano.Wienke@brf-br.com>
Assunto: RES: ENC: ADRIANA MARQUES CARVALHO - SUPERVISORA DE LABORATÓRIO

Doutor, bom dia!

No presente processo tentamos conciliação dentro dos parâmetros que consideramos como aceitáveis para acordo, nossa proposta inicial foi de R$29.000,00 sendo da Rte de R$90.000,00, após exaustivas trocas de email´s, telefonemas, chegamos num impasse de R$70.000,00 propostos pela Rte e de R$55.000,00 propostos pela empresa, onde a Rte não considerou ceder sua proposta, assim sendo analisando o processo, provisão, pedidos e tempo de empresa optamos por não realizar o acordo.

Caso a diretoria e gerência considere que podemos chegar em R$70.000,00, posso fechar hoje mesmo.

Aguardo.

Abs.

Tiago

157. Luciano Wienke forwarded Tiago's email to Baldissera, stating, "André . . . Let's go ahead and make the deal for R$70,000.00."

158. Baldissera quickly responded, stating that he recognized the urgent need to settle the Carvalho Lawsuit, and that he would defer to the attorney to assess the reasonableness of the settlement amount, stating, in pertinent part, as follows:

> Luciano,
>
> ***I understand that we need to close the subject fast!!***
>
> As for value, I leave it to the legal team to determine the fair values understood by the company.
>
> Att:
>
> André

159. A copy of the exchange between Luciano Weinke and Baldissera is produced below:

**De:** Luciano Wienke
**Enviada em:** segunda-feira, 5 de outubro de 2015 08:07
**Para:** Tiago Both; Andre Baldissera
**Assunto:** Re: RES: ENC: ADRIANA MARQUES CARVALHO - SUPERVISORA DE LABORATÓRIO

André, bom dia.
Vamos em frente com o acordo no valor de R$ 70.000,00?

Abraços

De: Andre Baldissera <Andre.Baldissera@brf-br.com>
Data: seg, 5 de out de 2015 08:35
A: Luciano Wienke <Luciano.Wienke@brf-br.com>, Tiago Both <tiago.both@brf-br.com>
Assunto: RES: RES: ENC: ADRIANA MARQUES CARVALHO - SUPERVISORA DE LABORATÓRIO

Luciano,

**Entendo que precisamos encerrar o assunto rápido!!**

Quanto ao valor, deixo para área jurídica conduzir dentro dos valores entendidos justos pela empresa.

Att

André

160. By email dated October 5, 2015, Luciano Wienke explained that under normal circumstances, the case would settle for less than R$15,000.00. But with respect to the Carvalho Lawsuit, the Company "***will have to pay more***" because "***we have a problem with this matter.***"

161. Luciano then instructed Tiago to "***make the deal***" and settle the case.

162. A true and correct copy of Luciano Wienke's October 5, 2015 email is produced below:

**Assunto: Fwd: RES: RES: ENC: ADRIANA MARQUES CARVALHO - SUPERVISORA DE LABORATÓRIO**
**De:** Andre.Baldissera@brf-br.com Andre.Baldissera@brf-br.com
**Para:** Ivan Peruzzo /o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT) /cn=Recipients/cn=d644f0d0d2714ea2aed62ddfc089a580-Ivan Antoni;
**Envio:** 12/10/2015 23:10:41

Pc

Enviado do meu iPhone

Início da mensagem encaminhada

**De:** Luciano Wienke <Luciano.Wienke@brf-br.com>
**Data:** 5 de outubro de 2015 08:38:11 BRT
**Para:** Andre Baldissera <Andre.Baldissera@brf-br.com>, Tiago Both <tiago.both@brf-br.com>
**Assunto: Re: RES: RES: ENC: ADRIANA MARQUES CARVALHO - SUPERVISORA DE LABORATÓRIO**

Valor de uma reclamatória com menos de 02 anos não chegaria nem a R$ 15.000,00 mas **como esse assunto temos esse problema vamos ter que pagar mais.**
**Tiago, vamos fazer o acordo.**
Abs

163. Notably, none of the BRF executives ever questioned the substantive merits of the allegations in the Carvalho Lawsuit.

### 3. The Suspicious Interest and Involvement of BRF's Top Executives in the Carvalho Lawsuit

164. According to BRF's 2015 Form 20-F, in the year ended December 31, 2015, the Company had 96,279 employees across the globe.

165. In the year 2015, the Company was involved in 19,830 labor lawsuits by claimants seeking R$1.4 billion in the aggregate, for which the Company reported R$377 million for provisions in labor contingencies.

166. In the 2015 Form 20-F, the Company stated that these proceedings "mainly related to overtime, time spent by the workers for changing uniforms, in-commuting hours, rest breaks, [and] occupational accidents," and that no single claim was "individually significant," stating, in pertinent part, as follows:

> **27.1.2. Labor**
>
> The Company is defendant in several labor claims, mainly related to overtime, time spent by the workers for changing uniforms, in-commuting hours, rest breaks, occupational accidents, among others. ***None of these labor claims is individually significant.*** The Company recorded a provision based on past history of payments.

167. Given these statistics, the direct involvement and interest of BRF's top executives – including the Company's Global CEO, three vice presidents, and a regional director – in settling this case is highly suspicious.

168. Moreover, the settlement amount in this case defies logic.

169. The Carvalho Lawsuit sought R$20,000.00 in damages, which was consistent with the normal range of damages awarded in such cases.

170. Indeed, in an email dated October 5, 2015, BRF's Legal Manager, Luciano Wienke, stated that the Company generally settles similar labor disputes for approximately R$15,000.00.

171. Yet, the Company ultimately authorized its attorneys to settle the Carvalho Lawsuit for R$70,000.00, which is more than quadruple the normal settlement amount.

172. In sum, the statements made by BRF officers and BRF's legal team regarding the Carvalho Lawsuit were clearly unusual:

(a) In his September 3, 2015 email to VP Hélio Rubens Mendes, Gilberto Orsato, and Roberto Rodriguez, Global CEO Pedro Faria stated that "***we always take busts from the same places***," and ordered Hélio Rubens Mendes to do "something drastic" with respect to the Carvalho Lawsuit.

(b) In his September 4, 2015, email to Baldiserra, VP Hélio Rubens Mendes wrote that "***we will eliminate all exposure!!***"

(c) In his October 5, 2015 email to Luciano Wienke, Baldissera wrote that he understood the urgent need to settle the Carvalho Lawsuit.

(d) In his October 5, 2015 email to Baldissera, Luciano Wienke wrote that "***we have a problem with this matter.***"

173. These facts suggest that the allegations in the Carvalho Lawsuit, which painted a picture of a company beset by fraud and with no regard for the safety of its consumers, were true.

### C. BRF Bribes Public Official to Prevent the Closure of a Poultry Facility Contaminated with Salmonella

| Key Figures | | |
|---|---|---|
| **Name** | **Position** | **Role in Scheme** |
| Abilio Diniz | Chairman of BRF's Board of Directors | Dinis asked BRF to help his grandson get a tryout at the São Paulo Soccer Club. In an intercepted phone call, Roney stated that he is going to discuss the request with Abilio Diniz. |
| Baldissera | BRF's Director of Operations in Midwest Brazil | Baldissera approved the payment of the R$300,000 political contribution to prevent the closure of the Mineiros unit. |
| Dinis da Silva | Regional Superintendent of SIPOA in Goiás | Intervened to prevent the closure of BRF's Mineiros plant, and demanded political contributions in return. Dinis was subsequently convicted of federal corruption charges for his involvement. |
| Evangeraldo Moreira dos Santos | Deputy to Jovair Arantes | The political "donation" was delivered to Evangeraldo. |
| Francisco de Assis | Former Regional Superintendent of MAPA in Goiás | Lobbied Dinis to issue a favorable decision to BRF in exchange for bribes, for which he was later convicted on corruption charges. |
| Hélio Rubens Mendes | BRF Vice President of Supply Chain and Member of the Executive Board | Hélio Rubens Mendes knew about the bribe and knew that BRF continued exporting contaminated products. |
| Jovair de Oliveira Arantes | Politician affiliated with Democratic Labor Party in Goiana (*Partido Democrático Trabalhista*) | Jovair Arantes is a Brazilian politician who assured Dinis remained in power. Through Dinis, Jovair accepted a R$300,000 political contribution from BRF. |
| Roberto Rodrigues | BRF's Vice President of Legal and Corporate Affairs | In an intercepted phone conversation, Roney states that he will discuss the bribe with "JR." |
| Roney Santos | BRF's Manager of Institutional and Government Relations | Roney aggressively negotiated the terms of the bribe with Dinis, and was later convicted on federal corruption charges. |
| Welman Oliveria | SIF Auditor and informal adviser to Dinis | Colluded with Dinis and Roney. |

### 1. The European Officials Detect Salmonella in BRF Products

174. In early 2016, European authorities detected traces of salmonella in twelve different poultry shipments produced at BRF's facility in Mineiros, Goiás. For each contamination, an alert was issued over the European Union's Rapid Alert System for Food and Feed ("RASFF"), a system designed to ensure the flow of information between European countries when public health risks are detected in the food chain.

175. Upon being informed of the contamination, SIPOA commenced an administrative investigation (SEI No. 20120.001527/2016-69) to investigate the contamination. The investigation took place between April 25, 2016 and April 28, 2016.

176. On Thursday, April 28, 2016, SIPOA officials Marina de Castro de Souza and Thais Fernandes Lima finalized a report describing their findings, and recommending that the matter be referred to DIPOA headquarters in Brasilia to determine whether the facility's operating and export licenses, and international sanitary certifications, would be suspended from MAPA's Establishment and Certification Database, SIGSIF (in Portuguese, *Sistema de Informações Gerenciais do Serviço de Inspeção Federal*).

177. The report was then presented to the regional chief of SIPOA in Goiás, Dinis Lourenço da Silva ("Dinis"). Dinis immediately suspended all poultry production at the Mineiros facility, and as an emergency measure, mandated additional laboratory testing before other non-poultry products could be produced and distributed.

178. As the regional chief, Dinis lacked the authority to suspend the facility's licenses and/or international certification. He was simply required to forward the report to DIPOA headquarters in Brasilia for further consideration, which he planned on doing the following Monday, May 2, 2016.

### 2. The Company Directs Roney to Contact Dinis and Try to Prevent the Closure of the Mineiros Facility

179. At the behest of BRF's Board of Directors, Roney called Dinis at 9:25 p.m. on April 28, 2016 and begged him not to take any action with respect to BRF until after a meeting on Monday between MAPA and BRF. At Roney's insistence, Dinis agreed to maintain the status quo for another two days. The transcript of the call, which was intercepted by the Brazilian authorities and transcribed in the *Carne Fraca* Decision, states, in pertinent part, as follows:

> DINIS: Hello
>
> RONEY: Doctor Dinis?
>
> DINIS: Hi
>
> RONEY: It is Roney from BRF. Everything okay?
>
> DINIS: Oh, Roney. Everything okay. Cool.
>
> RONEY: I'm sorry to call you at this time. But here is the following. ***I'm calling you because our quality assurance area, the BRF Board of Directors, the Quality Assurance Board, wants to arrange a meeting tomorrow with you and the doctor's personnel from the poultry area to deal with that audit that was done now at the Mineiros unit. The information that was relayed is that it appears that they have decided to suspend the license.***
>
> DINIS: I know.
>
> RONEY: ***So the Board asked me to get in touch with you so that you would not take any action via Brasilia prior to this meeting.Do not send the matter to Brasilia or suspend SIGSIF before we have this meeting tomorrow at 3:00 o'clock***. . . .
>
> DINIS: (interrupts RONEY) I'm traveling tomorrow. I'm going to Miquelandia. I am going, the superintendent is going.
>
> * * *
>
> RONEY: You suggest Monday, then. Then you promise me that until Monday the [unintelligible]
>
> DINIS: No, you can take it. It's already done. That's it. I saw their report this afternoon.
>
> RONEY: Um, man.

DINIS: I saw the report and there is a suggestion to suspend the qualifications, right?

RONEY: Yes.

DINIS: And I talked it over with Maria Cristina and with (pause).

RONEY: With Gabriela.

DINIS: With Gabriela. That I was going to travel. How am I going to travel? To take no action now, to take no action until Monday. Until I get there.

RONEY: ***So, can we have a meeting Monday, then? We can be there at nine o'clock, ten o'clock?*** What time can you meet?

DINIS: ***Yes, no problem.***

RONEY: Then I'll talk to the people. Since the doctor is not there and I also told him I'll call Dr. Dinis and then I'd like you to come along Monday too. ***So we'll schedule for Monday, then.***

* * *

180. On April 30, 2016, at 6:42 p.m., Roney called his old acquaintance and former superintendent of MAPA in Paraná, Dr. Francisco de Assis ("Dr. Francisco"), and asked him to help broker the negotiations with Dinis. After explaining the predicament at the Mineiros facility and confirming that Dr. Francisco was friendly with Dinis, Roney told Dr. Francisco that "***I want you to have a conversation with him [and] ask him to help us on Monday so that there is no suspension***." The transcript of the call, which was intercepted by authorities and reproduced in the *Carne Fraca* Decision and *Carne Fraca* Verdict, states, in pertinent part, as follows:

RONEY: On Monday, I am going to be in Goiana. I want to meet you there to have coffee and talk. It's been so long since we've talked.

DR. FRANCISCO: Call me when you arrive.

RONEY: I will call you. Tell me something. ***I need your support with something. Monday we will have a meeting at SIPOA. The girls audited MINEIROS and want to suspend the license.*** . . . So, I wanted to know. ***You are very good friends with Dinis, aren't you?***

DR. FRANCISCO: Very much. I will talk to him today still. Today or tomorrow I will talk to him.

RONEY: ***I want you to have a conversation with him like that: ask him to help us on Monday so that there is no suspension.*** That he gives us an extension to present results like: the factory is not a complicated factory. RIO VERDE is, but MINEIROS, very tranquil plant. It has always been a legal plant.

DR. FRANCISCO: Don't worry. I will talk to him.

RONEY: ***You can tell him like that: Roney has always been my partner and if he needs help in another side, since I always helped you I am with him for that. Understood? You know that. Depending on us.***

DR. FRANCISCO: Don't you worry.

RONEY: So listen, I am not as comfortable with him as I am with you, right? You can talk to him like: "Roney will be with me, he is my friend, BRF people are good people."

DR. FRANCISCO: Okay, you can trust me. You don't need to worry. I will agree with him.

RONEY: So, if anything happens, you tell me.

DR. FRANCISCO: No. Cool. You don't need to worry, I will agree with him.

* * *

181. True to his word, Dr. Francisco contacted Dinis and encouraged him to be lenient with BRF. After listening to Dr. Francisco, Dinis indicated that he would be interested in working out a mutually beneficial agreement with BRF to prevent the closure of the Mineiros facility. Dr. Francisco then reported back to Roney, explaining that Dinis was willing to help BRF in exchange for other favors, and that Roney could contact Dinis at any time for assistance.

182. Dr. Francisco also informed Roney that Dinis was reliably corrupt and that Roney could "open his toolbox" for Dinis. According to the *Carne Fraca* Verdict, the word "toolbox" was a euphemism for bribery, and was intended to convey to Roney that "he could request whatever he needed without any reservation."

183. In exchange for his efforts, Dr. Francisco asked Roney to send him a variety of meat products, including pork ribs, chicken breasts, thighs, and other products. During a May 2, 2016

phone call, for example, Dr. Francisco asked Roney to "***tell Ivan [Antonio Peruzzo, the Industrial manager at BRF's Rio Verde, Goiás facility,] to send some chickens and some other things to my house***." The transcript of the call, which was intercepted by Brazilian authorities and reproduced in the *Carne Fraca* Decision states, in pertinent part, as follows:

> RONEY: Yes. So, what did he say?
>
> DR. FRANCISCO: ***He said he will sit and talk to you. He said that he will help you in what he can.*** I asked him, etc. . . .
>
> RONEY: Ok. Cool.
>
> DR. FRANCISCO: ***I asked him, said that you are a nice guy. Whatever he needs from you, you will give him a hand, ok?***
>
> RONEY: Ok. I will give him a call now.
>
> DR. FRANCISCO: Ok. Look at the time you were calling me, I was talking to him, so I was not able to answer you.
>
> RONEY: Ok. Cool. Thanks. A hug.
>
> DR. FRANCISCO: So, I organized everything with him. All ok, ok?
>
> RONEY: Ok.
>
> DR. FRANCISCO: Roney, who is in Rio Verde? Is it Ivan?
>
> RONEY: Ivan is in Rio Verde.
>
> DR. FRANCISCO: ***Tell Ivan to send me some chicken, some stuff for me, to my house here.***
>
> RONEY: Ok, I will see with him. I will give Dinis a call. Ok. I am meeting with the people here. I will give Dinis a call. In the afternoon I will call for us to meet.
>
> DR. FRANCISCO: ***Dinis is very good person. Dinis is like me. You can open the tool box for him. Ok?***
>
> RONEY: Cool, then.
>
> DR. FRANCISCO: Roney, you can trust Dinis.

RONEY: OK, understood.[7]

* * *

184. After speaking with Dr. Francisco, Dinis displayed a newfound eagerness to help BRF and, on May 2, 2016, Dinis assured Roney that he "***will do [his] best to reverse the situation***," explaining that Dr. Francisco had given Roney a ringing endorsement. The transcript of the call, which was intercepted by Brazilian authorities and reproduced in the *Carne Fraca* Verdict, states, in pertinent part, as follows:

> DINIS: ***I'll do my best there to reverse the situation***.
>
> RONEY: Okay.
>
> DINIS: ***Dr. Francisco called me today***. Did you talk to him? Dr. Francisco?
>
> RONEY: I spoke to him on Thursday night, that I could not reach the Doctor, so I wanted his home phone number so we could arrange the meeting. But then you got back to me.
>
> DINIS: ***Oh, so it's good then. He told me today. He told me, "Ah, boy, Roney is good people." He even praised you***. (laughs)
>
> RONEY: Oh, what I need, what we need, Dr. Dinis, is the following: ***IT IS NOT TO SUSPEND [the production of raw products]. BECAUSE IT IS TO SUSPEND WHAT IS NOT BEING PRODUCED [i.e., prepared foods***]. We are already producing [prepared] spicy products and then the company took all the actions as we showed: we recalled the container [with contaminated meats].

* * *

185. On February 19, 2018, Dr. Francisco was convicted of federal corruption charges and sentenced to 42 months in prison. He was ordered to pay a penalty of R$10,000.00, and was barred from serving as a public official in Brazil for 8 years.

---

[7] Dr. Francisco later tried claiming that he wanted to distribute the meats to poor children on Christmas. Unsurprisingly, this defense failed because, as explained in the *Carne Fraca* Verdict: "The [bribe] took place on 5/2/16 and, by all accounts, Christmas is usually celebrated around the world on December 25th."

### 3. Dinis Agrees to Prevent the Closure of the Facility in Exchange for a R$300,000 Political "Donation"

186. Dinis then made the following proposal. In exchange for preventing the closure of the Mineiros facility, BRF would make a R$300,000.00 political contribution to the campaign of Jovair de Oliveira Arantes, the candidate for the Democratic Labor Party (the *Partido Democrático Trabalhista*) ("PDT") in Goias. On a telephone call intercepted by the Brazilian authorities, Roney can be heard discussing the political contribution with an unidentified person. The transcript of the call, which was intercepted by Brazilian authorities and reproduced in the *Carne Fraca* Decision, states, in pertinent part, as follows:

> RONEY: [explaining what Dinis said] What am I going to propose? ***We will suspend the certification of the prepared foods only and that I will give you a deadline to comply and I will do a new audit, to see if it worked***.
>
> UNIDENTIFIED CALLER: Okay, fine.
>
> RONEY: Then I said: Okay, if that's it, I agree too. But then what will be the payment, understood? Then he took it: "***Yes, I need your support, you know that the people there in the Ministry are by appointment from a political party and who puts us here in the Ministry, who keeps us in the position, is the staff of the PDT and our deputy here, who works with us, is Jovair Arantes [of the PTB], and then I need your support in the municipal electoral campaign***."

* * *

187. In addition to the R$300,000.00 political contribution, Dinis also asked Roney to arrange a test for his grandson at the exclusive São Paulo Football Club. According to a report published in Brazilian news outlet *FolhaPA*, Defendant Abilio Diniz, the Chairman of BRF's Board of Directors, was also an influential partner of the São Paulo football club.

188. In a conversation between Roney and Welman Oliveria, Dinis's confidante and co-conspirator, Roney stated that he would discuss Dinis' request with Abilio Diniz. The transcript of the call, which was intercepted by Brazilian authorities and reproduced in the *Carne Fraca* Decision, states, in pertinent part, as follows:

RONEY: . . . Doctor Dinis is on vacation, right?

WELMAN: He is. He comes back Friday.

RONEY: ***He even asked for my help, that he has a little grandson, he seems to play ball and asked me to see if we could help him to take a test here in São Paulo***.

WELMAN: Oh, yeah?

RONEY: Yeah, he said Monday. But I'm out, man, I'm just going to arrive tomorrow. ***I'll see if I can get because ABÍLIO DINIZ, the president of the board, he is one of the directors of São Paulo. I'll see if I can get anything there for him***.

WELMAN: Oh, that is great!

* * *

189. On or about May 2, 2016, Roney then contacted Baldissera to discuss the bribe and Dinis's proposal, which consisted of four parts: (i) Dinis would suspend BRF's license to produce cooked foods only for a period of 15-20 days; (ii) during that time, the Company would be permitted to prepare for a new audit; (iii) after the audit, BRF would be permitted to immediately resume all operations at the Mineiros facility; and (iv) Dinis would not notify his superiors at DIPOA in Brazil's capital about the contamination.

190. Dinis's proposal to suspend certification for the production of cooked products was a sham, because ***the Mineiros facility was not producing prepared products at that time!*** For that reason, Roney described the proposed suspension as a "kick in the chest."[8] The transcript of the call, which was intercepted by Brazilian authorities and transcribed in the *Carne Fraca* Decision, states, in pertinent part, as follows:

BALDISSERA: I was anxious to talk to you. So?

RONEY: He came in with another inspector. I know him, but he was not at the first meeting. His name is [Welman], he works with him in the office. Actually, it's the

---

[8] In Brazil, the phrase "kick in the chest" is a common expression which means to get something accomplished. It is adopted from soccer, where players kick the ball towards the chest of the goalie to score a goal.

> following, he said he talked to the people there, yeah, yeah. ***And the decision he has made is that he will not send anything to Brasilia. What they are going to propose is, is, to suspend the certification, only, and they will give 15 days, 15 or 20 days, for BRF to prepare, there, to meet the action plans and to make a new inspection to resume exports***. Then I said: Yes, but . . . (Baldissera interrupts).
>
> BALDISSERA: Which certification?
>
> RONEY: Only the certification of the prepared products.
>
> BALDISSERA: The prepared products??
>
> RONEY: It is just for the prepared [foods]. Because ***[MAPA Normative Instruction No. 27] says he has to suspend certification, so we will suspend the certification. Because we have nothing to produce, Dinis will not certify anything. That's it, so it's no use to certify . . . Then I said: no, okay, if there will be no restriction to suspend the license, and I came (sic) only the certification, we are not producing anything, there will be no impact.*** Then he said he's going to propose a new inspection within 15-20 days, okay?
>
> BALDISSERA: Yeah. (. . .)
>
> RONEY: ***Then he said that he will kick in the chest, not to take it to Brasilia, until there is a new inspection***. Then there's the blow, right. (laughs)
>
> BALDISSERA: ***Roney, my man, this is the news that makes us drink wine now before bed.***
>
> RONEY: (laughs) (. . .). It's not a subject for you, right? ***But he asked for the following, I'll tell you what he asked for: Today, he, Diniz, is going to take over here as Superintendent, because the political party that takes care of the Ministry of Agriculture and Livestock here is the PDT, and for him to stay as a superintendent or stay in SIPOA, he has to give results to the PDT party. He asked BRF for support in the municipal elections there, okay?***
>
> BALDISSERA: ***Oh, let's do it.*** (unintelligible) if we have to do it, ***let's do this shit***.

* * *

191. On May 5, 2016, at approximately 7:25 a.m., Dinis called Roney on the phone and asked to meet with him in person to "***delineat[e] a solution to the problem***." Roney was at the airport when he received Dinis' call, but agreed to skip his flight to meet with Dinis.

192. Later that day, Roney met with Welman Oliveria and Dinis to discuss the terms of the bribe. As was later revealed in the *Carne Fraca* Verdict, Roney secretly recorded the meeting on his

cell phone. The Brazilian federal police obtained this recording when they seized Roney's cell phone in the March 2017 raid. The transcript of the recording, which is transcribed in part in the *Carne Fraca* Verdict, reveals the following:

(a) During the meeting, Dinis and Welman made it absolutely clear that "***we are part of a political group***" and "***the deputy that has power there is Jovair Arantes***[.]"

> DINIS: (not understandable) by Cristina. But you know, let me tell you something, why I called you…
>
> RONEY: But Dr. Dinis when you guys call it is . . . what it is possible . . . you have already helped me a lot there at SIPOA . . . and we are always available as long as we can we will be there together.
>
> DINIS: The question is more political than personal (…) we don't want anything for us (…) it is that ***we are part of a political group*** (…) ***me, Welman and the deputy that has power there is Jovair Arantes*** (…)
>
> RONEY: Um, the one that was the speaker now (…)
>
> DINIS: With his report against [former Brazilian Vice President] Dilma. Dilma fired everybody, including Doctor Julio, who was the person that appointed me (…)
>
> RONEY: I understand…
>
> DINIS: Do you understand?
>
> RONEY: Aha. aha.

* * *

(b) Dinis unambiguously stated that he was seeking "***support for the party***" for the upcoming municipal elections, and that he "***need[s] money***" so that he could "***keep his position***":

> DINIS: ***What are we looking for? We are looking for support for the party (…) because we will have municipal elections this year***.
>
> RONEY: I know.
>
> DINIS: ***And what do people need? Need money***.
>
> RONEY: Yes, and who are you supporting? But here in Goiania? How are you supporting?

DINIS: ***We are supporting PTB***.

RONEY: Okay.

DINIS: PTB is supporting over 70 prefectures in the interior, including here in Goiania it is going to support the candidate Bittencourt…

WELMAN: This situation within the party is very broad (not intelligible) we do not participate on this. Because the demand from the party comes. It is to have this support, this compromise to support, that lots of times do not discuss even with Dr. Dinis, not even within us, you would go to the party and resolve it there, but we do not want to send you to the lion's mouth, understand? On this you have more experience than us… on reality we need this partnership to be able to… because new positions are coming…

DINIS: ***For us to be able to keep the position***.

RONEY: I understand. No, no, I know.

WELMAN: And there is this structure. (not understandable) we wanted to have this conversation with you, because we did not have this access.

DINIS: This has nothing to do with the business.

RONEY: No, no, be calm…

* * *

DINIS: What happens, let me explain to you. Dr. Julio was invited to accept a position in Brasilia.

RONEY: Ok.

DINIS: This only between us.

RONEY: Ok, no problem.

DINIS: ***Jovair invited him to a position much better than the one he is right now. And Dr. Julio named me to occupy the Superintendent position*** (…)

RONEY: Aha, I understood…

DINIS: Do you understand?

RONEY: And is there resistance?

DINIS: So I need support, I have to show that (not understandable) important for the party… You understand?

* * *

> WELMAN: It is his, right… and he has strength to guarantee. It was his and it will continue to be. There is this transition because he is as speaker. So this it is. ***What the party asks is support for the election***. Very carefully because now one cannot. So this support that we need even of your understanding….

* * *

(c) Welman assures Roney that in exchange for the bribe, ***"[Dinis] will treat BRF as if it were his problem in a healthy manner***":

> DINIS: Our action, our attitude will be the same (…)
>
> WELMAN: We have a lot of support (…) we have (not understandable) lots of support in the area of bovine because we have a lot more access (…) and in the birds we never had such access (not understandable) a big unit, ok (…) I am sure that Dr. Dinis position (…) he has a very good technical team (…) but there are these people that he will need on a second moment now to move ok (…) that is Cristina and so forth, he has knowledge to do it. But he is one of those people that assumes the responsibility to him, so ***he will treat BRF as if it were his problem in a healthy manner.***
>
> RONEY: Cool
>
> WELMAN: (…) if he asks and you permit, I even agree to go there (…) to understand (…) if you do not reach a conclusion of what it is, I go there and try to find out (…) I prepare and deliver on his hand and then he can define it (…) but like this (not understandable) the problem to him and resolves it.

* * *

(d) The three men discuss how the bribe will be executed. Dinis and Welman state that it is probably safer if Roney remains in the background and they act to carry out BRF's agenda. Dinis proposes that the bribe be delivered to Evangeraldo Moreira dos Santos, the main advisor and deputy of Jovair Arrantes. Roney asks whether Evangeraldo is "trustworthy" to talk to about these things, and emphasized that "***we only need to align in a manner that does not expose the company***":

> RONEY: Understood. ***So, let's see . . . what are the strategies that BRF could do in this regard.*** We have big contacts in Brasilia that could be (…) have a recommendation (…)

DINIS: No, ***we have***(…) ***the person responsible for this area of collection***. ***it is Mr. Evangeraldo, do you know him?***

RONEY: No, I do not know him.

DINIS: He Jovair's main advisor.

* * *

WELMAN: I have a different opinion from Dr. Dinis. Dr. Dinis prefers that you go and talk to the party. I think like that we put you in the lion's mouth, then the guy calls you there and then calls you again and sometimes it causes problem, I need to serve as the intermediary so they do not know the source of the donation.

RONEY: Understood.

WELMAN: This is the strategy that I prefer (…) but him so as not to compromise himself and in order to have a better trustworthiness (…)

RONEY: Both sides are complicated (…)

DINIS: Because BRF, a company that side will support some (…)

WELMAN: It has to(…)

DINIS: It has to (…)

RONEY: Yes, yes, each year we do… (…), we (…) every company does (…) So, what I wanted to see with you, is the following… (…) you have any name, who are the principal? Who are the key persons that maybe (…) Dr. Dinis could introduce (…) Dr. Dinis, it could be like this, I can guarantee to such people, maybe it is more than one, or you want to take this to the party? Example, there is one (…)

DINIS: ***The key person is Evangeraldo.***

RONEY: Okay.

* * *

DINIS: Party is Jovair Arantes (…) PTB

RONEY: No, we know there in Brasilia. He became well known.

DINIS: He is PTB leader (…)

RONEY: ***So tell me something. So how would this donation happen?***

WELMAN: No, look, it is (…) define there (unintelligible)

RONEY: This person, what is his name?

WELMAN: Evangeraldo.

RONEY: Tell me something (…) I have a great contact with you guys (…) ***Is the guy trustworthy?***

WELMAN: The guy is . . . in what sense do you ask?

RONEY: ***Of us trying to talk about this subject?***

WELMAN: (unintelligible) for many years. He was director of CONAB for many years. He is the one that resolves (unintelligible) of the party.

RONEY: Ah, ok then. I know, because I trust you very much (…)

WELMAN: Of course.

DINIS: We trust you also.

RONEY: Me too, understood?

WELMAN: I can go together or Dr. Dinis (…)

RONEY: Yes, it would be even better.

WELMAN: There is no difficulty. So, like that, of amounts (…) these things (…) You must have a lot (…) you have a lot more experience than us (…)

RONEY: No, not to treat this subject, this (…) there is no pro (…) there are no difficulties, ***we only need to align in a manner that does not expose the company*** (…) I have (…) this that I told you guys (…)

DINIS: Of course . . . .

* * *

(e) Roney explains that Brazilian election law prohibits BRF from making political contributions, but that he will "***talk to the people in São Paulo to see how we can help in this regard***." He further explains that he cannot make any commitment until he confers with his "***director and vice president***."

RONEY: (…) today all the companies are (…) we can no longer make donations to parties (…) so a question that I do not have a way to answer you at the moment, ***I have to take this subject, talk to the people in São Paulo to see how we can help in this regard***, treat this subject in a possible manner (…)

* * *

RONEY: I have to verify in São Paulo what the position will be, right? Since now legally there is nothing, understand? ***So, I need, even though I am the area's manager, but I have a director and a vice-president, right?***

WELMAN: Of course, of course.

RONEY: ***So, we need to try to agree on how to help the party because it is a hand that helps you.***

* * *

RONEY: It is Rio Verde, Concórdia, Chapeco, only there, you see? ***Now, with the electoral law that prohibits, right? Formerly, BRF would make donations, this is already in our annual report, that BRF does within the law, doing for the political parties, as the law allows it, but now it is a bit complicated, you understand?***

DINIS: ***But there must be a way.***

* * *

(f) Dinis and Welman assure Roney that his name and involvement will be kept confidential. Roney suggests that the bribe should be attributed to a "***big company in Goiás that showed itself to be proactive***."

DINIS: This is very important to us, okay?

RONEY: No, I know. Don't worry, it is (…) don't worry, sometimes they are (…) (…) positioned Roney about this, get worried, no (…) there is no problem. we stay, it stays here with us, ok? No, this subject also (…)

WELMAN: No, when we go talk about it there, we won't even mention your name. We will just say that it is a company.

RONEY: I think like this: while, while (…)

WELMAN: In the meeting you don't need to introduce yourself

RONEY: While I don't want to tell you what to do, I think that (…) you can present it like this . . . ***there is a big company in the State of Goiás, that showed itself, it is, proactive***, understand? But we are working on some details.

WELMAN: Correct.

RONEY: Understand? So, ok. When we all of a sudden say to you.. look, this happened, this worked out, what will we do. Then I come here and we have a reserved conversation.

WELMAN: Right.

RONEY: The least amount of people involved… so it is because of this.. not even introduce, understand? Introduce to the party, no. One person only, will know who I am and that is it, understand?

WELMAN: Correct.

RONEY: So, understood? This is the better.

WELMAN: (not understandable) introduce to everybody.

RONEY: Yes.

WELMAN: Even they ask us not to say their name. It is because of this that I am here (not understandable).

* * *

(g) Roney provided Dinis with his private cell phone number and helped him program his WhatsApp messaging service. Roney explained that they should send him a text message with a time that they will be available to speak:

RONEY: (…) I will give you a telephone number to you. ***This number here belongs to the company. So, please write down my number because I have my own private phone.*** So write it there and you send me on WhatsApp the time when you are back because WhatsApp is out, right?

WELMAN: Ah, WhatsApp?

RONEY: Yes, then you write my 11, so you speak with me on this phone. Understood?

DINIS: Correct. Welman will be more in touch with you.

RONEY: Yes, it is better.

* * *

(h) Dinis explains that his predecessor Dr. Francisco lost his position because he "***did not want to do anything to help***" the political party:

DINIS: There is no way. Why did Dr. Francisco fall?

RONEY: They are on both sides.

DINIS: Why did he fall? Do you know?

RONEY: No, I don't know. I have a great friendship with Dr. Francisco.

DINIS: No, he is my friend (not understandable).

RONEY: Yes, I have a very good relationship with him, but I don't, I don't, like that I (…)

DINIS: But do you know why he fell?

RONEY: No, I don't know.

DINIS: ***Because the deputy that was there, not him . . . Francisco did not want to do anything to help.***

RONEY: Ah, ok.

DINIS: It is the same now.

RONEY: Okay.

DINIS: It is the same way there now.

RONEY: No, I (…) I (…) these issues like this, I don't, I don't ask.

DINIS: Dr. Francisco is our friend, he is my brother.

* * *

### 4. Dinis Delivers and Prevents the Closures of the Mineiros Unit

193. On May 16, 2016, Dinis called Roney to inform him that the report was finalized. The transcript of the call, which was intercepted by Brazilian authorities and reproduced in the *Carne Fraca* Verdict, states, in pertinent part, as follows:

DINIS: ***We just did the report.*** You know. I had about five meetings with the girls.

RONEY: (laughs)

DINIS: (laughs)

RONEY: But has the report already been sent off?

DINIS: I sent it and, I tried to send it to you through WhatsApp, but it's not happening. I took the pictures and tried to pass it on to you and Welman, eh.

RONEY: Aha.

DINIS: For you and for Welman, the report. But it was the way we thought it was.

RONEY: Okay.

DINIS: ***There will not be any major alterations in operation there.***

RONEY: (unintelligible?) How did you stay?

DINIS: That line that you had spoken about. He did not mention anything. I ordered that European Union business to be taken away.

RONEY: Um, man.

DINIS: ***They were a little reluctant, but they did.***

RONEY: Okay.

DINIS: A little, no. Enough.

RONEY: I imagine. But how? You can more or less tell me (unintelligible).

DINIS: ***There was one analysis per week, why they want each shipment, eh. Stayed one a week, randomly.***

RONEY: Um, man.

DINIS: ***After three, in official laboratories. After three weeks with negative results, then release, there's no need to do more. Understood?***

RONEY: ***I got it. But there will be nothing to suspend, eh?***

DINIS: Huh?

RONEY: ***There's no suspension from raw products.***

DINIS: ***No, no. There is no suspension. Only that line you have already suspended.***

RONEY: That's the prepared spicy line?

DINIS: Yes.

RONEY: I do not have a copy. Where can I get a copy of this document?

DINIS: I'm trying to send it through. That's what I'm telling you. I took a picture of it.

RONEY: Oh, I get it.

DINIS: But, it stayed, ***I think it was better than what we were thinking.***

RONEY: Okay, okay.

DINIZ: ***Considering the situation. They wanted to send it to Brasilia. They wanted to send it to Brasilia anyway, boy. That gave me a job. They wanted to send it to: "not because there is the [MAPA Normative Instruction No. 20], that we are obligated, when there is loss of control, to report to Brasilia. I do not know what." Then I managed to hold on and it did not leave hear. I took responsibility for it.***

RONEY: Okay, beauty then.

DINIS: I told her I will take responsibility. You can rest easy.

RONEY: If you can send it to me, I'll thank you, all right.

DINIS: You spoke, RONEY.

RONEY: Beauty, doctor. A hug.

* * *

194. It is reasonable to infer that the R$300,000.00 political donation was made because Jovair Arantes was elected and the Mineiros facility indeed remained open.

195. BRF, however, did not report the contribution to the Superior Electoral Tribunal, as required by Brazilian law. In Brazil, records of campaign contributions are publicly available on the website of the Superior Electoral Tribunal. Members of the public can search for political donation by name or by an entity's CNJP number (the Brazilian tax identification number).

196. Online searches for contributions made by either (i) BRF; or (ii) any entities associated with BRF's CNJP number, 01838723000127, yielded no results, and instead displayed the words: "***Alert! No person found with the data provided.***" (in Portuguese, *Alerta! Nenhum prestador encontrado com os dados informados*).

### 5. BRF Continues Producing Contaminated Poultry Products at the Mineiros Facility and Salmonella is Again Detected in European Exports

197. As discussed, by April 2016, the European authorities had already issued twelve RASFF alerts for salmonella spp detected in poultry products produced at BRF's Mineiros facility, thereby prompting a SIPOA investigation.

198. At the time, due to the large number of alerts in a short period of time, BRF recalled 54 containers of products produced on contaminated lines that were already *en route* to Europe.

199. Over the next several months, the Mineiros facility was subject to a "special regime of inspection" and poultry exports to the European Union were restricted to those products that had undergone enhanced laboratory testing and analyses. On September 20, 2016, the "special regime of inspection" concluded, and the Company regained its export certification privileges.

200. BRF then decided to re-export 16 containers of contaminated products that had previously been recalled in April 2016.

201. Not surprisingly, the European authorities detected salmonella in the first four shipments that reached its ports, and issued RASFF alerts for each of the four containers. In addition, a fifth RASFF alert was issued after a different strain of salmonella was detected in yet another shipment that had been produced after the September 20, 2016 conclusion of the "special regime of inspection."

202. On February 6, 2017, the factory's license to export products to the European Union was suspended. On February 9, 2017, the suspension was expanded, and BRF lost the ability to export to Mexico, Russia, South Africa, and Europe.

203. The facility was audited again from February 21, 2017 to February 23, 2017, and MAPA issued new guidelines to verify the integrity of laboratory analyses performed by BRF itself.

204. In March 2017, the European Union warned BRF that it would impose a permanent embargo on all products originating from the Mineiros facility if salmonella was detected in even one more shipment.

205. This posed a serious dilemma for the Company, who knew that there were an additional three shipments of contaminated products headed for Europe.

206. Baldissera was especially concerned because he had authorized the shipment based on the assumption that the European authorities would simply reject the initial shipment if it was found to be tainted. In a March 13, 2017 conversation between Baldissera and Fabiano Luciani, BRF's logistics coordinator for export documentation, Baldissera stated:

> ANDRÉ: ***Shit man, I didn't know it was going to result in a [RASFF alert]. I thought it was going to be between returning or not returning the containers, man[.]***

207. Fabiano tried to assure Baldissera that everything would work out if the Company would stop exporting contaminated products. According to the transcript of the conversation, which was intercepted by Brazilian authorities and reproduced in the *Carne Fraca* Decision, Baldissera seemed shocked at the suggestion. The transcript of the conversation states, in pertinent part, as follows:

> FABRÍCIO: No, let me tell you, let me tell you why I think it is going to work out: we are entering with the same defense of the Chapecó situation, that had a container with that. That a "RASFF" arrived now in the Ministry and the doctor is accepting that we present a defense in relation to the contaminated frozen birds this way. ***What will we do from now on? We are not going to work anymore the way we have been working.***
>
> ANDRÉ: ***So I am going to have to stop shipping everything that is positive "in natura," Everything?***
>
> FABRÍCIO: No doubt, no doubt, no doubt.

* * *

208. To avoid another RASFF alert, Baldissera decided that he would divert the final three shipments from Spain and Italy to Rotterdam, in the Netherlands, which does not test for certain types of salmonella, including salmonella spp. This was the only way that the Company would avoid a permanent embargo on its Mineiros facility. The transcript of the call, which was intercepted by Brazilian authorities and reproduced in the *Carne Fraca* Decision, states, in pertinent part, as follows:

> FABRÍCIO: Talk to Viviane about it.
>
> ANDRÉ: No, I am going to tell her today. I am going to look for her. I am in Curitiba all week. I am going to find her here and tell her. Vivi***, there is only one decision. We either ship it to ROTTERDAM, or we will lose MINEIROS again, and that is final. There is no other decision.***

* * *

### 6. BRF Used Fraudulent Laboratory Reports to Obtain Health Certifications for Contaminated Products From its Mineiros Facility

209. On March 29, 2017, MAPA raided the Rio Verde laboratory and conducted a full, three-day audit of the records. The results of the audit were presented in two different infraction notices.

210. The first infraction notice (Infraction No. 25/SIF101/2017), issued in June 2017, reported that BRF obtained a certification to export poultry products to the European Union without informing SIF that ***fifty percent*** of product samples tested positive for the presence of salmonella spp.

211. The batch in question was produced at the Mineiros facility on February 2, 2016 (Batch No. 836592, Lot 6037). The Company sent ten (10) samples for testing at the Rio Verde laboratory. Five samples came back negative for salmonella spp; five were positive. But when BRF applied to SIF for an export certification to export the products to the European Union, it only

submitted the laboratory results for the five samples that tested negative. The five positive results were not submitted to MAPA. If BRF had submitted the positive test results, SIF would not have provided the certification. A copy of the MAPA report is included below:

**Serviço Público Federal**
**Ministério da Agricultura, Pecuária e Abastecimento.**
**Superintendência Federal de Agricultura em Goiás**
**Serviço de Inspeção de Produtos Agropecuários**

**AUTO DE INFRAÇÃO Nº 025/SIF 1010/2017**

Aos **catorze dias do mês de junho do ano de dois mil e dezessete** nesta cidade de Mineiros, Estado de Goiás, eu, **Cláudia Regina Ferreira da Silva,** Auditora Fiscal Federal Agropecuária, lotada no Serviço de Inspeção Federal 1010, Carteira Fiscal n° 1662, presente a testemunha abaixo assinada, constatei a infração, pela firma **BRF S.A** CNPJ 01.838.723/0182-55, localizada à Rodovia GO 341 km 2.5, Zona Rural, Mineiros/GO, do **Artigo 491, parágrafo segundo e Artigo 496, inciso XVIII e inciso XXIII do RIISPOA – Regulamento de Inspeção Industrial e Sanitária de Produtos de Origem Animal aprovado pelo Decreto n° 9.013 de 29 de março de 2017 combinado com o Regulamento (CE) n° 2073/2005 de 15/11/2005,** como abaixo se descreve:

"A empresa praticou seleção de relatórios de ensaio para Embasamento de Certificação para exportações de Preparados de Carne de Perus para a União Europeia, com omissão de relatórios de ensaio com resultados desfavoráveis para o patógeno *Salmonella spp.*, para a data de produção 06/02/2016. Foi verificado na Auditoria realizada nos dias 29 a 31/03/2017, no laboratório BRF em Rio Verde/GO, que a unidade BRF de Mineiros encaminhou ao laboratório da unidade em Rio Verde **dez (10) amostras** da data de produção, lote e código de produto referente a data de 06/02/2016. Sendo apresentados ao SIF 1010, **somente cinco (5) laudos (08362738; 08362753; 08362755; 08362758 e 08362761), TODOS COM AUSÊNCIA para o patógeno *Salmonella spp.*,** conforme Programa de Autocontrole da Empresa – PAC 15, na versão vigente à época. Os laudos: **08364938 (resultado: presença de *Salmonella spp.*); 08364942 (resultado: presença de *Salmonella spp.*), 08364945 (resultado: presença de *Salmonella spp.*); 08364949 (resultado: presença de *Salmonella spp.*), 08364951 (resultado: ausência de *Salmonella spp.*), não foram encaminhados ao SIF, sendo os produtos expedidos para o mercado europeu.** Para a data de produção 06/02/2016, lote 6037, código do produto 836592, após conferencia dos Certificados Sanitários Internacionais – CSIs, constatamos a presença desta data de produção em cinco (5) RASFFs: Alerta Rápido Memo. 59 AMB, CSI 0040/1010/16 (peito sem osso congelado temperado); Alerta Rápido Memo. 60 AMA, CSI 0051/1010/16 (peito sem osso congelado temperado); Alerta Rápido Memo. 68 AMP; CSI 0042/1010/16 (peito sem osso congelado temperado); Alerta Rápido Memo. 74 ANN; CSI 0055/1010/16 (peito sem osso congelado temperado) e Alerta Rápido Memo. 87 AOW, CSI 00060/1010/16 (peito sem osso congelado temperado). "

Para constar, lavrei o presente Auto de Infração, em duas vias, dando cópia ao infrator que fica sujeito às penas da lei. Fica estabelecido o prazo de 10 (dez) dias a partir da data do ciente para apresentação de defesa por escrito.

212. A copy of the laboratory report used by BRF to obtain the certification, which falsely indicates the absence of salmonella in the affected products, is included below:



brf

DIRETORIA DE QUALIDADE
GERENCIA DE LABORATORIO

RELATORIO DE ENSAIO/ Amostra No 08362738

Solicitante:LEONARDO KAISER | Area:

Endereco:

Descricao da Amostra: DDDBBB000 PEITO S/OPC MET PERU CONG TEM | Codigo da Amostra: 836592

UP / Fabricante:MINEIOS | Fornecedor:

Condicoes de Recebimento:2,2oC | Numero da Amostra: 08362738

Quantidade da Amostra:0,30 | Data da Coleta: 06/02/2016

Data Producao:06/02/2016 | Lote: 6037

Recebido em:08/02/2016 | Expedido em: 11/02/2016

Objetivo:PEITO AP. EUROPA

Observacoes:

AIOS MICROBIOLOGIA

| Ensaio | Met | Resultado | Unidade | Especificacao | | |
|---|---|---|---|---|---|---|
| SALMONELLA SPP 25G(VIDAS) | AOAC OMA2013.03 | Ausencia | a/p | A | 0,00 | 0,00 |

213. A copy of a laboratory report from BRF's Rio Verde facility confirming the presence of salmonella spp in the exact same product is produced below. Note that the product number, batch number, sample code, and date of production is identical on both reports:



DIRETORIA DE QUALIDADE
GERENCIA DE LABORATORIO

RELATORIO DE ENSAIO/ Amostra No 08364938

Solicitante:LEONARDO KAISER | Area: GARANTIA DA QUALIDADE
Endereco:ROD GO 341 KM 2,5 MINEIROS - GOIAS
Descricao da Amostra: DDDBBB000 PEITO S/OPC MET PERU CONG TEM | Codigo da Amostra: 836592
UP / Fabricante:MINEIROS | Fornecedor:
Condicoes de Recebimento:-0,9oC | Numero da Amostra: 08364938
Quantidade da Amostra:0.30 | Data da Coleta: 06/02/2016
Data Producao 06/02/2016 | Lote: 6037
Recebido em:10/02/2016 | Expedido em: 17/02/2016
Objetivo:PEITO AP. EUROPA
Observacoes:

ENSAIOS MICROBIOLOGIA

| Ensaio | Metodos | Resultado | Unidade | Especificacao |
|---|---|---|---|---|
| [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |

214. The second infraction notice (No. 037/SIF1010/2017), issued in December 2017, revealed that BRF produced feather meal under its Perdigao brand containing dioxins, furans, and PCPs with indices above the legal limit.

215. The feather meal was manufactured on October 23, 2017.

216. The report, which is reproduced in part in the *Trapaça* Report, indicates that BRF has inadequate controls to prevent products contaminated with dioxins, furans, and other PCBs from reaching the consumer market.

### 7. BRF Management Knew About the Contamination at the Mineiros Facility and the Bribe to Conceal the Contamination

217. Although Roney negotiated the bribe on behalf of the Company, he was acting at the direction of BRF's management. For example, during their May 5, 2016 meeting, Roney told Dinis and Welman that he cannot commit to paying the bribe until he "***verif[ies] in São Paulo what the [Company's] position will be***." He further explained that "***even though I am the area's manager . . . I have a director and a vice president[.]***"

218. Hélio Rubens Mendes and Roberto Rodrigues were both aware of this bribe.

219. In the transcript of the May 2, 2016 phone call between Roney and Baldissera, after Roney relates Dinis' request to Baldissera, Roney states that he is going to "discuss this with JR," a nickname for VP ***José Roberto*** Rodriguez. The transcript of the call states, in pertinent part:

> RONEY: (laughs) (. . .). It's not a subject for you, ok? But he asked for the following, I'll tell you. What did he ask for: today, he, DINIS, is about to take over as Superintendent. The political party that takes care of the Ministry of Agriculture and Livestock here is the PDT and for him to stay as Superintendent or stay in SIPOA, he has to give results to the PDT party. He asked BRF for support in the municipal elections there, okay.
>
> BALDISSERA: Oh, let's do it. (unintelligible) if we have to do it, let's do this shit.
>
> RONEY: Calm down. ***<u>Let me discuss this subject with JR</u>*** and with ADRIANO, and if everything goes accordingly to what he says he's going to do for us not to be harmed, and such. If we are not suspended and there is an audit. If we go through that, we will have to help out somehow. Understand. But regarding that, I will ask for your help later.
>
> ANDRÉ: But, man (RONEY interrupts)
>
> RONEY: First I am going to let him resolve it there, but later on I am going to need to have more support from someone. Then at that point: when we were going to be suspended and such: did not suspend the establishment. We did an audit, we resumed exporting: I will ask for your help, ok? Is that ok? Cool my man? That I made it very clear to him.

* * *

220. According to a letter the Company filed on a Form 6-K with the SEC on August 9, 2017, José Roberto Pernomian Rodrigues was also known as "JR."

221. Likewise, the following transcript makes clear that Roney and Baldissera intended to inform VP Hélio Rubens Mendes about the bribe:

> BALDISSERA: RONEY, let me ask you a question: can I tell HÉLIO that DINIS talked to us now and said he is going to *kick it in the chest*?
>
> RONEY: That.
>
> BALDISSERA: That he will suspend the certification to produce spicy products We are temporarily banned regarding all production of spicy foods.
>
> RONEY: Yes, that.

BALDISSERA: For 15 to 20 days until he asks for another inspection in Mineiros?

RONEY: That. If we pass the inspection, everything returns again. Ok?

BALDISSERA: And then there is no suspension and it won't escalate to Brasília?

RONEY: It won't go up to Brasília. So, what is it that I said ANDRÉ. If I were you, wait for the report to arrive tomorrow. I would not speak now. If you want to give HÉLIO a feedback you say: RONEY stayed there, the superintendent came back from SIPOA, but Hélio. You can speak, but don't say the guy will do it now. He guaranteed to RONEY that he will *kick in the chest*, understand? "But HÉLIO, see, we have to deliver the action plan. We have some things we have to do, and so forth . . ."

BALDISSERA: Do you want me to do the following: you want me not to say anything and then we deliver this plan tomorrow. You call him and then he considers this as being official and then we tell HÉLIO?

RONEY: I think it is better, because after it will create such a big expectation. Even though, it is like this: he was here very sure, sure that he will do. Understand? He would not come here without knowing what he had to propose. You know that.

* * *

RONEY: ANDRÉ, it was good that I stayed, you know why? Because later, now (André interrupts)

BALDISSERA: But of course man! But this was the best thing it happened in life, this man!

RONEY: Do you know why? Because what happens? Now I can ask him, understand? If he wants my help, he is going to have to *kick in the chest* and be able to get that for us. Because if he doesn't get it, I don't get anything. Understand?

BALDISSERA: This is very good news.

* * *

222. When salmonella was detected in European exports in early 2017, VP Hélio Rubens Mendes was aware of the situation, and knew that the Company was working to divert the shipments to the port at Rotterdam. The transcript of the call, which was intercepted by Brazilian authorities and reproduced in the *Carne Fraca* Decision, states, in pertinent part, as follows:

ANDRÉ: So here's the thing, FABRÍCIO. I think it's very important, and I don't know if you already did it, but I did not tell HÉLIO RUBENS about this subject.

FABRÍCIO: No, I already did. He was asking me about it.

ANDRÉ: ***Does he know about this issue here?***

FABRÍCIO: ***Yep. He knows about this subject***.

* * *

### D. The Line Speed Bribe

| Key Figures | | |
|---|---|---|
| **Name** | **Position** | **Role in Scheme** |
| Abilio Diniz | Chairman of BRF's Board of Directors | Referenced by Daniel Filho in an intercepted conversation. |
| Daniel Filho | Regional Superintendent of MAPA in Paraná | Daniel Filho interceded on Maria do Rocio's behalf, and demanded that BRF provide the fraudulent receipt. |
| José Mapelli | Maria do Rocio's personal attorney | Jose Mapelli arranged the delivery of the receipt and met with an outside lawyer hired by BRF to request the fraudulent receipt. For this conduct, Jose Mapelli was charged with and convicted of federal corruption charges in Brazil. |
| Maria do Rocio | Regional Superintendent of SIPOA in Paraná | In exchange for a trip to Europe financed by BRF, Maria do Rocio lobbied for regulatory policies favorable to BRF. When the Brazilian police started investigating the trip, she asked BRF to fabricate a receipt to undermine the investigation. Maria do Rocio was later convicted of federal corruption charges for her conduct. |
| Pericles Salazar ("Pericles") | President of the Brazilian Association of Refrigerators and President of the Union of the Meat and Dairy Industry in the State of Paraná | Acted as a go-between between Roney and Daniel Filho, and encouraged Roney not to alienate Daniel Filho. |
| Sylas Kok Ribeiro | Attorney from São Paulo | Colleague of VP Roberto Rodrigues who met with José Mapelli to transmit the fraudulent receipt. |
| Roberto Rodrigues | BRF's Vice President of Legal and Corporate Affairs | VP Roberto Rodrigues hired Sylas Ribeiro to meet with José Mapelli. He later testified that he was in close contact with Sylas Ribeiro throughout the entire process. |
| Roney Santos | BRF's Manager of Institutional and Government Relations of BRF | Negotiated the line speed bribe, and is heard on wiretaps discussing the fabrication of the receipt. |

### 1. Background: Line Speeds in the Poultry Industry

223. Like all manufacturing industries, the meat and poultry industry strives for maximum operating efficiency and productivity. Among other things, this requires that production lines be operated at speeds that optimize quality and volume for the labor input expended. Unlike in other industries, however, the meatpacking industry must also comply with regulations developed to ensure the wholesomeness and quality of the food supply it produces. These regulations include line speeds, which cap the number of birds that can be slaughtered per minute ("BPM").

224. Line speeds are a highly controversial topic, which pits industry against consumer protection groups. In the United States, for example, the Food Safety and Inspection Service ("FSIS") has established a maximum line speed of 140 BPM. *See* 9 CFR §381.69. This line speed, which was established in 2014 as part of the FSIS's New Poultry Inspection System ("NPIS"), was developed "to facilitate pathogen reduction in poultry products, improve the effectiveness of poultry slaughter inspection, make better use of the Agency's resources, and remove unnecessary obstacles to innovation."

225. On May 22, 2017, Congressman Doug Collins of Georgia's Ninth Congressional District asked Secretary of Agriculture Sonny Perdue to eliminate line speed regulations as part of the Trump Administration's deregulation efforts. Then, on September 1, 2017, the National Chicken Council ("NCC") petitioned the FSIS to implement a waiver system which would raise the line speed from 140 BPM to 175 BPM in companies that developed alternative control methods to protect against contamination.[9]

---

9 *See* Petition to Permit Waivers of the Maximum Line Speed Rates for Young Chicken Slaughter Establishments under the New Poultry Inspection System and Salmonella Initiative Program, *available at* www.fsis.usda.gov/wps/wcm/connect/7734f5cf-05d9-4f89-a7eb-6d85037ad2a7/17-05-Petition-National-ChickenCouncil-09012017.pdf?MOD=AJPERES (last visited Dec. 3, 2018).

226. The efforts by Congressman Collins and the NCC to raise the line speeds sparked intense backlash from consumer advocacy groups, health organizations, and politicians, all of whom argued that the proposal – which would require health inspectors to inspect ***three chickens per second*** – posed a public health risk. For example, on June 29, 2017, in an op-ed published on TheHill.com, Congresswoman Rosa DeLauro of Connecticut's 3rd Congressional District argued that "[a]ny attempt to increase line speed to the industry-preferred 175 birds per minute . . . or roughly 3 birds per second, would have serious detrimental effects to food, worker, and animal safety."[10] Likewise, in a letter dated December 13, 2017, which was signed by over 40 different consumer interest groups and public health groups, the Center for Science in the Public Interest argued that the proposal "has the potential to compromise food safety."[11]

227. On January 29, 2018, the USDA denied the NCC's petition to increase line speeds.[12]

### 2. BRF Bribes a Government Official to Increase the Line Speed

228. The Brazilian poultry production industry was not immune to the line speed controversy.

229. In 2011, under MAPA regulations, the maximum permitted line speed in Brazil was 10,000 birds per hour for poultry, or 166 BPM.

230. BRF had the technical capacity to produce birds at a faster rate, but was hamstrung by MAPA rules. Thus, BRF resorted to bribery to increase the line speed.

[10] *See* https://delauro.house.gov/sites/delauro.house.gov/files/USDA-Line-Speed-Letter-6-29-17.pdf (last visited Dec. 3, 2018).

[11] *See* https://cspinet.org/sites/default/files/attachment/cspi-poultry-line-speeds.pdf (last visited Dec. 3, 2018).

[12] *See* https://www.fsis.usda.gov/wps/wcm/connect/235092cf-e3c0-4285-9560-e60cf6956df8/17-05-FSIS-Response-Letter-01292018.pdf?MOD=AJPERES (last visited Dec. 3, 2018).

231. To that end, in the summer of 2011, BRF financed a trip to Europe for Maria do Rocio, the regional superintendent of SIPOA in Paraná. Maria do Rocio spent three days touring Holland, Belgium, and Germany.

232. When she returned from her trip, Maria do Rocio successfully lobbied MAPA to raise the legal line speed to the industry-preferred 200 BPM, or 12,000 birds per hour, resulting in a 20% boost to BRF's poultry production rate.

**3. BRF Promises to Fabricate Evidence to Undermine a Federal Corruption Probe into the Line Speed Bribe**

233. In early 2015, the Brazilian Federal Police opened an investigation into Maria do Rocio for accepting a bribe to raise the line speeds. Realizing she was facing serious criminal charges, Maria do Rocio turned to Roney for help.

234. On several occasions between February 15, 2016 and March 2, 2016, Maria do Rocio asked Roney to provide a fake receipt showing that she had reimbursed BRF for the trip so she could avoid criminal charges.

235. When Roney refused to provide the receipt, Maria do Rocio asked Daniel Filho, regional superintendent of MAPA in Paraná, to intervene. Daniel Filho was described as the "commander" of the entire corruption operation in Paraná, and later became the chief informant for the prosecution in Operation Weak Flesh.

236. On May 6, 2016, Daniel Filho called Roney on the telephone and demanded that BRF provide the fraudulent receipt. Daniel Filho argued that the fraudulent receipt "costs you nothing" and that it was an "injustice" that BRF gained a 20% productivity as a result of the bribe, and that Maria do Rocio might go to jail.

237. Daniel Filho also demanded that Roney set up a meeting with the BRF Board of Directors and BRF Chairman Abilio Diniz to convince them to provide the receipt, noting that

MAPA went out of their way to accommodate the Company "[w]hen the businessmen needed help from the Ministry," we went out of way to help them, and you will not do the same for us." When Roney stated that he already discussed the matter with the Company, Daniel Filho responded: "Who's the guy who's holding out? I want to know. We are going to ask for his head at BRF." The transcript of the call, which was intercepted by Brazilian authorities and reproduced in full in the *Carne Fraca* Decision, states, in pertinent part:

> DANIEL: You have to get the receipt for Dr. Maria from that trip. There is no other way out. If not, she'll lose her public job. Fine?
>
> RONEY: Ta.
>
> DANIEL: If you don't have the support there, please say so.
>
> RONEY: (unintelligible)
>
> DANIEL: Let me talk. If you do not support there, please tell us, ***we'll talk to ABILIO DINIZ,*** okay?
>
> RONEY: Ta.
>
> DANIEL: We're to escalate the matter up to where it has to go to be done, okay?
>
> RONEY: Okay. Cool, then.
>
> DANIEL: We will talk to the BRF shareholders[13] about this matter. ***Because it cannot be like this.*** The boy that is in DOIS VIZINHOS will lose his job, the boy who takes care of your company that slaughters 500 thousand chickens per day. Right? ***When the businessmen needed help from the Ministry, they traveled abroad for you. This subject is dragging on for too long. It is no longer possible.*** So, you schedule a meeting in São Paulo with whomever you have to schedule it with, for Tuesday, either Tuesday afternoon or Monday, that we have to go to São Paulo to solve this. If you have no support.
>
> RONEY: You want to set up a meeting here?
>
> DANIEL: That's it.
>
> RONEY: You want me to check it out?

[13] In this context, the term "shareholders" refers to the large shareholders who serve as members of the Company's Board of Directors.

DANIEL: Schedule it now. For Tuesday.

RONEY: Then it is done. Tuesday.

DANIEL: Now, if you have, your director has no support, your sky has no support, we will get the support that is needed. Fine?

RONEY: Am ham.

DANIEL: Why? ***Because this is an injustice, right. You have gained a productivity of 20% in all Brazil. Right? You used to slaughter ten thousand, you drop thirteen thousand chickens per hour. You gained 20% productivity.*** It's not fair that a federal inspector is going to be fired because of it. Is that okay? Clear your calendar because we have to talk.

* * *

DANIEL: ***It does not cost. It does not cost you to give her a receipt. It is so simple***.

RONEY: I know that. I'm the guy who already told the company (unintelligible).

DANIEL: ***Who's the guy holding it up? I want to know? Because we are going to ask for his head there at BRF. Okay?***

RONEY: Okay.

DANIEL: I'm going to unite whole Brazil over there, man. You do not play. Why? Because you benefited? Okay?

RONEY: Hum hum.

DANIEL: Okay. A hug.

* * *

238. On June 6, 2016, Roney contacted his colleague Pericles Salazar, President of the Brazilian Association of Refrigerators and President of the Union of the Meat and Dairy Industry in the State of Paraná, to discuss Daniel Filho's demand. Roney was clearly frustrated by Maria do Rocio's and Daniel Filho's repeated overtures to him, especially given that he could not authorize the receipt. As Roney explained on the call, which was intercepted by Brazilian authorities and transcribed in the *Carne Fraca* Decision, only a BRF director or VP could authorize it:

> PERICLES: Roney, Dr. Maria just now called, asking how it stayed because she needs to buy (unintelligible).
>
> RONEY: Actually, it is the following Pericles. She already sent me a message and I already replied. ***It's no use for her to come here and you to come here and not have the people who are responsible.*** Understood? So, what do I see? ***Our vice president is not going to be here. Our director) is not going to be here. It's no use for her to come here. I even told her in the message.Doctor Maria, I am checking the probable date when everyone will be here.The VP is traveling, the director is traveling and the legal department is traveling. So it's no use to come here and she's not going to be seen by the people who are responsible, understand?*** Because Daniel's message was very clear. It has to be the people who can make a decision. All right then. If it is to be people who can make a decision, that's fine.

* * *

239. Roney also told Pericles that he was very nervous about BRF's legal exposure if the fraudulent receipt was uncovered, explaining that it would be easy for the Brazilian authorities to determine that the receipt was fake, yet impossible for BRF to defend the receipt as legitimate. The transcript of the call, which was intercepted by Brazilian authorities and reproduced in the *Carne Fraca* Decision, states, in pertinent part, as follows:

> RONEY: ***Pericles, we've always been worried***. The problem is that what Dr. MARIA and DANIEL want, it is even riskier for the company and for her. Understood? It is not simply giving a receipt that she reimbursed BRF for the tickets. That happened in 2008 and 2009. How am I going to give her a receipt, now? Another thing: this money never entered BRF's account. Even more a company like BRF. Who kept the money? The manager? Who? It's not like this. Understood? This is what I want. It is good that you think about this, she wants to receive a reimbursement receipt, but if one day the Public Prosecutor's Office, someone starts to look into: "who", "where". Because here at BRF any trip that we do we have to deposit in the name of the *CNPJ* [*Brazilian tax ID for a company] of the company, who is inside the cashier of the company. Do you agree with me?
>
> PERICLES: Yes.
>
> RONEY: So imagine, it is the same thing, you paid an expense for someone there in the association, and the person paid for you, so you say: "No, I did not keep it. So, it is not in the association? No. This money is not in the association. We did not account for it." It is the same thing as did not pay. Understand?

* * *

> RONEY: Wait because if the company is called, we're going to present a great defense, understand? In the following sense: the company did nothing illegal. Our process was evaluated. She went in a technical capacity. There was the need to have a qualified person to go. The company did not benefit. There was no damage to the public accounts. We did not pay a bribe to benefit from her going. The process underwent a SIPOA analysis. Other companies followed the same process strictly. There was nothing. Understood? That's why it is like this. I do not understand Daniel calling me now the way he called me to question a receipt. Understood? Because, suddenly the receipt will not have ballast for us to confirm the origin, understand?
>
> PERICLES: Understood.

* * *

240. In the same conversation, Roney stated that he was torn because he has "great regard" for Daniel Filho because he "is a guy who is effective" and a guy "who does things for the Company."

241. Pericles then suggested that BRF demonstrate its commitment to Daniel Filho in other ways. Specifically, Pericles suggested that BRF submit a letter of recommendation supporting Daniel Filho's reappointment as regional superintendent of MAPA in Paraná following the upcoming elections.

242. Despite its reservations, BRF ultimately agreed to provide the fraudulent receipt to Maria do Rocio.

243. To avoid getting caught, however, VP Roberto Rodrigues insisted that the Company use outside counsel to transmit the false receipt to Maria do Rocio's personal attorney, José Mapelli. To that end, Roberto Rodrigues contacted his colleague, an attorney from São Paulo named Sylas Kok Ribeiro, to meet with José Mapelli and transmit the receipt.

244. In conversation between Roney and Maria do Rocio, Roney informed Maria do Rocio that the Company was arranging for an outside attorney to handle the delivery because the "vice president" does not want BRF lawyers to get involved. Roney also told Maria do Rocio that "our

vice president" was going to have Sylas contact José Mapelli to coordinate a time and place to meet. The transcript of the conversation, which was intercepted by Brazilian authorities and transcribed in the *Carne Fraca* Decision, states, in pertinent part, as follows:

> RONEY: We have a lawyer within the group of lawyers here in São Paulo. They are outsourced from BRF and they will get in touch with Dr. SILAS. Dr. Silas, who is Dr. Silas, will contact DR. MAPELLI. Due to the issues that are happening we have to be very careful Dona MARIA, in speaking regarding something like that. ***We are not going to get involved, that's a guideline from our vice president, the lawyers of the company's legal department.*** So it's going to be an outsourced law firm that already works for BRF in these matters, who will address this matter. They will contact you. ***I just talked this morning with our vice president.*** So, they will contact Doctor MAPELLI. Ok? Because we are very worried and we are taking a big risk. Understand?
>
> * * *
>
> MARIA: And what is the name of the person who will be in contact?
>
> RONEY: SILAS
>
> MARIA: Is he in São Paulo?
>
> RONEY: Yes in São Paulo. In an office here in São Paulo.
>
> MARIA: Hum Hum. And will he call immediately?
>
> RONEY: Our vice president said he was going to ask him to call between this morning or yesterday afternoon.
>
> * * *

245. Although Roney did not identify the vice president by name, the Brazilian authorities intercepted another phone call later that night which confirmed that the unnamed vice president was BRF VP Roberto Rodrigues. In the conversation, Roberto Rodrigues can be heard telling Roney that "I spoke to Sylas. Sylas is waiting for you to call him to give the guy's contact." The transcript of the call, which was intercepted by Brazilian authorities and reproduced in the *Carne Fraca* Decision, states, in pertinent part, as follows:

> RODRIGUES: I spoke to SILAS, SILAS is waiting for you to call him to give him the guy's contact.

RONEY: I do not have SILAS' telephone, but I'll get it tomorrow with ANA. Is that okay?

RODRIGUES: I'll give it to you, she's waiting for you . . .

RONEY: We are good then! You can give it to me now, and I'll call him right away. and give him Dr. MAPELLI contact's (. . .) Can you send it to me by WhatsApp?

RODRIGUES: I will send it to you right away (. . . .)

* * *

246. After Roney secured outside counsel, he turned his efforts to arranging a place for the meeting. This was no easy feat, as José Mapelli refused to meet at SIPOA headquarters or anywhere else indoors. On a telephone conversation between Maria do Rocio and José Mapelli, the latter insisted on meeting in a neutral place because "the walls are listening." The transcript of the call, which was intercepted by the Brazilian authorities and transcribed in the *Carne Fraca* Decision, states, in pertinent part, as follows:

MARIA: I spoke with the guy. RONEY from São Paulo, right. The person who will talk, that will deal with the matter is from here, from Curitiba, from the legal department here.

MAPELLI: I know. But I do not want to speak with the legal department. They will put obstacles. That's why I said it. I wanted to make an excuse, to say: he's going to be in São Paulo, he will talk to you right there. Understand?

MARIA: But then, if anyone else comes, why? It will be. ***He wants to schedule this meeting here at headquarters.***

MAPELLI: Understood.

MARIA: Did you understand?

MAPELLI: No, no, no. ***That's not good. That there are walls listening. No. No***. I did not want to meet even in my office. Why? Have a coffee in the street. Like that, you know.

MARIA: But he's waiting for a call to schedule somewhere. Doctor (unintelligible) spoke to him an hour ago, more or less, okay. He is expecting the call.

MAPELLI: Isn't there a way you can tell him that on Thursday I will be in São Paulo? If he cannot see me.

* * *

247. Sylas Kok Ribeiro did indeed meet with José Mapelli. During the conversation, José Mapelli asked Sylas for the receipt.

248. According to the *Carne Fraca* Verdict, VP Roberto Rodrigues testified that Dr. Sylas reported back to him that José Mapelli did in fact request a copy of the receipt at that time:

> The witness José Pernomian Rodrigues, BRF S/A vice-president . . . reports the facts in rich detail and states verbatim that after forwarding the case to the criminal lawyer hired by BRF S/A Sylas Kok Ribeiro, [Sylas Kok Ribeiro] effectively received JOSÉ ANTONIO DIANA MAPELLI in his office in São Paulo, and that Sylas informed [Roberto Rodrigues] that there was an express request for the issuance of the reimbursement receipt by the judge, in the name and benefit of MARIA . . . .

* * *

249. The foregoing conversations demonstrate that BRF – with the knowledge and consent of individuals at the highest level of the Company – used fraudulent and corrupt means to ensure the promulgation of regulatory policies to increase the production of poultry.

250. To cover up their misconduct, BRF engaged in further criminal activity by promising to fabricate evidence to undermine an ongoing police investigation in Brazil. This too was done with the knowledge and participation of an individual at one of the highest levels of the Company, *i.e.*, VP Roberto Rodrigues. The illegitimate nature of this arrangement is further illustrated by BRF's decision to use outside counsel to coordinate the delivery of the receipt, and by attorney Mapelli's refusal to meet inside because of concerns that someone would be listening in on the meeting.

251. On September 28, 2018, Maria do Rocio and Jose Mapelli were both convicted on federal corruption charges for their involvement in this episode (i.e., the *Carne Fraca* Verdict).

252. BRF's commitment to expose itself to substantial risk to help Maria do Rocio avoid criminal prosecution shows that BRF valued this corrupt relationship greatly, and was indebted to Maria do Rocio for the assistance she provided to the Company.

## E. The Company's Lack of Internal Controls Regarding Other Aspects of Food Safety

### 1. Lack of Controls Regarding Detection and Reporting of Salmonella and Other Pathogens

#### a. Salmonella Outbreak in Carambeí, Paraná

| Key Figures | | |
|---|---|---|
| **Name** | **Position** | **Role** |
| Daniela Baba de Siqueira | Laboratory Technician at Santo André Matrix | Testified that BRF knew that the breeder stocks at the Santo André matrix were contaminated with salmonella pullorum. |
| Decio Luis Goldini | BRF's Agricultural Manager at Santo André Hatchery | Authorized the transport of chicks contaminated with salmonella. |
| Edilson Andrade | BRF Veterinarian assigned to Santo André Hatchery | Confirmed the presence of salmonella pullorum in newly-hatched chicks. |
| Everaldo Frohlich | BRF Veterinarian assigned to Carambeí facility | Approved transport of birds from farms to Carambeí processing facility. |
| Humberto Schiffer Cury | BRF Veterinarian assigned to Carambeí facility | Confirmed the presence of salmonella pullorum in birds before they were slaughtered. |
| Loricel Rugeski | BRF Supervisor | Corresponded with Cristianne Liberti regarding salmonella contamination and authorized transport of additional lots of infected chicks to Liberti's farm. |
| Lucas Silvestre Teston Binotto | BRF Veterinarian assigned to Carambeí facility | Informed Liberti that the birds from the Santo André matrix were contaminated with salmonella pullorum. |
| Luis Augusto Fossato | Industrial Manager at BRF's Carambeí plant | Directed the slaughter of birds despite confirmed presence of salmonella pullorum. |
| Nelva Grando | Corporate Manager of Animal Health- Carambei | Present at April 25, 2016 meeting where BRF decided not to report the salmonella |
| Patricia Roche | Corporate Manager of Animal Health - Carambei | Present at April 25, 2016 meeting where BRF decided not to report the salmonella |
| Priscilla Koerich | Corporate Health Management – Carambei | Presented at April 24, 2016 meeting where BRF decided not to report the salmonella |

### (1) BRF's Poultry Production Model

253. BRF's poultry production model involves several phases. At the beginning of the poultry production cycle, BRF purchases breeder chicks in the form of eggs. The chicks are sent to BRF's grandparent stock farms where the chicks are hatched and raised to become a part of the breeding stock. The breeding stocks produce hatchable eggs that result in chicks that are ultimately used in the Company's poultry products. The breeder stock farms are called "matrices" (in Portuguese, *matrizeiros*).

254. The eggs produced by the breeding stock are hatched at BRF hatcheries and are monitored for a 24-hour period.

255. BRF then sends the day-old chicks to be "lodged" at designated local outsourced farmers, who are responsible for raising and fattening the chicks.

256. BRF is contractually obligated to supply the farmers with poultry feed and veterinary and technical support during this process.

257. Each production facility receives birds from a designated set of farmers.

258. When the birds are fully grown, they are transported to be slaughtered at BRF's production facilities.

259. The graph below depicts the poultry production chain described above:



### (2) SIF Inspectors Detect Salmonella Pullorum at the Carambei Facility

260. BRF's Carambei production facility sources its birds exclusively from integrated farmers Cristianne Liberti, Maurício Pusch de Macedo, Antonio Stanicheski, Pedro Fierzt, and Irene Kliewer (the "Carambei Farmers"). The Carambei Farmers, in turn, source their chicks from various matrices, including, *inter alia*, the Santo André matrix and the JBR matrix.

261. In early 2016, BRF procured a new batch of eggs from the Santo André matrix. The eggs were incubated and hatched at the Santo André hatchery. After observing the chicks for 24 hours, the day-old chicks were delivered to the Carambei Farmers.

262. The Carambei Farmers lodged the birds for several months, and, in March 2016, the birds started to be sent for slaughter.

263. The first batch of chickens from the Santo André Matrix was slaughtered at the Carambeí facility on March 10, 2016.

264. An assistant SIF inspector who was conducting post-mortem inspections of the chicken carcasses observed heart lesions in multiple birds, which is a known sign of salmonella.

265. After conducting a traceability analysis and determining that the infected birds were lodged by Carambei Farmer Pedro Fierzt, the inspector seized additional hearts and livers from birds lodged at the same farm, and sent them to a laboratory for histopathological analysis. The results reported pericarditis of subacute bacterial origin and hepatitis of bacterial origin, which is a sign of salmonella pullorum.

266. Seven days later, on March 17, 2016, the same strain of salmonella was confirmed in samples taken from birds raised by Carambei Farmer Irene Kliewer.

267. On April 14, 2016, after confirming that the bacterium salmonella pullorum posed a danger to public health, the SIF notified BRF of the contamination, directed the sanitary slaughter of

all affected birds, and suspended export certifications until the conclusion of the diagnoses. *See* MAPA Official Letter No. 052/2016/SIF 424.

268. By April 18, 2016, BRF already knew that the birds from the Santo André matrix were contaminated with salmonella pullorum (*see infra* ¶¶275-280). But it also knew that a ***different*** batch of birds hatched at a ***different*** hatchery, the JBR hatchery, was infected with the same strain of salmonella, and had already been reported to SIF and ADAPAR officials.

269. BRF therefore decided to attribute the contamination to the JBR hatchery, and conceal the contamination at the Santo André matrix. To that end, at a meeting of members of the agriculture and livestock sector and SIF auditors on April 18, 2016, Decio Goldini and Humberto Cury publicly announced that salmonella pullorum had been identified and confirmed in birds hatched at the JBR hatchery.

270. But then, on April 29, 2016, additional lesions were detected in birds raised by a different Carambei Farmer, Antonio Stanicheski. Although the lesions appeared identical to the previously detected lesions – which BRF claimed originated at the JBR hatchery – Antonio Stanicheski had not lodged chicks from the JBR hatchery. He only lodged birds from the Santo André hatchery.

271. This new development threw everything off course. The SIF demanded an investigation to determine how this batch of birds came to be contaminated and halted all further slaughter at the Carambeí unit to protect against any cross-contamination.

272. BRF stuck to its guns, and on May 10, 2016, reported that there was no contamination at the Santo André matrix, and that farmer Antonio Stanicheski had, in fact, received chicks from the JBR hatchery. The Company further explained that the transport documentation which indicated

that the chicks were hatched at the Santo André hatchery was simply incorrect, a result BRF chalked up to "operational failures." *See* BRF Official Letter No. 307/2016.

273. The ruse worked. BRF was hit with an infraction for using inaccurate export labels that falsely represented that the birds raised by Antonio Stanicheski were free of salmonella pullorum. DIPOA issued new guidelines for sanitary slaughter of contaminated birds. And on May 14, 2016, the Company reported that it had slaughtered the last of the contaminated birds from the JBR hatchery, in accordance with MAPA's sanitary slaughter guidelines.

274. But on May 18, 2016, everything fell apart when the SIF detected salmonella pullorum in birds raised by a Carambei Farmer that had not lodged birds from the JBR hatchery. The farmer, Maurício Pusch de Macedo, had received chicks from just one place: the Santo André hatchery.

#### (3) BRF Knew About the Contamination at the Santo Andréw Matrix and Decided Not To Report it to SIF

275. Emails, text messages, laboratory records, and other evidence seized in Operation Weak Flesh and Operation Trapaça confirm that BRF had detected and verified the presence of salmonella pullorum in the chicks from the Santo André hatchery as early as March 2016, but made a deliberate decision to conceal the contamination from the proper authorities.

276. A laboratory report summary (in Portuguese, *demonstrativo de laudos*) dated March 31, 2016 indicates that BRF had ordered several tests to determine whether birds originating from the Santo André hatchery were infected with salmonella. According to the report, on March 10, 2016, the Company sent at least two samples for salmonella testing. Then, on March 17, 2016, the samples were sent to be tested again, accompanied with the notation: "retest collection after medication" (in Portuguese, *coleta de reteste pos medicacao*). The report summary thus

indicates that the lot was medicated to control salmonella ***prior to March 17, 2016***, and then tested again to determine if the pathogen was still present.[14]

277. On April 23, 2018, BRF veterinarian Daniela Baba de Siqueira created a WhatsApp group to communicate with BRF officials regarding the contamination at the Carambei facility (the "Carambei WhatsApp Group"). At 2:04 p.m., Daniela Baba sent a message to the Carambei WhatsApp Group stating: "***5 pools of embryonated eggs from total of 10 of san03 [referring to the Santo André matrix], positive spullorum***." Later that day, she sent another message to the Carambei WhatsApp Group stating: "***san03 will not be notified to officials . . . due to delicate situation with SIF we will not notify***."

278. She also informed the Carambei WhatsApp Group that a meeting was scheduled with "corporate" on Monday, April 25, 2016, to discuss the Company's strategy regarding the contamination, writing: "***meeting in cbi Monday, teleconference with corporate and alignment on san03***."

279. On April 25, 2016, Patricia Roche, the Corporate Health Manager for the Carambei facility, sent an email to all BRF employees in Carambei, telling them to keep the contamination "***strictly confidential***" until corporate could decide whether to inform the authorities about the contamination.

---

[14] The report summary was signed by "Daniela," which presumably refers to Daniela Baba de Siqueira ("Daniela"). Daniela served as the BRF veterinarian at the Santo André matrix from July 2005 to June 2017, and was responsible for testing the breeder stock at the matrix. In sworn testimony before the Brazilian Federal Police given on March 5, 2018, Daniela stated that BRF was aware that the chicks were contaminated with salmonella pullorum.

**Assunto: ENC: alojamentos SAN 03 Incubatório.xlsx**
**De:** Patricia Rocha /O=EXCHANGELABS/OU=EXCH[illegible] FC31DE6A773-PATRICIA TI

**Para:** Francisco Perim /o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=4940e7e0851940319da893836265cd Francisco d; Marcelo Michelon /o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients /cn=7a2c75bcc3de4142bcae992b746bcf24-Marcelo Mic; Guilherme Barboza /o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=6c8b13c4dc184b3cbb04dd9b21add739-Guilherme E; Graciani Panizzon /o=ExchangeLabs/ou=Exchange Administr Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=64e5a6f6d2b34e36b64ffa3b6b751ecd-Graciani Ca; Humberto Cury /o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=b2e4afe02b1341408a0541d8ae4b1207-Humberto Sc;

**CC:** Tatiana Petry /o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=32ea7d7f75a3482e8ee146b11c259b7a-Ta Pet; Marcelo Cazara /o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=20cd46750ae14106ba68afd4338c1c24- Marcelo Caz; Edson Weirig /o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=225db9ccda2f46f9bdf51737ce9c Edson Weiri; Daniela Rosa /o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients /cn=e21eabc27ba849e4a5cc0e75e40ced19-Daniela Dal; Adriano Feilstrecker /o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=06a7df646ffc434cbeea3aaa053f8491-Adriano Fei; Joao Mitterer /o=ExchangeLabs/ou=Exchange Administrative Gr (FYDIBOHF23SPDLT)/cn=Recipients/cn=user7a9b720a; Cesar Sanchez /o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=dcc3691b096645f19958b5621cba4911-Cesar Augus; Edilson Andrade /o=ExchangeLabs/ou=Exchange Administrat Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=500d93538a914e55a691115aaeac4793-Edilson And; Humberto Cury /o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=b2e4afe02b1341408a0541d8ae4b1207-Humberto Sc; Loricel Rugeski /o=ExchangeLabs /ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=f25b307cb8e2485e9921d90311cc0a96-Loricel Rug; Decio Goldoni /o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=f48a64d017bf4e2ab53f175246e56ef1-Decio Luiz; Nelva Gra /o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=1b1453eae3034e8895e9a34a6c4390cf-Nelva Grand; Priscill Koerich /o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=448aba73c39943ec86dc7e6491a5c17a-Priscilla K; I Oldoni /o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=23dd848eb1af4c0697f87795876986ae-Ivomar Oldo; Nelson Bauermann /o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=a3c5b64159a345919a9064103670b1b2- Nelson Carl; Cleiton Hoepers /o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients /cn=4e1e1cd87b4a4a578ab4cdb5e5dcb251-Cleiton Hoe; Flagdemir Stalbaum /o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=9a84969035124bec98042065229b4b9d-Flagdemir G; Vilto Meurer /o=ExchangeLabs/ou=Exchange Administrative (FYDIBOHF23SPDLT)/cn=Recipients/cn=e0c59a4f7cbe488c91f928f025dd0e09-Vilto Miche; Daniela Baba /o=ExchangeLabs/ou=Exchange Administrative Gr (FYDIBOHF23SPDLT)/cn=Recipients/cn=8f7593b604274fbe97c2c2fc7680c698-Daniela Bab;

**Envio:** 25/04/2016 08:50:29

---

Bom dia Pessoal!

Por favor, mantenham esta informação restrita, pois está sendo decidido ou não pela comunicação oficial desta positividade das matrizes.

Assim que tivermos a definição informaremos a todos listados neste e-mail.

280. The meeting was at 4:00 p.m. During the meeting, Daniela Baba sent an email to Patricia Roche and Marcello Michelon stating: "***We are in conference with corporate. San03 will not be reported but it will be slaughtered. At 4 pm, we will have another conference to decide if we will report San03 or not.***"

**(4) Testimony of Cristianne Liberti**

281. Liberti was a long-time Carambei Farmer, who had lodged birds for BRF for over a decade. Liberti had the capacity to produce eight cycles of 50,000 birds per year, or approximately 400,000 birds per year.

282. On or about April 20, 2016, Liberti received a batch of approximately 46,000 day-old chicks from the Santo André matrix. In accordance with MAPA rules, the chicks were accompanied by an Animal Transit Certificate ("GTA") indicating that the chicks had been inspected, and that they were fit for human consumption. According to Juliana Martins Bressan, the SFA employee responsible for overseeing the National Poultry Health Program ("PNSA"), each GTA stated that the

birds from the Santo André hatchery "***meet[] the requirements established in current sanitary regulations, performing sanitary monitoring according to PNSA criteria and presenting the following sanitary condition: free of Salmonella Pullorum***."

283. On or about May 2, 2016, a BRF veterinarian named Lucas Binotto informed Liberti that the birds she received on April 20, 2016 were infected with salmonella pullorum, and that she had to halt operations for approximately three weeks to perform decontamination procedures.

284. By email dated May 3, 2016, from Liberti to BRF Supervisor Loricel Rugeski, Liberti blamed BRF for the contamination, expressing her frustration that she would miss 23 days of work because of BRF's negligence, stating as follows:

> Good afternoon, I was informed by Lucas on the property that it will not be possible to lodge on May 03, today because the matrix of the previous lot housed was contaminated with Salmonella Pullorum, and that I will have to remove manure, wash, disinfect, put limestone, and install new bedding.
>
> The company states that it will not replace the bedding.
>
> Until now, I have not received any laboratory report that proves the contamination. As it is provided for in the contract I have to be notified in writing of the measures to be taken.
>
> Lucas sent me an email, informing me about the removal of the dung, feed and replacing of the bedding.
>
> But I told him that it is not only that, there is the lime already placed in the aviary and also the days stopped, after all I was available to lodge. It is not right that I have to have all this work, if it was BRF that caused all this trouble. The value of the days I missed and the value of the lot divided by 29 days is R$586.00. How does the company want me to work 23 days without compensation?!

Alojamento

Cristianne Liberti

ter 03/05/2016 22:32

Para:Loricel Rugeski <loricel.rugeski@brf-br.com>; Lucas Veterinário <lucas.binotto@brf-br.com>; Decio Luiz Goldoni <decio.goldoni@brf-br.com>;

Boa tarde, fui informada por Lucas na propriedade que não será possível alojar dia 03 maio, hoje porque a matrizeira do lote anterior alojado estava com Salmonela Pullorum, e que terei que retirar esterco,lavar,desinfectar ,calcarear e colocar cepilho novo.
Que a empresa dará a reposição do cepilho.
Para mim até o momento não recebi nenhum laudo de laboratório que comprove a contaminação ,como diz no contrato tenho que ser notificada por escrito das providências a serem tomadas.
O Lucas me passou e mail, informando, sobre retirada do Esterco,lavagem e reposição cepilho.
Mas disse a ele que não é só isso,tem o cal que já foi colocado no aviário e também os dias parados, afinal eu estava disponível para alojar, não e correto eu ter que ter todo esse trabalho, se foi a Brf a causadora de todo este transtorno,o valor do meu dia parado e o valor do lote dividido por 29 dias R$ 586,00,como q a empresa quer que eu trabalhe 23 dias sem ter remuneração!

285. The Company capitalized on the situation. On or about May 4, 2016, Loricel asked Liberti to lodge an additional lot of contaminated birds before performing the decontamination procedures. Lucas Binotto followed up on Loricel's request by email dated May 4, 2016, writing:

> ***As per our conversation with Loricel, since we have not yet removed the contaminated bedding, we can host one more lot. When will the space be ready for an additional housing?***

286. Liberti responded to the email later that day, stating:

> ***Lucas and Loricel, you can count on me to lodge the birds on Monday, as long as the Company takes responsibility for any future abnormalities in the lot***.

287. A true and correct copy of the email exchange is produced below:

Re: Aviario

Cristianne Liberti

qua 04/05/2016 17:46

Para:Lucas Veterinário <lucas.binotto@brf-br.com>;

Cc:Loricel Rugeski <loricel.rugeski@brf-br.com>;

Boa tarde,

Lucas e Loricel se depender de mim pode alojar segunda- feira.Tanto que a empresa se responsabilize caso haja futuras anormalidade no lote.

Em 4 de mai de 2016 13:56, Lucas Binotto <lucas.binotto@brf-br.com> escreveu:

Boa tarde Cristianne.

Conforme conversa com o Loricel, já que ainda não tiramos a cama podemos alojar mais um lote. Qual o dia que o barracão fica pronto para o alojamento?

Fico no aguardo.

Att.

288. BRF sent Liberti an additional batch of chicks on May 10, 2016. The batch was slaughtered at BRF's Carambeí facility on June 6, 2016.

289. The Company sent yet another additional batch on June 30, 2016, which was slaughtered at the Carambeí facility on July 7, 2016.

290. Both of these batches were accompanied by GTAs stating that the birds were fit for human consumption. They were not.

291. After raising these two additional batches of infected chicks, Liberti again demanded that BRF reimburse her for the costs associated with decontaminating her farm, as well as any lost wages during the decontamination process.

292. The Company rejected Liberti's demand, and terminated her production contract.

293. Liberti has since commenced a breach of contract action against BRF in the Civil Court of Castro, State of Parana, seeking reimbursement for lost wages and other damages she incurred as a result of the contamination. That action is still pending.

#### (5) The Cover Up Would Have Been Done with the Knowledge of Senior BRF Officials

294. In total, nearly 900,000 birds were infected with salmonella pullorum. Under MAPA rules, these chickens should have been slaughtered and discarded in a practice known as "sanitary slaughter," and the entire breeder stock would have to be destroyed and replaced. The economic impact of complying with these rules would have been enormous. As explained in a report prepared by the SIF and reproduced in the *Trapaça* Report:

> The losses to the productive and financial chain of taking sanitary measures, as provided for in the legislation, are diverse: slaughter of dams, discard of 1-day chicks, discarding of fertile eggs in the hatchery, kidnapping of suspicious cargoes (from animals with lesions) bacteriological negative result and serology, restriction of broilers to markets that accept salmonella spp. (South Africa, Russia, EU, Saudi Arabia and Hong Kong), increase in the period between batches of broiler chicken due to a longer sanitary period (approximately 30 days), disinfection of poultry, discarding or redirection of feed, total condemnation of the parts of the chicken infected or with reflexes of the infection, complete hygiene of the lines of production in the intervals between shifts, reduction of the daily volume of slaughter of the establishment and use for raw materials of lower added value, which leads to losses beyond the minor turnover of chambers and expenditure with external storage until the release of products after official analysis; this without taking into account the risks to the health of poultry farms and the health of the consumer himself.

295. For that reason, the decision not to report the contamination could not have been made by a low level employee; it could ***only*** have been made by individuals at the highest levels of the Company.

296. Indeed, in a sworn statement before the Brazilian Federal Police on March 5, 2018, Edilson Andrade, a technician at Santo André Hatchery and a BRF veterinarian, stated that he believes the decision to conceal the contamination would have been made by senior officials at BRF, given the size of the potential loss.

#### b. BRF Knowingly Slaughters and Distributes over 25,000 Birds Infected with Salmonella Enteritis and Salmonella Typhimurium Without Informing MAPA About the Contamination

| Key Figures | | |
|---|---|---|
| **Name** | **Position** | **Role in Scheme** |
| Baldissera | BRF's Director of Operations in Midwest Brazil | Baldissera approved the slaughter of contaminated birds at another facility. |
| Fabio Loch | Industrial Director of Lucas do Rio Verde Facility | Was copied on email correspondence regarding the contamination. |
| Fabricio da la Silva Delgado | Director of Agriculture | Was copied on email correspondence regarding the contamination. |
| Graziela Borges dos Santos Zachini | Laboratory Manager at Rio Verde facility | Sent email reminding other BRF officials that the contamination would not be reported to SIF. |
| Hélio Garcia | BRF Administrative Coordinator | Explained that BRF chose not to report contamination because it would result in the condemnation of the entire lot, and risked further investigation. |
| Ivomar Oldoni | BRF's General Corporate Manager for Animal Health | Sent email stating that it would be detrimental to BRF to report the salmonella. |
| José Luiz Serra | BRF's Regional Manager of Agriculture | Noted history of rodent problems at Cinpak's farms. Suggested medical treatment for salmonella prior to processing. Arranged slaughter at Nova Marilandia facility. |
| Poliana Oliveira | Supervisor of Animal Health Laboratory at Lucas do Rio Verde, Mato Grosso do Sul | Sent email informing BRF officials about the positive laboratory results. |

297. The contamination at the Mineiros facility was not an isolated incident. At the same time, the Company was also contending with an outbreak of two different strains of salmonella, salmonella enteritis and salmonella typhimurium, at its facility in Rio Verde, Goiás. The contamination affected a lot of 26,250 broiler chickens raised by integrated farmer Naiane Cinpak ("Cinpak").

298. A series of emails reproduced in the *Trapaça* Report shows that BRF both knew about the contamination and concealed it from Brazilian authorities.

299. The contamination was first detected on May 26, 2016 by Poliana Oliveira ("Oliveira"), the Supervisor of the Animal Health Laboratory at the laboratory associated with BRF's Rio Verde, Goiás facility. At 2:10 p.m. that same day, Oliveira sent an email to Graziela Santos, Andreia Gheller, and Joao Zuffo alerting them about the contamination. A copy of the email is produced below:

**De:** Poliana Oliveira
**Enviado:** quinta-feira, 26 de maio de 2016 14:19:15
**Para:** Graziela Santos; Andreia Gheller
**Cc:** Joao Zuffo
**Assunto:** Alerta de Salmonella Typhimurium Monofásica FC LRV

Boa Tarde!

Prezados,

Segue abaixo alerta de *Salmonella* Typhimurium Monofáscia, ou seja, (*Salmonella* 1,4[5];12:I-):

| Unidade | Cadeia Produtiva | Data de Recebimento | R3 | Material | CT (PCR) | Observação da Amostra | Lote | Idade | Sorotipo Isolado |
|---|---|---|---|---|---|---|---|---|---|
| LRV | FC | 20.05.2016 | 8809438 | ÓRGÃOS AVES (LDP) | NA | NAIANE CINPAK - Aviário 23 - JUNÇÃO ÍLEO-CECAL | 16547595 | 25 | *Salmonella* 1,4[5];12:I- |

Atenciosamente,

*Descrição: Descrição:*
*Descrição: Descrição:*
*Descrição: Descrição:*
*Descrição: Descrição:*
**Poliana Oliveira**
Supervisão – Laboratório de Saúde Animal – Lucas de Rio Verde – MT.

Avenida das Industrias, N° 6000 N - Ala 2 - CEP. 78.455-000 - Lucas do Rio Verde - MT
Bairro: Distrito Industrial Senador Attilio Fontana
Tel (65) 3212 1540 / (65) 9228 2572
poliana.oliveira@brf-br.com
www.brf-br.com

300. Later that evening, José Serra, BRF's Regional Agricultural Manager, sent an email to Ivomar Oldoni ("Oldoni") and Fabricio Delgado with the subject "END: Salmonella Typhimurium Monophasic FC LRV Alert" alerting them about the salmonella contamination. Fabio Loch, and Baldiserra were also copied on the email. The email noted that as of May 26, the birds in the lot were 39 days old and weighed an average of 2.1 kilograms. Slaughter was scheduled for June 1, 2016, when the birds were expected to weigh an average of 2.5 kilograms. Given the size of the lot, José Serra proposed treating the birds with the antibiotic neomycin, and then re-evaluate slaughter closer to the slaughter date. Lastly, the email noted that in addition to the salmonella

contamination, "***we have had serious problems in prior lots [raised by Naiane Cinpak] with uncontrolled rodents***." A copy of the email is reproduced below:

**De:** Jose Serra
**Enviada em:** quinta-feira, 26 de maio de 2016 18:31
**Para:** Ivomar Oldoni; Fabricio Delgado
**Cc:** Fabio Loch; Andre Baldissera
**Assunto:** ENC: Alerta de Salmonella Typhimurium Monofásica FC LRV

Boa tarde,
Conforme alinhado estou enviando o comunicado abaixo do lote isolado com St.
Este lote é de frango de corte, esta alojado na granja da Nayane CimpacK (Julio Cimpack ) e apesar das orientações já tivemos sérios problemas em lotes anteriores com descontrole de roedores.
Hoje o lote esta com 39 dias de idade, e peso médio de 2,100,Kg e tinha como previsão de abate o dia 26 de maio.

Agora o abate esta previsto para dia 01 de junho ( quarta- feira ) com 45 dias e 2,500Kg de peso médio aproximandamente, com cerca de 26.250 aves .
Aguardamos definição e orientação sobre o abate deste lote.

Ivomar será que valeria a tentativa de tratarmos com Neomicina, coletar propé novamente e órgãos a fim de avaliar as opções de abate?
No aguardo
Serra

301. The next morning, May 27, 2016, Oldoni rejected Jose Serra's recommendation to treat the birds with medication, writing that "***we are not able to guarantee anything with medication***" and that this particular strain of salmonella poses a risk to public health. Given the positive laboratory diagnoses, Oldoni suggested redirecting the lot to be slaughtered at BRF's Nova Marilandia to be used as raw material for cooking. A copy of the email is produced below:

**De:** Ivomar Oldoni
**Enviada em:** sexta-feira, 27 de maio de 2016 09:14
**Para:** Jose Serra; Fabricio Delgado
**Cc:** Fabio Loch; Andre Baldissera; Rodrigo Yano
**Assunto:** RES: Alerta de Salmonella Typhimurium Monofásica FC LRV

Serra,

Infelizmente não conseguimos garantir nada com a medicação pois essa salmonela temos uma preocupação com saúde pública.
O direcionamento desse lote, já positivo em órgãos, deve será matéria prima para cozimento. Vejam a possibilidade de abater em Nova Marilandia. Nesse caso precisamos alinhar as perdas.

Att.

302. José Serra then forwarded Ivomar's email to Baldissera, requesting approval to schedule the slaughter at the Nova Marilandia facility. All of the previous members of the email chain were copied on his email. Baldissera quickly approved the slaughter, writing "***let's shoot them in Marilandia.***" A copy of the email is produced below:

**Assunto: Re: Alerta de Salmonella Typhimurium Monofásica FC LRV**
**De:** Jose Serra /O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS /CN=0313AF7D743F49C1B46B4AD1ED3EECD6-JOSE LUIZ S
**Para:** Andre Baldissera /o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=dc36f2ce875b4e509fd455ceb0a019dc-Andre Luis;
**CC:** Ivomar Oldoni /o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=23dd848eb1af4c0697f87795876986ae-Ivomar Oldo; Fabricio Delgado /o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=50d7810f31d94b41ac36cc46d45f16d5-Fabricio da; Fabio Loch /o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=1d8f1e13ad274ffdbda1f25e38f1f997-Fabio Rober; Rodrigo Yano /o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=e68f04d8fbbf4127bc9dbabc383d2c71-Rodrigo Hid;
**Envio:** 27/05/2016 09:27:42

Bom dia. Vou alinhar com o Proner o melhor momento de abater...ok?

Conectado pela Motorola

Andre Baldissera <Andre.Baldissera@brf-br.com> escreveu:

Vamos abater em Marilandia.

303. On June 2, 2016 at 10:58 a.m., Graziela Santos sent an email to Hélio Garcia, José Serra, Fabio Loch, Ivomar Oldoni, and Andreia Gheller with the subject "Slaughter Lot Naiane Cinpak Av. 23 – June 3 – Salmonella Typhimurium (in *Portuguese, Abate Lote Naiane Cinpak Av. 23 – 03/06 – Salmonella Typhimurium*), confirming that the contaminated birds were scheduled to be slaughtered the next day, but that "***it won't be reported to the SIF,***" writing, in pertinent part, as follows:

> Good morning,
>
> It is scheduled for tomorrow the slaughter of the positive lot for Typhimurium in organs – intestine.
>
> ***According what we decided with Hélio today, we will process this lot, however, it won't be reported to the SIF.***
>
> ***Everybody understand??***
>
> I await your replies.
>
> Graziela Borges dos Santos Zachini
> Agriculture and Livestock
> Lucas do Rio Verde – Mato Grosso

304. A copy of the email is produced below:

**De:** Graziela Santos
**Enviada em:** quinta-feira, 2 de junho de 2016 10:58
**Para:** Helio Garcia; Jose Serra; Fabio Loch
**Cc:** Ivomar Oldoni; Andreia Gheller
**Assunto:** Abate Lote Naiane Cinpak Av. 23 - 03/06 - Salmonella Typhimurium

Bom dia,

Está programado para amanhã o abate do lote positivo para Typhimurium em órgãos – intestino.

Segundo alinhamento hoje com Hélio, iremos termo processar esse lote, porém não será abatido como lote informado para o SIF.

Todos cientes?
Aguardo retorno
Att,

*BRF_Pos_Hor_Cor*

**Graziela Borges dos Santos Zachini**
**Agropecuária**
**Lucas do Rio Verde (MT)**
Rodovia MT 449, Km 4,6, Distrito Industrial Senador Atílio Fontana
Caixa Postal - 127 Cep - 78455-000
E-mail: graziela.santos@brf-br.com
Telefone: (65) 3212-1544
www.brf-br.com

305. On June 2, 2016 at 10:10 a.m., Ivomar Oldoni asked Hélio Garcia why the contamination was not being reported to SIF. A copy of Oldoni's email is produced below:

**De:** Ivomar Oldoni
**Enviada em:** quinta-feira, 2 de junho de 2016 10:10
**Para:** Graziela Santos; Helio Garcia; Jose Serra; Fabio Loch
**Cc:** Andreia Gheller
**Assunto:** RES: Abate Lote Naiane Cinpak Av. 23 - 03/06 - Salmonella Typhimurium

Helio,

Qual o impedimento de informar esse lote como positivo?

Att.

cid:image004.jpg@01C

**Ivomar Oldoni**
Gerência Corporativa de Sanidade Suínos/Aves - Diretoria de Operações Agropecuária
Rodovia BR 277 - 3001 - Mossunguê, Curitiba, PR
CEP: 82.305-100

306. At 6:15 p.m. that evening, Hélio Garcia responded to Oldoni's email, explaining that the Company would not be permitted to use the birds for raw materials if the contamination was reported to SIF, and any such report would increase the risk of an investigation into the source of the contamination. Given these downsides, Hélio posed the reverse question to Oldoni, asking, "***what is***

***the need to inform the SIF of the presence of salmonella typhimurium***?" A copy of Hélio's email is produced below:

**De:** Helio Garcia
**Enviada em:** quinta-feira, 2 de junho de 2016 18:15
**Para:** Ivomar Oldoni; Graziela Santos; Jose Serra; Fabio Loch; Evandro Proner; Eduardo Libera
**Cc:** Andreia Gheller
**Assunto:** RES: Abate Lote Naiane Cinpak Av. 23 - 03/06 - Salmonella Typhimurium

Ivomar, pode ser que a Inspeção não permite que façamos MP destas aves, peito e coxa (MP), outro ponto é a possível investigação a campo da origem das aves.

Nunca informamos WT+ para SIS não sabemos exato as ações que SIF pode fazer.

A pergunta é ao contrário, qual a necessidade de informar ao SID esta presenta de WT+?

Hélio.

307. Given the Company's history of serious problems with uncontrolled rodents at the Cinpak farm, it is understandable why the Company was anxious to avoid any further scrutiny.

308. The birds were ultimately slaughtered at the Nova Marilandia facility on June 3, 2016, and were distributed to at least ten different Brazilian states. And, as was later confirmed by MAPA official Dr. Juliana Ferreira de Souza in an August 31, 2018 memorandum, the Company never reported contamination to MAPA or SIF.

309. A post-mortem inspection of the lot resulted in a partial condemnation of 888 birds based on the presence of macroscopic cellulite, which is indicative of avian colibacillosis, a major bacterial disease in the poultry industry.

310. According to MAPA records, however, none of the birds were condemned as a result of the salmonella contamination.

311. Of the 26,250 affected birds, 25,365 made it to the marketplace.

### c. Cover Up of Salmonella Outbreak at Uberlândia Facility

| **Key Figures** | | |
|---|---|---|
| **Name** | **Position** | **Role** |
| Maria Estela | BRF Employee | Contacted Roney for help avoiding the legal testing requirements. |
| Roney Santos | Manager of Institutional and Government Relations of BRF | Arranged for BRF to circumvent legal requirements to conduct salmonella testing at |

| Key Figures | | |
|---|---|---|
| **Name** | **Position** | **Role** |
| | | official MAPA laboratory. |

312. On or about January 11, 2017, MAPA issued a new regulation – Normative Instruction No. 01/2017 – mandating that all poultry farms be registered.

313. In April 2017, DIPOA issued a circular memorandum which required comprehensive testing for salmonella at official MAPA laboratories as a prerequisite to registration. Companies that had already registered with MAPA before the issuance of the circular memorandum were also required to conduct testing, but were permitted to conduct the testing in their own facilities. Under the circular memorandum, companies that had not yet registered were required to perform the salmonella testing and analyses at official MAPA laboratories.

314. In the Brazilian state of Minas Gerais, the testing and registration process was to be conducted under the auspices of the Minas Gerais Institute of Agriculture ("IMA").

315. Because BRF had not yet completed its registration for its poultry farms, it was required to do the salmonella testing at official MAPA laboratories under the auspices of the IMA.

316. BRF, however, had already detected salmonella at its chicken farm in Uberlândia, Minas Gerais. The regulatory requirement that salmonella testing be conducted in official MAPA labs under IMA supervision presented a serious obstacle to obtaining registration.

317. To ensure that BRF would obtain satisfactory test results and meet the registration standards, Roney used his connections at IMA to arrange for the testing to be done at BRF's own laboratories so that BRF could present fraudulent laboratory reports, and thereby demonstrate "compliance" with the MAPA registration standards.

318. The *Carne Fraca* Decision includes a relevant transcript of a telephone conversation between Roney and a BRF employee named Maria Estela which states, in pertinent part, as follows:

MARIA ESTELA: There is a recommendation that the poultry farms that supply to freezers should have a registration that used to be with MAPA and now it was handed off to IMA. BRF has 74 chicken farms and 75 turkey farms that do not have this registration. There is no problem, it can continue to supply, it is supported by SIF. That would not be the biggest problem. What happened is that recently***, now in the month of April, a new MAPA Circular Memorandum establishing a more rigid procedure for the control of salmonella was passed***. What is established ***under the new protocol: there are different procedures for farms that are already registered and farms that are not yet registered. Farms that are already registered can perform the new salmonella testing in their own internal laboratories***. But for unregistered farms – which include the 74 chicken farms and 75 turkey farms that I mentioned before, the rules are much more strict and the analysis need to be done in official laboratories of the Ministry of Agriculture.

RONEY: Okay.

MARIA ESTELA: It is a condition for the chicken to enter. For the chicken to enter, it must be accompanied by this analysis which is valid for four months.

RONEY: I got it.

MARIA ESTELA: So what is our problem there? We have incidence of salmonella.

* * *

RONEY: From what I understand there in MINAS GERAIS, in UBERLÂNDIA, it can be registered, but it is not a requirement.

MARIA ESTELA: That, it passes, if you do not register, it passes.

RONEY: And what is the difficulty for the company to register with IMA?

MARIA ESTELA: Before, the difficulty was to obtain a document and so forth. But with this Circular Memorandum here, the unit has run into everyone and wants to get 100% of these poultry farms registered. Make so that all farms are registered because then we will run a lower risk of ***an official laboratory analysis***.

RONEY: Absolutely.

MARIA ESTELA: That today would be the big problem.

RONEY: Of course.

MARIA ESTELA: ***And that is where we need your help***. The unit has already done very fast, several protocols have been made. I can say that about 80% of the total here already has its documentation okay and a filing done at IMA, in IMA's office. Then the procedure is: the local IMA performs an analysis, after the analysis is done

he sends it to Belo Horizonte [the capital city of Minas Gerais] to issue this registration. The registration is issued by Belo Horizonte.

RONEY: Ok, but at IMA or at MAPA? At IMA. This has been delegated to IMA now.

RONEY: Uh huh.

MARIA ESTELA: So we need your help, right? Our staff chatted with IMA offices, asking to speed up the process.

RONEY: Uh huh.

MARIA ESTELA: And some we are succeeding and at this time they are already in Belo Horizonte. Others not. Others not. Others are slow. And what do we need your support for? In this conversation in Belo Horizonte to make the local offices aware of the urgency, also after it goes to them, to release the registration.

RONEY: That is great, Maria Estela. Certainly. Every demand that you send me the first thing I do is run after it to resolve. . .

RONEY: I have a contact inside IMA, but I need to know if the guy is still there. He is a type like MARCILIO, you know? But I do not know if he's there. But tomorrow I will retrieve his contact information and I will reach out to him. Tomorrow, regardless of whether he is there or not, we will go after it to make this regular. How many poultry farms are there?

* * *

RONEY: I'm going to organize it now, and ask GUARANÁ to formalize a document and I'm going to reach out to my contacts here to see whether I can talk to the person there. Is it ok? ***How much time do we have to get registered***?

MARIA ESTELA: The deadline is actually for the unit, because while they do not have the registration, they will have to do the official analyzes.

RONEY: Got it. The deadline is yesterday, then.

MARIA ESTELA: And each analysis that we do we is a risk that we are running that a result will come out that the entire lot will not be received.

RONEY: Got it. Okay. We cannot leave it. Send it to me what I'm going to run after these, okay?

MARIA ESTELA: All right. This week, I believe we will have 100% of the farms with a protocol completed.

RONEY: Yeah, okay.

MARIA ESTELA: Such an urgency that the Unit gave to this subject, so that it does not have to do an external analysis.

RONEY: Yes, I imagine. And the risk, right.

MARIA ESTELA: The risk is too great.

* * *

### 2. Lack of Controls in Production of Poultry Feed and Premix

| Key Figures | | |
|---|---|---|
| **Name** | **Position** | **Role in Scheme** |
| Augusto Heck | Manager of Corporate Health for Swine | Was copied on emails discussing alterations. |
| Edenir Medeiros da Silva | BRF's Manager of Agricultural and Livestock | Sent email stating that BRF was vulnerable in the event of an audit. |
| Fabiana Rassweiller de Souza | BRF's Regulatory Compliance Supervisor in the Company's Feed Production Segment | Was involved in major email correspondences relating to adulteration of premix compound. Attended monthly meetings where the alterations were discussed. |
| Ivomar Olodini | General Corporate Manager for Animal Health | Was copied on emails discussing alterations. |
| Natacha Camilotti Mascarello | BRF Quality Control Technician | Sent email describing "routine" adulterations of premix. |
| Tatiane Cristina Alviero | BRF Quality Control Technician responsible for NIR analyses and Quality Management System documentation, and former feed factory supervisor. | Sent email stating that the ingredients in premix manufactured by BRF are rarely declared properly. |
| Valter Joao Vivan Jr. | Corporate Rations Manager until January 2015. Was then promoted to role of Technical Advisor. | Was copied on emails discussing alterations. Attended monthly meetings where the alterations were discussed. |

#### a. Background: Use of Medications in Poultry Farming

319. In addition to producing meat and poultry products, the Company also manufactures its own premix compound for poultry and swine that are raised for human consumption.[15] The

[15] A premix is a mixture of vitamins, trace minerals, medicaments, feed supplements, and diluents, which is added to ordinary animal feed. *See* The Poultry Site, Manufacturing a Quality Premix

production of premix is highly regulated, both with respect to the types of ingredients that can be added to it, and the ratios of permitted ingredients in each batch. These regulations, codified in MAPA's Antimicrobial Resistance Program, are specifically designed to combat the indiscriminate use of antimicrobials in farming, which has caused a dramatic uptick in the appearance of drug resistant bacteria in the past several years.

320. According to a recent study by The Review on Antimicrobial Resistance, there is a "clear correlation" between human consumption of antimicrobials and increased drug resistance, and the "[h]igher use of antibiotics drives increased drug resistance."[16] Thus, the indiscriminate use of antibiotics in farming increases the chance that bacteria would develop resistance to the drugs, making them useless when treating patients, and posing a severe public health crisis. This is especially so in large-scale commercial farming where "significant volumes are used either prophylactically among healthy animals, to stop the development of an infection within a flock or heard, or simply for growth promotion, to speed up the pace at which animals gain weight."[17]

321. Since 2014, the fight against antimicrobial resistance has intensified globally, and the WHO and other international organizations have promulgated global action plans to fight against

---

(Feb. 13, 2006), *available at* http://www.thepoultrysite.com/articles/518/manufacturing-a-quality-premix/ (last visited Dec. 3, 2018).

[16] Jim O'Neill, THE REVIEW ON ANTIMICROBIAL RESISTANCE, *Antimicrobials in Agriculture and the Environment: Reducing Unnecessary Use and Waste* at 1 (Dec. 2015). *See also* Madlen Davies and Rahul Meesaraganda, *A Game of Chicken: How Indian Poultry Farming is Creating Global Superbugs*, Bureau of Invest. J. (Jan. 30, 2018), *available at* https://www.thebureauinvestigates.com/stories/2018-01-30/a-game-of-chicken-how-indian-poultry-farming-is-creating-global-superbugs (last visited, Dec. 3, 2018).

[17] Jim O'Neill, THE REVIEW ON ANTIMICROBIAL RESISTANCE, *Antimicrobials in Agriculture and the Environment: Reducing Unnecessary Use and Waste* at 1 (Dec. 2015).

superbugs, which has been adopted into the Codex Alimentarius.[18] Brazil is a member country to the Codex Alimentarius Commission.

322. As a member country to the Codex Alimentarius Commission, Brazil has developed strict controls for the use in commercial farming of antibiotics and other medications, including, *inter alia*, colistin, tylosin, nicarbazin, nitrofurazone, carbadox, nasarina, amoxicillin, salinomycin, amprolium, febendazole, ractopamine, and others.

323. **Colistin**: Colistin is an antibiotic given to broiler chickens to help them gain weight faster so more can be grown each year at a profit. The misuse of colistin in poultry farming is said to be directly related to the emergence of a deadly strain of E. coli bacteria with the antibiotic resistant gene *mcr-1*. Brazil banned the use of colistin in 2016. Before 2016, colistin was permitted for use in poultry at the ratio of 2 grams/ton of feed.[19]

324. **Tylosin**: Tylosin is an antimicrobial antibiotic used by poultry farmers not only to treat disease, but also to improve growth performance. *See generally* IN No. 04/2013. Although the use of tylosin in broiler chickens is not illegal, its use must strictly comply with safety criteria, including withdrawal periods, doses, and treatment.

325. **Nitrofurazone**: Nitrofurazone is an antimicrobial organic compound that is most commonly used as a topical antibiotic ointment. Animal studies provide clear evidence that

[18] The Codex Alimentarius, or "Food Code," is a collection of standards, guidelines, and codes of practice designed to protect the health of consumers. The Codex Alimentarius adopted by the Codex Alimentarius Commission, a joint intergovernmental body of the Food and Agriculture Organization of the United Nations and the WHO. The Commission has 188 member countries and one member organization, the European Union. *See generally* http://www.fao.org/fao-who-codexalimentarius/thematic-areas/antimicrobial-resistance/en/ (last visited Dec. 3, 2018).

[19] When MAPA first banned colistin in 2016, poultry producers were given a grace period to use up their existing stock of colistin. Shortly thereafter, a patient in Brazil tested positive for carrying bacteria with the *mcr-1* gene. A Brazilian federal judge immediately enjoined the further use of colistin, finding it to be a grave danger to public health.

nitrofurazone has mutagenic and carcinogenic properties. It has induced mammary tumors in rats and ovarian tumors in mice. Its persistent use can cause convulsions, ovarian atrophy, testicular degeneration, and degeneration of articular cartilage. Nitrofurazone has been banned in products of animal origins in Brazil since 1998. Brazil ratified the prohibition in 2003. *See* IN 09/2003. It has been banned in the United States in food-producing animals since 2002.

326. **Carbadox**: Carbadox is an antimicrobial antibiotic used by swine producers to improve feed efficiency, stimulate the rate of weight gain, and control swine dysentery and bacterial swine enteritis. Carbadox has been prohibited in Brazil since 2005. *See* IN 35/2005.

327. **Ractopamine**: Ractopamine hydrochloride ("ractopamine") is an ingredient in animal feed that makes animals more muscular and increases feed efficiency, causing the livestock to grow at a more rapid rate while consuming less feed, which, in turn, increases profits per animal. Animal research has linked ractopamine to reductions in reproductive function; birth defects; increase of mastitis in dairy herds; and increased disability and death. FDA records show 'death' is the most-often reported side effect. Ractopamine is banned from food production in at least 160 countries around the world, including countries across Europe, Russia, mainland China and Republic of China (Taiwan), due to its suspected health effects. Since 1998, more than 1,700 people have reportedly been "poisoned" from eating pigs fed the drug.

328. **Amoxicillin**: Amoxicillin is an antibiotic that is commonly used in poultry farming as a growth promoter. The European Union prohibits this use of amoxicillin because of concerns about the development of antimicrobial resistance. When used appropriately, amoxicillin carries a 5-20 day withdrawal period.

329. **Febendazole**: Febendazole is an antiparasitic medication administered to birds to prevent pinworms or other parasitic infections. Febendazole carries a 14-day withdrawal period.

330. **<u>Nicarbazin, Nasarina, Salinomycin, and Amprolium</u>**: These medications are referred to interchangeable as coccidiostats or anti-coccidiostats, and are used to treat the poultry disease coccidiosis. The use of anti-coccidiocals in poultry products in broiler chickens is not illegal, but its use must strictly comply with safety criteria, including withdrawal periods, doses, and treatment durations to avoid the presence of residues in edible tissues. Amprolium, for example, carries a three-day withdrawal period. As for salinomycin, the maximum permitted dosages and withdrawal periods differs for egg laying chickens (up to 50 mg/kg in chickens up to 12 weeks of age but no withdrawal period) and broiler chickens (70 mg/kg with no age restrictions, but 1-day withdrawal period).

### b. BRF's Indiscriminate Use of Antimicrobials and Other Prohibited Substances in Premix

331. Emails seized in Operation Weak Flesh revealed that BRF's premix production plants routinely adulterated the premix compound by either: (i) adding ingredients that are prohibited, including unauthorized and/or legally prohibited antimicrobial medications; or (ii) adding permissible ingredients at impermissible ratios.

332. Based in part on these emails (discussed in detail *infra*), Brazilian Judge Dusczak authorized the March 5, 2018 raids on BRF in Operation Trapaça.

333. On March 23, 2018 (18 days after the Operation Trapaça raids), MAPA officials launched surprise inspections at 21 different BRF facilities, with the goal of corroborating whether BRF was still manufacturing adulterated premix. Samples of premix were collected from each BRF facility, including samples of premix that were manufactured during the Class Period, and were sent for laboratory testing and analyses at certified MAPA laboratories.

334. The results of these analyses show that BRF continued adding medications and other prohibited substances to premix, usually without a veterinarian's prescription, even after the outbreak of Operation Weak Flesh and beyond the Class Period. For example:

- On March 1, 2018, BRF's Videira, Santa Catarina facility manufactured a poultry premix compound identified as 280FP18 PX VIT/MIN FINAL CHICKEN. The labels and other records prepared by BRF did not identify amoxicillin as an ingredient in the compound. On March 27, 2018, MAPA officials raided the Videira, Santa Catarina facility, seized samples of 280FP18 PX VIT/MIN FINAL CHICKEN, and sent them for testing in MAPA's Lanagro laboratory. According to the official report of the Lanagro laboratory, the premix contained undeclared nitrofurazone, which is prohibited in Brazil, as well as amoxicillin, which was not declared.

- On March 1, 2018, BRF's Videira, Santa Catarina facility manufactured a poultry premix compound identified as 216FL11 PX VIT/MIN PRE INITIAL CHICKEN. The labels and records prepared by BRF indicated that the compound contained 2.751 mg/kg of senduramicia and 7.336 mg/kg of nicarbazine. On March 27, 2018, MAPA officials raided the Uberlândia facility, seized samples of the 216FL11 PX VIT/MIN PRE INITIAL CHICKEN premix, and sent the samples to MAPA's Lanagro laboratory for testing. According to the official report of the Lanagro laboratory, the premix actually contained 44.84 mg/kg of senduramycin and 121.86 mg/kg of nicarbazine.

- On March 1, 2018, BRF's Videira, Santa Catarina facility manufactured a poultry premix compound identified as 231 FP11 PX VIT/MIN FRANGO PRÉ INI. The label and documentation prepared by BRF indicated that 13.5 mg/kg of nicarbazine were added to the premix. On March 14, 2018, MAPA officials raided the Videira facility, seized samples 231 FP11 PX VIT/MIN FRANGO PRÉ INI, and sent them for testing in MAPA's laboratory in Lanagro. The official report from the Lanagro laboratory indicates that the nicarbazin content in the premix was overstated.

- On January 25, 2018, BRF's Rio Verde, Goiás facility manufactured a swine premix compound identified as 231 ST 31 PX VIT/MIN SUI CRES 01. The label and documentation prepared by BRF indicated that the premix contained 50.0 g/kg of the antibiotic tiamulin and 100.0g/kg of amoxicillin w added to the premix. On March 14, 2018, MAPA officials raided the Rio Verde facility, seized samples 231 ST 31 PX VIT MIN SUI CRES 0, and sent them for testing in MAPA's laboratory in Lanagro. The official report from the Lanagro laboratory indicates that the tiamulin content in the premix was different than what was indicated on the label.

- On February 23, 2018, BRF's Videira, Santa Catarina facility manufactured a premix compound identified as 280FP11 PX VIT/MIN ING CHICKEN. The labels and records prepared by BRF indicated that nicarbazine and nasarina were added to the compound. On March 27, 2018, MAPA officials raided the Rodovia facility, seized samples of the 280FP11 PX VIT/MIN ING CHICKEN premix, and sent the samples

to MAPA's Lanagro laboratory for testing. According to the official report of the Lanagro laboratory, in addition to the nicarbazine and nasarina, the compound also contained undeclared amoxicillin and tiamulin.

- On February 27, 2018, BRF's Chapecó, Santa Catarina facility manufactured a poultry premix identified as 218CP01 PX VIT/MIN PERUS PRE INITIAL. On March 5, 2018, MAPA officials raided the Chapeco facility, seized samples of the 218CP01 PX VIT/MIN PERUS PRE INITIAL premix, and sent the samples to MAPA's Lanagro laboratory for analysis. According to the official report of the Lanagro laboratory, the premix contained undeclared monensina.

- On February 27, 2018, BRF's Videira, Santa Catarina facility manufactured a poultry premix compound identified as 216 FL 15 PX VIT/MIN FRANGO CRESC. The labels and records prepared by BRF indicated that 13.04g/kg of nasarina was added to the compound. On March 27, 2018, MAPA officials raided the Videira, Santa Catarina facility, seized samples 231 ST 31 PX VIT MIN SUI CRES 0, and sent them for testing in MAPA's Lanagro laboratory. The official report from the Lanagro laboratory indicates that no nasarina was detected in the compound.

- On March 2, 2018, BRF's Chapecó, Santa Catarina facility manufactured a swine premix compound identified as 237ST05 PX VIT/MIN SUI CRESC 3. On March 5, 2018, MAPA officials raided the Chapeco facility, seized samples of 237ST05 PX VIT/MIN SUI CRESC 3, and sent the samples to the Lanagro laboratory for analysis. According to the official report of the Lanagro laboratory, the premix compound contained the antimicrobials ciprofloxacin, fenbendazole, tilmicosin, and lincomycin.

- On March 5, 2018, BRF's Chapecó, Santa Catarina facility manufactured a swine premix compound identified as 237ST02 PX VIT/MIN SUI INI 2. On March 5, 2018, MAPA officials raided the Chapeco facility, seized samples of the 237ST02 PX VIT/MIN SUI INI 2 premix, and sent the samples to MAPA's Lanagro laboratory for testing. According to the official report of the Lanagro laboratory, the premix contained undeclared fenbendazole.

- On March 5, 2018, BRF's Videira, Santa Catarina facility manufactured a poultry premix compound identified as 240FP14PX VITFRANGO GROWTH. On March 27, 2018, MAPA officials raided the Videira facility, seized samples of 240FP14PX VITFRANGO GROWTH, and sent them for testing in MAPA's laboratory in Lanagro. The official report from the Lanagro laboratory states that the anticoccidiostat nasarina was detected in the premix, but was neither declared on the label nor authorized by a veterinarian.

- On March 10, 2018, BRF's Rio Verde, Goiás facility manufactured a swine premix identified as 240 ML05 PX VIT MIN SUI CRESC3 RVE. On March 27, 2018, MAPA officials raided the Rio Verde facility, seized samples of 240 ML05 PX VIT MIN SUI CRESC3 RVE, and sent them for testing in MAPA's laboratory in Lanagro. According to the official report of the Lanagro laboratory, the premix contained carbadox, which is prohibited in Brazil.

- On March 12, 2018, BRF's Videira, Santa Catarina facility manufactured poultry premix identified as 213 FP 01 PX VIT/MIN. The label and other records prepared by BRF indicated that 10.416 mg/kg of narasina was added to the compound. On March 27, 2018, MAPA officials raided the Videira facility, seized samples of 213 FP 01 PX VIT/MIN, and sent them for testing in MAPA's laboratory in Lanagro. According to the official report of the Lanagro laboratory, no narasina was detected in the premix compound.

- On March 13, 2018, BRF's Rio Verde, Goiás facility manufactured a poultry premix compound identified as GALLI MIX POSTURA FASE 3. On March 27, 2018, MAPA officials raided the Rio Verde facility, seized samples of GALLI MIX POSTURA FASE 3, and sent them for testing in MAPA's laboratory in Lanagro. According to the official report of the Lanagro laboratory, the premix contained traces of florfenicol.

- On March 16, 2018, BRF's Rio Verde, Goiás facility manufactured a poultry premix compound identified as GALLI MIX POSTURA 1 JTI. On March 27, 2018, MAPA officials raided the Rio Verde facility, seized samples of GALLI MIX POSTURA 1 JTI, and sent them for testing in MAPA's laboratory in Lanagro. According to the official report of the Lanagro laboratory, the premix contained traces of tiamulina.

335. In total, according to the official MAPA report following the inspections, (Information No. 52, dated June 26, 2018, SEI No. 21000.009804), there were 77 different incidences of irregularities, as follows:

| **Irregularity** | **No. of Occurrences** |
|---|---|
| ***Absence of declared antimicrobial***: labels and documents reported that the product contained the antimicrobial, but the active principle was not detected in the laboratory analysis. | 11 |
| ***Presence of an undeclared antimicrobial on the label***: laboratory tests detected antimicrobials that were not declared on the labels and documents. | 16 |
| ***Antimicrobial content lower than that declared on the label***: labels and documents reported that the product contained the antimicrobial, but the amount found in the analysis was below the declared level. | 18 |
| ***Antimicrobial content higher than that declared on the label***: labels and documents reported that the product contained the antimicrobial, but the amount found in the analysis was above the declared level. | 1 |
| ***Antimicrobial residue above 1% of the normal dose of use***: products presented antimicrobial residues in quantities greater than 1% of the | 7 |

| | |
|---|---|
| recommended dose. | |
| ***Insufficient withdrawal period prior to slaughter***: products presented antimicrobials that were not being declared and the grace period of these antimicrobials was higher than indicated on the labels. In one of the situations, the antimicrobial content was higher than the legal limit, and the withdrawal period, which was calculated based on the regular dose, was insufficient. | 6 |
| ***Presence of prohibited substance***: Premix contained prohibited antimicrobials. | 3 |
| ***Traceability failures***: Audited units presented errors, difficulties and problems of product traceability, including, *inter alia*, labeling irregularities, missing, incomplete, or illegible manufacturing records, non-contemporaneous preparation of records, and inconsistent records for the same products throughout the production chain. | 6 |
| ***Use of drugs without authorization***: Use of drugs in an unauthorized facility. These premixes were manufactured by one authorized unit, but were seized at another that was not authorized by MAPA to administer medicated products. | 2 |
| ***Presence of ractopamine in unit declared absent***: The product containing the ractopamine substance was manufactured by a company unit audited by MAPA to acquire the "ractopamine-free" designation. Some countries only permit the import of pork products from ractopamine-free facilities. | 2 |
| ***Premix contained prohibited combinations of antimicrobials***: Samples contained combinations of antimicrobials that were illegal under Brazilian and/or international law. The labels and supporting documentation only declared one of the components, but not the other. | 5 |
| Total: | 77 |

336. In connection with these irregularities, MAPA identified 131 different regulatory violations, categorized as follows:

| **Violation** | **No. of Violations** |
|---|---|
| Undeclared antimicrobials in internal documents and product labeling | 36 |
| Inadequate food safety controls | 47 |

| | |
|---|---|
| Inaccurate laboratory reports | 31 |
| Inaccurate production records and labeling information | 17 |
| **Total:** | **131** |

337. Emails seized during Operation Weak Flesh confirm that the routine adulteration of premix dated as far back as 2013.

338. Between November 2013 and March 2014, for example, BRF produced several batches of feed at its Chapeco feed mill that contained colistin and tylosin at levels that exceeded the legally permissible amount. The feed was fed to pigs that were then slaughtered at BRF's Concórdia plant and exported to Russia.

339. In February 2015, BRF was asked to provide a traceability report for the feed that was fed to the pigs that were exported to Russia. To conceal the Company's wrongdoing, Quality Control Technician Natacha Mascarello prepared a fraudulent traceability report which changed the true ratios of the medications contained in the animal feed. The alterations were recorded on a chart prepared by Natacha Mascarello that had two columns showing, respectively, the "real" measurement and the "presented" (in Portuguese, *Apresentado)* measurement.

340. According to the chart, which was seized by Brazilian authorities in Operation Weak Flesh produced in the *Trapaça* Decision, at least two batches of feed contained, but failed to declare, colistin. Several batches of feed containing 30 PPM of tilosin were falsely labeled as containing 22 PPM of tilosin. Batches containing 80-100 PPM of colistin were falsely labeled as containing 10-40 PPM of the antibiotic. A true and correct copy of the chart is below:

**De:** Natacha Mascarello
**Enviada em:** sexta-feira, 20 de fevereiro de 2015 16:57
**Para:** Tatiane Alviero
**Assunto:** ALTERAÇÕES NA RASTREABILIDADE

Segue as alterações realizadas quinta e sexta:

| LOTE | PX | REAL | APRESENTADO |
|---|---|---|---|
| 2001-07 | ST02 | COLISTINA E TILOSINA | TILOSINA |
| 1511-25 | ST02 | COLISTINA E TILOSINA | TILOSINA |
| 0503-70 | ST13 | TILOSINA 30 PPM | TILOSINA 22PPM |
| 0503-64 | ST13 | TILOSINA 30 PPM | TILOSINA 22PPM |
| 0503-70 | ST13 | TILOSINA 30 PPM | TILOSINA 22PPM |
| 0612-82 | ST14 | TILOSINA 30 PPM | TILOSINA 22PPM |
| 0505-45 | ST14 | TILOSINA 30 PPM | TILOSINA 22PPM |
| 1202-30 | ST03 | COLISTINA 80 PPM | COLISTINA 10 |
| 2111-01 | ST03 | COLISTINA 80 PPM | COLISTINA 11 |
| 0403-21 | ST04 | COLISTINA 80 PPM | COLISTINA 12 |
| 0704-03 | ST13 | TILOSINA 30 PPM | TILOSINA 22PPM |
| 2302-19 | ST01 | COLISTINA 100 PPM | COLISTINA 40 PPM |
| 1702-03 | ST13 | TILOSINA 25% - 30 PPM | TILOSINA 22% - 22 PPM |

Natacha Mascarello
Garantia da Qualidade – Fabrica de rações

Rua Sen. Atilio da Fontana 600E Bairro Efapi Chapecó SC
Tel +55 49 4411 4246 / +55 49 3311 4313

Canal de voz interno 6605 4246
natacha.mascarello@brf-br.com
www.brf-global.com

341. BRF also failed to comply with the mandatory withdrawal periods and routinely sold poultry products containing residues of medications. For example, according to the testimony of farmer Cristianne Liberti, on November 8, 2016, BRF supervisor Loricel Rugeski forwarded a text message to a WhatsApp messaging group in which she was a member, which stated:

> ***Urgent: slaughter for tonight and tomorrow are cancelled. Reason: nicarbazin residues found in shipment to Singapore. Extremely serious situation subject to closure of our export factory***.

**c. BRF Employees Casually Discuss the Routine Adulteration Premix**

342. The fraudulent practices described above were not limited to a select group of individuals. Rather, the recurring violations of Brazilian and international law in BRF's animal feed segment were a matter of company policy.

343. On February 23, 2015, Tatiane wrote to Fabiana Rassweiller de Souza ("Souza"), the coordinator of regulatory affairs in BRF's animal feed segment, who was responsible for reviewing and maintaining the records of animal feed inputs imported by BRF, and served as the liaison between MAPA and BRF for all matters related to its feed factories, to report "***a situation that was occurring routinely at the feed mill at the Chapecó plant***."

344. Tatiane stated that "***we rarely declare products correctly***," and set forth suggested practices for keeping track of the most common fraudulent practices at the Chapecó feed mill, including, the "***use of promoters above the established maximum limit***," "***undeclared drug use***," and "***the use of two promoters in the composition***."

345. Tatiane also noted the risk of storing noncompliant premix at the factory. She explained that while the Company could arrange to remove the noncompliant premix before a scheduled audit, it would not be able to remove it if the authorities conducted a surprise audit.

346. The email is reproduced in the *Carne Fraca* Decision, and states, as follows:

> Good morning Fabiana,
>
> As we have already discussed, ***I would like to report a situation that routinely occurs at the premix plant in Chapecó.*** In this specific case, we had a request for traceability to present to MAPA, relating to a production of Concórdia feed mill.
>
> In this situation, traces of Premixes produced between November 2013 and March 2014 were requested. These were for pig premixes, in this case rare, by the way, we had almost all the drugs declared via Rio Verde. However, I report that this is not the only problem we have, ***and I describe what it is necessary to fabricate in many cases when we have these audit requests***:
>
> - ***Due to the Use of Promoters above the established maximum limit for phase/species***: In this case, we need to save the formula in editable format, recalculate the value in kg of the product measured considering the maximum ppm in the feed, change the weight of the product and insert the difference in rice husk;
> - ***Due to Undeclared Drug Use***: In this case, we need to save the formula in editable format, if there is an option to change by a promoter (e.g., tylosin 25% for tylosin 22%), we change the product. For this, we need to track

production batches and change all information. If there is no option to change by promoter, we exclude the product and insert the difference in rice husk;

- ***Due to the use of two promoters in the composition***: It is also necessary to save the formula in editable format, then we exclude one of the promoters, and usually we need to recalculate the other promoter if it is above the maximum allowable dose. In the case that occurred on Thursday, ***we were asked to track 20 premixes, out of which we had to make changes in 13 (65%), and check 100%, because we rarely correctly declare the products, it is necessary to re-evaluate all of them.*** It took more than 8 hours for two people to complete the assignment. Because we received the request at 12:00 o'clock on that day, ***we stayed at the factory until we made the adjustments. But in cases of surprise audits or immediate traceability requests, you can imagine that we do not have enough time to change everything that is necessary, and there is a risk of error!!!***

I want to be clear, that ***we are and we have always done our best to make adjustments, but we have risks***.

***Note: Not to mention, in the case of receiving audit/inspection in the factory, of the products that we have not declared in any program, which is already known, that risk being caught in our stock. In this case, because it was a scheduled audit, we were able to organize the withdrawal of these from the stock, it would be impossible in a surprise inspection***. For awareness of risk, Regards, Tatiane.

*De: Tatiane Alviero*
*Enviada em: segunda-feira, 23 de fevereiro de 2015 09:05*
*Para: Fabiana Souza*
*Cc: Itacir Silva; Edenir Silva; Natacha Mascarello*
***Assunto**: Alterações Premix - Auditorias/ Fiscalização MAPA*

***Bom Dia Fabiana,***
*Conforme já conversamos, gostaria de relatar uma situação que rotineiramente ocorre na fábrica de premix de Chapecó. Neste caso especificamente, tínhamos uma solicitação de rastreabilidade para apresentar ao MAPA, referente a uma produção da Fabrica de rações de Concórdia. Nesta situação, foram solicitadas rastreabilidades de Premixes produzidos entre Novembro de 2013 a Março de 2014.* ***Sendo estes referentes a premixes suínos, neste caso, raro por sinal, tínhamos quase todos os medicamentos declarados via RV. Porém relato que este não é o único problema que temos, e descrevo o que é necessário BURLAR, em muitos casos, quando temos estas solicitações de auditoria:***

*-* ***Devido ao Uso de Promotores acima do limite máximo estabelecido para fase/ espécie:*** *Neste caso, precisamos salvar a fórmula em formato editável, recalcular o valor em kg do produto dosado considerando o valor em ppm máximo esperado na ração, alterar o peso do produto e inserir a diferença em casca de arroz;*

*–* ***Devido ao Uso de Medicamentos sem declarar:*** *Neste caso, precisamos salvar a fórmula em formato editável, Caso houver opção de alterar por um promotor (ex: tilosina 25% para tilosina 22%), alteramos o produto, para isso, precisamos rastrear lotes de produção e alterar todas as informações. Caso não haja opção de alterar por promotor, excluímos o produto e inserimos a diferença em casca de arroz;*

*–* ***Devido ao Uso de dois promotores na composição:*** *Também é necessário salvar a fórmula em formato editável, depois excluímos um dos promotores, e normalmente precisamos recalcular o outro promotor, caso estiver acima da dose máxima permitida. "*

*No caso ocorrido na quinta feira, foram* ***solicitados 20 premixes para rastrear, destes 13 tivemos que realizar adequação (65%), e a conferencia dos 100%, pois como raramente declaramos corretamente os produtos, é necessário reavaliar todos.*** *Demoramos mais de 8h em duas pessoas para realizar a atividade, aonde recebemos a demanda as 12h, neste dia ficamos na fábrica até realizar os ajustes, mas em casos de auditoria surpresa ou rastreabilidade imediata, dá pra imaginar que não tenhamos tempo ágil, para alterar tudo o que é necessário, e risco de erro!!! Quero que fique claro, que estamos e fizemos sempre o possível para realizar ajustes, mas temos riscos. Obs: Isso sem contar, de no caso do recebimento de auditoria/ fiscalização na fábrica, dos produtos que não temos declarados em nenhum programa, que já é de prévio conhecimento, que temos o risco de serem "pegos" no nosso estoque. Neste caso, de auditoria programada, pudemos organizar a retirada destes do estoque, caso impossível em fiscalização surpresa. Para ciência do risco, Abc, Tatiane.*

347. Souza immediately forwarded the email to Ivomar Olodini, Augusto Heck, and Valter Joao Vivan Jr. ("Vivan") to take action and address the issues raised in Tatiane's email.

348. On February 24, 2015, Edenir da Silva, the Manager of Agricultural and Livestock Operations at the Chapecó facility, sent an email to Tatiane Alviero asking who was responsible for

developing the formulas for the premix compounds. In response, Tatiane Alviero explained that MAPA promulgated a chart containing the minimum and maximum levels of each component allowed for each production phase. But because BRF routinely exceeds those requirements, "***we have to circumvent the reports***" and "***hide them in the audit***." A copy of the email is produced below:

**De:** Edenir Silva
**Enviada em:** terça-feira, 24 de fevereiro de 2015 13:50
**Para:** Tatiane Alviero
**Assunto:** RES: Alterações Premix - Auditorias/ Fiscalização MAPA

Tati quem é o responsável por essas formulações.

Edenir Medeiros da Silva
Gerência Agropecuária

Av. Senador Atilio F.X. Fontana 600E, B. Efapi Chapeco SC
Tel +55 49 3311 4330 / 6605 4330 / 49 88284147

edenir.silva@brf-br.com

www.brf-br.com

---

**De:** Tatiane Alviero
**Enviada em:** terça-feira, 24 de fevereiro de 2015 13:54
**Para:** Edenir Silva
**Assunto:** RES: Alterações Premix - Auditorias/ Fiscalização MAPA

Edenir, os programas quem define são os sanitaristas do corporativo com os das unidades, o que acontece, é que temos uma lista do MAPA que descreve os máximos permitidos por fase, e por vezes isto não é atendido... ou seja, usamos a mais, ai temos que burlar os relatórios ... Fora a questão das unidades que não tem IN65 e usam medicamento, estes Tb a gente tem que esconder na auditoria...

349. By email dated March 9, 2015, Edenir asked Tatiane if the Company ever "***walks within the law***." To which she responds, "***we have [in the past], but today this is the Company's strategy***." A copy of the email is produced below:

**De:** Edenir Silva
**Enviada em:** terça-feira, 24 de fevereiro de 2015 14:09
**Para:** Tatiane Alviero
**Assunto:** RES: Alterações Premix - Auditorias/ Fiscalização MAPA

Tati tem como nós andarmos dentro da lei...

Edenir Medeiros da Silva
Gerência Agropecuária

Av. Senador Atilio F.X. Fontana 600E, B. Efapi Chapecó SC
Tel +55 49 3311 4330 / 6605 4330 / 49 88284147

edenir.silva@brf-br.com

www.brf-br.com

---

**De:** Tatiane Alviero
**Enviada em:** terça-feira, 24 de fevereiro de 2015 14:24
**Para:** Edenir Silva
**Assunto:** RES: Alterações Premix - Auditorias/ Fiscalização MAPA

Ter tem, mas hoje é uma estratégia da empresa, porém, a questão de repassar o email, é para que todos tenham conhecimento dos riscos para a Fab de PX...

350. Tatiane later explained in a sworn statement given to the Brazilian Federal Police that each time she identified and reported irregularities in the composition and/or traceability of the premix, she was informed by her superiors that "this is the Company's strategy" and that the irregularities would not be corrected.

351. Edenir then forwarded Tatiane's email to Souza, stating: "Fabiana [Souza], are you able to help us in this matter of premix, as we are very vulnerable in terms of an audit." The email is produced below:



**Assunto:** RES: Alterações Premix - Auditorias/ Fiscalização MAPA
**De:** Edenir Silva
**Para:** Tatiane Alviero;
**CC:** Fabiana Souza;
**Envio:** 09/03/2015 17:35:27

Fabiana, tu tens condição de nós ajudar nessa questão do "premix" estamos muito vulneráveis em termos de auditoria

Edenir Medeiros da Silva
Gerência Agropecuária

Av. Senador Atilio F.X. Fontana 600E, B. Efapi Chapecó SC
Tel +55 49 3311 4330 / 6605 4330 / 49 88284147
edenir.silva@brf-br.com
www.brf-br.com

352. Three days after the email exchange above, Tatiane was forced to resign from her position at BRF.

### d. BRF Management Was Aware of the Fraud

353. Notably, this was done with the knowledge and consent of senior members of BRF's Quality Control division and with the knowledge of Company management. Indeed, BRF management held monthly meetings, during which the issues regarding the composition and traceability of the premix were routinely discussed.

354. Souza stated in a sworn statement given to the Brazilian Federal Police on March 8, 2018 that she brought these issues to the Company's attention during the monthly meetings with management.

355. Valter Vivan, BRF's former corporate rations production manager, later (on April 20, 2018) provided a sworn statement to the Brazilian Federal Police in which he confirmed that these meetings occurred and that he personally participated in the meetings.

356. August Heck, BRF's Manager of Corporate Health for Swine also confirmed in a sworn statement given to the Brazilian Federal Police on April 19, 2018 that Souza would have

addressed the traceability and composition issues at monthly meetings with management, but he did not personally attend the monthly meetings.

357. The foregoing conduct was only possible because of BRF's failure to implement and maintain effective internal controls over the production process at its feed mills.

### 3. Lack of Controls Regarding Use of Accredited Laboratories to Analyze Food Products

| Key Figures | | |
|---|---|---|
| **Name** | **Position** | **Role in Scheme** |
| Harissa Silverio El Ghoz Frausto | Pharmacist and lab technician | Would create fraudulent laboratory reports for BRF. |
| Fabio | Unknown BRF employee | Heard on intercepted telephone call asking Roney to help the Sao Camilo Laboratory get accredited. |
| João Paulo Zuffo | BRF Laboratory Technician at Animal Health Laboratory in Videira, Santa Catarina | Responsible for assessing laboratories and recommending laboratory partnerships. His name is mentioned on a conversation between Roney and Fabio. |
| Roney Santos | BRF's Manager of Institutional and Governmental Relations | Arranged for Sao Camilo Laboratory to get accredited. |

358. BRF also worked with a network of outside laboratories to create fraudulent laboratory reports, conceal inspections, and circumvent MAPA certification requirements, including: (i) Merieux Nutrisciences Group f/k/a Bioagri Ambiental Ltda.; (ii) Sao Camilo Laboratory; and (iii) Allabor Laboratorios Ltda.

359. According to an investigation conducted by the Brazilian Federal Police in Maringa (the "Maringa Investigation") the person at the center of this operation was a woman named Harissa Silverio El Ghoz Frausto ("Harissa").

360. Harissa was the official representative of Bioagre Ambiental LTDA ("Bioagre") and two subsidiary laboratories, Merieux Nutriscience Corporation Laboratory ("Merieux"), and Laboratory Allabor ("Allabor").

361. Originally, Harissa operated primarily through Merieux, where she served as the Technical Director and Operations Manager. Merieux was originally accredited by MAPA but lost its accreditation after MAPA officials detected irregularities in laboratory analyses conducted by Merieux.

362. Several BRF facilities performed their pathogen testing at Merieux, where Harissa would use fraudulent data points to manipulate the analyses and generate laboratory reports stating that the samples were free of pathogens.

363. After Merieux was disaccredited, those BRF facilities started using Allabor to perform its testing.

364. For example, according to the testimony of Daniela Baba de Siqueira, the veterinarian at the Santo André matrix, the pathogen testing for the breeder stock at the Santo André matrix was conducted at Allabor.

365. Although BRF officially started using a new laboratory, the fraud did not stop. According to the Maringa Investigation, the fraud involved several steps. For example, BRF would send food samples to Allabor. Allabor would then send the samples to Merieux, where testing was conducted under Harissa's supervision.

366. Under Harissa's guidance, laboratory technicians would utilize false inputs in the form of blank samples to manipulate the data and produce results stating the absence of salmonella in the samples.

367. The manipulated data was presented on a spreadsheet and sent back to Allabor, where laboratory technicians would use the data to prepare a final report on Allabor stationery.

368. In addition, according to the Maringa Investigation, whenever BRF identified a batch of clean poultry without any pathogens, it would send multiple samples to Allabor for storage.

369. If the Company later needed to obtain certifications for a contaminated batch of poultry, Allabor would later utilize those clean samples to prepare current reports stating the absence of any pathogens.

370. To protect itself against surprise audits, Allabor would store the extra samples in closets or in vehicles belonging to employees.

371. BRF also helped Harissa obtain MAPA accreditation at the Laboratories São Camilo de Análises de Alimentos e Agua Ltda. (the "São Camilo Laboratory"). In a telephone call intercepted by Brazilian authorities, a man named Fabio asks Roney to help facilitate the accreditation of the São Camilla Laboratory. The transcript of the call, which is transcribed in the *Carne Fraca* Decision, states as follows:

> FABIO: You know JOÃO ZUFFO, do not you?
>
> RONEY: Who?
>
> FABIO: JOÃO ZUFFO from agricultural and livestock laboratories. No, correct?
>
> RONEY: No, I already talked to him already.
>
> FABIO: I will. So here is the following, we need help, big help from you. We have an analysis account of about a million per month in the hands of big labs and there is no way to get a better price. We want you to pressure government personnel to accredit. The guy requested accreditation to go there, to do an audit, right. Actually, it's not to accredit, but to perform an accreditation audit. If it passes, it is a laboratory called São Camilo. So I'm going to ask him to give you the right information. This is something I owe the company and I need you to help me with it. Even if we have to go to Brasilia
>
> RONEY: Cool, agreed . . .

* * *

### 4. Lack of Controls Regarding Water Absorption in Poultry Products

| Key Figures | | |
|---|---|---|
| **Name** | **Position** | **Role** |
| Antonio Pereira | SIF inspector at Carambeí Facility | SIF auditor whom BRF sought to remove. |
| Joyce Pellanda | BRF's Legal Coordinator | Helped coordinate the request to remove Antonio Pereira from Carambeí. |
| Laércio José Brunetto | Industrial Manager of the BRF's Mineiros plant | Charged with intentionally selling chicken with excess water absorption. |
| Luciano Wienke | BRF Legal Manager | Coordinated the request to remove Antonio Pereira from Carambeí. |
| Luiz Augusto Fossato | Industrial Manager at BRF's Carambeí facility | Requested the removal of Antonio Pereira. |
| Simone Karina Hahn Weber | BRF Quality Control Manager at Mineiros Plant | Responsible for ensuring integrity of frozen poultry products. Criminally charged for violating Brazil's consumer protection laws. |

372. The routine industrial plant processing of chicken meat is standardized in Brazilian slaughterhouses and consists essentially of a sequence of electrical stunning, bleeding, scalding, defeathering, evisceration, washing, carcass water cooling, deboning and refrigeration, or freezing storage.

373. The water cooling of the carcasses generally consists of continuous passage in tanks that contain cold water and ice.

374. Poultry producers are required to control the amount of water that is absorbed in the chicken carcasses during the cooling process.

375. Under MAPA Normative Instruction 21/1999, water absorption in frozen carcasses is measured using a "drip test." Essentially, the frozen carcasses are weighed, refrigerated in a chiller for 36 minutes, dripped for 10 minutes and then weighed again. The water absorption is expressed as the difference between the initial and final weight.

376. Under MAPA Normative Instruction 210/98, the maximum limit for the absorption and water loss in frozen chicken carcasses is 6.0%.

377. Companies that produce poultry with water content above the legal index are subject to civil and criminal liability under Brazil's consumer protection law (Law No. 8,137/90, Art. 7, Item III).

378. Throughout the Class Period, BRF fraudulently injected excess water into poultry products produced at its Carambeí and Mineiros units, respectively, resulting in artificially inflated chicken weights and inferior products.

379. **Carambeí Facility:** In November 2015, BRF fraudulently injected excess water into frozen poultry products at the Carambeí facility. After injecting the poultry with excess water, Luiz Augusto Fossato, the industrial manager of the Carambeí plant, repackaged the poultry using labels which stated that the water content was within the legal index. To avoid surveillance, the repackaging took place at night on November 11, 2015.

380. In total, BRF repackaged over 2,000 cases of frozen chickens with excess water.

381. SIF inspector Antonio Pereira was tipped off about this fraudulent repackaging by a BRF employee named Franciele Silva. Pereira conducted a drip test on the products and confirmed that the poultry products did, in fact, contain excess water.

382. He cited an infraction to BRF, and reported the crime to the Federal Police in Ponta Grossa.

383. The Federal Police apprehended Luiz Augusto Fossatto, and questioned him about the crime.

384. Thereafter, a request was made to remove Antonio Pereira from his position. As stated in ¶345, *infra*, the request was made at the request of the BRF Board of Directors to the Superintendent of MAPA in Paraná.

385. **Mineiros Facility:** On four separate occasions in 2017 (02/02/17, 03/21/17, 03/22/17, and 03/23/17), MAPA officers audited BRF's chicken production facility in Mineiros, during which drip tests were conducted on chickens from four separate production runs.

386. The average water absorption in frozen carcasses produced at the Mineiros facility was 8.56%, well beyond the 6% limit established by MAPA regulations.

387. During this period, Laércio José Brunetto was the industrial manager of the Mineiros facility and Simone Karina Hahn Weber was the quality control manager at the Mineiros unit.

388. On January 22, 2018, Laércio Brunetto and Simone Weber were criminally charged for committing crimes against consumers based on their repeated violations of water absorption laws.

### 5. Lack of Controls Relating to Legal, Regulatory, and Health Certifications

| Key Figures | | |
|---|---|---|
| **Name** | **Position** | **Role in Scheme** |
| Daniel Filho | Regional Superintendent of MAPA in Paraná | Provided SEI login credentials to Roney. |
| Daniel Teixeira | Former SIF auditor and Whistleblower | Confronted Roney about BRF's inappropriate access to the MAPA network. |
| Dinis da Silva | Regional Superintendent of SIPOA in Goiás | Intervened to prevent the closure of BRF's Mineiros plant, and demanded political contributions in return. |
| Fabiana | BRF Employee | Accessed the SEI network to generate fraudulent certifications. |
| Felisberto Luis de Andrade | MAPA Employee | Provided Fabiana with SEI login credentials. |
| Laércio Brunetto | BRF Employee | Heard on intercepted phone call discussing BRF's ability to access SEI system. |
| Nazareth Magalhaes | Regional Superintendent of SIPOA in Minas Gerais | Provided SEI login credentials to Roney. |

| Key Figures | | |
|---|---|---|
| **Name** | **Position** | **Role in Scheme** |
| Rogerio Peninha Mendonça ("Mendonça") | Federal Deputy at PMDB-SC | Parliamentarian who helped BRF obtain fraudulent export certifications. |
| Roney Santos | BRF Manager of Institutional and Government Relations | Received SEI login credentials from government officials and arranged for BRF employees to obtain access to MAPA computers. |

389. MAPA officers utilize a computer system called the SEI system to generate and issue official certifications to food processors who have met its strict certification and licensing requirements. Access to the SEI system is restricted to MAPA employees, and MAPA Administrative Rule 11 prohibits its employees from sharing or lending their individual login information to anyone else.

390. As explained in the *Carne Fraca* Verdict:

> There is no doubt that RONEY NOGUEIRA DOS SANTOS has actually accessed the SEI system and that the public servant Nazareth Aguiar Magalhães, in relation to which the records were dismembered before the acceptance of the agreement of criminal transaction offered by the MPF (cases nº 5026887 -40.2017.4.04.7000), you have unduly granted your login and password.
>
> All the terms of use of the Electronic Information System, created by the competent IT sector of the Federal Regional Court of the 4th Region and assigned to the Executive Branch by a Cooperation Agreement with the Ministry of Planning, Development and Management (https://softwarepublico.gov .br / social / sei / sobre-o-sei), are signed by the public servant and imply the express commitment of personal and non-transferable use of access prerogatives. Therefore, regardless of whether there is possibility of access to SEI by interested companies at times alternated by MAPA's central policy in Brasília, it is a fact that the privileges that a public servant has when accessing the System are infinitely superior to those contemplated in the public consultation that, when existing, can be carried out by third parties.
>
> The public servants have access to minutes of administrative decisions and, more than that, can produce documents and, with their login and password only, sign them and lend progress to procedures of any nature within the agency. Therefore, it is scandalous for an employee to promote the clandestine assignment of their data so that the representative of a company accesses the system as if it were the person of the server. It is a shameful irresponsibility liable to exemplary censorship.

> In turn, the third party is expected to have the ethical decency to refuse to do so, even if the public servant has overcome the barrier of legal and moral violations by providing his personal access data.

391. To obtain the required certifications without having to comply with MAPA health and sanitary regulations, BRF would: (i) use the login information of MAPA employees to access the SEI system and generate fraudulent certifications for Company products; or (ii) ask corrupt MAPA officers to issue certifications for noncompliant products.

**a. Fraudulent Certification of Export to Malaysia**

392. BRF's Manager of Institutional and Government Relations, Roney Santos, had a very close relationship with Nazareth Malgahaes, the regional superintendent of SIPOA in the Brazilian state of Minas Gerais.

393. Nazareth had jurisdiction over BRF's poultry production facility in Uberlândia, Minas Gerais, and he would frequently help BRF obtain fraudulent health and export certifications for poultry produced at the Uberlândia plant.

394. In 2016, the Company was prepared to export a shipment of poultry produced at its Uberlândia facility to Malaysia, but could not meet the regulatory requirements necessary to obtain the requisite certifications.

395. On or about September 8, 2016, Roney asked Nazareth to prepare a fraudulent export certification. Nazareth, however, was unavailable, so he gave Roney his login credentials so Roney could access the SEI system and generate the document by himself.

396. After he prepared a draft certification, Roney contacted Nazareth to review the draft. Nazareth listened as Roney read the language in the draft out loud, and then stated that the certification was fine and could be sent out immediately. The transcript of the conversation, which was intercepted by the Brazilian authorities and reproduced in the *Carne Fraca* Decision, states, in pertinent part, as follows:

RONEY: ***Hey, look, I drafted the document, okay?*** I understood what you asked yesterday. I had forgotten.

NAZARETH: Oh, that's why I asked you. I don't have time to make the document for you.

RONEY: I did it. It's ready. All you have to do is put in your formatting and send it to them. Then you have to attach. I already put in a sentence below: attached is a list of the establishments to enable frozen poultry products for Malaysia. There is that sheet that describes that SIF 121 is certified. But I did just like the model. I actually copied the model of one of the certification information that DIPOA does. I just put it like this, want to see?

NAZARETH: Okay, and did you put the language that people in Brasília uses?

RONEY: Yes, yes. I put it like this. I will check for you quickly, do you want to see it?

NAZARETH: I'm getting there ok.

RONEY: And look: I put information. Then you are going to put the number, of the Federal Animal Inspection Service of Products of Animal Origin SIPOA Minas Gerais. To the person in charge of SIF 121. Subject: Malaysia. Certification of SIF 121. We communicate for the proper purposes that according to the orientation of the Qualification and Certification Division DHC- and following the guidelines described in the Circular Memorandum 97, the Brazilian establishment described below is qualified to export to Malaysia the following products. Then I put the SIF number, such, such, frozen poultry products, in parentheses, mechanically separated meat. Ok?

RONEY: No, but I think that. No, he wants a document. You'd better do an "*ofício circular*". Make a "*Informação.*"

NAZARETH: Ah, ok. Am ham.

RONEY: Oh, another thing, can you correct for me that mechanically separated meat. Ok, mechanically. Now that I saw it. Ok?

NAZARETH: Oh, okay, there's no mistake. I will read it at ease there.

RONEY: Ok then. You better make an "*ofício circular*" as per guidance.

NAZARETH: I'll do the SEI document then.

RONEY: That. Great. Even better.

NAZARETH: Is that Okay?

RONEY: Super thanks ok.

NAZARETH: Cool then.

RONEY: Are you able to release it today?

NAZARETH: Yes. Absolutely.

* * *

**b. Fraudulent Certification for Contaminated Mortadella**

397. In July 2016, MAPA officials determined that a shipment of approximately 700 kilos of mortadella, a type of Italian sausage, failed to meet the MAPA health standards.

398. Rather than destroying the mortadella as required by law, Roney sought the assistance of Dinis da Silva, the regional superintendent of SIPOA in Goiás.

399. On or about July 6, 2016, Dinis helped Roney obtain fraudulent SIPOA certifications to reprocess the mortadella.

400. The mortadella was then reprocessed in the BRF facilities in Rio Verde, Goiás and Videira, Santa Catarina.

**c. BRF Employees Freely Accessed the SEI System to Generate Fraudulent Certifications**

401. Like Nazareth, Daniel Filho provided Roney with login credentials to the SEI system, and gave BRF employees free access to MAPA's computer systems and offices.

402. On one such occasion, Daniel Filho instructed a MAPA employee named Felisberto Andrade to provide Fabiana, a BRF employee, with login credentials to the MAPA system. Felisberto logged onto the computer and then left Fabiana alone at the MAPA office to do whatever she needed to do.

403. This outraged Daniel Teixeira, a SIF health inspector who later became the whistleblower that resulted in the entire Operation Weak Flesh. Daniel Teixeira called Roney to

complain, calling it the "height of absurdity" to "log[] her in and leave her alone working in a room." He also voiced his outrage that "she is accustomed to doing it because they give her freedom do it." The transcript of the call, which was intercepted by Brazilian authorities and transcribed in the *Carne Fraca* Decision, states, in pertinent part:

> RONEY: What happened yesterday there that the girl (unintelligible). She used a computer without authorization? What was it?
>
> DANIEL TEIXEIRA: Actually, what happens is the following, dude: the dudes put her on the computer to do things for the inspectors, dude. Then I wrote the guy the act, to the guy that did this.
>
> RONEY: Who's the guy?
>
> DANIEL TEIXEIRA: He is FILISBERTO, okay?
>
> RONEY: Oh, ok.
>
> DANIEL TEIXEIRA: Then I reprimanded him, because of this and such. Then she was embarrassed. He came to tell me that she was embarrassed. Then to avoid that she complains, to do anything at their request, I already sent that email due to that. Understand? Because in fact he could not even have let her use it or have asked her to use it. Imagine I go to BRF, I'll go through the gates there, I'll sit in your computer and I start to do things for you there. There is no such thing. And there, the internal network sees everything, from all companies, everything. So she had access to all the competition. JBS, and everything else.
>
> RONEY: Of course, but she had to figure out where the files were. Okay, take it easy. I have known Fabiana for a long time. Also if she used the computer, she only did it because Felisberto asked her to do it.
>
> DANIEL TEIXEIRA: That, exactly. Yes, but for later.
>
> RONEY: But he was there with her, was he not?
>
> DANIEL TEIXEIRA: No, no. She stayed in a room alone doing it. Understand?
>
> RONEY: Am, yes.
>
> DANIEL TEIXEIRA: Because he went to attend another company, "no, you can stay and start working on it". ***He started the system and left her working on the system***. That's when I said: no, it is not like that. Not even chaperoned you can do it. Understand? ***The problem is as follows, she is accustomed to coming here, right, sit there, do things in the system logged as if she were him. He gives his password for her to work.*** That's what it is fucked up. Even our system. And then she

> approves everything, she leaves here with everything approved. This is a shame, that. And then yesterday, as there were more people: "No, no, do it there in the other room," then he removed the trainee from the computer and sat her down to sit and work on the trainee's computer.
>
> RONEY: Got it.
>
> DANIEL TEIXEIRA: Then he logged the system there for her.
>
> RONEY: Yeah, that's complicated, right.
>
> DANIEL TEIXEIRA: Gee, you imagine. It is not allowed.
>
> * * *
>
> DANIEL TEIXEIRA: No, no need to apologize, no need for any of this. She did, because she is accustomed to doing it, because they give her freedom to do it. But it is not allowed. Understand? Then came to the height of absurdity of even logging her in and leave her alone working in a room. For much less people were fired in Brasília. Do you recall that a guy had an advisor inside DIPOA, inside the DIPOA director's room, JBS? He had. So, to avoid this kind of thing and get her involved and make things even worse.
>
> RONEY: Yes, that is right.
>
> DANIEL TEIXEIRA: Because in a while people will file a proceeding here and will call her here to ask, she'll talk, no, I've always done so. I do it this way, I do that way, and so forth and this shit goes down in the media. It is going to be even worse for those that do that. Understand?
>
> * * *

404. In a later call intercepted by authorities, Roney told Fabiana that she has to be careful with BRF's "freedoms" in MAPA and that she must not be too casual with Daniel Filho. Roney tells Fabiana that "***Felisberto and Daniel . . . are guys that help a lot***" and that if she is not careful, "***they will take Felisberto from there and put another guy to take your case . . . and then you're screwed.***"

405. On other occasions, BRF employees would access the SEI system to check on the status of a certification. In a conversation between Roney, Laércio, and Baldiserra, Roney states that he will access the SEI system to "***see what they wrote***" so that BRF could decide what steps are

necessary to obtain the required certification. The transcript of the call, which was intercepted by Brazilian authorities, was transcribed in the *Carne Fraca* Decision, and states, in pertinent part, as follows:

> LAÉRCIO: It's me and ANDRÉ here. We would like to talk with you for a little bit. He is there. We were having a conversation there. I would like to tell you this, man, about the special regime. Remember that you told us to talk.
>
> RONEY: Uh huh. Yes.
>
> LAÉRCIO: The doctor put in the SEI the opinion of what was actually requested.
>
> RONEY: Ok. Do you have the SEI number there or not. (. . .)
>
> LAÉRCIO: I just wanted to ask you the following, which is our question here: do you think we could talk to DINIS, because, in fact, MARIA CRISTINA will attach to go to DINIS, to go to Brasília. That's what happens.
>
> RONEY: Yes. That.
>
> LAÉRCIO: Do you think we should give DINIS a call to say that we have fulfilled the ninety days and what would be our next fastest step for us to resume?
>
> RONEY: Of course. Certainly. Let's do this. ***That's why I wanted the SEI number. Because then I can look here, see what they wrote and then I can talk to him:*** look, they asked for this. They are saying this. They already gave a favorable opinion.
>
> LAÉRCIO: Oh, I'll tell you something, man, not her. She told me she could not make a copy, right. That she would only read to me what she wrote.
>
> RONEY: Yes, but I have it. Yes. I can see it here.
>
> LAÉRCIO: Ok.
>
> RONEY: If you get the number. Tell her: hey, doctor, get the SEI number for us.

* * *

#### d. BRF Circumvents Vigiagro Export Certification Requirements

| Key Figures | | |
|---|---|---|
| **Name** | **Position** | **Role** |
| Roney Santos | Manager of Institutional and Government Relations of BRF | Asked Mendonça to help get a BRF export approved without the appropriate documentation. |

| Key Figures | | |
|---|---|---|
| **Name** | **Position** | **Role** |
| Rogerio Peninha Mendonça ("Mendonça") | Federal Deputy at PMDB-SC | Parliamentarian who agreed to help BRF. |
| Luiz Gustavo Balena Pinto | Former Superintendent of MAPA in Santa Catarina and Superintendent of VIGIAGRO in Santa Catarina | Referenced in phone conversation between Roney and Mendonça. |

406. The International Agricultural Surveillance System – Vigiagro is the MAPA agency in charge of inspecting and certifying imports and exports containing products of animal origin at Brazil's ports, airports, border posts, and special customs.

407. On or about October 27, 2015, Vigiagro promulgated Normative Instruction No. 39/2015, which regulated the documentation necessary for international import and export of products of animal origin.

408. In February 2016, BRF sought to export meat products from the port at Itajai, Santa Catarina. The shipment, however, was intercepted by Vigiagro authorities because it did not contain the documentation required by Normative Instruction No. 39/2015.

409. On Friday evening, February 26, 2016, Roney contacted Rogerio Peninha Mendonça ("Mendonça"), stating that he "need[ed] support" circumventing Normative Instruction No. 39/2015.

410. Roney further explained that the new procedures are "causing a delay in our exports," and that he "would like the doctor to intervene with his political forces, call the secretary of defense, and ask to stop these people."

411. In response, Mendonça stated that he will go see the director of Vigiagro on Tuesday, and that Roney should send him a brief summary of the issue through the WhatsApp messaging service.

412. Roney told Mendonça that immediate action is necessary, but Mendonça pushed back, arguing that "the right thing to do is to talk in person," and that he would be in Brasilia first thing Tuesday morning and he would personally go in to speak to the director.

413. Roney asked Mendonça to at least "give [Luiz] Balena a call because . . . instead of helping us . . . he kind of plays game[s]."

414. At the time of the call, Luiz Balena was the superintendent of MAPA in Santa Catarina and the superintendent of VIGIAGRO in Santa Catarina. He was arrested on May 16, 2017, and removed from his post, when the Brazilian Federal Police launched the fish industry-equivalent to Operation Weak Flesh, "Operation Fugu" (in Portuguese, *Operação Fugu*).

415. The transcript of the conversation, which was intercepted by Brazilian authorities, and was published by the Brazilian news outlet *Estadao*,[20] states, in pertinent part, as follows:

> RONEY: How's the Congressman?
>
> PENINHA: Friend, the other time you called I was in the middle of a meeting, actually I was talking.
>
> RONEY: ***Congressman, I need your support***, since the Congressman had a good participation and we also had a good contact there in Santa Catarina, the port issue. ***The Ministry of Agriculture, through VIGIAGRO, implemented Normative Instruction 39 and it is causing a major problem in Santa Catarina and in all of Brazil, in fact, but as the Congressman is from Santa Catarina, we need your support in Santa Catarina.What this rule has created, is an electronic procedure and on paper and there is a delay in our exports and so . . . we are at risk of locking everything in Santa Catarina.*** I need your support because the people at the Port, including Balena, I wanted you, sir, to give him a call because he instead of helping us to try to talk to the other inspectors so that the compliance with the rule, which was issued on a document from the Secretary of Defense . . . he kind of plays the game against, pushing these issues there. Then . . . ***I would like you, Doctor, with your political strength there, call the Secretary of Defense, ask to stop these*** (unintelligible) . . . .

[20] *See* Julia Affonso, Ricardo Brandt, Mateus Coutinho, and Luiz Vassallo, *Executivo da BRF pedui apoio a deputado do PMDB por exportação em Itajaí, diz PF*, ESTADÃO (Mar. 23, 2017), *available at* https://politica.estadao.com.br/blogs/fausto-macedo/executivo-da-brf-pediu-apoio-a-deputado-do-pmdb-por-exportacao-em-itajai-diz-pf/ (last visited Dec. 2, 2018).

PENINHA: I will go there, on Tuesday I will go there visit him, you will send this, it can be via WhatsApp . . . a very brief thing (. . .) I am going to VIGIAGRO, to the VIGIAGRO Director (. . .)

RONEY: . . . I needed an action or maybe if you Congressman call today. Call . . . the people from the Santa Catarina companies' are complaining . . .

PENINHA: . . . but today . . . noon on Friday . . . the right thing is to talk in person

RONEY: but the problem is that I lost, I will lose a lot of boarding now at the end of the year, end of the month. It is not only us, JBS, AURORA.

* * *

**e. Unlicensed Operation of Turkey Production Facility in Buriti Alegre, Goiás**

| Key Figures | | |
|---|---|---|
| **Name** | **Title** | **Role in Scheme** |
| Roney Santos | Manager of Institutional and Government Relations of BRF | Heard on intercepted call discussing unlicensed operation of turkey facility. |
| Ciro | Unknown | Heard on intercepted call discussing unlicensed operation of turkey facility. |

416. During the Class Period, BRF operated a turkey production facility in Buriti Alegre, Goiás, without the appropriate certifications and/or licenses.

417. The Brazilian authorities intercepted a telephone call between Roney and another BRF employee named Ciro, in which the two discuss the unlicensed operation of the facility.

418. Indeed, in a telephone conversation between Roney and a BRF employee named Ciro, the certain issues that the Company is facing, as well as the Ciro tells Roney that it is urgent that the Company obtain a license to slaughter turkeys at the Buriti Alegre facility because "we are operating there without a license.

419. The transcript of the call, which was intercepted by Brazilian authorities and reproduced in by Brazilian prosecutors in a court filing addressed to Brazilian Judge Marcos Joségrei da Silva of the Fourteenth Federal Court of Curitiba, states, in pertinent part, as follows:

RONEY: No, no, not urgent. There are fifty-nine proceedings, but urgents we have a percentage here. But urgent? How urgent will it be in relation to the others?

CIRO: Look, the Buriti Alegre license is the most urgent, we are operating there without a license. It is the most critical.

RONEY: And it is here, too? Closed. Operating license. It's here. Closed. I saw it.

CIRO: Right there. This is the most critical.

RONEY: So, only the yellow ones we need most urgently.

CIRO: Yeah. There is also the one for the slaughter of turkeys in Mineiros.

RONEY: I see it here too.

CIRO: That one, man, what happens, our license does not authorize us to slaughter turkey.

RONEY: Okay, man.

CIRO: And we're slaughtering.

RONEY: Yeah, but why doesn't the license authorize it?

CIRO: Okay, we did the entire process but the analyst did not include the slaughter of turkey on the license.

* * *

#### f. BRF Conspires to Remove or Transfer Honest SIF Inspectors

| Key Figures | | |
|---|---|---|
| **Name** | **Position** | **Role in Scheme** |
| André Baldissera | BRF Director of Operations in Midwest | Directed Roney to arrange the removal of SIF auditor assigned to Uberlândia facility. |
| Antonio Carlos Prestes Pereira | SIF Inspector at BRF's Carambeí facility | SIF auditor who identified the salmonella outbreak in Carambeí. BRF sought to have him removed. |
| Fernando Gonçalves Santos | Health inspector at BRF's Uberlândia, Minas Gerais facility | SIF auditor reassigned by Nazareth. |
| José Ascândio da Silveira | Health Inspector at BRF's Paraná facility | SIF auditor whom Roney sought to have removed. |

| Key Figures | | |
|---|---|---|
| **Name** | **Position** | **Role in Scheme** |
| Nazareth | Regional Superintendent of SIPOA in Minas Gerais | Nazareth made the official request to transfer the SIF inspector assigned to BRF's Uberlândia facility. |
| Roney | Manager of Institutional and Government Relations of BRF | Arranged for removal and/or transfer of honest SIF auditors assigned to BRF facilities. |

420. BRF relied on its relationships with government officials to remove any SIF inspector that meddled in its operations.

421. In or about March of 2016, an SIF auditor named Fernando Gonçalves Santos was assigned to BRF's Uberlândia facility. On a telephone call intercepted by Brazilian authorities, which is transcribed in the *Carne Fraca* Decision, Baldissera can be heard telling Roney that "***we have to tear out that Fernando from Uberlândia***" and that "***I want this guy to be out by next week***." Roney assures Baldissera that "***Nazareth is helping me on this***," but to avoid suspicion, "***we will have to create a situation for [Fernando Santos] to be transferred without letting him know that asked for his transfer***."

422. In 2015, an SIF inspector named Antonio Carlos Prestes Pereira issued a citation to the Company for packaging frozen poultry products with excess water content at its Carambeí facility. Thereafter, a request was made to remove or transfer him from his position. According to testimony given by Daniel Teixeira on December 7, 2015, the request was made by the BRF Board of Directors to the Superintendent of Paraná:

> [T]he articulation for removal of the inspector Antonio Carlos Prestes, to what he knew involves, on one hand, the Board of Managers of BRF S.A. and its legal department, the legal manager Luciano Wienke, the coordinator of the legal department Joyce Pellanda and the industrial manager Luiz Augusto Fossati, of the Carambeí Unit, and, on the other, the Superintendence of MAPA in Paraná.

* * *

423. According to the *Carne Fraca* Decision, on a different occasion, Roney contacted a SIPOA employee named Dr. Diemerson to arrange the removal of a SIF health inspector in Paraná named José Ascândio da Silveira.

## IX. POST CLASS PERIOD EVENTS

### A. BRF Launches a Public Relations Campaign

424. The day after Brazilian Federal Police raided the Company in Operation Weak Flesh, BRF launched a full-throated public relations campaign in an effort to protect its reputation. According to *Reuters*, BRF and other meatpackers were "striving to restore confidence in their quality controls as they pursue plans to list overseas units after a scandal over alleged bribery of health officials that triggered bans on Brazilian meat exports." *See Reuters*, Brazil scandals tests JBS, BRF push for overseas units in IPO (Mar. 22, 2017), *available at* https://www.reuters.com/article/us-brazil-corruption-food-deals-analysis-idUSKBN16T2U0 (last visited Dec. 3, 2018).

425. According to Bloomberg, on March 18, 2017, BRF ran full page advertisements addressing "the millions of consumers whose confidence we have earned," vowing to adhere to the principles of "truth, respect, quality and transparency." *See Reuters*, Brazil's JBS and BRF launch PR campaign after rotten meat raids (Mar. 18, 2017), *available at* https://www.reuters.com/article/brazil-corruption-food-idUSL2N1GV0D5 (last visited Dec. 3, 2018).

426. In addition, the Company released a video of Cesar Salce, a senior quality control manager, talking about the high quality control standards at the Company. In the video, which was posted on the BRF's YouTube channel and other social media accounts, Cesar Salce says that BRF pays close attention to the quality of the final product. He also states that the entire product is closely analyzed to make sure that there are no anomalies. As further evidence of the Company's

high quality control standards, Cesar Salce stated that chicken breasts are passed through an x-ray machine to ensure that there are no bones or pieces of cartilage left in the breast.

**B. Europe and Other Countries Ban All Poultry Exports from Brazil**

427. In March 2018, the European Commission's standing committee on plants, animals, food and feed, presented a proposal "to delist certain Brazilian establishments from which imports of products of animal origin are currently authorized." According to reports published on the food industry website *Just-Food*, a spokesperson at the European Commission's Health and Food Safety department confirmed that "the measure is indeed related to the deficiencies recently detected in the Brazilian official control system." *Just-Foods*, Brazil meat firms risk being struck off EU's supplier list after Carne Fraca probe (Mar. 13, 2018), *available at* https://www.just-food.com/news/brazil-meat-firms-risk-being-struck-off-eus-supplier-list-after-carne-fraca-probe_id138861.aspx (last visited Dec. 3, 2018).

428. On March 16, 2018, MAPA announced that as a "precautionary measure," it had temporarily suspended meat exports from BRF plants in the towns of Rio Verde and Mineiros, in Goiás state, and Carambeí, in Paraná state.

429. According to a Form 6-K filed with the SEC that same day announcing the suspension, MAPA suspended the production licenses and sanitary certification for the following nine BRF facilities: (i) Concórdia, SIF 1; (ii) Dourados, SIF 18; (iii) Serafina Corrêa, SIF 103; (iv) Chapecó, SIF 104; (v) Varzea Grande, SIF 292; (vi) Rio Verde, SIF 1001; (vii) Marau, SIF 2014; (viii) Francisco Beltrão, SIF 2518; and (ix) Nova Mutum, SIF 4657.

430. In April 2018, reports began circulating that the European Union was going to issue a decision on the proposal to ban exports from Brazil. *See Reuters*, Brazil lists embargo on some BRF plants ahead of potential EU ban, (Apr. 18, 2018), *available at* https://www.reuters.com/article/us-

brazil-chicken-eu/brazil-lifts-embargo-on-some-brf-plants-ahead-of-potential-eu-ban-idUSKBN1HP23U (last visited Dec. 3, 2018).

431. In anticipation of that decision, on April 19, 2018, MAPA lifted the suspension and allowed those facilities to resume exports to Europe. According to a statement issued by agricultural defense secretary Luis Rangel: "With Europe signaling a de-listing of these slaughterhouses, and lacking technical reasons to do so, we suspended the measure[.]"

432. On April 20, 2018, the European Union banned all exports from 20 different meat packing facilities in Brazil, 12 of which belonged to BRF. *See Just Foods*, EU bans meat from 20 Brazilian plants (Apr. 20, 2018), *available at* https://www.just-food.com/news/eu-bans-meat-from-20-brazilian-plants_id139097.aspx (last visited Dec. 3, 2018).

### C. BRF Shareholders Remove the Entire Board of Directors

433. On Thursday, February 23, 2017, BRF announced its year end results for the year ending December 31, 2017. The Company reported a net loss of 1.1 billion reais ($339.78 million) in 2017, which, according to *Reuters*, was the Company's largest loss ever.

434. Analysts at BB Investimentos attributed the Company's poor financial performance to "[t]he 'Carne Fraca' effects, along with some management issues in terms of strategy[.]"

435. The shareholders had finally had enough. Within 48 hours, two of the Company's largest investors, Caixa de Previdência dos Funcionários do Banco do Brasil ("Previ") and Petrobras Seguridade Social ("Petros") demanded that Abilio Diniz convene for a shareholder meeting to remove the entire Board of Directors.

436. Over the next two months, the shareholders and Abilio Diniz were engaged in a bitter feud over whether and how the Board should be reconstituted.

437. Finally, at an extraordinary meeting on April 26, 2018, the shareholders overwhelmingly voted to remove the entire Board of Directors, and install a new Board of Directors.

438. The synthetic voting map for the extraordinary meeting was filed on a Form 6-K with the SEC on April 27, 2018, and indicated that 96% of shareholders voted in favor of the proposal to remove the Board.

### D. Brazilian Judge Bars VP Hélio Rubens Mendes from Entering BRF Facilities

439. On March 9, 2018, Brazilian Judge André Duszczak ordered all BRF executives and employees detained in Operation Trapaça to stay away from the Company and any establishments BRF dealt with, including laboratories.

440. BRF VP Hélio Rubens Mendes who was arrested in Operation Trapaça, was barred from returning to his position, or even accessing or entering BRF facilities.

## X. BRF FAILED TO COMPLY WITH INTERNATIONAL CERTIFICATION STANDARDS

441. Throughout the Class Period, despite representations to the contrary, BRF failed to comply with the international food safety standards set forth in: (i) the BRC Global Standard for Food Safety; (ii) the GlobalGAP Certification Standards; (iii) the IFS International Food Standards; (iv) the AloFree Certification Standards; and (v) the GenesisGAP Standards.

#### a. The BRC Certification Standards

442. The BRC Global Standards for Food Safety (the "Global Standards") provides a framework to manage product safety, integrity, legality and quality, and the operational controls in the food and food ingredient manufacturing, processing, and packing industry. The Global Standards include requirements for product specifications, supplier approval, traceability, and the management of incidents, and product recalls. The Global Standards also regulate the product packaging.

443. To comply with the Global Standards, a food producer must meet, *inter alia*, the following requirements:

- A full description for each product or group of products shall be developed, which includes all relevant information on food safety, including, *inter alia*, the composition, origin of ingredients, and physical or chemical properties that impact food safety. (§2.3.1)

- The food safety team shall consider the control measures necessary to prevent or eliminate a food safety hazard or reduce it to an acceptable level. (§2.7.3)

- For each hazard that requires control, critical control points ("CCPs") shall be established to prevent or eliminate a food safety hazard or reduce it to an acceptable level. (§2.8.1)

- For each CCP, the appropriate critical limits shall be defined in order to identify clearly whether the process is in or out of control. (§2.9.1)

- The food safety team shall validate each CCP. Documented evidence shall show that the control measures selected and critical limits identified are capable of consistently controlling the hazard to an acceptable level. (§2.9.2)

- Records associated with the monitoring of each CCP shall include the date, time and result of measurement and shall be signed by the person responsible for the monitoring and verified, when appropriate, by an authorized person. (§2.10.2)

- Documentation and record keeping shall be sufficient to enable the site to verify that food safety controls are in place and maintained. (§2.13.1)

- Where a nonconformity in handling procedures places the safety, legality or quality of products at risk, this risk shall be investigated and recorded, including, *inter alia*, clear documentation of the non-conformity, the person responsible for the correction, verification that the correction has been implemented and is effective, and identification of the root cause of the conformity and implementation of any necessary actions to prevent recurrence. (§3.7.2)

- There shall be documented procedures for managing non-conforming products, which shall include, *inter alia*, records of the decision on the use or disposal of the product and records of destruction where a product is destroyed for food safety purposes. (§3.8.1)

- Identification of raw materials, part-used materials, and finished products shall be adequate to ensure traceability. (§3.9.1)

- All products shall be labelled to meet legal requirements for the designated country of use. There shall be a process to verify that ingredient and allergen labelling is correct based on the product recipe and ingredient specifications. (§5.2.1)

- Systems shall be in place to minimize the risk of purchasing fraudulent or adulterated food raw materials and to ensure that all product descriptions and claims are legal, accurate, and verified. (§5.4)

- A documented vulnerability assessment shall be carried out on all food raw materials to assess the potential risk of adulteration or substitution. (§5.4.2)

- The facility shall maintain purchasing records, traceability of raw materials usage, and final packing records to substantiate labelling claims. (§5.4.4)

- The process flow for the production of products where claims are made shall be documented and potential areas for contamination or loss of identity identified. Appropriate controls shall be established to ensure the integrity of the product claims. (§5.4.6)

- The company shall undertake or subcontract inspection and analyses which are critical to confirm product safety, legality, and quality, using appropriate procedures, facilities, and standards. (§5.6)

- There shall be a scheduled program of testing covered products, which may include microbiological, chemical, physical, and organoleptic testing according to risk. The methods, frequency, and specified limits shall be documented. (§5.6.1.1)

- Test and inspection results shall be recorded and viewed regularly to identify trends. The significance of external laboratory results shall be understood and acted upon accordingly. Appropriate actions shall be implemented promptly to address any unsatisfactory results or trends. (§5.6.1.2)

- Where the company undertakes or subcontracts analyses which are critical to product safety or legality, the laboratory or subcontractors shall have gained recognized laboratory accreditation or operate in accordance with the requirements and principles of ISO/ICE 17025. Documented justification shall be available where accredited methods are not undertaken. (§5.6.2.3)

- Procedures shall be in place to ensure the reliability of laboratory results. (§5.6.2.4)

- The site shall operate in accordance with documented procedures and/or work instructions that ensure the production of consistently safe and legal produced with the desired quality characteristics, in full compliance with the HACCP food safety plan. (§6.1)

- Documented process specifications and work instructions shall be available for key processes in the production of products to ensure product safety, legality, and quality. (§6.1.1)

- There management controls of product labeling activities shall ensure that products will be correctly labeled and coded. (§6.2)

444. The Global Standards designate certain requirements as "fundamental," which is defined to mean "crucial to the establishment and operation of an effective food quality and safety operation." The requirements set forth in §§1.1; 2; 3.4; 3.5.1; 3.7; 3.9; 4.3; 4.11; 5.3; 6.1; 6.2; and 7.1 are deemed "fundamental."

445. In addition to the Global Standards, BRC has industry-specific certification "modules." *Additional Module 9 – Management of Food Materials for Animal Feed* is applicable to animal feed manufacturers whose primary output is the production of food products for human consumption. Producers of animal feed must comply with, *inter alia*, the following requirements:

- The company shall demonstrate a commitment to the supply of food products for animal feed that meet the legislative requirements for animal feed products. (§9.1)
- The company should be aware of legislation and codes of practice relating to the supply of food products for animal feed. (§9.1.1)
- Specifications for the food materials for animal feed shall be in place. The company shall have processes to ensure that the materials are in compliance with these specifications. (§9.4.1)
- There shall be a scheduled risk-based product inspection and testing program in accordance with legal requirements. The scheduled program should include salmonella testing as laid down in the Defra/FSA code of practice for the control of salmonella in animal feed where the risk assessment has demonstrated that this is required. (§9.4.2)
- The company shall ensure that there is a traceability system in place which covers the production and distribution of food products for animal feed. (§9.5)
- The company shall maintain records which enable the component food products included within each lot of food for animal feed to be identified. (§9.5.1)
- The company shall meet legal requirements for the labeling or provision of accompanying documentation for the product supplied. (§9.7)
- Each lot of food products for animal feed shall either be labeled or (for bulk products) supplied with information to meet legal requirements. (§9.7.1)

**b. GlobalGAP Certification Standards**

446. The GlobalGAP Integrated Farm Assurance ("IFA") Standard covers the certification of the whole agricultural production process of the product from when the animal enters the facility, all the way through the completion of production.

447. The IFA consists of General Regulations and Control Points and Compliance Criteria ("CPCC"). The General Regulations map out the criteria for successful CPCC implementation as well as set guidelines for the verification and the regulation of the standard. The CPCC clearly define the requirements for achieving the quality standard required by the IFA.

448. To comply with the CPCC, poultry producers must meet the following compliance criteria:

- Breeding flocks must be monitored for salmonella so that they are kept in accordance with the country of production's legal requirements. Salmonella tests for all hatcheries must be performed by an ISO 17025 accredited laboratory and all records kept. (PY §2.9)

- All eggs entering hatcheries must be able to demonstrate that all supplying flocks are salmonella enteritis and S. typhimurium free. Test results or certificate demonstrating the salmonella-free status of the eggs shall be available. Eggs from flocks infected with S. enteritis or S. typhimurium shall be prohibited from entering the hatchery. (PY §3.1.8)

- Hatcheries shall be monitored in accordance with the country of production's legal requirements. Records of test results by an ISO 17025 accredited laboratory shall be present and any available action plan in case of positive results shall be available and implemented. All unhatched eggs shall be recovered, destroyed, and disposed of appropriately. (PY §3.1.9)

- All compound feed shall carry a statutory statement (e.g. ref. EU Council Directive 2002/2) or a label which includes a description of the feed, quantity, storage life, moisture content (if above 14%) and ingredients (either by specific name or category). Analytical constituents shall be declared. (PY §4.1)

- All chickens shall be fed a wholesome diet, which is appropriate to their age and species and is fed in sufficient quantity to maintain them in good health and satisfy their nutritional needs. (PY §4.7)

- A system shall be in operation to safeguard and identify that segregation of feed containing coccidiostats with a withdrawal time. (PY §8.2.10)

- The results of all laboratory tests and the effectiveness of therapies shall be recorded and made available to the veterinarian. (PY §8.2.14)

- Broiler flocks must be tested for salmonella within three weeks of going to slaughter. Tests must be carried out in an ISO 17025 accredited laboratory. (PY §8.3.1)

- Confirmed infected flocks must be sent for slaughter at the end of the processing plants' slaughter program. (PY §8.3.2)

- Where a flock is confirmed as salmonella infected, records shall be kept demonstrating appropriate cleaning and disinfectant procedure after depopulation. (PY §8.3.3)

- In the case of a previous positive salmonella test, chicks may only be brought back on site after the site is confirmed to be salmonella negative. (PY §8.3.4)

449. In addition, the GlobalGAP Compound Feed Manufacturers Compliance Criteria (the "CFM Criteria") contains detailed protocols designed to protect the integrity of feed.

450. The CFM Criteria consists of three types of control points: (1) "major musts"; (2) "minor musts"; and (3) "recommendations." To achieve and maintain certification, facilities must comply with 100% of all applicable "Major Musts" and 95% of all applicable "Minor Musts."

451. To comply with the CFM Criteria, feed producers must meet the following requirements:

- All non-compliances [identified in the course of an internal poultry feed audit] shall be reported and appropriative corrective actions be performed and documented. (§4.3)

- All feed ingredients, intermediate products, veterinary medicines, medicated premixtures, additives and premixtures shall have a written specification, which is regularly updated. (§5.2.1)

- The batch records shall show individual weights of feed ingredients and bags or part bags. (§7.1.3)

- The feed additives and premixtures used shall be documented, and shall be in accordance with legal requirements. (§7.1.4)

- The feed specification shall comply with appropriate legislation of the national authority with regards to limits for undesirable substances and inclusion of feed additives. (§7.2.2)

- There shall be a system that documents any amendments to the formulation by an authorized person. (§7.2.6)

**c. IFS Certification Standards**

452. The International Featured Standard (the "IFS") contains guidelines applicable to all companies involved in food processing and packaging. To comply with the IFS requirements, producers must demonstrate compliance with, *inter alia*, the following specifications:

- Specifications must be available for all product inputs, such as raw materials, ingredients, additives, packaging materials, rework, and finished products. (BA §1.1)

- Available specifications must comply with relevant safety, legislative, and customer requirements. (BA §1.2)

- The business has established a traceability system which enables identification of product lots and their relation to batches of ray materials, packaging materials, processing and distribution records. (BA §2)

- There is a documented traceability system in place that meets regulatory and customer requirements for every product. (BA §2.1)

- The business shall implement a test plan to ensure that analysis of products and ingredients is systematically undertaken for issues that are identified as being critical to food safety and legal requirements as well as customer specifications. Results of analysis shall be achieved via recognized and validated methods. (BA §12)

- The business shall ensure appropriate facilities and procedures are in place to minimize the risk of physical, chemical, or microbiological contamination of product. (BB §4)

- The business shall identify and comply with regulatory and customer requirements related to the product and to the product category. (BC §1)

- The business shall assess its ability to prevent intentional product tampering/intentional contamination and put in place the appropriate preventive control measures. (IC §4)

### d. The AloFree Standards

453. The Agricultural Labeling Ordinance Standards (the "AloFree Standards") are promulgated by Switzerland's Federal Food Safety and Veterinary Office ("FSVO").

454. The AloFree Standards consist of a tracking program for the production control of chicken and turkey without antibiotics and/or antimicrobial substances that enhance growth.

455. The AloFree Standards regulate the entire chain of production, from the incubators to the slaughterhouse, including animal nutrition.

### e. The GenesisGap Certification Standards

456. The Genesis GAP Chicken Production Technical Requirements (the "Genesis Standards") contain legal, food safety, animal welfare and relevant environmental requirements associated with the production, catching, transport and slaughter of chicken. Poultry producers are required to meet the minimum Good Agricultural Practice requirements established by the Genesis Standards, in addition to all relevant national legal requirements.

457. To comply with the Genesis Standards, poultry producers must demonstrate compliance with the following criteria:

- There must be a documented procedure to follow in the event that a product recall is required. This documented procedure must identify the likely occurrences that could require a recall and these will include those that could arise from the purchase of unsafe inputs or intentional threats to product integrity and safety. The procedure must state who is responsible for making the decision and list the businesses that would need to be notified and involved which would include the certification body and Genesis QA. (AF §2.9)

- All livestock shall be inspected at least once each day and prompt action taken, if necessary. All housed stock, young stock, those in isolation, reliant on automated systems, about to give birth, or having recently given birth, shall be inspected more often. In the case of chickens kept for meat production, all chickens kept on the holding must be inspected at least twice a day. Special attention should be paid to signs indicating a reduced level of animal welfare and/or animal health. In the case of poultry, records of inspection and any observations must be maintained. (AL §1.7)

- Veterinary medicines (including excess or waste), must be kept in their original packaging. All veterinary medicine stores shall be locked to prevent unauthorized access and provide a storage environment which is in accordance with professional advice or the product safety data sheet (PSDS). (AL §2.1)

- Veterinary medicines must only be used when absolutely necessary, in accordance with label instructions or when prescribed by a veterinary surgeon. Veterinary medicines that are banned in the country of intended destination for the product must not be used. Antibiotics or steroid hormones must not be used to promote growth. (AL §2.3)

- Veterinary medicine withdrawal periods must be adhered to and there shall be a practical method, known to all workers, by which animals treated with veterinary medicines can be identified. Any animals sold within a veterinary-medicine withdrawal period must be accompanied by documentation that clearly states this. (AL §2.4)

- A program of tests to detect residues of prohibited substances shall be undertaken. The tests must focus on substances prohibited in the country of intended destination. In many cases, the national testing program will be sufficient. The farm must respond to and involve their veterinary surgeon in any issues arising from residue testing relating to Maximum Residue Levels (MRL). All such issues must be recorded as a complaint and be reported to Genesis Standards by email in English to info@genesisqa.com. (AL §2.5)

- The ration must only include constituents permitted by UK and EU law, or the laws of the country of intended destination for the product if these are more restrictive. Animal or avian fat, blood or blood products, meat or meat by-products or catering waste must not be included in livestock diets. (AL §3.4)

- All bought-in compound/ blended feed must be manufactured to the relevant standard laid down by legislation and approved under the Agricultural Industries Confederation (AIC) Universal Feed Assurance Scheme (UFAS) or other scheme formally recognized by Genesis Standards. (AL §3.6)

- All feeds and feed ingredients shall be readily identifiable and traceable to their suppliers and adequately separated and stored to prevent contamination and deterioration. Feed formulated for a particular species or production stage shall not be fed to or be accessible by other livestock. (AL §3.12)

- There must be a recipe/formulation for each finished feed mixed on-farm and this must be retained for three years. (AL §3.16)

- Parallel production must not occur. The intended production of certificated and non-certificated livestock of the same species must not occur on the holding. It is expected that a small number of individual animals may fail to meet scheme requirements and these can be present on the holding as non-conforming product and

must not be sold as certificated or intermingled with certificated stock at the marketing or transport stage. (AL §5.1)

- There must be a robust system of traceability of livestock onto, within and off the holding. Records must show the date of movement, number of animals, their ID and the details of any consigning or receiving holdings. These records are to be retained for at least six years. For cattle, sheep and pigs, any documents/ systems required by the competent authority must be used. For pigs, a record of source, breed, parental lines and maternal-line stress status of incoming stock must be retained. Deadstock will be clearly identified in the records as a movement off the holding. Records will include number disposed of, date and disposal method/ destination. (AL §5.3)

- Records for each flock shall be maintained and shall include: (i) daily alarm checks on all houses; (ii) weekly generator tests; (iii) water portability tests; (iv) salmonella testing; (v) feed purchases; (vi) daily lighting program; (vii) medicine usage including vaccine and multi-vitamin; (viii) post mortem and veterinary record; and (ix) number of birds placed, placement date and breed (by house). (PO §2.2)

- Where flocks are shown to be positive for Salmonella infection there must be an appropriate written deep cleaning and more rigorous disinfection procedure for the house and equipment following depopulation. In this case supplies for subsequent flocks must not be brought onto site until laboratory tests have confirmed that Salmonella is no longer present. *Analysis of samples must be undertaken in a laboratory accredited to ISO 17025.* (PO §2.5)

- Breeding stock must be vaccinated against infection by Salmonella Enteritis and Salmonella Typhimurium using licensed vaccines only. Eggs from Salmonella Enteritis- or Salmonella Typhimurium-positive flocks must not be used for hatching. It is recommended that additional vaccination or control programs are used for other disease agents, including Salmonella where necessary, identified by the farm veterinarian. (PO §5.10)

- Breeding flocks must be monitored for Salmonella and records retained. Eggs from flocks where Salmonella Enteritis or Salmonella Typhimurium is confirmed must not be used and the flock must be slaughtered. *Analysis of samples must be undertaken in a laboratory accredited to ISO 17025.* (PO §5.11)

- Meat birds must be tested within 3 weeks of slaughter for Salmonella infection. *Analysis of samples must be undertaken in a laboratory accredited to ISO 17025*. (PO §5.13)

- Where flocks are shown to be positive for Salmonella infection there must be an appropriate written cleaning and disinfection procedure for the house and equipment following depopulation. In this case supplies for subsequent flocks must not be brought onto site until laboratory tests have confirmed that Salmonella is no longer present. (PO §5.14)

- All eggs must be sourced only from flocks that are Salmonella Enteritis- or Salmonella Typhimurium-free or free from other relevant serovars in countries where SE and ST are not a problem. (PO §7.4)

- Hatcheries must be monitored for Salmonella and records retained. Unhatched eggs from hatcheries where Salmonella Enteritis, Salmonella Typhimurium or other relevant serovars are confirmed must be recovered, destroyed and disposed of appropriately. *Analysis of samples must be undertaken in a laboratory accredited to ISO 17025*. (PO §7.5)

- Production records for each consignment of eggs shall be kept. These must include: (i) farm of origin; (ii) date laid; (iii) date of collection and identity of vehicle; (iv) setting date; (v) setter number; (vi) transfer date; (vii) hatcher number; (viii) newly-hatched bird and cull numbers, (ix) transport records; and (x) placement details. (PO §7.23)

- Flocks that have tested positive for Salmonella infection must be slaughtered at the end of the production run. (PO §9.7)

458. Based on the misconduct detailed above, ¶¶88-423, Defendants failed to comply with these standards.

## XI. DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD

### A. Materially False and Misleading Statements Regarding the Company's Growth and Operations

459. The Class Period begins on April 4, 2013, when BRF filed the 2012 Form 20-F. In the 2012 Form 20-F, the Company stated that its net sales increased by R$2,811.2 million in the year 2012, "primarily due to organic growth," stating, in pertinent part, as follows:

> **Net Sales**
>
> **Our net sales increased by R$2,811.2 million, or 10.9%, to R$28,517.4 million in 2012 from R$25,706.2 million in 2011, primarily due to organic growth**, the incorporation of companies acquired in Argentina, especially Quickfood, and an expanded portfolio due to the launch of various products and categories designed to minimize the impact of asset transfers in the third quarter of 2012 in accordance with the TCD, the agreement signed with the CADE.

460. In the 2012 Form 20-F, BRF also stated that it "adopted a long-term strategic plan, the BRF 15 Strategic Plan, to be one of the world's premier food companies by 2015, admired for its world-class brands, innovation and results."

461. The 2012 Form 20-F contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Fay and Saboya, stating that the information contained in the 2012 Form 20-F "fairly presents, in all material respects, the financial condition and results of operations of the Company."

462. On April 30, 2013, BRF issued a press release and filed a Form 6-K with the SEC stating, in pertinent part, that "BRF's growth and returns reported for 1Q13 benefited from the success in positioning of brands, innovation and portfolio diversification implemented during the course of 2012."

463. On May 2, 2013, BRF filed a Management Report for 1Q13 on a Form 6-K filed with the SEC. The management report was signed by Abilio Diniz and Fay, and stated, in pertinent part: "The successful positioning of the brands, portfolio and innovation established during the preceding year by the Company, were instrumental in driving the growth and returns reported in the quarter compared with 2012." The management report further stated that "[t]his improved performance was a result of a positive contribution of all segments of the business, more especially the domestic market[.]"

464. On October 28, 2013, BRF filed a Form 6-K filed with the SEC which, among other things, attributed BRF's performance in the third quarter of 2013 to "the results of operational and financial improvements introduced by the company and a gradual recovery in exports, with prices receiving a boost from the exchange rate" and "a shift in the portfolio product mix towards higher value added and the inclusion of 41 new products during the quarter[.]"

465. In a management report filed on Form 6-K with the SEC on the same day, the Company attributed its growth to "the better trading environment for the Company's exports together with the reduced costs of acquiring raw materials.

466. On February 28, 2014, BRF filed a Form 6-K with the SEC stating, in pertinent part, that its financial performance for the fourth quarter of 2013 "reflects the sustainable work that was done this year" and BRF's "new . . . focus[] on customers and consumers . . . operational improvements and greater efficiency in optimizing working capital[.]"

467. On March 5, 2014, BRF filed its 2013 Sustainability Report, which highlighted the Company's net income and net margin, stating, in pertinent part, as follows:

> **Net Income and Net Margin**
>
> In 2013 we reached R$ 1.1 billion net income, 38% more than in 2012, with net margin of 3.5% compared to 2.7% in 2012, reflecting the best scenario for exports of the Company, summed up to the onlending of domestic prices, mitigating the pressure of gross margin even with consumption decline in the domestic market.

468. On March 31, 2014, BRF filed an annual report on Form 20-F with the SEC, announcing the Company's financial and operating results for the quarter and fiscal year ended December 31, 2013 (the "2013 Form 20-F"). In the 2013 Form 20-F, the Company described a revised plan, now called the BRF 17, which was "part of [its] international growth strategy," that was described as a "long-term strategic plan . . . to be one of the largest food companies in the world, admired for its brands, innovation and results, contributing to a better and sustainable world."

469. The 2013 Form 20-F contained signed certifications pursuant to SOX by Defendants Galeazzi and Ribeiro, stating that the information contained in the 2012 Form 20-F "fairly presents, in all material respects, the financial condition and results of operations of the Company."

470. On March 31, 2015, BRF filed an annual report on Form 20-F with the SEC, announcing the Company's financial and operating results for the quarter and fiscal year ended

December 31, 2014 (the "2014 Form 20-F"). In the 2014 Form 20-F, the Company again referred to "the BRF 17, which upholds our objective of being one of the biggest food companies in the world, admired for its brands, innovation and results, and contributing to a better and sustainable world."

471. The 2014 Form 20-F contained signed certifications pursuant to SOX by Defendants Faria and Ribeiro, stating that the information contained in the 2014 20-F "fairly presents, in all material respects, the financial condition and results of operations of the Company."

472. On April 5, 2016, BRF filed an annual report on Form 20-F with the SEC, announcing the Company's financial and operating results for the quarter and fiscal year ended December 31, 2015 (the "2015 Form 20-F"). In the 2015 Form 20-F, the Company stated, among other things: "We intend to become the most inspiring and relevant global food company. In order to achieve this, we reviewed our long-term plan in our yearly strategic planning process . . . BRF is focused on three main strategic pillars: [i] Build Sadia as a truly global brand; . . . [ii] Focus in four key global opportunities; [. . . and] [iii] Capture global opportunities."

473. The 2015 Form 20-F contained signed certifications pursuant to SOX by Defendants Faria and Borges, stating that the information contained in the 2015 Form 20-F "fairly presents, in all material respects, the financial condition and results of operations of the Company."

474. On April 26, 2017, BRF filed an annual report on Form 20-F with the SEC, announcing the Company's financial and operating results for the quarter and fiscal year ended December 31, 2016 (the "2016 Form 20-F"). The 2016 20-F was signed by Defendants Pedro Faria and Hélio Rubens Mendes. The 2016 20-F contained a signed certification pursuant to SOX by Defendant Faria, stating that the information contained in the 2016 Form 20-F "fairly presents, in all material respects, the financial condition and results of operations of the Company."

475. On April 30, 2014, BRF filed its management report for the first quarter of 2014 on a Form 6-K with the SEC (the "1Q14 Management Report"). The Company reported net sales of R$7.3 billion and net income of R$315.3, results which were attributed to BRF's "strategy of reducing volumes in selected markets." The 1Q14 Management Report was signed by Abilio Diniz and Claudio Galeazzi.

476. On August 1, 2014, the Company announced its earnings for the second quarter of 2014 on a Form 6-K filed with SEC. That same day, the Company issued a press release attributing its earnings to "the optimization of [BRF's] investments and the consistent strength and sustainability of its working capital needs," and "good performance by processed foods and fresh poultry on the domestic market[.]"

477. In addition, on August 1, 2014, BRF filed its management report for the second quarter of 2014 on a Form 6-K with the SEC (the "2Q14 Management Report"). The 2Q14 Management Report, which was signed by Abilio Diniz and Claudio Galeazzi, reported net sales of R$7.7 billion and stated that the positive results were "largely due to growth in revenue flows from the commercialization of industrialized products and in natura poultry to the domestic market[.]"

478. On October 31, 2014, the Company announced its earnings for the third quarter of 2014 in a management report and press release, both filed on Forms 6-K with the SEC (the "3Q14 Management Report" and "3Q14 Press Release," respectively). The 3Q14 Management Report was signed by Abilio Diniz and Claudio Galeazzi, and attributed the Company's earnings to its recent corporate restructuring, which allowed BRF to "eliminat[e] inefficiencies . . . become more proficient and . . . agil[e] in the decision-making process." The 3Q14 Management Report also stated that "the go-to-market project has allowed us to expand our client network and take advantage of the cross-selling opportunities for our brands. The higher sales volume in 3Q14 is a result of this

effort." With respect to the international market, the 3Q14 Management Report noted that the Company's "solid quarter" was driven by new initiatives such as "optimizing volumes, enhancing the profitability of the main markets, [and] the strategy of acquiring distributors in the Middle East."

479. Likewise, the 3Q14 Press Release stated that "BRF's net income expand[ed] by 117.5% to R$64 million in 3Q14," and stated that "[t]his performance arose from management techniques and processes that have been implemented over the last year."

480. On February 27, 2015, the Company announced its results for the fourth quarter of 2014 and year ended December 31, 2014 on a press release filed on a Form 6-K with the SEC (the "4Q14 Press Release"). The 4Q14 Press Release announced that "BRF net income increases 109.4%, reaching R$2.2 billion in 2014," and stated that "[t]he company's performance was mainly driven by positive results in the international market, growth of sales points across Brazil and improved service quality."

481. On April 29, 2015, the Company announced its earnings for the first quarter of 2015 on a press release filed on a Form 6-K with the SEC (the "1Q15 Press Release"). The 1Q15 Press Release stated that "BRF posts net income of R$462 million in 1Q15," results the Company stated "reflect the structural and strategic changes made over the last two years . . . and an increasingly greater focus on the consumer."

482. On July 31, 2015, the Company announced its earnings for the second quarter of 2015 on a press release filed on a Form 6-K with the SEC (the "2Q15 Press Release"). The 2Q15 Press Release announced that "Net revenue of BRF grows 12.8% in 2Q15 to R$7.9 billion," results which were attributed in large part to "[b]usiness performance in the international market . . . which benefited from the structural changes implemented [in 2014] and from the favorable cycle."

483. On October 30, 2015, the Company announced its earnings for the third quarter of 2015 in a press release filed on a Form 6-K with the SEC (the "3Q15 Press Release"). According to the 3Q15 Press Release, the reported increase in BRF's net operating revenue "was driven by growth of 7.8% in revenue from processed products and of 8% in fresh poultry."

484. On February 26, 2016, the Company announced its earnings for the fourth quarter of 2015 and year ended December 31, 2015 in a press release filed on Form 6-K with the SEC (the "4Q15 Press Release"). According to the 4Q14 Press Release, "BRF's 2015 Net Income gr[ew] 46% to R$3.1 billion," a positive performance which was "driven by the expansion in its international operations, an increase in the number of points of sale in Brazil and improvements in the quality of customer service."

485. On July 29, 2016, BRF announced its earnings for the second quarter of 2016 in a press release filed on a Form 6-K with the SEC (the "2Q16 Press Release"). The Company reported net revenue of R$8.5 billion in the second quarter of 2016, and stated that "[r]evenue growth was driven by higher average sales prices and sales volume growth."

486. The statements referenced in ¶¶459-485 were materially false and misleading when made because they misrepresented and/or failed to disclose the following adverse facts, which were then known to, or recklessly disregarded by, Defendants, and were required to be disclosed;

(a) that the Company's growth was being driven by illegal activities, including: (i) the payment of bribes to regulators and politicians to subvert inspections in order to conceal unsanitary practices at the Company's meatpacking and poultry facilities; (ii) the use of fraudulent means to obtain legal, regulatory, and health certifications for products that did not meet the strict licensing and certification requirements; (iii) the processing of birds contaminated with salmonella, other pathogens, and/or pollutants; (iv) the manipulation of laboratory results and falsification of

traceability reports to pass inspections; (v) the unlawful adulteration of animal feed and premix by adding ingredients that were prohibited and/or by adding permissible ingredients at impermissible ratios; (vi) the failure to comply with legal and regulatory restrictions on the administration of antibiotics and other medications to chickens; (vii) the use of non-accredited laboratories to conduct health and sanitary laboratory analyses; and (viii) the packaging of poultry products with water absorption levels above the legal index and/or that had been injected with excess water;

(b) that these illegal activities were able to be carried out because the Company lacked adequate (or any) controls over its operations, including for the testing and reporting of poultry products contaminated with salmonella and other pathogens; the production of poultry feed and premix; the administration of medication to poultry; the process for identifying and vetting outside laboratories; and the packaging of poultry products; and

(c) that, in light of the foregoing, Defendants' statements regarding the Company's growth and operations were materially false and misleading and lacking in a reasonable basis at all relevant times.

### B. Defendants' Statements Regarding Product Quality and Food Safety Were Materially False and Misleading and Omitted Material Facts Defendants Had a Duty to Disclose

#### 1. Defendants' Statements Regarding BRF's Commitment to Product Quality and Food Safety Were Materially False and Misleading and Omitted Material Facts Defendants Had a Duty to Disclose

487. In the 2012 Form 20-F, the Company stated that it "focus[es] on quality and food safety . . . in order to . . . prevent contamination and minimize the risk of outbreaks of animal diseases," stating, in pertinent part, as follows:

> ***Emphasis on Product Quality and Safety and on a Diversified Product Portfolio.***
>
> ***We focus on quality and food safety in all our operations in order to meet customers' specifications, prevent contamination and minimize the risk of***

> ***outbreaks of animal diseases. We employ traceability systems that allow us to quickly identify and isolate any farm on which a quality or health concern may arise. We also monitor the health and treatment of the poultry and hogs that we raise at all stages of their lives and throughout the production process***. We were the first Brazilian company approved by the European Food Safety Inspection System as qualified to sell processed poultry products to European consumers. We have a diversified product range, which gives us the flexibility to channel our production according to market demand and the seasonality of our products.

488. In the 2012 Form 20-F, the Company further stated that it had adopted a code of conduct and ethics which "recognizes that food safety and the perception of the quality of its products are the foundation of its success," and stated that "no such amendment was made or waiver granted" to its code of ethics during the year ended December 31, 2012, stating, in pertinent, as follows:

> Under NYSE Rule 303A.10, each U.S. listed company must adopt and disclose a code of business conduct and ethics for directors, officers and employees and promptly disclose any waivers of the code for directors or executive officers. We are subject to a similar recommendation under Brazilian law, and we have adopted a code of ethics that applies to our officers and employees.
>
> Our code of ethics, as well as further information concerning our corporate governance practices and applicable Brazilian law, is available on our website www.brf-br.com/ir. Information on our website is not incorporated by reference in this form. Copies of our Code of Business Conduct and Ethics are also available without charge upon request to our Investor Relations Office. "Item 10 – Additional Information – B. Memorandum and Articles of Association."
>
> If we make any substantive amendment to the code of ethics or grant any waivers, including any implicit waiver, from a provision of the code of ethics, we will disclose the nature of such amendment or waiver on our website. ***During the year ended December 31, 2012, no such amendment was made or waiver granted.***

489. The Company's Code of Ethics and Conduct stated, in pertinent part:

> **4.3 PRODUCT QUALITY**
>
> BRF is committed to the manufacture of safe, healthy and tasty products, seeking continuous improvement of its standards, processes, products and services. ***The Company recognizes that food safety and the perception of the quality of its products are the foundation of its success. BRF values the quality and responsible management throughout its supply chain, based on internationally recognized laws and standards***.

490. In the 2013 20-F, the Company stated, in relevant part:

> ***Emphasis on Product Quality and Safety and on a Diversified Product Portfolio.*** We focus on quality and food safety in all our operations in order to meet customers' specifications, prevent contamination and minimize the risk of outbreaks of animal diseases. We employ traceability systems that allow us to quickly identify and isolate any farm on which a quality or health concern may arise. We also monitor the health and treatment of the poultry and hogs that we raise at all stages of their lives and throughout the production process. We were the first Brazilian company approved by the European Food Safety Inspection System as qualified to sell processed poultry products to European consumers. We have a diversified product range, which gives us the flexibility to guide our production according to market demand and the seasonality of our products. To support the continued innovation of our products portfolio, we invested in a new Technology Center in Jundiaí, in the State of São Paulo.

491. In the 2013 Form 20-F, the Company further stated that it had adopted a code of conduct and ethics which "recognizes that food safety and the perception of the quality of its products are the foundation of its success," and stated that "no such amendment was made or waiver granted" to its code of ethics during the year ended December 31, 2013, using language similar to the language quoted in ¶488.

492. In the 2013 Sustainability Report, BRF stated that the "[l]aboratory tests ensure the adequacy to legislation and internal [food safety] standards," and that "[t]he Company operates in accordance with national and international laws, in order to mitigate or eliminate risks to consumer health, stating, in pertinent part, as follows:

> ***Food safety is basic and essential premise for the production of any product BRF.*** The impact evaluation on the health and safety of consumers begins in the conceptualization of all products and extends to the stages of production, packaging, transportation and consumption. ***Laboratory tests ensure the adequacy to legislation and internal standards***. This aspect has high impact on the operation and the supply chain as it should seek joint solutions to mitigate risks to food safety and product quality. ***The Company operates in accordance with national and international laws, in order to mitigate or eliminate risks to consumer health, maintain the reputation of its brands, ensure the safety of food and its processes, as well as transparency.***

493. The 2013 Form 20-F also referenced BRF's Code of Ethics and Conduct which contained the representations described *supra* at ¶489.

494. In the 2014 Form 20-F, the Company stated that it "attend[s to] the most demanding clients in the world and meet[s] their quality controls," stating, in pertinent part, as follows:

> ***Emphasis on Product Quality and Safety and on a Diversified Product Portfolio***. We focus on quality and food safety in all our operations in order to meet customers' specifications, prevent contamination and minimize the risk of outbreaks of animal diseases. We employ traceability systems that allow us to quickly identify and isolate any farm on which a quality or health concern may arise. We also monitor the health and treatment of the poultry and hogs that we raise at all stages of their lives and throughout the production process. We were the first Brazilian company approved by the European Food Safety Inspection System as qualified to sell processed poultry products to European consumers. We have a diversified product range, which gives us the flexibility to guide our production according to market demand and the seasonality of our products. To support the continued innovation of our products portfolio, we invested in a new Technology Center in Jundiaí, in the State of São Paulo.

495. In the 2014 Form 20-F, the Company further stated that it had adopted a code of conduct and ethics which "recognizes that food safety and the perception of the quality of its products are the foundation of its success," and stated that "no such amendment was made or waiver granted" to its code of ethics during the year ended December 31, 2014, using language similar to the language quoted in ¶488, above.

496. In the 2015 Form 20-F, the Company stated that it "attend[s to] the most demanding clients in the world and meet[s] their quality controls," stating, in pertinent part, as follows:

> ***Emphasis on Product Quality and Safety and on a Diversified Product Portfolio***. We focus on quality and food safety in all our operations in order to meet customers' specifications, prevent contamination and minimize the risk of outbreaks of animal diseases. We employ traceability systems that allow us to quickly identify and isolate any farm on which a quality or health concern may arise. We also monitor the health and treatment of the poultry and hogs that we raise at all stages of their lives and throughout the production process. We were the first Brazilian company approved by the European Food Safety Inspection System as qualified to sell processed poultry products to European consumers. We have a diversified product range, which gives us the flexibility to guide our production according to market demand and the seasonality of our products. To support the continued innovation of

> our products portfolio, we invested in a new Technology Center in Jundiaí, in the State of São Paulo.

497. In the 2015 Form 20-F, the Company further stated that it had adopted a code of conduct and ethics which "recognizes that food safety and the perception of the quality of its products are the foundation of its success," and stated that "no such amendment was made or waiver granted" to its code of ethics during the year ended December 31, 2015, using language similar to the language quoted in ¶488, above.

498. In the 2016 Form 20-F, the Company stated that it "attend[s to] the most demanding clients in the world and meet[s] their quality controls," stating, in pertinent part, as follows:

> ***Emphasis on Product Quality and Safety and on a Diversified Product Portfolio***. We focus on quality and food safety in all our operations in order to meet customers' specifications, prevent contamination and minimize the risk of outbreaks of animal diseases. We employ traceability systems that allow us to quickly identify and isolate any farm on which a quality or health concern may arise. We also monitor the health and treatment of the poultry and hogs that we raise at all stages of their lives and throughout the production process. We were the first Brazilian company approved by the European Food Safety Inspection System as qualified to sell processed poultry products to European consumers. We have a diversified product range, which gives us the flexibility to guide our production according to market demand and the seasonality of our products. To support the continued innovation of our products portfolio, we invested in a new Technology Center in Jundiaí, in the State of São Paulo.

499. In the 2016 Form 20-F, the Company further stated that it had adopted a code of conduct and ethics which "recognizes that food safety and the perception of the quality of its products are the foundation of its success," and stated that "no such amendment was made or waiver granted" to its code of ethics during the year ended December 31, 2016, using language similar to the language quoted in ¶488 above.

500. BRF's Code of Ethics and Conduct contained the representations described *supra* at ¶489.

501. The statements referenced in ¶¶487-500 were materially false and misleading when made because they misrepresented and/or failed to disclose the following adverse facts, which were then known to, or recklessly disregarded by, Defendants, and were required to be disclosed;

(a) that BRF employees routinely disregarded sanitary inspection systems by manipulating laboratory results and falsifying traceability reports;

(b) that BRF employees paid bribes to regulators and politicians to subvert inspections in order to conceal unsanitary practices at the Company's meatpacking and poultry facilities;

(c) that the Company used fraudulent and illegal means to obtain legal, regulatory and health certifications for products that did not meet the strict licensing and certification requirements;

(d) that the Company had inadequate controls over the testing and reporting of poultry products contaminated with salmonella, other pathogens and/or pollutants;

(e) that the Company had inadequate controls over the production of animal feed and premix compound and, as a result, BRF employees unlawfully adulterated the composition of premix by adding ingredients that were prohibited and/or by adding permissible ingredients at impermissible ratios;

(f) that the Company had inadequate controls over the administration of medication to poultry, and, as a result, BRF employees failed to comply with legal and regulatory restrictions on the administration of antibiotics and other medications to chickens;

(g) that the Company had inadequate controls over the process for identifying and vetting outside laboratories, and, as a result, BRF employees used non-accredited laboratories to conduct health and sanitary laboratory analyses;

(h) that the Company had inadequate controls over the packaging of poultry products, and, as a result, BRF employees packaged poultry products with water absorption above the legal index and/or injected excess water into frozen poultry products; and

(i) that, in light of the foregoing, Defendants' statements regarding BRF's product quality and its concerns over food safety were materially false and misleading and lacking in a reasonable basis at all relevant times.

### 2. Defendants' Statements About Traceability Systems and Feed Control Were Materially False and Misleading and Omitted Material Facts Defendants Had a Duty to Disclose

502. Throughout the Class Period, Defendants made numerous statements regarding BRF's traceability systems.

503. For example, in the 2012 Form 20-F and 2013 Form 20-F the Company stated that it "employ[s] traceability systems that allow [BRF] to quickly identify and isolate any farm on which a quality or health concern may arise," stating, in pertinent part, as follows:

> ***Emphasis on Product Quality and Safety and on a Diversified Product Portfolio.*** We focus on quality and food safety in all our operations in order to meet customers' specifications, prevent contamination and minimize the risk of outbreaks of animal diseases. ***We employ traceability systems that allow us to quickly identify and isolate any farm on which a quality or health concern may arise.*** We also monitor the health and treatment of the poultry and hogs that we raise at all stages of their lives and throughout the production process. We were the first Brazilian company approved by the European Food Safety Inspection System as qualified to sell processed poultry products to European consumers. We have a diversified product range, which gives us the flexibility to channel our production according to market demand and the seasonality of our products.

504. In the 2013 Sustainability Report, BRF stated that food products "produced in any unit can be traced through a history that identifies the path to the consumer, in a process that includes feed control and drugs supplied to animals," stating, in pertinent part, as follows:

> Food safety – The risks related to food safety are controlled by the BRF Quality System and specific food safety programs (such as the Good Manufacturing Practices, Hazard Analysis and Critical Control Points – HACCP). These programs,

> in particular HACCP, guarantee the elimination or minimization of biological, chemical and physical hazards that may occur in the product, ensuring that products commercialized by the Company pose no risk to consumers health. The Company makes use of metal detectors and X-ray equipment to maintain the safety of the final product. In addition, all suppliers sign contracts with clauses guaranteeing the safety of commercialized items and ***those produced in any unit can be traced through a history that identifies the path to the consumer, in a process that includes feed control and drugs supplied to animals***.

505. In addition, in the 2013 Sustainability Report, the Company stated that it "uses only permitted food additives and their maximum limits," stating, in pertinent part, as follows:

> They are also substances added to food during processing to increase its life in shelf (safety) or improve its taste and presentation. There are many kinds of food additives, particularly colorants, preservatives, sweeteners, antioxidants, emulsifiers and flavorings. The laws of ANVISA and the Ministry of Agriculture establish the additives and usage limits allowed by product category. ***BRF uses only permitted food additives and their maximum limits***.

506. The statements referenced in ¶¶502-505 were materially false and misleading when made because they misrepresented and/or failed to disclose the following adverse facts, which were then known to, or recklessly disregarded by, Defendants, and were required to be disclosed:

(a) that BRF employees routinely disregarded sanitary inspection systems by manipulating laboratory results and falsifying traceability reports;

(b) that BRF employees paid bribes to regulators and politicians to subvert inspections in order to conceal unsanitary practices at the Company's meatpacking and poultry facilities;

(c) that the Company used fraudulent means to obtain legal, regulatory and health certifications for products that did not meet the strict licensing and certification requirements;

(d) that the Company had inadequate controls over the testing and reporting of poultry products contaminated with salmonella, other pathogens, and/or pollutants;

(e) that the Company had inadequate controls over the production of animal feed and premix compound and, as a result, BRF employees unlawfully adulterated the composition of

premix by adding ingredients that were prohibited and/or by adding permissible ingredients at impermissible ratios;

(f) that the Company had inadequate controls over the administration of medication to poultry, and, as a result, BRF employees failed to comply with legal and regulatory restrictions on the administration of antibiotics and other medications to chickens;

(g) that the Company had inadequate controls over the process for identifying and vetting outside laboratories, and, as a result, BRF employees used non-accredited laboratories to conduct health and sanitary laboratory analyses;

(h) that the Company had inadequate controls over the packaging of poultry products, and, as a result, BRF employees packaged poultry products with water absorption above the legal index and/or injected excess water into frozen poultry products; and

(i) that, in light of the foregoing, Defendants' statements regarding BRF's traceability systems and feed control were materially false and misleading and lacking in a reasonable basis at all times.

### 3. Defendants' Statements Regarding the Potential Impact of Animal Disease and Other Health Risks on BRF's Operations Were Materially False and Misleading and Omitted Material Facts Defendants Had a Duty to Disclose

507. In the 2012 Form 20-F, Defendants stated that the "risks" posed by contamination, product tampering, animal diseases, and other health concerns "could" affect BRF's ability to sell products, but assured investors that the Company "maintain[s] systems designed to monitor food safety risks throughout all stages of the production process," stating, in pertinent part, as follows:

> ***Health risks related to the food industry could adversely affect our ability to sell our products***
>
> ***We are subject to risks affecting the food industry generally***, including risks posed by contamination or food spoilage, evolving nutritional and health-related concerns, consumer product liability claims, product tampering, the possible unavailability and

> expense of liability insurance and the potential cost and disruption of a product recall. ***Among such risks are those related to raising animals, including disease*** and adverse weather conditions. ***Meat is subject to contamination during processing and distribution. Contamination during processing could affect a large number of our products and therefore could have a significant impact on our operations***.
>
> Our sales are dependent on consumer preferences and any actual or perceived health risks associated with our products, including any adverse publicity concerning these risks, could cause customers to lose confidence in the safety and quality of our products, reducing the level of consumption of those products.
>
> Even if our own products are not affected by contamination, our industry may face adverse publicity if the products of other producers become contaminated, which could result in reduced consumer demand for our products in the affected category. ***We maintain systems designed to monitor food safety risks throughout all stages of the production process (including the production of poultry, hogs, cattle and dairy products***).
>
> Our systems for compliance with governmental regulations may not be fully effective in mitigating risks related to food safety. Any product contamination could have a material adverse impact on our business, results of operations, financial condition and prospects.

508. In the 2012 Form 20-F, Defendants stated that BRF "could" be required to "suspend the sale of some of [its] products to customers in Brazil and abroad in the event of an outbreak of disease affecting animals," stating, in pertinent part, as follows:

> ***Raising animals and meat processing involve animal health and disease control risks, which could have an adverse impact on our results of operations and financial condition***.
>
> Our operations involve raising poultry and hogs and processing meat from poultry, hogs and cattle, as well as the purchase of milk and the sale of milk and dairy products, which require us to maintain animal health and control disease. ***We could be required to destroy animals or suspend the sale of some of our products to customers in Brazil and abroad in the event of an outbreak of disease affecting animals***, such as the following: (1) in the case of poultry, avian influenza (discussed below) and Newcastle disease; (2) in the case of hogs, cattle and certain other animals, foot-and-mouth disease and A(H1N1) influenza (discussed below); and (3) in the case of cattle, foot-and-mouth disease and bovine spongiform encephalopathy, known as "mad cow disease." Destruction of poultry, hogs or other animals would preclude recovery of costs incurred in raising or purchasing these animals and result in additional expense for the disposal of such animals . . . .

* * *

> ***Outbreaks, or fears of outbreaks, of any of these or other animal diseases may lead to cancellation of orders by our customers and, particularly if the disease has the potential to affect humans, create adverse publicity that may have a material adverse effect on consumer demand for our products. Moreover, outbreaks of animal disease in Brazil may result in foreign governmental action to close export markets to some or all of our products, relating to some or all of our regions***. For example, due to foot-and-mouth disease cases affecting cattle in the States of Mato Grosso do Sul and Paraná, certain major export markets, including Russia (which has been the largest importer of Brazilian pork) banned imports of pork from the entire country in November 2005. Russia partially lifted this ban in the second quarter of 2006 for pork products from the State of Rio Grande do Sul, and this ban was completely lifted in December 2008. However, in 2011, Russia prohibited imports from several Brazilian states, citing health and sanitary reasons, and this ban remains in place. ***Any future outbreaks of animal diseases could have a material adverse effect on our results of operations and financial condition***.

509. Similarly, in the 2013 20-F, the Company stated that the "risks" posed by contamination, product tampering, animal diseases, and other health concerns "could" affect its ability to sell products, but assured investors that the Company "maintain[s] systems designed to monitor food safety risks throughout all stages of the production process," using language similar to the language cited in ¶507.

510. In addition, in the 2013 Form 20-F, BRF stated that it "could" be required to "suspend the sale of some of our products to customers in Brazil and abroad in the event of an outbreak of disease affecting animals," using language similar to the language cited in ¶508.

511. In addition, the Company stated in the 2013 Form 20-F that foreign countries may ban imports from Brazil if the Company does not comply with the applicable sanitary requirements, stating, in pertinent part, as follows:

> ***Effects of Trade and Other Barriers***
>
> Global demand for Brazilian poultry, pork and beef products is significantly affected by trade barriers, whether: (i) tariff barriers, or high rates that ultimately protect certain markets; and (ii) non-tariff barriers, mainly import quotas, sanitary barriers (which are the most common type of barriers faced by the meat industry) and technical/religious barriers. In addition, some countries employ subsidies for production and exports, which tend to distort international trade and interfere with our business.

> With regard to sanitary requirements, most countries demand specific sanitary agreements so that Brazilian producers can export to them. Moreover, zoonosis outbreaks may result in banishment to imports.

512. In the 2014 Form 20-F, the Company stated that the "risks" posed by contamination, product tampering, animal diseases, and other health concerns "could" affect its ability to sell products, but assured investors that the Company "maintain[s] systems designed to monitor food safety risks throughout all stages of the production process," using language similar to the language cited in ¶507.

513. In the 2014 Form 20-F, BRF stated that it "could" be required to "suspend the sale of some of our products to customers in Brazil and abroad in the event of an outbreak of disease affecting animals," using language similar to the language cited in ¶508.

514. In addition, the Company stated in the 2014 Form 20-F that foreign countries may ban imports from Brazil if the Company does not comply with the applicable sanitary requirements, stating, in pertinent part, as follows:

> With regard to sanitary requirements, most countries demand specific sanitary agreements so that Brazilian producers can export to them. Outbreaks of animal disease may also result in bans on imports, such as when many countries temporarily suspended the imports of bovine meat in 2013 after reports of a possible case of BSE in the State of Paraná in Brazil.

515. In the 2015 Form 20-F, the Company stated that the "risks" posed by contamination, product tampering, animal diseases, and other health concerns "could" affect its ability to sell products, but assured investors that the Company "maintain[s] systems designed to monitor food safety risks throughout all stages of the production process," using language similar to the language cited in ¶507.

516. In the 2015 Form 20-F, BRF stated that it "could" be required to "suspend the sale of some of our products to customers in Brazil and abroad in the event of an outbreak of disease affecting animals," using language similar to the language cited in ¶508.

517. In addition, the Company stated in the 2015 Form 20-F that foreign countries may ban imports from Brazil if the Company does not comply with the applicable sanitary requirements, stating, in pertinent part, as follows:

> **International Markets**
>
> Brazil is a leading player in global export markets due to its natural advantages (land, water, climate), competitive inputs costs and increasing efficiencies in animal production. Like other large Brazilian producers, we have capitalized on these advantages to develop the scope and scale of our business.
>
> Global demand for Brazilian poultry, pork and beef products is significantly affected by trade barriers, both (i) tariff barriers, with high rates that ultimately protect certain domestic markets (e.g., the extra-quota tariffs for chicken imports in the EU and the high import tax for poultry in South Africa), or (ii) non-tariff barriers, mainly import quotas, such as those imposed by Russia and Europe, sanitary barriers (sanitary requirements, disease-related bans, and regulations) which in the case of meat industry is the type of trade barrier that mostly affects exports, and technical/religious barriers (i.e. customs, technical standards, licensing requirements, and religious considerations).
>
> ***With regard to sanitary requirements, most countries demand specific sanitary agreements so that Brazilian producers can export to them. Outbreaks of animal disease may also result in bans on imports***, such as when many countries temporarily suspended the imports of bovine meat in 2013 after reports of a possible case of BSE in the State of Paraná in Brazil.

518. In the 2016 Form 20-F, the Company stated that the "risks" posed by contamination, product tampering, animal diseases, and other health concerns "could" affect its ability to sell products, stating, in pertinent part, as follows:

> ***Health risks related to the food industry could adversely affect our ability to sell our products***.
>
> We are subject to risks affecting the food industry generally, including risks posed by contamination or food spoilage, evolving nutritional and health-related concerns, consumer product liability claims, product tampering, the possible unavailability and expense of liability insurance, public perception of product safety for both the industry as a whole and also our products specifically, but not exclusively, as a result of disease outbreaks or the fear of such outbreaks, the potential cost and disruption of a product recall and possible impacts on our image and brands. Among such risks are those related to raising animals, including disease and adverse weather conditions.

519. The Company also stated in the 2016 Form 20-F that "processed meat may become exposed to various disease-producing pathogens, including listeria monocytogenes, salmonella and generic E. coli," but assured investors that the Company "maintain[s] systems designed to monitor food safety risks throughout all stages of production" stating, in pertinent part, as follows:

> ***Meat is subject to contamination during processing and distribution. In particular, processed meat may become exposed to various disease-producing pathogens, including listeria monocytogenes, salmonella and generic E. coli. These pathogens can also be introduced to our products during production or as a result of improper handling by third-party food processors, franchisees, distributors, foodservice providers or consumers***. Spoilage, especially spoilage due to failure of temperature-control storage and transportation systems, is also a risk. ***We maintain systems designed to monitor food safety risks throughout all stages of production and distribution***, but these systems could fail to function properly and product contamination could still occur. Failures in our systems to ensure food safety could result in harmful publicity that could cause damage to our brands, reputation and image and negatively impact sales, which could have a material adverse impact on our business, results of operations, financial condition and prospects.

520. Similarly, the 2016 Form 20-F stated that outbreaks of animal disease "may lead to cancellation" of orders and "may result in foreign governmental action to close export markets," stating, in pertinent part, as follows:

> ***Outbreaks, or fears of outbreaks, of any animal diseases may lead to cancellation of orders by our customers and, particularly if the disease has the potential to affect humans***, create adverse publicity that may have a material adverse effect on consumer demand for our products. Moreover, ***outbreaks of animal diseases in Brazil may result in foreign governmental action to close export markets to some or all of our products, which may result in the destruction of some or all of these animals. Our poultry business in Brazilian and export markets could also be negatively affected by avian influenza***.

521. In addition, the Company stated in the 2016 Form 20-F that foreign countries may ban imports from Brazil if the Company does not comply with the applicable sanitary requirements, stating, in pertinent part, as follows:

> **International Markets**
>
> Brazil is a leading player in global export markets due to its natural advantages (land, water, climate), competitive inputs costs and increasing efficiencies in animal

> production. Like other large Brazilian producers, we have capitalized on these advantages to develop the scope and scale of our business.
>
> Global demand for Brazilian poultry, pork and beef products is significantly affected by trade barriers, both (i) tariff barriers, with high rates that ultimately protect certain domestic markets (e.g., the extra-quota tariffs for chicken imports in the EU and the high import tax for poultry in South Africa), or (ii) non-tariff barriers, mainly import quotas, such as those imposed by Russia and Europe, sanitary barriers (sanitary requirements, disease-related bans, and regulations) which in the case of meat industry is the type of trade barrier that mostly affects exports, and technical/religious barriers (i.e. customs, technical standards, licensing requirements, and religious considerations).
>
> ***With regard to sanitary requirements, most countries demand specific sanitary agreements so that Brazilian producers can export to them. Outbreaks of animal disease may also result in bans on imports***, such as when many countries temporarily suspended the imports of bovine meat in 2013 after reports of a possible case of BSE in the State of Paraná in Brazil.

522. The statements referenced in ¶¶507-521 were materially false and misleading when made because they misrepresented and/or failed to disclose the following adverse facts, which were then known to, or recklessly disregarded by, Defendants, and were required to be disclosed:

(a) that the Company had already experienced outbreaks of animal diseases, but failed to report the outbreaks to the appropriate authorities;

(b) that the risk posed by animal diseases and other health risks affecting BRF's ability to sell products had already greatly increased because of the ongoing but undisclosed illegal activities at BRF, including: (i) the payment of bribes to regulators and politicians to subvert inspections in order to conceal unsanitary practices at the Company's meatpacking and poultry facilities; (ii) the use of fraudulent means to obtain legal, regulatory, and health certifications for products that did not meet the strict licensing and certification requirements; (iii) the processing of birds contaminated with salmonella, other pathogens, and/or pollutants; (iv) the manipulation of laboratory results and falsification of traceability reports to pass inspections; (v) the unlawful adulteration of the composition of animal feed and premix by adding ingredients that were

prohibited and/or by adding permissible ingredients at impermissible ratios; (vi) the failure to comply with legal and regulatory restrictions on the administration of antibiotics and other medications to chickens; (vii) the use of non-accredited laboratories to conduct health and sanitary laboratory analyses; and (viii) the packaging of poultry products with water absorption levels above the legal index and/or that had been injected with excess water; and

(c) that, in light of the foregoing, Defendants' statements regarding potential risks associated with animal disease and other health risks were materially false and misleading and lacking in a reasonable basis at all times.

**C. Defendants' Statements Regarding BRF's Use of Medications Were Materially False and Misleading and Omitted Material Facts Defendants Had a Duty to Disclose**

523. In the 2013 Sustainability Report, BRF stated that "medicines, vaccines, and disinfectants" are administered "under the indication and recommendation of a veterinarian," stating, in pertinent part, as follows:

> Any physical change procedures are not performed in animals and in no time hormones are used. ***Other medicines, vaccines and disinfectants are handled just under the indication and recommendation of a veterinarian and in accordance with national and international legislation and good manufacturing practices and handling standard***. Some units that service specific markets comply with the most restrictive laws, moreover the possibility of gradually reducing the use of antibiotics in the production chain is continuously monitored.

524. On February 27, 2015, BRF filed its Annual and Sustainability Report on Form 6-K with the SEC for year ended December 31, 2014 (the "2014 Sustainability Report"). In the 2014 Sustainability Report, BRF stated that the traceability of supplied food and medicines would be assured, stating, in pertinent part, as follows:

> **FOOD SAFETY** – BRF quality system has specific programs for food safety, such as Good Manufacturing Practices and Hazard Analysis and Critical Control Points, with preventive measures to eliminate biological, physical and chemical hazards. Suppliers have specific clauses of quality assurance in their contracts, ensuring traced production to the level of agricultural care and practices (supplied food and

> medicines, for example). Additionally invests in cutting-edge equipment such as metal detectors and X-ray equipment to reduce physical contamination, certification of production sites and shopping aligned to international standards.
>
> * * *
>
> BRF does not use hormones in cutting livestock**.** ***Drugs, antibiotics and vaccines are handled only on the advice and recommendation of a veterinarian, in line with the legislation***. In some markets, there is restrictive and specific legislation to that theme. With regard to antibiotics, the Company monitors possibilities of gradual reduction of its use in the chain.

525. In the 2015 Sustainability Report, BRF stated that "all medication is administered to animals responsibly . . . and in compliance with the laws of the countries to which the products will be shipped as well as those of Brazil," and that "[a]ll product withdrawal periods are rigorously followed, not leaving any type of residue in the final product," stating, in pertinent part, as follows:

> **MEDICATION**
>
> ***As a company practice, all medication is administered to animals*** responsibly, meeting the client's specific requirements and ***in compliance with the laws of the countries to which the products will be sent as well as those of Brazil***.
>
> We maintain an agricultural intelligence department (CIEX), composed of veterinarians with extensive experience in the health field, which organizes and authorizes the use of veterinary medication for each unit, aiming to ensure the correct use of antibiotics and the safety of the food product. The grace period for medication is continuously revised and reinforced by the veterinarians in charge.
>
> ***All product withdrawal periods are rigorously followed, not leaving any type of residue of the final product***.
>
> Over the years, BRF, following world trends and searching for constant improvement in company processes, has been gradually reducing the use of medication, without causing any type of harm to animal welfare or negatively affecting the quality of animals.

526. In 2016 Sustainability Report, BRF stated that "[m]edication is administered cautiously" and in "compliance with norms and regulations . . . and a veterinarian's prescription," stating, in pertinent part, as follows:

**USE OF MEDICATION**

At BRF, ***we have adopted responsible drug management*** following specific client requirements, expert recommendations, and market rules and laws. ***The agricultural and livestock intelligence area has a team of veterinarians with experience in animal health, who must define and plan the use of medication for all production units. Our goal is to promote the correct use of antibiotics and ensure the safety of the end product***.

The shelf life of medication is reviewed and reinforced by the veterinarians responsible, ***and withdrawal of use prior to slaughter is carried out within an appropriate period of time, freeing the product from residue***.

We recognize international guidelines and best practices, and we have sought to gradually reduce the use of medication without adversely affecting animal welfare and the quality of our products. We focus on researching the use of alternatives to antibiotics, such as vaccines, prebiotics, probiotics, and organic acids, and improvements in management, environment, and biosafety.

Medication is administered cautiously, considering real needs, compliance with norms and regulations in the countries in which we operate, and a veterinarian's prescription.

527. Furthermore, in the 2016 Sustainability Report, BRF stated that the "use of growth promoters is restricted to markets and legislation that allow the use of these products," stating, in pertinent part, as follows:

***The use of growth promoters is restricted to markets and legislation that allow the use of these products*** and their use has been diminishing year on year, without prejudice to the quality of life of the animals.

528. Also in the 2016 Sustainability Report, BRF specifically assured investors that it would not use antibiotics as growth promoters at the Chapecó facility, stating, in pertinent part, as follows:

We certify the chicken production process (breeding, loading, transport, and slaughter) at the Buriti Alegre (GO) unit, and the turkey production process (breeders, initiator, terminator, loading, transport, and slaughter) at the Chapecó, SC, unit in the Certified Humane standard of the American NGO, Humane Farm Animal Care. This standard is respected and recognized internationally as an advantage in breeding animals for production.

> Among the adaptations, we ensure that birds are bred with a larger circulation space than required by European guidelines (reduced density), we install alarms to identify faults in the feeding system, drinking fountains, and ventilation, we adopt environmental enrichment in 100% of the farms involved in the project, ***we guarantee the non-adoption of antibiotics as growth promoters***, we adjusted the plant's waiting area, and adopted slaughter parameters and training for all staff involved in handling live birds.

529. The statements referenced in ¶¶523-528 were materially false and misleading when made because they misrepresented and/or failed to disclose the following adverse facts, which were then known to, or recklessly disregarded by, Defendants, and were required to be disclosed:

(a) that BRF employees routinely disregarded sanitary inspection systems by manipulating laboratory results and falsifying traceability reports to conceal the fact that antibiotics and other prohibited medications were inappropriately and unlawfully being administered to birds;

(b) that the Company used fraudulent means to obtain legal, regulatory, and health certifications for poultry products containing traces of antibiotics and other medications;

(c) that the Company had inadequate controls over the production of poultry feed and premix compound and, as a result, BRF employees unlawfully added antibiotics and other unapproved medications such as colistin, tylosin, and nicarbazin, to the premix without declaring what they added and/or misrepresenting the amount added;

(d) that BRF employees routinely administered antibiotics and other unapproved medications to poultry to stimulate and enhance growth;

(e) that BRF employees failed to comply with legal and regulatory withdrawal periods, and, as a result, traces of medications remained in final poultry products;

(f) that BRF employees administered antibiotics and other medications to poultry without obtaining a veterinarian's prescription; and

(g) that, in light of the foregoing, Defendants' statements regarding BRF's use of medication were materially false and misleading and lacking in a reasonable basis at all relevant times.

### D. Defendants' Statements Regarding Compliance with Labeling Requirements Were Materially False and Misleading and Omitted Material Facts Defendants Had a Duty to Disclose

530. In the 2013 Sustainability Report, BRF stated, in pertinent part, as follows:

> ***BRF meets the demands of each market and keeps 100% of its products under different labeling requirements.*** In Brazil, the products meet the laws set by agencies such as the National Health Surveillance Agency (ANVISA), Ministry of Agriculture, Livestock and Supply (MAPA), Ministry of Justice and the National Institute of Metrology, Standardization and Industrial Quality (INMETRO). All labels contain information on the composition (list of ingredients), nutrition table (with information on nutrients, portion and % VD - recommended daily value of consumption), name, net weight, storage conditions, manufacturing date, expiry date, mode of preparation and consumption, and data of manufacturer unit (company name, address, CNPJ).
>
> In case of products of responsibility of the Ministry of Agriculture, the labels feature Seal of the Federal Inspection Service (SIF), registration number and classification of the establishment in the Ministry of Agriculture.

531. Likewise, in the 2014 Sustainability Report, the Company stated that "it follows the Brazilian laws on labeling" and that "100% of BRF's products are in line with the standards for labeling of products in different markets," stating, in pertinent part:

> **LABELLING**
>
> One of the Company's commitment is to provide information to the consumer to make an informed choice of his purchase, including in a safe way for his health. For this, ***it follows the Brazilian laws on labeling and brand communication as well as the Consumer Protection Code*** (CDC), and invests in specific training for areas such as quality and customer service.
>
> Today, ***100% of BRF's products are in line with the standards for labeling of products in different markets***. In Brazil, the laws of the National Health Agency (ANVISA), Ministry of Agriculture, Livestock and Supply (MAPA), Ministry of Justice and the National Institute of Metrology, Standardization and Industrial Quality (Inmetro) are met. Regions such as the EU, block containing the strictest controls followed, serve as reference for BRF.

532. Likewise, in the 2015 Sustainability Report, the Company stated that "100% of BRF's products are in line with the [applicable] labeling standards," stating, in pertinent part, as follows:

> **LABELLING**
>
> In order to encourage conscious purchasing by consumers, BRF adopts Brazilian labeling and brand communication laws, in line with the Consumer Protection Code, and trains employees in areas such as Quality and Customer Service to ensure that accurate information is available to the public. For the Company, continuously meeting labeling standards and adapting to any change in the standards are important requirements for risk management, avoiding fines and sanctions and guaranteeing our reputation before end consumers.
>
> Today, ***100% of BRF's products are in line with the labeling standards for products in the different markets in which we operate***. In Brazil, the Company meets ANVISA, MAPA, Ministry of Justice, National Institute of Industrial Metrology, Standardization, and Quality (INMETRO) standards. In addition to standards for animal welfare, the Company is inspired by health and labeling controls in regions such as the European Union.

533. In the 2016 Sustainability Report, BRF stated that "100% of our products are in line with the [applicable] labeling standards," stating, in pertinent part, as follows:

> Compliance with labeling standards and adaptation to regulatory changes are an important challenge for our risk management, avoiding sanctions and guaranteeing our corporate reputation. ***Currently, 100% of our products are in line with the labeling standards of the markets in which BRF is present***.

This is false because BRF was incorrectly labeling chickens with too much water weight.

534. The statements referenced in ¶¶530-533 were materially false and misleading when made because they misrepresented and/or failed to disclose the following adverse facts, which were then known to, or recklessly disregarded by, Defendants, and were required to be disclosed:

(a) that BRF employees would package contaminated poultry products with false labels stating that the poultry was free of pathogens and fit for human consumption when it was not;

(b) that BRF employees unlawfully adulterated the composition of premix by adding ingredients that were prohibited and/or by adding permissible ingredients at impermissible

ratios, and sold or transported the premix with fraudulent labels stating that the premix contained only permissible components in permissible amounts, even though it did not;

(c) that BRF employees packaged poultry products with excessive water content bearing labels falsely stating that the water content was within the permissible range when it was not;

(d) that the Company had inadequate controls in place to prevent or identify the foregoing illegal activity; and

(e) that, in light of the foregoing, Defendants' statements regarding BRF's compliance with Brazil's labeling requirements were materially false and misleading and lacking in a reasonable basis at all relevant times.

**E. Defendants' Statements Regarding BRF's Compliance with Voluntary International Certification Standards Were Materially False and Misleading and Omitted Material Facts Defendants Had a Duty to Disclose**

535. Throughout the Class Period, BRF stated that it complied with international certification standards.

536. For example, in the 2013 Sustainability Report, the Company stated that its Chapecó and Mineiros units were certified by the BRC Global Standards. It also stated that its Chapecó unit met the IFS International Food Standards and the GlobalGAP certification standards. Finally, BRF stated that its Mineiros and Uberlândia facilities had implemented the AloFree traceability program for the production of chicken and turkey.

537. In the 2014 Sustainability Report, the Company stated that its Chapecó, Uberlândia, and Mineiros units met the certification requirements of the Global Standards. It also stated that its Chapecó and Uberlândia units complied with the IFS Standards. Finally, the Company stated that the Chapecó facility was in compliance with the GlobalGAP certification standards.

538. In the 2015 Sustainability Report, BRF stated that its Chapecó, and Mineiros units complied with the Global Standards and with the IFS Standards. The Company also stated that the Chapecó unit was certified in accordance with the GlobalGap certification standards. Finally, BRF stated that its Mineiros unit met the AloFree certification standards.

539. In the 2016 Sustainability Report, BRF stated that its Chapecó, Mineiros, and Uberlândia units were certified in accordance with the Global Standards, the IFS Standards, and the ISO 17025:2005. The Company further stated that the Chapecó plant was certified in accordance with the GlobalGAP standards and the Mineiros facility was certified in accordance with the AloFree certification standards.

540. In its 2016 Sustainability Report, BRF stated: "We also follow BRC, IFS, GlobalGAP, AloFree, GenesisGap, and ISO 17025:2005 certification standards," stating, in pertinent part, as follows:

> In recent years, we have intensified efforts to not only ensure perceived quality and consumer safety and health, but also to prevent variations in quality and problems regarding compliance in the over 150 markets where we operate.
>
> We evaluate consumer health impacts as a work premise, from conceiving a product to its production, transportation and consumption. The Food Quality and Safety Policy, the standards of the BRF Quality System, and the Hazard Analysis and Critical Control Point Program (HACCP) are our main benchmarks. Through them, we define standard procedures, measures, criteria, and controls that cover 100% of BRF products, mitigating sanitary and regulatory risks.
>
> ***We also follow BRC, IFS, Global-GAP, AloFree, GenesisGap, and ISO 17025:2005 certification standards***, and are externally audited by several markets and clients, in addition to the Ministry of Agriculture and Supply (MAPA - Brazil), the National Surveillance Agency (ANVISA - Brazil), the Ministry of Agriculture and Cooperatives/Department of Livestock Development (DLD - Thailand), and the Servicio Nacional de Sanidad Y Calidad Agroalimentaria (Senasa - Argentina), among other government agencies in the countries where we operate.

541. The statements referenced in ¶¶535-540 were materially false and misleading when made because they misrepresented and/or failed to disclose the following adverse facts, which were then known to, or recklessly disregarded by, Defendants, and were required to be disclosed:

(a) that BRF employees routinely disregarded sanitary inspection systems by manipulating laboratory results and falsifying traceability reports;

(b) that BRF employees paid bribes to regulators and politicians to subvert inspections in order to conceal unsanitary practices at the Company's meatpacking and poultry facilities;

(c) that the Company used fraudulent means to obtain legal, regulatory and health certifications for products that did not meet the strict licensing and certification requirements;

(d) that the Company had inadequate controls over the testing and reporting of poultry products contaminated with salmonella, other pathogens, and/or pollutants;

(e) that the Company had inadequate controls over the production of poultry feed and premix compound and, as a result, BRF employees unlawfully adulterated the composition of premix by adding ingredients that were prohibited and/or by adding permissible ingredients at impermissible ratios;

(f) that the Company had inadequate controls over the administration of medication to poultry, and, as a result, BRF employees failed to comply with legal and regulatory restrictions on the administration of antibiotics and other medications to chickens;

(g) that the Company had inadequate controls over the process for identifying and vetting outside laboratories, and, as a result, BRF employees used non-accredited laboratories to conduct health and sanitary laboratory analyses;

(h) that the Company had inadequate controls over the packaging of poultry products, and, as a result, BRF employees packaged poultry products with water absorption above the legal index and/or injected excess water into frozen poultry products; and

(i) that, in light of the foregoing, Defendants' statements that BRF complied with the international certification standards cited above in ¶¶443, 445, 448, 451, 452, and 457 were materially false and misleading and lacking in a reasonable basis at all relevant times.

**F. Defendants' Statements Regarding the Company's Code of Ethics and Conduct Were Materially False and Misleading and Omitted Material Facts Defendants Had a Duty to Disclose**

542. In the 2012 Form 20-F, the Company stated, in pertinent part, as follows:

> Under NYSE Rule 303A.10, each U.S. listed company must adopt and disclose a code of business conduct and ethics for directors, officers and employees and promptly disclose any waivers of the code for directors or executive officers. We are subject to a similar recommendation under Brazilian law, and we have adopted a code of ethics that applies to our officers and employees.
>
> Our code of ethics, as well as further information concerning our corporate governance practices and applicable Brazilian law, is available on our website www.brf-br.com/ir. Information on our website is not incorporated by reference in this form. Copies of our Code of Business Conduct and Ethics are also available without charge upon request to our Investor Relations Office. "Item 10 – Additional Information – B. Memorandum and Articles of Association."
>
> If we make any substantive amendment to the code of ethics or grant any waivers, including any implicit waiver, from a provision of the code of ethics, we will disclose the nature of such amendment or waiver on our website. During the year ended December 31, 2012, no such amendment was made or waiver granted.

543. In BRF's Code of Ethics and Conduct (last updated in 2015), the Company stated, in pertinent part, as follows:

> **3.2 ANTI-BRIBERY AND CORRUPTION**
>
> BRF conducts its business in strict compliance with both national and international anti-bribery and anticorruption legislation, and People should do the same. The Company condemns all forms of corruption, direct or indirect, whether in public (transactions directly or indirectly involving the government) or in private relations (transactions between private companies without the involvement of governmental

> entities). People are forbidden to support or participate in acts of corruption, both passive and active, whether directly or indirectly.
>
> **3.3 GOVERNMENT RELATIONS**
>
> BRF and all People must act transparently, in accordance with the ethical principles set forth herein, in their relationships and communications with public agencies and/or government authorities. Offering any kind of benefit or advantage to public agents in view of their position or function is strictly forbidden. Moreover, demonstrations or contributions to political parties and/or government agencies on behalf of the Company are prohibited without prior approval from the Board of Directors.

544. The Forms 20-F filed by the Company in 2013, 2014, 2015, and 2016 contained language identical to the language cited in ¶542. In each filing, BRF stated "During the year[s] ended [December 31, 2012, 2013, 2014, 2015, 2016 and 2017], no such amendment [to BRF's code of ethics] was made or waiver granted."

545. In the 2012 Form 20-F, the Company stated that it adopted the "best corporate governance practices" that "translat[es] into greater transparency, liquidity and confidence for our investors," stating, in pertinent part, as follows:

> **ITEM 16G. CORPORATE GOVERNANCE**
>
> We adopt best corporate governance practices based on a continual process of organizational improvement, translating into greater transparency, liquidity and confidence for our investors.

546. Similarly, in the 2013 Form 20-F, the Company stated that it adopted the "best corporate governance practices" that "translat[es] into greater transparency, liquidity and confidence for our investors," stating, in pertinent part, as follows:

> **ITEM 16G. CORPORATE GOVERNANCE**
>
> We adopt best corporate governance practices based on a continual process of organizational improvement, translating into greater transparency, liquidity and confidence for our investors.

547. In the 2013 Form 20-F, the Company highlighted its "positive image and reputation," stated that the Company's public image is "aligned with values such as trust, ethics, and transparency," stating, in pertinent part, as follows:

> ***We rely on our positive image and reputation in the marketplace***.
>
> ***BRF has a strong image related to solid corporate governance and is reviewed as aligned with values such as trust, ethics and transparency, which we wish to maintain***. We have a clear image and reputation risk policy that supports all business segments and its commercial standards cover internal and external market relations. In cases of bad publicity or acts that may negatively affect our image, we have put a Crisis Committee in place to work with BRF stakeholders. Any negative reflection on our image or the strength of our brand could have a negative impact on our results of operations, as well as our ability to achieve our growth strategy.

548. In the 2013 Sustainability Report, BRF stated that it "acts based on ethics" to protect investors "from risk of non-compliance with laws and regulations," stating, in pertinent part, as follows:

> **Legal/Tax** – There is constant monitoring of aspects that may be questioned by government agencies so as to reduce administrative and law suits. Moreover, ***the Company acts based on ethics protecting from risk of non-compliance with laws and regulations of all walks.***

549. In the 2014 Form 20-F, the Company stated that it adopted the "best corporate governance practices" that "translat[es] into greater transparency, liquidity and confidence for our investors," stating, in pertinent part, as follows:

> **ITEM 16G. CORPORATE GOVERNANCE**
>
> We adopt best corporate governance practices based on a continual process of organizational improvement, translating into greater transparency, liquidity and confidence for our investors.

550. In the 2014 Form 20-F, the Company highlighted its "positive image and reputation," and stated that the Company's public image is "aligned with values such as trust, ethics, and transparency," using language similar to the language cited in ¶547.

551. In the 2014 Sustainability Report, the Company stated that it "seeks to adopt corporate governance practices that ensure transparency, equity, [and] ethics," stating, in pertinent part, as follows:

> **Corporate Governance**
>
> BRF incorporates the main international governance practices through a steering and monitoring system, led by the guidelines of shareholders and collegiate bodies, which proposes to increase the market value of the Company, the good relationship with the public and facilitated access to the capital, contributing to the longevity of the business.
>
> Listed on "Novo Mercado" and signatory to the guidelines established by São Paulo Stock Exchange (BM&F Bovespa) and by New York Stock Exchange (NYSE), ***BRF seeks to adopt corporate governance practices that ensure transparency, equity, ethics, risk management, the balance of strategic decisions and accountability***.

552. Furthermore, in the 2014 Sustainability Report, the Company stated that "[a]ll relationships, practices and negotiations help by BRF assume compliance with . . . Company conduct guidelines," and stated that the Code of Ethics and Conduct is the "[m]ain set of guidelines that guides business activities," stating, in pertinent part, as follows:

> **ETHICAL AND RIGHTEOUS BEHAVIOR**
>
> ***All relationships, practices and negotiations held by BRF assume compliance with policies, standards and the Company conduct guidelines***. In 2014, the structures were strengthened to prevent fraud and anti-corruption. The Related Party Policy, which governs various operations carried out with BRF stakeholders - such as joint ventures, business partnerships and business agreements, was also approved.
>
> * * *
>
> ***Compliance and righteous aspects are highly relevant to BRF and its supply chain, involving various social and environmental risks*** - such as quality of life of the neighborhood, consumer health, food safety, business reputation etc. Acting preventively it can reduce financial, environmental and social impacts, correct the causes with agility, reduce non-compliance and maintain the reputational image of the Company before government and society. These situations are addressed under the Code of Ethics and Conduct and the Articles of Association.
>
> ***Main set of guidelines that guides business activities, the Code of Ethics and Conduct is based on the principles of consistency, transparency, integrity and***

> ***respect for society.*** The Code is currently undergoing a revision process in order to put it in line with the new demands and modern issues of the markets where the Company operates. The document is available on the intranet and the Internet, for employees and investors and business partners, in Portuguese, English and Spanish. Among the issues covered are ethics, behavior and human rights.

553. Furthermore, in the 2014 Sustainability Report, BRF assured investors that it "meets, in its daily practices," the provisions of international anti-corruption laws, stating, in pertinent part, as follows:

> During the year, was also published corporate policy on combating bribery and corruption. ***BRF meets, in its daily practices, international provisions of references*** such as the Foreign Corruption Practice Act (FCPA), United Kingdom Bribery Act (UKBA) and the Brazilian Law 12,846 (Anti-Corruption Act).

554. On June 25, 2015, the Company filed its Code of Ethics and Conduct on Form 6-K with the SEC.

555. In the 2015 Form 20-F, the Company stated that it had adopted corporate governance practices "aimed at greater transparency," stating, in pertinent part, as follows:

> **ITEM 16G. CORPORATE GOVERNANCE**
>
> We adopt corporate governance practices for a continual process of organizational improvement aimed at greater transparency, liquidity and return for our investors.

556. In the 2015 Sustainability Report, the Company touted its corporate governance model, which it stated was based on the "best national and international practices," stating, in pertinent part, as follows:

> **Corporate Governance**
>
> ***BRF's corporate governance model is based on best national and international practices, having as pillars, corporate responsibility, ethics, transparency, equity, accountability, and balance of strategic decisions, in compliance with all laws, standards and rules applicable, internal policies and guidelines***, as well as all people, administration bodies, departments, processes, and technologies at BRF.

557. In the 2016 Form 20-F, the Company stated that it had adopted corporate governance practices "aimed at greater transparency," stating, in pertinent part, as follows:

> **ITEM 16G. CORPORATE GOVERNANCE**
>
> We adopt corporate governance practices for a continual process of organizational improvement aimed at greater transparency, liquidity and return for our investors.

558. In its 2016 Sustainability Report, BRF stated that its relationships with government representatives "comply with strict legal, ethical, and moral standards," stating:

> **Government, Institutions, and the Food Sector**
>
> **Relationships with governments and government representatives comply with strict legal, ethical, and moral standards**
>
> As a leading company in several market segments, we are committed to maintaining a network of partnerships and dialogues with the various institutional players in Brazil and abroad – including the government and entities and associations representing our sector.
>
> * * *
>
> ***BRF's relations with governments and government representatives follow strict legal, ethical and moral standards***, based on laws such as the US Foreign Corrupt Practices Act (FCPA), the Sarbanes-Oxley Act (SOX), the Brazilian Anti-Corruption Law (12,846/2013) and the United Kingdom Bribery Act (UKBA).
>
> In the BRF Transparency Guide, company employees are expressly prohibited from participating in acts of corruption or engaging in bribery, either passively or actively, directly or indirectly. It is forbidden to antagonize, embezzle, deceive, hinder, or disrupt public or private bidding procedures.

559. The statements referenced in ¶¶542-558 were materially false and misleading when made because they misrepresented and/or failed to disclose the following adverse facts, which were then known to, or recklessly disregarded by, Defendants, and were required to be disclosed:

(a) that the Company and its employees, including high level executives, had engaged in numerous illegal activities, including: (i) the payment of bribes to regulators and politicians to subvert inspections in order to conceal unsanitary practices at the Company's meatpacking and poultry facilities; (ii) the use of fraudulent means to obtain legal, regulatory, and health certifications for products that did not meet the strict licensing and certification requirements; (iii) the processing of birds contaminated with salmonella, other pathogens, and/or pollutants; (iv)

the manipulation of laboratory results and falsification of traceability reports to pass inspections; (v) the unlawful adulteration of the composition of animal feed and premix by adding ingredients that were prohibited and/or by adding permissible ingredients at impermissible ratios; (vi) the failure to comply with legal and regulatory restrictions on the administration of antibiotics and other medications to chickens; (vii) the use of non-accredited laboratories to conduct health and sanitary laboratory analyses; and (viii) the packaging of poultry products with water absorption levels above the legal index and/or that had been injected with excess water;

(b) that these illegal activities were able to be carried out because the Company lacked controls over its operations, including the testing and reporting of poultry products contaminated with salmonella and other pathogens; the production of poultry feed and premix; the administration of medication to poultry; the process for identifying and vetting outside laboratories; and the packaging of poultry products; and

(c) that, in light of the foregoing, Defendants' statements regarding the Company's compliance with its code of ethics and conduct were lacking in a reasonable basis at all times.

### G. Defendants' Statements Regarding the Company's Political Contributions Were Materially False and Misleading and Omitted Material Facts Defendants Had a Duty to Disclose

560. In the 2013 Sustainability Report, BRF stated that it makes political contributions "in accordance with the electoral law," and that the Company "sets its support to political parties (not the people)," stating, in pertinent part, as follows:

> **DEMOCRACY**
>
> Within the narrower legal, ethical and moral standards, following Brazilian and international rules, such as the American FCPA Foreign Corrupt Practices Act and Sarbanes-Oxley (SOX), BRF contributes to the electoral process by making donations to political campaigns, with the objective of helping Brazilian democracy. ***In 2013, no contributions, since these occur in election periods, always in***

> ***accordance with the electoral law which states* (including with respect to the publicity of gifts in the Superior Electoral Court TSE website ). *BRF sets its support to political parties (not the people) from internally established criteria, which value the transparency in its relations, and the support to government projects aimed at the development of agribusiness*.**

561. In the 2013 Form 20-F, BRF stated that the Company "cannot predict what policies will be adopted by the Brazilian government," stating, in pertinent part, as follows:

> A presidential election will be held in Brazil in 2014. The President of Brazil has considerable power to determine governmental policies and actions that relate to the Brazilian economy and, consequently, affect the operations and financial performance of businesses, such as our company. The run-up to the presidential election may result in changes in existing governmental policies, and the post-election administration – even if incumbent Dilma Rouseff is reelected – may seek to implement new policies. For example, the current administration or the post-election administration may face domestic pressure to retreat from the current macroeconomic policies in an attempt to achieve higher rates of economic growth. ***We cannot predict what policies will be adopted by the Brazilian government and whether these policies will negatively affect the economy or our business or financial performance***. In addition, uncertainty leading up to and after the election over whether the Brazilian government may implement changes in policy or regulations may contribute to economic uncertainty in Brazil and to heightened volatility in the Brazilian securities markets and securities issued abroad by Brazilian issuers.

562. Similarly, in the 2014 Form 20-F, the Company stated that it has "no control over, and cannot predict, what policies or actions the Brazilian government may take in the future," using language substantially identical to language cited in the preceding paragraph:

> ***Brazilian economic, political and other conditions, and Brazilian government policies or actions in response to these conditions, may negatively affect our business and results of operations***.
>
> The Brazilian economy has historically been characterized by interventions by the Brazilian government and unstable economic cycles. The Brazilian government has often changed monetary, taxation, credit, tariff and other policies to influence the course of Brazil's economy. For example, the government's actions to control inflation have at times involved setting wage and price controls, blocking access to bank accounts, imposing exchange controls and limiting imports into Brazil. ***We have no control over, and cannot predict, what policies or actions the Brazilian government may take in the future***.

563. In the 2014 Sustainability Report, BRF stated that it "follow[s] Brazilian and international rules," including the reporting requirements under Brazil's electoral law, when it makes political donations, and that "the company defines its support to political parties (not people)," stating, in pertinent part, as follows:

> **Governments, Institutions and Industry**
>
> In line with the Code of Ethics and Conduct, all officers and employees of BRF are prohibited from participating in acts of bribery and/ or corruption, whether passive or active, directly or indirectly. It is also forbidden from frustrating, defrauding, deceiving, preventing or disturbing public or private bidding procedures.
>
> BRF strives to maintain a close relationship with the entities and associations representing its segment in order to ensure the continuity of the business and its contribution to the development of markets in which it operates.
>
> ***Under strict legal, ethical and moral standards, following Brazilian and international rules***, such as the American FCPA Foreign Corrupt Practices Act and Sarbanes-Oxley (SOX), ***BRF contributes to the electoral process by making donations to political campaigns in order to help Brazilian democracy***. In the 2014 elections, BRF made donations totaling R$18.1 million, and ***the company defines its support to political parties (not people) based on internally established criteria, which have the transparency in their relationships, trustworthiness of candidature and support to government projects aimed at the development of agribusiness. The contribution of funds complied with provisions of the Brazilian electoral law, disclosed at the Superior Electoral Court's website (TSE)***.

564. Similarly, in the 2015 Sustainability Report, the Company stated that it "follow[s] Brazilian and international rules," including the reporting requirements under Brazil's electoral law, when it makes political donations, and that "the company defined its support to political parties (not people)," stating, in pertinent part, as follows:

> **Governments, Institutions, and the Sector**
>
> BRF is committed to maintaining a close relationship with entities and associations representing its sector, aiming to ensure the continuity of its business and its contribution to the development of its markets. In industry relations, the Company prioritizes participation in discussions linked to our core business, occupying management positions or acting as a consultant. The Company is a signatory of several pacts and volunteer initiatives proposing the improvement of industrial practices, focusing on corporate sustainability.

***Following the strictest legal, ethical and moral standards, and Brazilian and international rules*** such as the American Foreign Corrupt Practices Act (FCPA), Sarbanes-Oxley (SOX), the Brazilian Anti-corruption law (12,846/2013) and the United Kingdom Bribery Act (UKBA), ***BRF contributed to the electoral process by donating to political campaigns, aiming to assist Brazilian democracy***. BRF only makes donations to political parties in election years; additionally, the Company doesn't make continuous contribution. ***The Company defined its support for political parties (not individuals) through internally established criteria, which value transparency in relationships, the integrity of candidates, and the support of government projects toward the development of agribusiness***.

***The use of funds always obeys Brazilian electoral law, published on the Superior Electoral Court's website***.

In 2015, there were no elections, so no donations were made.

565. In the 2016 Sustainability Report, BRF stated:

**Governments, Institutions, and the Food Sector**

***Relationships with governments and government representatives comply with strict legal, ethical, and moral standards***. As a leading company in several market segments, we are committed to maintaining a network of partnerships and dialogues with the various institutional players in Brazil and abroad – including the government and entities and associations representing our sector.

* * *

***BRF's relations with governments and government representatives follow strict legal, ethical and moral standards***, based on laws such as the US Foreign Corrupt Practices Act (FCPA), the Sarbanes-Oxley Act (Sox), the Brazilian Anti-Corruption Law (12,846/2013) and the United Kingdom Bribery Act (UKBA).

In the BRF Transparency Guide, company employees are expressly prohibited from participating in acts of corruption or engaging in bribery, either passively or actively, directly or indirectly. It is forbidden to antagonize, embezzle, deceive, hinder, or disrupt public or private bidding procedures.

* * *

***With regard to the elections for Municipal, State and Federal positions held in Brazil in 2016, BRF followed the new Brazilian electoral law (Federal Law No. 13,165/2015) and did not provide any support or make any donation to campaigns, candidates, parties or political associations***. The company, through its Corporate Integrity Vice Presidency, disclosed the guidelines to be followed by all its employees during the electoral period, in addition to having created a channel to clarify and answer the questions of its employees.

566. The statements referred to in ¶¶560-565 were materially false and misleading when made because they misrepresented and/or failed to disclose the following adverse facts, which were then known to, or recklessly disregarded by, Defendants, and were required to be disclosed:

(a) that the Company's political contributions were made based on whichever person would advance BRF's interests, and not based on political party;

(b) that contrary to its statement that the Company "did not provide any support or make any donation to campaigns, candidates, parties or political associations" in the 2016 federal state or municipal elections, BRF contributed R$300,000.00 to the campaign of Jovair Arantes in the 2016 election in Goiana;

(c) that the Company did not report the R$300,000.00 on the Superior Electoral Tribunal's website, as required under Brazilian law;

(d) that the Company's contributions did not comply with legal or ethical standards;

(e) that, contrary to its statement that it "could not predict" what policies or actions the government would take, BRF knew that the bribes it was paying to politicians would influence those policies and actions; and

(f) that, in light of the foregoing, Defendants' statements regarding the Company's political contributions were materially false and misleading and lacking in a reasonable basis at all relevant times.

## H. Defendants' Statements Regarding BRF's Competitive Advantages Were Materially False and Misleading and Omitted Material Facts Defendants Had a Duty to Disclose

567. In the 2012 Form 20-F, BRF stated that its "competitive advantages" included "low animal feed and labor costs and increasing efficiencies in animal production." The 2012 Form 20-F stated, in pertinent part, as follows:

> Brazil has become a leading participant in export markets for food products on a global basis, ***due in part to its competitive advantages, which include low animal feed and labor costs and increasing efficiencies in animal production***. We, like other large Brazilian producers, have built on these advantages to develop the scope and scale of our businesses.

568. In the 2013 Form 20-F, the Company stated that its "competitive advantages" included "low animal feed and labor costs and increasing efficiencies in animal production," using language substantially similar to the language used in the 2012 Form 20-F to describe BRF's competitive advantages.

569. In the 2013 Form 20-F, BRF stated that its Brazilian competitor JBS has "many of the same competitive advantages that we have," stating, in pertinent part, as follows:

> **Export Markets**
>
> We face significant competition in our export markets, both from Brazilian producers and from producers in other countries. An increasingly relevant example is cooperatives, which have tax advantages and certain mobility to reassign their production to foreign markets at times when exports become more attractive than the domestic market. ***Another example is JBS, one of our direct competitors in the international market that has many of the same competitive advantages that we have over producers in other countries***, including natural resources and competitive inputs costs.

570. In the 2014 Form 20-F, the Company stated that its competitive "advantages" included "low feed and labor costs" and increasing "efficiencies in animal production," using language substantially similar to the language used in the 2012 Form 20-F to describe BRF's competitive advantages:

> Brazil is a leading player in the global export markets ***due to natural advantages, including low feed and labor costs, and gains in efficiencies in animal production.*** Like other large Brazilian producers, we have capitalized on these advantages to develop the scope and scale of our businesses.

571. In the 2014 Form 20-F, BRF stated that its Brazilian competitor JBS has "many of the same competitive advantages that we have," using language similar to the language used in the 2013 Form 20-F to describe international competition.

572. On June 29, 2015, BRF filed its Code of Ethics and Conduct on Form 6-K filed with the SEC. In the Code of Ethics and Conduct, the Company stated that it "conducts business transactions in strict compliance with national and international legislation applicable to export and import controls," stating, in pertinent part, as follows:

> **3.6 Export and import controls**
>
> ***BRF conducts business transactions in strict compliance with national and international legislation applicable to export and import controls***. People must check the restrictions imposed on countries, companies or legal entities before starting new businesses.

573. In the 2015 Form 20-F, the Company stated that its competitive "advantages" included "low feed and labor costs" and increasing "efficiencies in animal production," using language substantially similar to the language used in the 2012 Form 20-F to describe BRF's competitive advantages.

574. In the 2015 Form 20-F, BRF also stated that with respect to international competition, its Brazilian competitor JBS has "many of the same competitive advantages that we have," using language similar to the language used in the 2013 Form 20-F to describe international competition.

575. In the 2016 Form 20-F, BRF stated that it is a "leading player in global export markets due to its natural advantages" and "competitive input costs and increasing efficiencies in animal production," stating, in pertinent part, as follows:

> Brazil is a leading player in global export markets due to its natural advantages (land, water, climate), competitive inputs costs and increasing efficiencies in animal production. Like other large Brazilian producers, we have capitalized on these advantages to develop the scope and scale of our business.

576. The 2016 Form 20-F further stated that in the domestic market, BRF competes "primarily on brand recognition, distribution capabilities, selling prices, quality, and service to our customers," stating, in pertinent part, as follows:

> Brazil's domestic market is highly competitive, particularly for fresh food and frozen poultry and pork products. BRF endeavors to develop quality products, focusing on innovative solutions that meet clients' needs and capture value for the strong brands it owns, such as Sadia and Perdigão.
>
> * * *
>
> In the Brazilian market for whole poultry, poultry and pork cuts, we face competition from small producers, some of which operate in the informal economy and offer lower quality products at lower prices. This competition from small producers is a significant factor in our selling a majority of our whole chickens, poultry and pork cuts in the export markets and is a barrier to expanding our sales of those products in the domestic market.
>
> ***In the domestic market, we compete primarily based on brand recognition, distribution capabilities, selling prices, quality and service to our customers***. The market for processed food products is still growing in Brazil and we believe that the medium and long-term prospects for this segment are positive based on the trend over the preceding years. Simultaneously, BRF is focusing on initiatives aimed at innovation, such as launching new products with a focus on healthiness, a rationalization of our processed meat portfolio in the domestic market and an improvement in the positioning of the brands in our portfolio.

577. In the 2016 Form 20-F, BRF stated that with respect to international competition, its Brazilian competitor JBS has "many of the same competitive advantages that we have," using language similar to the language used in the 2013 Form 20-F to describe international competition.

578. The statements referenced in ¶¶567-577 were materially false and misleading when made because they misrepresented and/or failed to disclose the following adverse facts, which were then known to, or recklessly disregarded by, Defendants, and were required to be disclosed:

(a) that the Company's competitive advantages included numerous illegal activities, including: (i) the payment of bribes to regulators and politicians to subvert inspections in order to conceal unsanitary practices at the Company's meatpacking and poultry facilities; (ii) the use of fraudulent means to obtain legal, regulatory, and health certifications for products that did not meet the strict licensing and certification requirements; (iii) the processing of birds contaminated with salmonella, other pathogens and/or pollutants; (iv) the manipulation of laboratory results and

falsification of traceability reports to pass inspections; (v) the unlawful adulteration of the composition of animal feed and premix by adding ingredients that were prohibited and/or by adding permissible ingredients at impermissible ratios; (vi) the failure to comply with legal and regulatory restrictions on the administration of antibiotics and other medications to chickens; (vii) the use of non-accredited laboratories to conduct health and sanitary laboratory analyses; and (viii) the packaging of poultry products with water absorption levels above the legal index and/or that had been injected with excess water; and

(b) that, in light of the foregoing, Defendants' statements regarding BRF's competitive edge due to other legitimate factors were materially false and misleading and lacking in a reasonable basis at all relevant times.

### I. Defendants' Statements Regarding the Amount of Poultry BRF Slaughtered Were Materially Misleading and Omitted Material Facts Defendants Had a Duty to Disclose

579. Throughout the Class Period, the Company highlighted its slaughtering capacity, and suggested that its ability to generate increasing revenues was directly connected to the number of birds it could produce annually.

580. For example, in the 2012 Form 20-F, the Company stated that its "size and scale," which enabled it to slaughter approximately 1.8 billion chickens and other poultry in 2012, was one of its "major competitive strengths," stating, in pertinent part, as follows:

> **Competitive Strengths**
>
> We believe our major competitive strengths are as follows:
>
> ***Leading Brazilian Food Company with Strong Brands and Global Market Presence. We are one of Brazil's largest food industry companies, with a size and scale that enable us to compete both in Brazil and globally. We believe that our leading position allows us to take advantage of market opportunities by enabling us to expand our business, increase our offering of value-added products and increase our share of international markets. In 2012, we slaughtered approximately 1.8 billion chickens and other poultry*** and 11.0 million hogs and

cattle. We sold nearly 6.3 million tons of poultry, pork, beef, milk and processed food products, including dairy products and other processed products, in the same year. Our own and licensed brands are highly recognized in Brazil, and we are expanding our international brands presence in key foreign markets.

581. In the Business Overview section of the 2012 Form 20-F, BRF again highlighted its production rate, stating, in pertinent part, as follows:

**Poultry**

We produce frozen whole and cut poultry, partridges and quail. ***In 2012, we slaughtered approximately 1.79 billion chickens and other poultry, compared to 1.76 billion in 2011***. We sold 2,186 thousand tons of frozen chicken and other poultry products in 2012, compared to 1,932 thousand tons in 2011 and 1,895 thousand tons in 2010. Most of our poultry sales are to our export markets.

582. In the 2012 Form 20-F, in describing the poultry production process, the Company again referred to its annual slaughtering capacity, stating, in pertinent part, as follows:

***At December 31, 2012, we had a fully automated slaughtering capacity of 35.5 million heads of poultry per week***.

583. In the 2013 Form 20-F, the Company stated that its "size and scale," which enabled it to slaughter approximately 1.8 billion chickens and other poultry in 2013, was one of its "major competitive strengths," stating, in pertinent part, as follows:

**Competitive Strengths**

We believe our major competitive strengths are as follows:

***Leading Brazilian Food Company with Strong Brands and Global Market Presence. We are one of Brazil's largest food industry companies, with a size and scale that enable us to compete both in Brazil and globally. We believe that our leading position allows us to take advantage of market opportunities by enabling us to expand our business, increase our offering of value-added products and increase our share of international markets. In 2013, we slaughtered approximately 1.8 billion chickens*** and other poultry and 9.8 million hogs and cattle. We sold nearly 5.9 million tons of poultry, pork, beef, milk and processed food products, including dairy products and other processed products, in the same year. Our own and licensed brands are highly recognized in Brazil, and we are expanding our international brands presence in key foreign markets.

584. In the Business Overview section of the 2013 Form 20-F, BRF again highlighted its poultry production rate, stating, in pertinent part, as follows:

> ***We produce frozen whole and cut poultry, partridges and quail. In 2013, we slaughtered approximately 1.80 billion chickens and other poultry, compared to 1.79 billion in 2012***. We sold 2,086 thousand tons of frozen chicken and other poultry products in 2013, compared to 2,186 thousand tons in 2012 and 1,932 thousand tons in 2011. Most of our poultry sales are to our export markets.

585. In the 2013 Form 20-F, in describing the poultry production process, the Company again referred to its annual slaughtering capacity, stating, in pertinent part, as follows:

> ***At December 31, 2013, we had a fully automated slaughtering capacity of 36.6 million heads of poultry per week***.

586. In the 2014 Form 20-F, the Company stated that its "size and scale," which enabled it to slaughter approximately 1.7 billion chickens and other poultry in 2014, was one of its "major competitive strengths," stating, in pertinent part, as follows:

> **Competitive Strengths**
>
> We believe our strongest competitive points are:
>
> ***Leadership in the Brazilian Food Market with Strong Brands and a Global Presence in the Market. We are one of the biggest food companies in Brazil, the biggest company in Brazilian agribusiness*** (according to Globo Rural magazine), ***with a size and scale that allows us to compete in Brazil as well as in export markets***. We are the seventh-largest food company in the world in terms of market capitalization (Bloomberg). ***We believe our leading position allows us to take advantage of market opportunities by expanding our business, increasing our offer of added value products and improving our initiatives in export markets. In 2014, we slaughtered around 1.7 billion chickens and other poultry*** and 9.6 million hogs and cattle. In this same year, we sold around 4.7 million tons of poultry, hogs, beef and processed products. Our own and licensed brands have a high recognition in Brazil and we are expanding the presence of our export brands in key export markets. Our sustainable practices have also brought BRF great recognition over the years. We are the only representative of the food sector on a list of 10 leading companies in terms of transparency published by the Carbon Disclosure Project (CDP). We are the only company in the food sector to be part on BM&F Bovespa's Corporate Sustainability Index (ISE) of the BM&F-Bovespa stock exchange for the last 10 years. The company also became part of the Emerging Markets portfolio of the Dow Jones Sustainability Index two years ago. BRF is also among the companies listed on the Global Compact 100 Index, a new list of the United Nations Global Pact.

587. In the Business Strategy section of the 2014 20-F, BRF again highlighted its poultry production rate, stating, in pertinent part, as follows:

> We produce frozen whole and cut poultry. In ***2014, we slaughtered approximately 1.66 billion heads of poultry, compared to 1.80 billion in 2013***. We sold 1,984 thousand tons of frozen chicken and other poultry products in 2014, compared to 2,086 thousand tons in 2013 and 2,186 thousand tons in 2012. Most of our poultry sales are to our export markets.

588. In the 2014 Form 20-F, in describing the poultry production process, the Company again referred to its annual slaughtering capacity, stating, in pertinent part, as follows:

> ***At December 31, 2014, we had a fully automated slaughtering capacity of 35.7 million heads of poultry per week***.

589. In the 2015 Form 20-F, the Company stated that its "size and scale," which enabled it to slaughter approximately 1.724 billion chickens and other poultry in 2015, was one of its "major competitive strengths," stating, in pertinent part, as follows:

> **Competitive Strengths**
>
> We believe our strongest competitive points are:
>
> ***Leadership in the Brazilian Food Market with Strong Brands and a Global Presence in the Market***. We are one of the biggest food companies in Brazil, the biggest company in Brazilian agrobusiness (according to Globo Rural magazine), with a size and scale that allows us to compete in Brazil as well as in international markets. We believe our leading position allows us to take advantage of market opportunities by expanding our business, increasing our offer of added-value products and improving our business in international markets. In 2015, we slaughtered around 1,724.4 million chickens and other poultry, 9.5 million hogs and cattle. In this same year, we sold around 4.5 million tons of poultry, pork and processed products. Our own and licensed brands have a high recognition specially in Brazil, Argentina and Golf countries and we are expanding our presence internationally. Our sustainable practices have also brought BRF great recognition over the years. We are the only representative of the food sector on a list of 10 leading Brazilian companies in terms of transparency published by the Carbon Disclosure Project (CDP). We are the only company in the food sector to be part on BM&F Bovespa's Corporate Sustainability Index (ISE) of the São Paulo stock exchange for the last 11 years. The company also became part of the Emerging Markets portfolio of the Dow Jones Sustainability Index four years ago. BRF is also among the companies listed on the Global Compact 100 Index, a list of the United Nations Global Pact.

590. In the Business Strategy section of the 2015 Form 20-F, BRF again highlighted its poultry production rate, stating, in pertinent part, as follows:

> We produce frozen whole and cut poultry. In 2015, we slaughtered approximately 1.72 billion heads of poultry, compared to 1.66 billion in 2014. We sold 1,944 thousand tons of frozen chicken and other poultry products in 2015, compared to 1,977 thousand tons in 2014. Most of our poultry sales are to our export markets.

591. In the 2015 Form 20-F, in describing the poultry production process, the Company again referred to its annual slaughtering capacity, stating, in pertinent part, as follows:

> ***At December 31, 2015, we had a fully automated slaughtering capacity of 35.8 million heads of poultry per week***.

592. In the 2016 Form 20-F, the Company stated that its "size and scale," which enabled it to slaughter approximately 1.72 billion chickens and other poultry in 2016, was one of its "major competitive strengths," stating, in pertinent part, as follows:

> ***Competitive Strengths***
>
> We believe our major competitive strengths are as follows:
>
> ***Leadership in the Brazilian Food Market with Strong Brands and a Global Presence***. We are one of the largest producers of fresh and frozen protein foods in the world with a size and scale that allows us to compete in Brazil as well as in our export markets. We are one of the largest food companies in the world in terms of market capitalization. We believe our leading position allows us to take advantage of market opportunities by expanding our business, increasing our offer of added value products and improving our initiatives in export markets. In 2016, we slaughtered approximately 1.72 billion chickens and other poultry and 9.61 million hogs and cattle. In the same year, we sold approximately 5.0 million tons of poultry, hogs, beef and processed products. Our own and licensed brands are highly recognized in a number of countries, such as Brazil, Argentina, Saudi Arabia, Angola, to name a few, and we are expanding the presence with local brands in key markets. Our Sadia and Perdigão brands were included among the "Most Valuable Brand in Brazil" in 2016 and 2015, respectively, by Millward Brown Vermeer. Our sustainable practices have also brought BRF great recognition over the years. We are one of the leading companies in terms of transparency published by the Carbon Disclosure Project, or "CDP." We are the only company in the food sector to have been included in BM&F BOVESPA's Corporate Sustainability Index, or "ISE," for the last 12 years. We became part of the Emerging Markets portfolio of the Dow Jones Sustainability Index five years ago and are also among the companies listed on the United Nations Global Compact 100 Index since 2013.

593. In the Business Overview section of the 2016 Form 20-F, BRF again highlighted its production rate, stating, in pertinent part, as follows:

> We produce frozen whole and cut poultry. ***In 2016, we slaughtered approximately 1.72 billion heads of poultry, 0.5% decrease compared to 1.72 billion in 2015.*** We sold 2,006 thousand tons of frozen chicken and other poultry products in 2016, compared to 1,944 thousand tons in 2015. Most of our poultry sales are to our export markets.

594. In the 2016 Form 20-F, in describing the poultry production process, the Company again referred to its annual slaughtering capacity, stating, in pertinent part, as follows:

> ***At December 31, 2016, we had a fully automated slaughtering capacity of 35.7 million heads of poultry per week***.

595. The statements referenced in ¶¶579-594 were materially misleading when made because they misrepresented and/or failed to disclose the following adverse facts, which were then known to, or recklessly disregarded by, Defendants, and were required to be disclosed:

(a) that BRF employees had paid bribes to regulators to lobby for regulatory policies favorable to BRF that would allow for an increase in the number of birds that could be slaughtered per minute;

(b) that but for the illicit bribe, the Company's annual poultry production rate would have been reduced by approximately 20% in each year during the Class Period; and

(c) that, in light of the foregoing, Defendants' statements about the number of chickens BRF had slaughtered were materially misleading at all relevant times.

### J. Defendants' Statements Regarding and in Response to Operation Weak Flesh Were Materially False and Misleading and Omitted Material Facts Defendants Had a Duty to Disclose

596. On March 17, 2017, the day Operation Weak Flesh began, the Company filed a Form 6-K with the SEC in which BRF stated that "[t]he Company . . . complies with the rules and

regulations related to the production and commercialization of its products," stating, in pertinent part, as follows:

> BRF S.A. ("BRF" or "Company") (BM&F Bovespa: BRFS3; NYSE: BRFS), pursuant to CVM Instruction 358 of January 3 2002, informs its shareholders and the market in general that, in relation to the investigation held on this Friday morning by the Brazilian federal police, the Company is cooperating with the authorities to clarify the facts. ***The Company reiterates that it complies with the rules and regulations related to the production and commercialization of its products, has strict processes and controls and does not concur with any illegal conduct. BRF ensures the quality and safety of its products and guarantees that there is no risk to its consumers, either in Brazil or in the more than 150 countries it operates.***

597. In a letter to the Brazilian Securities Commission, dated March 20, 2017, which the Company also filed on a Form 6-K with the SEC that same day, BRF acknowledged the arrests of Baldissera and Roney, and stated that the Company "complies with the rules and regulations related to the production and commercialization of its products," stating, in pertinent part, as follows:

> We confirm that Mr. Roney Nogueira dos Santos, institutional relations manager, and André Baldissera, manufacturing officer for Goais, Minas Gerais and Mato Grosso, were preemptively arrested as a result of the "Weak Flesh Investigation," conducted by the Brazilian federal police ("Investigation").
>
> The Company learned about the arrest warrants by the wide dissemination in the media during the day of March 17, 2017. The employee, André Baldissera was arrested on March 17, 2017 and Mr. Roney Nogueira dos Santos on March 18, 2017. The Company understands that the arrest of the employees mentioned above do not affect the carrying on of business and is not a material fact. These employees are not statutory directors and are of intermediate level of management of the Company, which is composed of approximately 660 people.
>
> BRF will keep the market and its shareholders informed about the Investigation, pursuant to current regulations and in line with current practices, per Announcements to the Market published on March 17, 2017 and March 20, 2017.
>
> Finally, ***BRF reiterates that it complies with the rules and regulations related to the production and commercialization of its products, has strict processes and controls and does not concur with any illegal conduct. BRF ensures the quality and safety of its products and guarantees that there is no risk to its consumers, either in Brazil or in the more than 150 countries it operates.***

598. In its 2016 Sustainability Report, BRF stated:

SUBSEQUENT EVENT We communicate to our shareholders and the market in general that on March 17, 2017, BRF was informed of an investigation by the Federal Police, called Operação Carne Fraca – an investigative process that involves dozens of other companies in the industry***. BRF reiterates that it complies with all standards and regulations associated with the production and marketing of its products, that it has in place strict processes and controls, and that it does not condone illegal practices***. We ensure the quality and safety of our products, and guarantee that there is no risk for consumers, neither in Brazil nor in the more than 150 countries where we operate.

* * *

The correct facts are as follows: in 2011, the European Union defined a new regulation (CE 1086/2011) for the control of Salmonella in poultry, produced locally or imported. Pursuant to this regulation, products in natura [i.e., frozen products] cannot contain two types of Salmonella SE and ST (Salmonella Enteritis and Salmonella Typhimurium). Notwithstanding, the type of Salmonella found in some lots of four BRF containers sent to Italy is not any of those mentioned above and is allowed by the European legislation for meat in natura [i.e., frozen meats].

599. In the 2016 Form 20-F, BRF stated:

**Weak Flesh Operation**

The Brazilian authorities are investigating Brazil's meat processing industry in the so-called "Weak Flesh Operation," which became public on March 17, 2017. The investigation involves a number of companies in the industry in Brazil.

On March 17, 2017, we learned of a decision issued by a federal judge of the state of Paraná authorizing the search and seizure of information and documents, and the detention of certain individuals in the context of this Weak Flesh Operation. Two BRF employees were detained (one of which has been released) and three were identified for questioning (of which two were questioned, including Mr. Rodrigues, our Vice President – Corporate Integrity).

In addition to the above our Mineiros plant was temporarily suspended by the MAPA on March 17, 2017, so that MAPA could conduct an additional audit on its production process. After conducting an audit, the MAPA authorized the Mineiros plant to resume operations as of April 8, 2017. The Mineiros plant reopened on April 10, 2017 and resumed its operations on April 11, 2017.

On April 15, 2017, the Brazilian Federal Police issued a report on the investigation and recommended charges against three BRF employees. On April 20, 2017, based on the Brazilian Federal Police investigation, Brazilian federal prosecutors filed charges against two BRF employees (one of our regional manufacturing officer and one of our corporate affairs manager).

> Based on the charges filed against such two employees, the main allegations at this stage involve alleged misconduct relating to improper offers and/or promises to government inspectors.
>
> BRF has communicated with, and has received requests for information from certain regulators and governmental entities, including the U.S. Securities and Exchange Commission and U.S. Department of Justice in relation to this matter. BRF is cooperating with these inquiries.
>
> BRF's Statutory Audit Committee has already initiated an investigation with respect to the allegations involving BRF employees in the Weak Flesh Operation and is in the process of engaging outside counsel in connection with this investigation.
>
> For information about the risks related to this investigation, see "Item 3. Key Information – D. Risk Factors. We have a governance structure and compliance processes designed to sustain our positive image and reputation in the marketplace, but they may fail to ensure compliance with relevant anti-corruption, anti-bribery, anti-money laundering and other international trade laws and regulations."

600. During the 1Q17 Conference Call, Defendant Pedro Faria stated that "[Operation] Weak Flesh . . . came out of nowhere," and that it "diverted business away" from the Company, stating, in pertinent part, as follows:

> ***Weak Flesh, of course, came out of nowhere.*** This was, I think, quite a relevant episode for us, as we mentioned. I think as I said in the call, in Portuguese, I'm extremely proud to see how the team has handled what could have been a much worse situation. And that, I think, talks a lot about how we see the world, our transparency thoughts, stakeholders and our willingness to improve processes, beef compliance, beef quality. I cannot be so sure that the main thing is behind us because there is a second or the third order impact. We're seeing that quite vividly, in terms of the Mineiros situation. And the intention is now we have to process also some bargaining power that was shifted from sellers to buyers, even in the context of markets generally getting better. So I think, its – unfortunately, the year of 2017, will be marked by impacts of the Weak Flesh. But I think longer-term, what you'll see is a much more unified, robust company that has been given the ability to improve the way we operate. And thirdly, and this is what makes this moment so special, we already signaling to the market the need to change. And we've been quite busy also promoting that change, which I would say, goes in the way of creating a much more transversal collaborative way of operating, eliminating unnecessary degrees of decentralization, making our team more robust. I am extremely pleased to have Alexandre participate in our call, having joined a few months back. Also, the strengthening of our supply, vice presidency, which we start to have – and Leonardo and the team looking quite carefully into how we think through issues, pertaining to the harmony between our value chain and the market. So these are kind of transformation processes that ***I'd say, of course, Weak Flesh did not help in the***

> ***sense that it kind of divert the business attention.*** But what I'm seeing going forward is this very important opportunity for convergence.

601. Defendant Roberto Rodriguez participated in the 1Q17 Conference Call and addressed the bribery allegations, stating, in pertinent part, as follows:

> I think as usual, this is a long process. We're facing charges against 2 of our employees. At this moment, they are connected to bribery things like this – that you probably read in news. We have very highly skilled specialists working on this with us. And at this moment, we're trying to cooperate and support the authorities the best we could. And hopefully, we can clear up and explain everything connected to our operations.

602. During the 4Q17 Conference Call, Defendant Abilio Diniz stated that the Company was "taken aback" by Operation Weak Flesh, stating, in pertinent part, as follows:

> **Abilio Diniz**
>
> ***So we were surprised and taken aback with an episode that I never imagined I would have in my life, something that was really shocking, Operation Weak Flesh. You have no idea what it was about. You don't know what the impact was to this company and to other companies, too***. We had very serious problems, problems in the market, closing the doors to us. 7 million broilers are slaughtered per day, not per year, but per day. Imagine, when you break the chain, when you break such a long chain, there is things interrupted, think about the impact in ports, harbors, distribution centers, our raw materials, our products, our inventories. We had some imbalance since late 2016. It's true. It has to be admitted. But Weak Flesh still requires some actions, and we have been actively working on it as you see in our numbers today. But that was a terrible episode. The markets closed the doors and then started to renegotiate prices. And now conditions are more favorable to buyers, and things are more challenging to us, debtors. But we are overcoming step-by-step, but we still have plans that have not been fully believed.
>
> ***So this episode was really shocking, a huge impact.*** And most of the earnings last year were not only related to Weak Flesh, but mostly related to it.

603. The statements referred to in ¶¶592-602 were materially false and misleading when made because they misrepresented and/or failed to disclose the following adverse facts, which were then known to, or recklessly disregarded by, Defendants, and were required to be disclosed:

(a) that the Company did not comply with all rules and regulations related to the production of its products, as the Company and its employees, including high level executives, had

engaged in numerous illegal activities, including: (i) the payment of bribes to regulators and politicians to subvert inspections in order to conceal unsanitary practices at the Company's meatpacking and poultry facilities; (ii) the use of fraudulent means to obtain legal, regulatory, and health certifications for products that did not meet the strict licensing and certification requirements; (iii) the processing of birds contaminated with salmonella, other pathogens, and/or pollutants; (iv) the manipulation of laboratory results and falsification of traceability reports to pass inspections; (v) the unlawful adulteration of the composition of animal feed and premix by adding ingredients that were prohibited and/or by adding permissible ingredients at impermissible ratios; (vi) the failure to comply with legal and regulatory restrictions on the administration of antibiotics and other medications to chickens; (vii) the use of non-accredited laboratories to conduct health and sanitary laboratory analyses; and (viii) the packaging of poultry products with water absorption levels above the legal index and/or that had been injected with excess water;

(b) that the Company did not have strict processes and controls in place and the above-referenced illegal activities were able to be carried out precisely because the Company lacked controls over its operations, including the testing and reporting of poultry products contaminated with salmonella and other pathogens; the production of poultry feed and premix; the administration of medication to poultry; the process for identifying and vetting outside laboratories; and the packaging of poultry products; and

(c) in light of the foregoing, Defendants' statements regarding and in response to Operation Weak Flesh were materially false and misleading and lacking in a reasonable basis at all relevant times.

## XII. ADDITIONAL SCIENTER ALLEGATIONS

604. As alleged herein, Defendants acted with scienter in that Defendants knew, or recklessly disregarded, that the public documents and statements issued or disseminated in the name

of the Company (or in their own name) were materially false and misleading; knew or recklessly disregarded that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance of such statements or documents as primary violations of the federal securities law. Defendants, by virtue of their receipt of information reflecting the true facts regarding BRF, their control over, and/or receipt and/or modification of BRF's materially false and misleading misstatements, were active and culpable participants in the fraudulent scheme alleged herein.

605. Defendants knew and/or recklessly disregarded the false and misleading nature of the information which they caused to be disseminated to the investing public. The multi-year fraudulent activity alleged herein could not have been perpetrated during the Class Period without the knowledge and complicity or, at least, the reckless disregard of the personnel at the highest levels of the Company.

606. The Individual Defendants were executive officers at BRF and, at a minimum, should have been aware of key facts related to the Company's operations, while Defendants Pedro Faria, Hélio Rubens Mendes, Roberto Rodrigues, Gilberto Orsato, and Andre Baldissera, are alleged to have been directly involved in the bribery scheme described herein.

607. The Individual Defendants, by virtue of their high-level positions with the Company, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels, and were privy to confidential proprietary information concerning the Company and its business, operations, financial statements, and financial condition, as alleged herein.

### A. The Coordinated Efforts by BRF's Chairman, Global CEO, Three Vice Presidents, General Manager of Asia, and a Director of Operations to Control the Flow of Information Regarding the Dioxin Contamination Support an Inference of Scienter

608. Upon learning that the Chinese government had detected dioxins in BRF products, the Company engaged in a coordinated three-part strategy to control the flow of any information that might harm the Company or its reputation: (1) control the information that was transmitted to the Chinese government by persuading the Brazilian authorities to forego a "deep audit" and instead rely on BRF's own internal investigation; (2) control the flow of information to the general public by working behind the scenes to quash any potentially harmful reporting; and (3) control the flow of information to the Brazilian government by obtaining the accreditation of a corrupt laboratory that would provide fraudulent certifications to obscure the presence of any contaminants.

609. Numerous BRF officers and directors knew about this strategy.

610. For example, in an August 8, 2015 email sent by Adriano Zerbini, VP Gilberto Orsato, VP Hélio Rubens Mendes, VP Roberto Rodrigues, Asia GM Simon Cheng, and others, Zerbini noted the BRF's "***presentation to MAPA will be . . . a shortcut***" that will allow BRF to avoid a "***deep investigation***" into its controls.

611. In addition, the Company communicated about the contamination primarily through the Dioxin WhatsApp Group. The members of the Dioxin WhatsApp Group included Global CEO Pedro Faria, VP Roberto Rodrigues, VP Hélio Rubens Mendes, VP Gilberto Orsato, Asia General Manager Simon Cheng, and other high ranking BRF employees.

612. Similarly, Global CEO Pedro Faria and Chairman Abilio Diniz discussed the contamination on the Partners WhatsApp Group. On September 12, 2015, for example, Pedro Faria sent a message to the Partners WhatsApp Group stating that "***we have been able to control the information[.]***"

613. And in sworn testimony given on November 28, 2018 before the Brazilian Federal Police, former BRF Chairman Abilio Diniz testified that the entire Board of Directors learned about the dioxin contamination on July 30, 2018.

614. Thus, the admitted knowledge and/or personal involvement of the chairman of the board, the entire board of directors, the Global CEO, three out of five vice presidents, a general manager who reported directly to the Global CEO, and a director of operations strongly contributes to an inference of scienter.

### B. Cover Up of Claims of Possible Food Contamination by BRF's Global CEO, Three of BRF's Five Vice Presidents and a Director of Operations Supports an Inference of Scienter

615. The Carvalho Lawsuit was one of 19,830 labor lawsuits against BRF in 2015.

616. According to the 2015 20-F, "[n]one of the[] labor claims" filed in 2015, including the Carvalho Lawsuit, were "individually significant."

617. Yet, within one month of its filing, the Carvalho Lawsuit was brought to the attention of the Company's Global CEO (Pedro Faria, who oversaw 96,279 employees globally), three of the Company's five Vice Presidents (Roberto Rodrigues, Hélio Rubens Mendes, and Gilberto Orsato), and the Director of Operations in Midwest Brazil (Baldissera), who was responsible for overseeing 26,000 employees, or more than 25% of all BRF employees.

618. On September 3, 2015, upon learning about the Carvalho Lawsuit, Global CEO Pedro Faria wrote that it is absurd that "***we always take busts from the same places***," and directed VP Hélio Rubens Mendes to take some "drastic" action in relation to the Carvalho Lawsuit.

619. The next day, after Baldissera was assigned the task of managing and settling the Carvalho Lawsuit, he wrote to VP Hélio Rubens Mendes, stating that "***we will eliminate all exposure!!***"

620. In a court ruling authorizing Pedro Faria's arrest, Judge André Duszczak said Global CEO Pedro Faria and other BRF officers sought to cover up claims of possible food contamination, as alleged in the Carvalho Lawsuit. This supports scienter. Moreover, the frenzied conversation between high-ranking BRF senior executives, and their concerted effort to eliminate the exposure caused by an ordinary labor lawsuit also contributes to a strong inference of scienter.

621. Notably, the settlement amount in this case – R$70,000.00 – was more than four times higher than settlements in other labor lawsuits (R$15,000.00), and more than triple the amount sought by Carvalho in her pleading (R$20,000.00). This, too, strongly contributes to an inference of scienter.

622. As the *Carne Fraca* Decision found:

> As pointed out by the Public Prosecutor, it is clear that the investigated PEDRO, HÉLIO, ANDRÉ, LUCIANO and FABIANNE acted with intention, on their own free will, with conscious, deliberate and orchestrated willingness to "maintain the company's policy of practicing systematic fraud, with the intention in order to circumvent federal inspection," acting as "a true criminal association, in which all the cited participated with the purpose to keep the criminal scheme intact."

### C. The Company Authorized the Payment of a R$300,000.00 Political Contribution to Jovair Arantes to Prevent the Closure of a Poultry Facility Contaminated with Salmonella

623. As detailed above, in 2016, the Company bribed Dinis to prevent the closure of the poultry production facility in Mineiros, Goiás, after salmonella was detected in meat products produced at that facility.

624. Although the bribe was negotiated by Roney, Roney was acting at the behest of the Company's Board of Directors, and kept senior BRF executives apprised of all developments during the negotiation process.

625. Indeed, when Roney first initiated contact with Dinis, he stated: "I'm calling you because . . . the BRF Board of Directors, the Quality Assurance Board, wants to arrange a meeting tomorrow with you . . . to deal with that audit that was done." (¶179).

626. Furthermore, when Dinis asked Roney to arrange a R$300,000.00 donation to the campaign of Jovair Arantes, Roney had to seek approval from Baldissera. (¶188). Indeed, the *Carne Fraca* Verdict concluded that Roney could not make any commitment to Dinis without first obtaining "the deliberate and conscious approval of the director of BRF ANDRE LUIS BALDISSERA."

627. And in a telephone transcript of a conversation between Roney and Baldissera, Roney states that he will discuss the bribe with "JR," referring to VP José Roberto Rodrigues. (¶¶219-220).

628. VP Roberto Rodriguez later testified that he was personally involved in arranging the rendezvous between Dr. Sylas and Jose Mapelli, and that he received detailed updates regarding the status of the request.

629. In another conversation, Roney and Baldissera discuss when they should inform VP Hélio Rubens Mendes about the bribe. Notably, there was never a question *if* Hélio Rubens Mendez should be informed about the bribe. The only question was *when* he should be informed about it. (¶222).

630. The knowledge and participation of VP Roberto Rodrigues, VP Hélio Rubens Mendes, and Baldissera in this bribe thus contributes to a strong inference of scienter.

**D. Defendants Knew About the Line Speed Bribe and Participated in the Cover Up**

631. As discussed in detail in ¶¶223-252, Defendants promised to fabricate evidence to undermine a federal corruption investigation into Mario do Rocio related to the line speed bribe.

632. Although BRF's direct involvement in the line speed bribe and the cover up was mostly done through Roney, BRF executives were intimately involved in the decision to fabricate the receipt, and the plans for transmitting the receipt to Maria do Rocio.

633. This is apparent from the phone conversation between Roney and Pericles referenced in ¶238 above, where Roney states that it is futile for him to discuss the receipt with Maria do Rocio or Daniel Filho because only a director or a vice president has the authority to grant Maria do Rocio's request.

634. In addition, after the Company agreed to provide the fraudulent receipt, VP Roberto Rodriguez was adamant that the delivery take place in a neutral place to avoid any suspicion.

635. VP Roberto Rodriguez also retained the services of attorney Dr. Sylas to coordinate the delivery of the receipt with José Mapelli, Maria do Rocio's attorney.

636. VP Roberto Rodrigues's involvement in delivery of the fraudulent receipt further contributes to a strong inference of scienter.

637. Finally, the *Carne Fraca* Verdict unambiguously found that Roney "was careful not to confront Maria [do Rocio] directly by refusing access to higher levels of the company to present her request," and that "he kept the upper echelons informed of the movements of Maria and Mapelli."

### E. André Baldissera's Conduct Is Imputed to the Board

638. As the Director of Operations in the Midwest region of Brazil, Baldissera was responsible for managing over 26,000 employees, more than 25% of all BRF employees. He was charged with overseeing the entire production chain in every BRF production facility in the Midwest. This consisted of, *inter alia*, managing the agricultural and livestock operations units, all production processes, sanitary and environmental compliance, and human resources.

639. Given the breadth of his duties, Baldissera played a critical role in establishing and overseeing the Company's policies in the Midwest.

640. This was by design. Indeed, in announcing its newly-decentralized management model, the Company explained that the model was designed to augment "the leading role and autonomy of the Company's regional structures," and stated that "regional leaders will play a decisive role in establishing BRF's priorities in different markets[.]" (¶49). In other words, regional leaders' intent could be imputed to BRF.

641. Within BRF's organizational hierarchy, Baldissera was two tiers beneath the highest ranking executive in the Company, the Global CEO. Baldissera reported to the Brazil CEO who reported directly to the Global CEO.

642. Baldissera also worked closely with the Company's five vice presidents, who also served as members of the executive board.

### F. Roney's Conduct Is Imputed to the Board

643. Although he was technically employed as BRF's Manager of Institutional and Governmental Relations, Roney essentially served as the Company's "fixer."

644. As detailed herein, Roney, acting on behalf of the Company, employed a variety of dubious, and often illegal means, to obtain access to, and develop relationships with, politicians, government officials, and industry leaders across Brazil.

645. These were the classic two-way relationships, in which Roney provided his government contacts with bribes and other favors provided by BRF. In return, when the Company needed assistance to skirt regulatory, legal, or compliance issues, its senior executives and/or its directors would call upon Roney to lean on his relationships with government officials to achieve the desired outcome.

646. In 2016, for example, the Board of Directors instructed Roney to contact Dinis, the superintendent of SIPOA in Goiás, and persuade him to intervene and prevent the closure of the Mineiros facility. After speaking with Roney, Dinis agreed to intervene, but only if the Company agreed to: (i) donate R$300,000.00 to the political party that kept him in power; and (ii) arrange a tryout for his grandson at the São Paulo Soccer Club.

647. Roney's role as an arm of the Board is also evident from various statements he made with respect to the line speed bribe and the cover up. During his conversation with Pericles, for example, Roney stated that it was futile for Mario do Rocio and Daniel Filho to continue making demands of him because he had no authority to issue the false receipt. He nevertheless continued to serve as the liaison between Maria do Rocio and the Board until the receipt was delivered.

648. Because Roney served as an agent of the Board, his actions are imputed to the Board.

649. As Brazilian Judge Marco da Silva explained in the *Carne Fraca* Decision:

At BRF, although he has no decision-making power regarding the Board of Executive members, RONEY has a strong influence on employees and companies of the group . . . when they have problems with processes and inspection analysis they go to RONEY who always has a solution bordering illegality for the problems presented to him. And the board certainly supports the employee's performance, as it also has 'big glass roof'[.]

## XIII. DEFENDANTS FAILED TO DISCLOSE KNOWN MATERIAL TRENDS AND UNCERTAINTIES

650. BRF's Class Period Forms 20-F failed to disclose material information required to be disclosed therein pursuant to controlling SEC rules and regulations.

651. The SEC created specific rules governing the content of disclosures made by public companies in their filings with the SEC. SEC Regulation S-K requires that every Form 10-K and 10-Q filing contain "Management's Discussion and Analysis of Financial Condition and Results of

Operations" ("MD&A"), drafted in compliance with Item 303 of Regulation S-K, 17 C.F.R. §229.303. The MD&A requirements are intended to provide material historical and prospective textual disclosures that enable investors and others to assess the financial condition and results of operations of a company, with emphasis on that company's prospects for the future.

652. Although Item 303 does not directly apply to foreign corporations, the SEC has stated that its interpretations of Item 303 "apply to MD&A disclosures drafted pursuant to Item 5 of Form 20-F," which does apply to foreign corporations. *See Comm'n Guidance Regarding MD&A of Fin. Condition & Results of Operations*, SEC Release No. 33-8350 (Dec. 19, 2003). Accordingly, courts "interpret [Item 5 of Form 20-F] as calling for the same disclosure as Item 303 of Regulation S-K." *See Int'l Disclosure Standards*, SEC Release No. 33-7745 (Sept. 28, 1999).

653. Item 303(a)(3) of Regulation S-K requires that the MD&A section of a company's filings with the SEC (*i.e.*, Forms 10-Q and 10-K), among other things:

> (i) Describe any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent to which income was so affected. In addition, describe any other significant components of revenues or expenses that, in the registrant's judgment, should be described in order to understand the registrant's results of operations.
>
> (ii) Describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material ***favorable or unfavorable*** impact on net sales or revenues or income from continuing operations. If the registrant knows of events that will cause a material change in the relationship between costs and revenues (such as known future increases in costs of labor or materials or price increases or inventory adjustments), the change in the relationship shall be disclosed.

654. Regulation S-K also states that "[t]he discussion and analysis [section] shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition." According to the SEC's interpretive guidance on Item 303, issued on May 18, 1989: "A disclosure duty exists where a trend, demand, commitment, event or uncertainty is both presently

known to management and reasonably likely to have material effects on the registrant's financial condition or results of operation."

655. Defendants' fraudulent scheme and course of conduct during the Class Period constituted events and created uncertainties that were both "presently known to management" – who themselves participates in that course of conduct – and "reasonably likely to have material effects on [BRF's] condition or results of operation" (and indeed did have those effects).

656. Defendants violated the affirmative disclosure duties imposed by Item 5 of Form 20-F, and, thus Section 10(b) of the Exchange Act, by failing to disclose in BRF's Class Period Forms 20-F:

(a) that BRF employees routinely disregarded sanitary inspection systems by manipulating laboratory results and falsifying traceability reports;

(b) that BRF employees paid bribes to regulators and politicians to subvert inspections in order to conceal unsanitary practices at the Company's meatpacking and poultry facilities;

(c) that the Company used fraudulent means to obtain legal, regulatory, and health certifications for products that did not meet the strict licensing and certification requirements;

(d) that the Company had inadequate controls over the testing and reporting of poultry products contaminated with salmonella, other pathogens, and or pollutants, and, as a result, BRF employees routinely processed infected birds;

(e) that the Company had inadequate controls over the production of poultry feed and premix and, as a result, BRF employees unlawfully adulterated the composition of premix by adding ingredients that were prohibited and/or by adding permissible ingredients at impermissible ratios;

(f) that the Company had inadequate controls over the administration of medication to poultry, and, as a result, BRF employees failed to comply with legal and regulatory restrictions on the administration of antibiotics and other medications to chickens;

(g) that the Company had inadequate controls over the process for identifying and vetting outside laboratories, and, as a result, BRF employees used non-accredited laboratories to conduct health and sanitary laboratory analyses;

(h) that the Company had inadequate controls over the packaging of poultry products, and, as a result, BRF employees packaged poultry products with water absorption levels above the legal index and/or injected excess water into frozen poultry products;

(i) that the unlawful practices perpetrated by Defendants subjected the Company to numerous known, but undisclosed risks, including monetary risk, reputational risk, risks associated with retention and/or renewal of existing operating licenses, risks associated with the Company's expansion efforts, and the imposition of civil and/or criminal sanctions, including the suspension of the Company's business activities;

(j) that the unlawful practices perpetrated by Defendants were reasonably likely to have a material adverse effect on the Company's future operating results;

(k) that the unlawful practices perpetrated by Defendants were in direct violation of the Company's code of ethics, which Defendants represented guided their operations; and

(l) that Defendants failed to disclose that BRF's financial growth was due, in large part, to the bribery of government officials, and misled investors into believing that the Company's growth was wholly organic and would continue on its upward trajectory.

657. In sum, the foregoing concealed facts were required to be disclosed because they were, among other things: (i) "material events and uncertainties known to management that would

cause reported financial information not to be necessarily indicative of future operating results or of future financial condition"; (ii) "known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations"; and/or (iii) "unusual or infrequent events or transactions or [] significant economic changes that [were] materially affect[ing] the amount of reported income from continuing operations."

## XIV. THE RISK DISCLOSURES IN BRF'S CLASS PERIOD FORMS 20-F WERE INADEQUATE

658. Item 503(c) of Regulation S-K [17 C.F.R. §229.503] imposes a disclosure obligation on foreign private issuers such as BRF. It requires that a prospectus or other required filing contain "a discussion of the most significant factors that make the offering speculative or risky." Once undertaken, such a discussion, whether voluntary or required, must be complete and accurate.

659. Like Item 503(c), Item 3(D) of Form 20-F [17 C.F.R. §249.220f] requires companies to disclose the most significant factors that make investments in the company's securities speculative or risky.

660. In this case, Defendants violated the affirmative disclosure duties imposed by Item 3(D) of Form 20-F, and thus Section 10(b) of the Exchange Act, because the risk factors contained in BRF's Class Period Forms 20-F were neither complete, nor accurate, because they failed to disclose the following significant factors:

(a) that BRF employees routinely disregarded sanitary inspection systems by manipulating laboratory results and falsifying traceability reports;

(b) that BRF employees paid bribes to regulators and politicians to subvert inspections in order to conceal unsanitary practices at the Company's meatpacking and poultry facilities;

(c) that the Company used fraudulent means to obtain legal, regulatory, and health certifications for products that did not meet the strict licensing and certification requirements;

(d) that the Company had inadequate controls over the testing and reporting of poultry products contaminated with salmonella, other pathogens, and/or pollutants, and, as a result, BRF employees routinely processed infected birds;

(e) that the Company had inadequate controls over the production of poultry feed and premix and, as a result, BRF employees unlawfully adulterated the composition of premix by adding ingredients that were prohibited and/or by adding permissible ingredients at impermissible ratios;

(f) that the Company had inadequate controls over the administration of medication to poultry, and, as a result, BRF employees failed to comply with legal and regulatory restrictions on the administration of antibiotics and other medications to chickens;

(g) that the Company had inadequate controls over the process for identifying and vetting outside laboratories, and, as a result, BRF employees used non-accredited laboratories to conduct health and sanitary laboratory analyses;

(h) that the Company had inadequate controls over the packaging of poultry products, and, as a result, BRF employees packaged poultry products with water absorption levels above the legal index and/or injected excess water into frozen poultry products;

(i) that the unlawful practices perpetrated by Defendants subjected the Company to numerous known, but undisclosed risks, including monetary risk, reputational risk, risks associated with retention and/or renewal of existing operating licenses, risks associated with the Company's expansion efforts, and the imposition of civil and/or criminal sanctions, including the suspension of the Company's business activities;

(j) that the unlawful practices perpetrated by Defendants were reasonably likely to have a material adverse effect on the Company's future operating results; and

(k) that the unlawful practices perpetrated by Defendants were in direct violation of the Company's code of ethics, which Defendants represented guided their operations.

## XV. LOSS CAUSATION

661. As detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct which artificially inflated the price of BRF ADRs and operated as a fraud or deceit on Class Period purchasers of BRF ADRs. When Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the trading price of BRF ADRs fell precipitously as the artificial inflation was removed.

662. As a result of their purchases of BRF ADRs during the Class Period, Lead Plaintiff and other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws. Defendants' false and misleading statements throughout the Class Period had the intended effect and caused BRF ADRs to trade at artificially inflated levels throughout the Class Period, reaching a Class Period high of more than $27.19 per ADR on November 17, 2014.

663. On March 17, 2017, news outlets reported that Brazilian federal police had raided the offices of BRF and dozens of other meatpackers following a two-year investigation into, among other things, alleged bribery of regulators to subvert inspections of their plants.

664. On this news, BRF's ADR price fell $0.99, or 7.73%, to close at $11.81 on March 17, 2017.

665. Indeed, BRF's 1Q17 earnings report reported net income of R$-166 million, or R$0.21 per diluted share, on revenue of R$8.02 billion, compared with net income of R$462 million, or R$.54 per diluted share, on revenue of R$7.04 billion, in 1Q16.

666. According to a BB Investimentos analyst report dated May 12, 2017, the weak 1Q17 financial results were directly impacted by Operation Weak Flesh. The BB Investimentos report states, in pertinent part, as follows:

> ***BRF released another weak result despite a better performance observed in Brazil. As expected, the competitive environment in the international units, which has already been a concern in the previous quarter, was further impacted by the "Carne Fraca" operation***.
>
> * * *
>
> Lower competitiveness remains in the international front**. *In general, the performance in the international units were negatively impacted by***: (i) the challenging competitive environment, with oversupply in some regions pressuring average prices; (ii) the dollar depreciation y/y; and ***(iii) the "Carne Fraca" operation that negatively impacted export volumes***.

667. On February 23, 2018, the Company held an earnings conference call with investors and analysts to discuss the Q4 2017 earnings results. During the call, Chairman Abilio Diniz stated that as a result of Operation Weak Flesh, "[t]he markets closed the doors and then started to renegotiate prices . . . [a]nd now conditions are more favorable to buyers, and things are more challenging to us, debtors."

668. CFO Lorival Luz stated that there was a direct financial impact of BRL 40 million in 1Q2017, BRL 118 million in 2Q2017, and BRL206 million in 4Q2017.

669. On this news, BRF's ADR price fell $0.76, or 8.00%, to close at $8.73 on February 23, 2018.

670. Then, on Monday, March 5, 2018, *Reuters* reported that BRF's former CEO Pedro Faria and other executives, including the Company's VP of Global Operations Hélio dos Santos, were implicated in the third wave of Operation Weak Flesh and had been arrested earlier that morning.

671. On this news, BRF's ADR price fell $1.83, or 19.42%, to close at $7.59 per ADR on March 5, 2018.

## XVI. APPLICABILITY OF THE PRESUMPTION OF RELIANCE

672. Lead Plaintiff will rely upon the presumption of reliance established by the fraud on the market doctrine as enunciated in *Basic Inc. v. Levinson*, 485 U.S. 224 (1988) ("*Basic*") and the presumption of reliance for omissions as enunciated in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972) ("*Affiliated Ute*").

673. With respect to the *Basic* presumption, a presumption of reliance under the fraud-on-the-market doctrine is appropriate because, among other things:

(a) Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(a) the omissions and misrepresentations were material;

(b) the ADRs traded in an efficient market;

(c) the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the ADRs; and

(d) Lead Plaintiff and other members of the Class purchased the ADRs between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

674. At all relevant times, the market for the ADRs was efficient for the following reasons, among others:

(a) the ADRs met the requirements for listing and were listed and actively traded on the NYSE, a highly efficient, electronic stock market;

(b) as a regulated issuer, BRF filed periodic public reports with the SEC and the NYSE;

(c) BRF regularly communicated with public investors via established market communications mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d) BRF was followed by stock analysts employed by major brokerage firms who wrote reports distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

675. As a result of the foregoing, the market for BRF ADRs promptly digested current information regarding the Company from publicly available sources and reflected such information in the price of BRF ADRs. Under these circumstances, all purchasers of BRF ADRs during the Class Period suffered similar injury through their purchase of such ADRs at artificially inflated prices, and a presumption of reliance applies.

676. In addition to the *Basic* presumption, a class-wide presumption of reliance is also applicable in this action under the Supreme Court's holding in *Affiliated Ute*, because the claims alleged are grounded on Defendants' material omissions. Because this action involves Defendants' failure to disclose material adverse information regarding BRF's business operations and financial prospects and performance – information Defendants were obligated to disclose – positive proof of reliance is not a prerequisite to recovery.

677. Rather, all that is necessary to invoke the *Affiliated Ute* presumption of reliance is that the facts withheld would be material in a sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## XVII. CLASS ACTION ALLEGATIONS

678. Lead Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all purchasers of BRF ADRs during the Class Period, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants and their families, as well as the officers and directors of the Company and the members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

679. The members of the Class are so numerous that joinder is impracticable. Throughout the Class Period, BRF ADRs were actively traded on the NYSE. While the exact number of class members is unknown to Lead Plaintiff at this time and can only be ascertained through discovery, Lead Plaintiff believes there are hundreds, if not thousands of members of the proposed Class. Record owners and other members of the Class may be identified from records maintained by BRF or its transfer agent, and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

680. Lead Plaintiff's claims are typical of the claims of members of the Class because all Class members are and were similarly affected by Defendants' wrongful conduct in violation of federal law, as alleged herein.

681. Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and securities litigation.

682. Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the Exchange Act was violated by Defendants as alleged herein;

(b) whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations, and practices of BRF;

(c) whether the trading price of BRF ADRs was artificially inflated during the Class Period; and

(d) to what extent the members of the Class have sustained damages and the proper measure of damages.

683. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XVIII. NO SAFE HARBOR

684. The statutory safe harbor provided for certain forward-looking statements under certain circumstances does not apply to any of the false statements alleged. Many of the statements herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, no meaningful cautionary statements identified important factors that could cause any actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer and/or director of the Company who knew that those statements were false when made.

**COUNT I**

**Violation of §10(b) of the Exchange Act and Rule 10b-5**
**Against BRF**

685. Lead Plaintiff repeats and realleges the allegations set forth in ¶¶1-684 as if set forth in full herein.

686. During the Class Period, BRF knowingly or recklessly made, participated in the preparation of and/or caused to be disseminated, false and misleading statements of material fact, and omitted material facts necessary to make the statements about BRF's financial results, operations, and legal compliance, in light of the circumstances in which they were made, not misleading.

687. In addition to the duties of full disclosure imposed on the Company as a result of its affirmative statements and reports, BRF had a duty to promptly disseminate truthful information that would be material to investors, including truthful, complete, and accurate information with respect to the Company's operations and financial results.

688. BRF had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available, or made those misrepresentations and omissions of material fact without a reasonable belief in their accuracy. BRF's misconduct was engaged in knowingly or with reckless disregard for the truth, and for the purpose and effect of concealing BRF's operating condition and financial status from the investing public, and supporting the artificially inflated price of its ADR shares.

689. As a result of the dissemination of the materially false or misleading information and failure to disclose material facts, as set forth above, the market price of BRF ADRs was artificially inflated during the Class Period. In ignorance of the fact that the market price of the Company's ADRs was artificially inflated, and relying directly or indirectly on the false and misleading

statements, or upon the integrity of the market in which the Company's ADRs traded, and/or on the absence of material adverse information that was known to or recklessly disregarded by BRF, but not disclosed in BRF's public statements during the Class Period, Lead Plaintiff and other Class members purchased BRF ADRs during the Class Period at artificially high prices and were ultimately damaged thereby.

690. At the time of said misrepresentations and omissions, Lead Plaintiff and other Class members were ignorant of their falsity, and believed them to be true. Had Lead Plaintiff or other Class members and the marketplace known the truth regarding BRF, which BRF did not disclose, Lead Plaintiff and other Class members would not have purchased BRF ADRs, or, if they had purchased BRF ADRs during the Class Period, would not have done so at the artificially inflated prices which they paid.

691. As a direct and proximate result of BRF's false and misleading statements, Lead Plaintiff and the other Class members suffered losses and damages in connection with their Class Period purchases of BRF ADRs.

692. By reason of the foregoing, BRF has violated §10(b) of the Exchange Act and Rule 10b-5.

**COUNT II**

**Violation of §10(b) of the Exchange Act and Rule 10b-5**
**Against the Individual Defendants**

693. Lead Plaintiff repeats and realleges the allegations set forth in ¶¶1-692 as if set forth in full herein.

694. During the Class Period, the Individual Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and/or failed to disclose

material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

695. The Individual Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of the Company as specified herein.

696. The Individual Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they:

(a) employed devices, schemes, and artifices to defraud;

(b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

(c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Lead Plaintiff and others similarly situated in connection with their purchases of BRF ADRs during the Class Period.

697. Lead Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for BRF ADRs. Lead Plaintiff and the Class would not have purchased BRF ADRs at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by the Individual Defendants' misleading statements and omissions.

698. As a direct and proximate result of the Individual Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their

purchases of BRF ADRs during the Class Period and the Individual Defendants violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

## COUNT III

### Violation of §20(a) of the Exchange Act Against the Individual Defendants

699. Lead Plaintiff repeats and realleges the allegations set forth in ¶¶1-698 as if set forth in full herein.

700. During the Class Period, the Individual Defendants participated in the operation and management of BRF, and conducted and participated, directly and indirectly, in the conduct of BRF's business affairs. Because of their senior positions, they knew the adverse non-public information about BRF's false statements and omissions, as well as its materially weak internal controls.

701. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to BRF's financial condition and results of operations, and to correct promptly any public statements issued by BRF that had become materially false or misleading.

702. Because of their positions of control and authority as senior officers and/or directors, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings that BRF disseminated in the marketplace during the Class Period. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause BRF to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of BRF within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of BRF ADRs.

703. Each of the Individual Defendants, therefore, acted as a controlling person of BRF. By reason of their senior management positions and/or being directors of BRF, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, BRF to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of BRF and possessed the power to control the specific activities that comprise the primary violations about which Lead Plaintiff and the other members of the Class complain.

704. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by BRF.

**PRAYER FOR RELIEF**

WHEREFORE, Lead Plaintiff, on behalf of itself and the Class, prays for judgment as follows:

A. Determining that this action is a proper class action, and certifying Lead Plaintiff as the Class representative under Rule 23 of the Federal Rules of Civil Procedure and Lead Plaintiff's counsel as Class counsel;

B. Awarding compensatory damages in favor of Lead Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D. Awarding such other relief as the Court deems just and proper.

**JURY DEMAND**

Lead Plaintiff hereby demands a trial by jury.

DATED: December 4, 2018

ROBBINS GELLER RUDMAN
& DOWD LLP
SAMUEL H. RUDMAN
DAVID A. ROSENFELD
MOSHE O. BOROOSAN

*/s/ David A. Rosenfeld*
DAVID A. ROSENFELD

58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
drosenfeld@rgrdlaw.com
mboroosan@rgrdlaw.com

*Lead Counsel for Plaintiff*

CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on December 4, 2018, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses on the attached Electronic Mail Notice List.

*/s/ David A. Rosenfeld*
DAVID A. ROSENFELD

ROBBINS GELLER RUDMAN
& DOWD LLP
58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)

E-mail: drosenfeld@rgrdlaw.com